

FILED
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 1 0 2019

JAMES W. McCORMACK, CLERK
By:_____
                    DEP CLERK

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

| | |
|---|---|
| THE CHRISTIAN MINISTERIAL ALLIANCE, ARKANSAS COMMUNITY INSTITUTE, MARION HUMPHREY, OLLY NEAL, and RYAN DAVIS, <br><br> Plaintiffs, <br><br> v. <br><br> STATE OF ARKANSAS; ASA HUTCHINSON, the GOVERNOR of the STATE OF ARKANSAS and CHAIRMAN of the ARKANSAS BOARD OF APPORTIONMENT, in his official capacity; JOHN THURSTON, the SECRETARY OF STATE of the STATE OF ARKANSAS and MEMBER of the ARKANSAS BOARD OF APPORTIONMENT, in his official capacity; LESLIE RUTLEDGE, the ATTORNEY GENERAL of the STATE OF ARKANSAS and MEMBER of the ARKANSAS BOARD OF APPORTIONMENT, in her official capacity; the ARKANSAS BOARD OF ELECTION COMMISSIONERS, and the ARKANSAS BOARD OF APPORTIONMENT, <br><br> Defendants. | **COMPLAINT** <br><br> Civil Case No. _4:19-cv-402-JM_ <br><br><br><br><br><br><br><br><br><br><br> **This case assigned to District Judge** Moody <br> **and to Magistrate Judge** Volpe |

## INTRODUCTION

Plaintiffs the Christian Ministerial Alliance, Arkansas Community Institute, Marion Humphrey, Olly Neal, and Ryan Davis (collectively, "Plaintiffs") assert that Defendants the State of Arkansas, Governor Asa Hutchinson, in his official capacity, Secretary of State John Thurston, in his official capacity, Attorney General Leslie Rutledge, in her official capacity, the Arkansas Board of Election Commissioners, and the Arkansas Board of Apportionment's methods of electing judges to the Arkansas Supreme Court and Court of Appeals violate Section

1

2 of the Voting Rights Act, 52 U.S.C. § 10301 ("Section 2") by illegally diluting the voting strength of Black voters in Arkansas.

The Arkansas Supreme Court is the highest court in the State of Arkansas and is comprised of seven judges all elected at-large. This means that all eligible voters can vote for all members of this body. The Supreme Court's jurisdiction includes interpretation or construction of the State's Constitution; appeals involving the death penalty or life imprisonment; and election procedures. *See* Ark. S. Ct. Rule 1-2(a) 1-8. The Supreme Court also has authority to review an appeal that involves an issue it determines to be of "significant public interest or a legal principle of major importance." Ark. S. Ct. Rule 1-2(d).

The Arkansas Court of Appeals, the intermediate appellate court, consists of twelve judges elected from a mix of seven single-member and multimember districts. It has jurisdiction over matters assigned to it by the Supreme Court.

Together, Arkansas' Supreme Court and the Court of Appeals render consequential decisions that deeply and directly affect the lives of all Arkansans, including Black voters whose power to elect judges on these courts is stifled by the courts' current electoral structures. When, as here, a state chooses to elect its judges, those judicial elections must comply with the Voting Rights Act of 1965, including Section 2. *Chisom v. Roemer*, 501 U.S. 380 (1991) (holding that state judicial elections are included within the ambit of Section 2).

A Section 2 violation is established with regard to the Arkansas Supreme Court, in part, because Arkansas' (1) Black population is sufficiently numerous and geographically compact to form a majority of the voting-age population in a single-member district for electing a member to this court, where no such district currently exists, as all seven Justices are elected at-large; (2) Black voters are politically cohesive; (3) white voters tend to vote as a bloc usually defeating

2

candidates preferred by Black voters, resulting in no Black candidate having ever been elected to the Supreme Court; and (4) use of staggered terms and a numbered place system, along with other structures, enhances the discriminatory nature of at-large elections for this body. This action seeks to enjoin Defendants' at-large method of electing the Justices of the Supreme Court in favor of a system that complies with Section 2 by giving Black voters an equal opportunity to participate in the political process and elect candidates of their choice.

With regard to the Arkansas Court of Appeals, Defendants' current method of electing the state's intermediate appellate court judges employs a mix of single and multimember districts to elect twelve judges. Currently, only one single-member district allows Black voters an opportunity to elect their candidates of choice within this structure. This election system dilutes Black voting strength insofar as the districts needlessly pack or crack the Black population. The Section 2 violation is established, in part, because Arkansas' (1) Black population is sufficiently numerous and geographically compact to form a majority of the voting-age population in two single-member districts; (2) Black voters are politically cohesive; and (3) white voters tend to vote as a bloc to defeat candidates preferred by Black voters, resulting in no Black candidate ever having won a biracial contested election to the Court of Appeals. This action seeks to enjoin Defendants' current method of electing the members of the Court of Appeals in favor of a system that complies with Section 2 by providing Black voters an equal opportunity to participate in the political process and elect candidates of their choice.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a), and 1357; 42 U.S.C. §§ 1983 and 1988; and 52 U.S.C. §§ 10301, 10302, 10308(f), and 10310(e).

2.     This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

3.     This Court has personal jurisdiction over Defendants, all of whom are located in the State of Arkansas.

4.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

### Plaintiffs

5.     CHRISTIAN MINISTERIAL ALLIANCE ("Ministerial Alliance") is a non-profit, non-partisan interfaith coalition of religious leaders from Pulaski County and neighboring areas founded in 1968—just three years after Congress' enactment of the Voting Rights Act. It is devoted to furthering racial equality and justice in Arkansas, and in furtherance of its mission, has been involved in litigation relating to minority voting rights, including *Hunt v. State of Arkansas*, No. PB-C-89-406, 1991 WL 12009081 (E.D. Ark. Nov. 7, 1991) (challenging the dilution of Black voting strength under the method of electing Arkansas' trial court judges).

6.     The Ministerial Alliance's membership includes Black registered voters whose voting strength in elections for the Arkansas Supreme Court and Court of Appeals is currently diluted under the existing electoral methods in violation of Section 2. Members of the Ministerial Alliance reside in areas of the State that could constitute single-member districts containing majority-Black voting-age populations for electing members to both courts, which, if established, would remedy the existing Section 2 violations alleged herein.

7.     ARKANSAS COMMUNITY INSTITUTE is a non-profit, non-partisan membership-based organization devoted to empowering low- to moderate-income Arkansas

4

citizens through education, training, organizing, research, and advocacy. Its work includes engaging with state law and policy to address barriers to economic empowerment and advancement.

8.    The Arkansas Community Institute's membership includes Black registered voters whose voting strength in elections for the Arkansas Supreme Court and Court of Appeals is currently diluted under the existing electoral methods in violation of Section 2. Members of the Arkansas Community Institute reside in areas of the State that could constitute single-member districts containing majority Black-voting-age populations for electing members to both courts, which, if established, would remedy the existing Section 2 violations alleged herein.

9.    MARION HUMPHREY is a Black registered voter in and resident of Pulaski County. Mr. Humphrey was born and raised in Pine Bluff, where he registered to vote when he became eligible to do so in 1972. Mr. Humphrey later moved to Pulaski and became a registered voter there in 1986. Defendants' methods of electing judges for the Arkansas Supreme Court and the Court of Appeals dilute Mr. Humphrey's right to vote in violation of Section 2. Mr. Humphrey resides in an area of Arkansas that could constitute a majority-Black voting-age population district which, if established, would remedy the existing Section 2 violations alleged herein.

10.    OLLY NEAL is a Black registered voter in and resident of Lee County. Mr. Neal was born and raised in Lee, where he registered to vote when he became eligible to do so in 1970. Defendants' methods of electing judges for the Arkansas Supreme Court and the Court of Appeals dilute Mr. Neal's right to vote in violation of Section 2. Mr. Neal resides in an area of Arkansas that could constitute a majority-Black voting age population district for electing

members to both courts which, if established, would remedy the existing Section 2 violation alleged herein.

11.    RYAN DAVIS is a Black registered voter in and resident of Pulaski County. Mr. Davis was raised in Little Rock, where he registered to vote when he became eligible to do so in 1996. Defendants' methods of electing judges for the Arkansas Supreme Court and the Court of Appeals dilute Mr. Davis' right to vote in violation of Section 2. Mr. Davis resides in an area of Arkansas that could constitute a majority-Black voting age population district which, if established, would remedy the existing Section 2 violation alleged herein.

### Defendants

12.    Defendant State of Arkansas is the governmental entity that has adopted and maintained the election systems challenged herein.

13.    Defendant Asa Hutchinson is the Governor of the State of Arkansas and the Chairman of the Arkansas Board of Apportionment and is being sued in his official capacity. Under the Arkansas Constitution, Governor Hutchinson holds the "supreme executive power of th[e] State," Ark. Const. art. VI, § 2, and must "see that the laws are faithfully executed." *Id*. at § 7. In his capacity as Governor, Defendant Hutchinson enforces the provisions of the Arkansas Constitution, *see* Ark. Const. art. VI, § 2, including those that require the at-large election of Justices of the Arkansas Supreme Court. *See* Ark. Const. amend. LXXX, § 2(A). Defendant Hutchinson is also empowered to sign legislation into law that would change the electoral method for the Arkansas Court of Appeals. Ark. Const. art. VI, § 15.

14.    Defendant John Thurston is the Secretary of State of Arkansas and a Member of the Arkansas Board of Apportionment and is sued in his official capacity. Defendant Thurston is responsible for, among other things, preparing and certifying the ballots for all Arkansas

elections, Ark. Code Ann. § 7-5-203 (West 2018), including for elections to the Arkansas Supreme Court and the Arkansas Court of Appeals; overseeing the certification of votes for all Arkansas elections, including votes for Arkansas Supreme Court and Arkansas Court of Appeals candidates, *id.* at § 7-5-707; promulgating all election returns, including the returns for elections to the Arkansas Supreme Court and Arkansas Court of Appeals, *id.* at § 7-5-704(a); certifying all ballot measures submitted to voters, *id.* at § 7-5-204; certifying the results of all measures submitted to Arkansas voters for approval, including amendments to the Arkansas Constitution, *id.* at § 7-9-119(c); publishing all measures approved by Arkansas voters, *id.* at § 7-9-120(a); and publishing all laws enacted by the legislature, including laws establishing the electoral process for Judges of the Arkansas Courts of Appeals, *id.* at § 25-16-403. Defendant Thurston also serves as the Chair and Secretary of the State Board of Election Commissioners, *id.* at § 7-4-101(b).

15.     Defendant Leslie Rutledge is the Attorney General of the State of Arkansas and a Member of the Arkansas Board of Apportionment and is being sued in her official capacity. Defendant Rutledge acts as "the attorney for all state officials, departments, institutions, and agencies," Ark. Code Ann. § 25-16-702 (West 2018), and is charged with "maintain[ing] and defend[ing] the interests of the state in matters before the United States Supreme Court and all other federal courts." *Id.* § 25-16-703. Like other executive officers of the State, Defendant Rutledge is required to support the U.S. Constitution, including the Fourteenth and Fifteenth Amendments, in executing her duties as Attorney General. 4 U.S.C. § 101. Congress enacted Section 2 to enforce the Fourteenth and Fifteenth Amendments. Defendant Rutledge is also responsible for "provid[ing] legal assistance to the State Board of Election Commissioners in answering questions regarding election laws." Ark. Code Ann. § 7-4-101(g).

7

16.    Defendant the State Board of Apportionment, consisting of the Governor, Secretary of State and Attorney General, each of whom is elected at-large, is responsible for the apportionment of elected officials. Ark. Const. art. VIII, §§ 1, 4. The Board of Apportionment is also authorized to undertake reapportionment as ordered by federal courts.

17.    Defendant the State Board of Election Commissioners is responsible for overseeing and conducting elections throughout the State of Arkansas, including elections for the courts at issue. Commissioners are responsible for, among other duties, training election officers and county election commissioners to administer elections throughout Arkansas, including elections for the courts at issue, monitoring all election law-related legislation, including legislation that would change the electoral methods for the courts at issue, as well as investigating alleged election misconduct and election law violations. Ark. Code Ann. § 7-4-101(f)(2), (4), (9).

## Section 2 of the Voting Rights Act

18.    Section 2 prohibits Defendants from applying or imposing any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

19.    Section 2 prohibits the use of electoral schemes—such as the at-large and multimember electoral schemes at issue here—that result in diluting the voting strength of Black voters and denies those voters an opportunity to elect candidates of their choice. 52 U.S.C. § 10301(b).

20.    Defendants' current methods of electing the Justices of the Supreme Court and judges of the Court of Appeals violate Section 2 because they result in the denial or abridgment

8

of the rights of Black voters to have an equal opportunity to participate in the political process and to elect candidates of their choice.

### Arkansas Demographics

21. According to the 2010 Census, the total population of Arkansas is 2,915,918 people. Of this total population, 77.0 percent are non-Hispanic white and 15.4 percent are non-Hispanic Black.

22. According to the 2017 American Community Survey (ACS), Arkansas' total voting-age population is 2,295,846 (76.4 percent), of whom 1,728,701 are white (75.3 percent), and 345,445 (15.0 percent) are Black.

23. A significant portion of Arkansas' Black population lives in either the state capital, Little Rock, or in the eastern and southeastern Delta region of the state.

### Arkansas Supreme Court

24. The Arkansas Supreme Court, the state's highest court, has a total of seven Justices, one of whom serves as Chief Justice. All seven Justices of the Arkansas Supreme Court are elected at-large on a statewide, nonpartisan basis to serve staggered eight-year terms. The next Supreme Court election will be held in 2020.

25. Candidates for the Supreme Court run in nonpartisan primary elections for one of seven numbered places, formally titled Positions 1 through 7. Supreme Court elections are subject to a majority-vote requirement.

26. The Arkansas Supreme Court is the only state court in Arkansas for which judges are elected via statewide at-large elections. The at-large election of Justices is provided for in Amendment 80, § 2 of the Arkansas Constitution.

27.     Justices are required to run for reelection upon the expiration of their terms. No sitting Arkansas Supreme Court justice has lost a bid for reelection since at least 1976. Supreme Court Justices that are appointed to the court are not eligible to run for election to succeed themselves pursuant to Amendment 29, § 2 to the Arkansas Constitution.

28.     Pursuant to Amendment 80, § 16 of the Arkansas Constitution, to qualify for a seat on the Arkansas Supreme Court, a candidate must have been a licensed attorney in Arkansas for at least eight years and must be a "qualified elector" within the State of Arkansas.

29.     Midterm vacancies on the Supreme Court are filled via interim appointment by the Governor of Arkansas, pursuant to Amendment 29, § 1 to the Arkansas Constitution. An interim justice serves during the remainder of the unexpired term if the vacancy was to be filled at the next general election, or otherwise serves until the next general election taking place four or more months following the occurrence of the vacancy.

30.     No Black candidate has ever been elected to the Arkansas Supreme Court. Thus far, the only Black Justices to serve on the Supreme Court have been appointed and were not eligible to run for election to succeed themselves pursuant to Amendment 29, § 2 to the Arkansas Constitution.

**Arkansas Court of Appeals**

31.     The Court of Appeals, Arkansas' intermediate appellate court, has twelve judges, including one Chief Judge, elected from seven electoral districts. The next Court of Appeals election will be held in 2020.

32.     The Arkansas General Assembly was given the power to create and establish the Court of Appeals via Amendment 58 of the Arkansas Constitution.

10

33.     The jurisdiction of the Court of Appeals is determined by the Arkansas Supreme Court. *See* Ark. Sup. Ct. R. 1-2 ("Appellate jurisdiction of the Supreme Court and Court of Appeals").

34.     The Court of Appeals consists of a mix of seven single and multimember districts. Districts 1, 2, 3, 4, and 6 are multimember districts that elect two judges from numbered places (Position 1 and 2). Districts 5 and 7 are single-member districts that elect one judge each.

35.     The voting-age population of District 7 is approximately 49 percent Black. The population of voters in the other six districts is overwhelmingly white.

36.     Judges are held to the same qualifications standard as Supreme Court Justices and have the same interim appointment system. *See* Ark. Const. amend. LXXX, § 5; *see also supra* ¶¶ 28-29.

37.     As with Arkansas Supreme Court Justices, Court of Appeals judges are elected on a nonpartisan basis by majority vote for staggered, renewable eight-year terms. *See supra* ¶ 24.

38.     Court of Appeals judges appointed to the court are not eligible to run for election to succeed themselves pursuant to Amendment 29, § 2 of the Arkansas Constitution.

39.     The Court of Appeals' only current Black judge, Judge Waymond Brown, was elected in 2008 to District 7, which, as noted above, is comprised of a plurality of Black voters. *See supra* ¶ 35. Since the Court's expansion to twelve judgeships in 1997, other Black judges have been appointed to the Court of Appeals. Judge Brown, however, is the only Black judge to be elected to a seat on the Court of Appeals in a contested election, winning his seat against another Black candidate in 2008.

### *Thornburg v. Gingles* Preconditions

40.    The United States Supreme Court, in *Thornburg v. Gingles*, identified three necessary preconditions to sustain a claim that a challenged voting practice results in minority vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group must be "politically cohesive," and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. 30, 50-51 (1986). Plaintiffs satisfy all three preconditions.

41.    Arkansas' Black population is sufficiently numerous and geographically compact to provide for the creation of single-member districts for electing members of the Arkansas Supreme Court in which Black voters in at least one district would constitute a majority of the voting-age population. A majority-Black single-member district for electing a member of the Supreme Court can be drawn that satisfies traditional redistricting principles.

42.    Arkansas' Black population is sufficiently numerous and geographically compact to provide for the creation of two single-member districts for electing members of the Arkansas Court of Appeals in which Black voters would constitute a majority of the voting-age population in each district. Two majority-Black single-member districts for electing two members of the Court of Appeals can be drawn that satisfy traditional redistricting principles.

43.    Black voters in Arkansas are consistently politically cohesive across judicial elections. There is a positive relationship between areas of Arkansas with higher Black populations and increased support for Black candidates.

44.    The white voting majority in Arkansas is sufficiently cohesive to defeat candidates preferred by Black voters. In biracial elections in which Black voters preferred the Black candidate, white voters consistently vote as a bloc to defeat that candidate.

12

45.    Judicial and other elections in Arkansas are characterized by pronounced levels of racial polarization, with non-Black voters consistently defeating Black-preferred candidates when given a choice of Black or non-Black candidates.

46.    In a 2004 race for Arkansas Supreme Court Position 1, for example, Judge Wendell Griffen, a Black Arkansan and the Black-preferred candidate running against a white candidate, lost the election with 37.5 percent of the vote, but earned the majority of Black voter support.

47.    In a 2006 race for Arkansas Supreme Court Position 5, Judge Griffen again ran against a white candidate, losing the election with 42.8 percent of the vote but earning a significant majority of Black voter support.

48.    In over two decades, no Black candidate for the Arkansas Court of Appeals has ever won against a white candidate or in a district comprised of a white voter majority. In 2008, for example, Judge Griffen lost with only 39.96 percent of the vote against a white candidate, despite being the incumbent.

49.    The only successful Black candidate in a contested election for the Court of Appeals has been Judge Waymond Brown, who won against another Black candidate for District 7 in 2008.

50.    No Black candidate has ever been elected statewide to any office in Arkansas, despite Black candidates running for various statewide positions.

51.    For example, in the 2018 Lieutenant Governor contest, Anthony Bland, a Black candidate, received a significant majority of Black voter support, but a low percent of white voter support, losing to the white candidate.

52. In the 2014 State Auditor general election, Regina Stewart Hampton, a Black candidate, received overwhelming support from Black voters, but a low percent of white voter support. Ms. Hampton lost to the white candidate.

53. In the 2012 Presidential election, President Barack Obama, a Black incumbent, received overwhelming support from Black voters, but a low percent of white voter support in Arkansas. White Arkansan voters overwhelming supported Mitt Romney, a white candidate.

54. In the 2008 Presidential election, Barack Obama, a Black candidate, received the vast majority of Black voter support, but only a minority of white voter support in Arkansas. White voters overwhelmingly supported John McCain, a white candidate.

55. During the 2008 Presidential primary contest, Barack Obama, a Black candidate, received the vast majority of Black voter support, but only a minority of white voter support in Arkansas. White voters overwhelmingly supported Hillary Clinton, a white candidate.

56. Repeated failures of Black candidates in judicial and non-judicial contests, in conjunction with other factors, including prohibitively high campaign costs, have had a significant chilling effect on potentially qualified Black judicial candidates competing for positions elected at-large.

### Section 2's Totality of the Circumstances ("Senate Factors")

57. After the three *Gingles* preconditions are satisfied, Section 2 requires an analysis of the "totality of the circumstances" to show that Black Arkansans have less opportunity than other members of Arkansas' electorate to participate in the political process and to elect the candidates of their choice. 52 U.S.C. § 10301(b). Though not dispositive, satisfying the *Gingles* preconditions takes the plaintiff "a long way towards showing a section 2 violation . . . " *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1021 (8th Cir. 2006).

14

58.    To determine whether plaintiffs have shown vote dilution under the totality of the circumstances, courts look at the following Congressionally-delineated Senate factors: (1) "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;" (2) "the extent to which voting in the elections of the state or political subdivision is racially polarized;" (3) "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;" (4) "if there is a candidate slating process, whether the members of the minority group have been denied access to that process;" (5) "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;" (6) "whether political campaigns have been characterized by overt or subtle racial appeals;" (7) "the extent to which members of the minority group have been elected to public office in the jurisdiction;" (8) "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;" and (9) "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Gingles*, 478 U.S. at 36-37 (quoting S. Rep. No. 97-417, at 28-29, reprinted in 1982 U.S.C.C.A.N. 177, 206-07).

59.    These factors confirm the existence of a Section 2 violation in this case.

60.    Senate factors two and seven bear heavily on Section 2 challenges to multimember districts. Here, plaintiffs are able to demonstrate both factors. Plaintiffs will be able

15

to demonstrate the second factor, racially polarized voting, as elections in Arkansas are characterized by stark patterns of racial polarization. *See supra* ¶¶ 44-55. And with respect to the seventh factor, there has never been a Black candidate elected to the Arkansas Supreme Court, in a biracial election for the Court of Appeals, or any other statewide elected position. *See supra* ¶¶ 30, 48-50.

61.     The State of Arkansas has a thoroughly documented and judicially recognized history of official racial discrimination against Black voters. *See, e.g., Taylor v. Howe*, 225 F.3d 993, 1003 (8th Cir. 2000) ("There has been a 'long history of racial discrimination in the electoral process in Arkansas.'"); *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1390 (8th Cir. 1995) (en banc) ("No one party to the litigation denies the long history of racial discrimination in the electoral process in Arkansas."); *Jeffers v. Beebe*, 895 F. Supp. 2d 920, 940 (E.D. Ark. 2012) ("'[T]here is a history of racial discrimination in the electoral process in Arkansas.'"); *Jeffers v. Clinton*, 730 F. Supp. 196, 204 (E.D. Ark. 1989) (three-judge court), *aff'd mem.*, 498 U.S. 1019 (1991) (noting that it was necessary for the Court "to reckon with the present effects of past racial discrimination, much of it official and governmental.").

62.     The Arkansas legislature's enactment of majority-vote requirements for municipal and county offices as part of a "systematic and deliberate attempt to reduce black political opportunity," *Jeffers v. Clinton*, 740 F. Supp. 585, 595 (E.D. Ark. 1990), along with the State's history of racial discrimination in voting, was the basis for the Court's ruling that Arkansas was to be partially covered under Section 3(c) of the Voting Rights Act. *See id.* at 601-02.

63.     Similarly, in *Smith v. Clinton*, plaintiffs challenged at-large voting for two seats in the Arkansas House of Representatives from the dual-member district in Crittenden County under Section 2. The Court found that the multimember configuration deprived Black Arkansans

16

an equal opportunity to participate in the political process and to elect candidates of their choice. The Court further held that "[c]andidates favored by blacks can win, but only if the candidates are white." *Smith*, 687 F. Supp. 1310, 1318 (E.D. Ark. 1988).

64.     As referenced above, in *Hunt v. Arkansas*, plaintiffs challenged Arkansas' system for the election of state-level trial judges through at-large elections in multimember districts pursuant to Section 2. The State of Arkansas admitted liability and the Court issued a decree that created new judicial subdistricts within five districts with substantial Black populations. *Hunt*, 1991 WL 12009081 (E.D. Ark. Nov. 7, 1991). This resulted in eight new Black trial judges being elected. The decree remains in effect today.

65.     The methods for electing the Supreme Court and Court of Appeals employ practices and procedures, such as at-large and multimember districts, majority-vote requirements, numbered places, and staggered terms, that enhance the opportunity for racial discrimination because Black-preferred candidates, even with cohesive Black voter support, cannot win a majority of the total vote without white crossover voting, which does not occur at meaningful levels in Arkansas elections.

66.     Black Arkansans bear the effects of discrimination in areas of life such as education, the environment, employment, criminal justice, and health, which hinder their ability to participate equally in the political process.

67.     For example, according to a 2014 survey, at least sixteen school districts in Arkansas remain subject to desegregation orders because these districts have yet to eliminate the vestiges of racial discrimination. Nikole Hannah-Jones and Yue Qiu, *A National Survey of School Desegregation Orders*, ProPublica, Dec. 23, 2014 (available at https://projects.propublica.org/graphics/desegregation-orders). As recently as 2011, the Eighth

17

Circuit recognized that the State itself remained subject to certain desegregation obligations. *See Little Rock Sch. Dist. v. Arkansas*, 664 F. 3d 738, 757-58 (8th Cir. 2011). And Arkansas continued to operate a racially segregated higher education system into at least the 1970s. *Adams v. Richardson*, 351 F. Supp. 636, 637-38 (D.D.C. 1972).

68. Because of the State's history of discrimination, socioeconomic disparities remain stark between Black and white Arkansans. For example, according to the 2013-2017 American Community Survey 5-Year Estimates, 17.9 percent of Black Arkansans lack a high school diploma, while 11.7 percent of white Arkansans lack a high school diploma. Further, 23.8 percent of white Arkansans have a bachelor's degree or higher as compared to 14.8 percent of Black Arkansans.

69. The median household income for Black Arkansans is $30,509, while white Arkansans have a median income of $49,890. The unemployment rate for white Arkansans stands at 2.8 percent, while Black Arkansans face an unemployment rate of 5.2 percent. Twenty-three percent of Black family households in Arkansas live below the poverty level, while only 9 percent of white family households live below the poverty level. Of these households, 57.5 percent of Black families rent their homes, while only 28.7 percent of white families rent housing units. Further, 15 percent of Black families lack a vehicle in their home, while only 4.6 percent of white families lack a vehicle.

70. Further, even though Black Arkansans comprise approximately 15 percent of the State's population, 42 percent of Arkansas' imprisoned population is Black. As a result of the interaction between Arkansas' incarceration rate and its felony disfranchisement law, nearly 8 percent of Arkansas' Black voting-age population cannot vote. Christopher Uggen, et al., *State-Level Estimates of Felon Disenfranchisement in the United States, 2010*, at 17 (2012),

18

https://www.sentencingproject.org/wp-content/uploads/2016/01/State-Level-Estimates-of-Felon-Disenfranchisement-in-the-United-States-2010.pdf.

71.     Defendants' methods of electing Justices and appellate judges interact with these sociohistorical conditions to undermine the ability of Black voters to participate equally in the political process.

**COUNT ONE**
**VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT OF 1965**

72.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

73.     Arkansas' methods of election for the Supreme Court and Court of Appeals result in the dilution of the voting strength of Black Arkansans, including Plaintiffs, and deny or abridge the rights of Black voters to participate equally in the political process and to elect candidates of their choice, in contravention of Section 2. 52 U.S.C. §§ 10301, 10302(b).

74.     Unless enjoined by order of this Court, Defendants will continue to violate Section 2 by administering elections for the Supreme Court and Court of Appeals in a manner that dilutes Black voting strength.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that the Court enter an order:

a.     Declaring that Defendants' use of the electoral methods challenged herein has the result of denying and/or abridging the right to vote on account of race or color in violation of Section 2;

b.     Enjoining Defendants, their agents and successors in office, and all persons acting in concert with, or as an agent of, any Defendants in this action, from enforcing, administering, implementing, or conducting any further elections under the election systems challenged herein;

19

c.    Setting an immediate and reasonable deadline for the State of Arkansas to enact and adopt new methods of election for the Arkansas Supreme Court and Court of Appeals that (1) fully remedy the dilution of the voting strength of Black Arkansans and provide Black voters with an equal opportunity to elect judicial candidates of their choice, and (2) do not violate the Voting Rights Act, federal or state constitutions, or other applicable laws;

d.    Alternatively, ordering the implementation of an at-large electoral system using cumulative voting, or an alternative election system for the Supreme Court and Court of Appeals that complies with Section 2, 52 U.S.C. § 10301, and other applicable laws;

e.    Ordering Defendants to pay Plaintiffs' costs, expenses, and reasonable attorneys' fees pursuant to 2 U.S.C. § 1988 and 52 U.S.C. § 10310(e); and

f.    Ordering any such additional relief as the interests of justice may require.

Respectfully submitted on June 10, 2019.

/s/ *Arkie Byrd*
Arkie Byrd
MAYS, BYRD & O'GUINN, PLLC
212 Center Street
Suite 700
Little Rock, AR 72201
Phone: (501) 372-6303
Fax: (501) 399-9280
abyrd@maysbyrdlaw.com

/s/ *Natasha Merle*
Natasha Merle*
Kristen Johnson*
John Z. Morris*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
Phone: (212) 965-2200
Fax: (212) 226-7592
nmerle@naacpldf.org
kjohnson@naacpldf.org
zmorris@naacpldf.org

/s/ *Jonathan Greenblatt*
Jonathan Greenblatt*
Philip Urofsky*
Jon Weingart*
Timothy Slattery*
SHEARMAN & STERLING LLP
401 9th Street, NW, Suite 800
Washington, DC 20004
Phone: (202) 508-8000
Fax: (202) 508-8100
JGreenblatt@Shearman.com
Philip.Urofsky@Shearman.com
Jon.Weingart@Shearman.com
Timothy.Slattery@Shearman.com

*Pro Hac Vice Motions forthcoming*

21