IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

THE CHRISTIAN MINISTERIAL ALLIANCE, et al.   PLAINTIFFS

v.        NO. 4:19-cv-402

STATE OF ARKANSAS, et al.      DEFENDANTS

<u>ORDER</u>

  This is a vote dilution case brought pursuant to Section 2 of the Voting Rights Act of 1965, 52 U.C.C. §10301 ("VRA").  Plaintiffs, the Christian Ministerial Alliance, the Arkansas Community Institute, Marion Humphrey, Olly Neal, and Kymara Hill Seals, filed an amended complaint challenging Arkansas's method of electing judges to its Supreme Court and Court of Appeals. (ECF No. 9) They argue that the current method of electing these judges denies black voters an equal opportunity to participate in the electoral process.

  The named Defendants are the State of Arkansas; Asa Hutchinson, in his official capacity as governor and as chairman of the Arkansas Board of Apportionment; John Thurston in his official capacity as Secretary of State and as a member of the Arkansas Board of Apportionment; Leslie Rutledge in her official capacity as attorney general and as a member of the Arkansas Board of Apportionment; the Arkansas Board of Election Commissioners; and the Arkansas Board of Apportionment.  Defendants filed a motion to dismiss the amended complaint arguing that it is barred by sovereign immunity as to some defendants and otherwise fails to state a claim for which relief can be granted. Plaintiffs responded, and Defendants filed a reply (ECF No. 29).

I. <u>Legal Framework of a Section 2 Claim.</u>

Section 2 of the VRA states as follows:

**(a)** No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a

manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

Section (b) sets out how a plaintiff establishes a violation of §2:

> **(b)** A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* [t]hat nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C.A. § 10301 (West).

To prevail in a Section 2 challenge, plaintiffs must pass two hurdles.  First, the United States Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30 (1986), identified three preconditions that plaintiffs must prove: "(1) that the minority group is large enough and geographically compact enough that it would be a majority in a single-member district; (2) that the minority group is politically cohesive; and (3) that the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate." *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1385 (8th Cir. 1995) (citing *Gingles* at 50–51).

The second hurdle requires plaintiffs to prove that the "totality of the circumstances" indicates minority voters had "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1021 (8th Cir. 2006); 52 U.S.C.A. § 10301 (formerly cited as 42

U.S.C.A. §1973).  In deciding whether plaintiffs have met this burden, courts are to consider

these factors,[1] which are "neither comprehensive nor exclusive:"

> (1) the history of voting-related discrimination in the State or political subdivision;

> (2) the extent to which voting in the elections of that State or political subdivision is racially polarized;

> (3) the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;

> (4) the exclusion of members of the minority group from candidate slating processes;

> (5) the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

> (6) the use of overt or subtle racial appeals in political campaigns;

> (7) the extent to which members of the minority group have been elected to public office in the jurisdiction;

> (8) the extent to which elected officials are unresponsive to the particularized needs of the members of the minority group; and

> (9) whether the policy underlying the State's or political subdivision's use of the contested practice or structure is tenuous.

*Gingles*, 478 U.S. at 44-45; see also *League of United Latin Am. Citizens v. Perry* (LULAC),

548 U.S. 399, 426 (2006).  "A voting procedure violates § 2 if it has the 'result' under the

'totality of the circumstances' of affording minority voters less opportunity than white voters 'to

elect representatives of their choice.'" *Stabler v. Cty. of Thurston, Neb.*, 129 F.3d 1015, 1020

(8th Cir. 1997) (quoting 52 U.S.C.A.  §10301[2]).

---

[1] This list of factors was included in the Senate Report on the 1982 amendments to the VRA. LULAC, 548 U.S. at 426.
[2] Formerly cited as 42 USC §1973.

## II.  The Amended Complaint

The amended complaint makes the following allegations regarding the demographics of Arkansas.  As of the 2010 Census, 77.0% of Arkansas's residents are non-Hispanic white and 15.4% are non-Hispanic black.  According to the 2017 American Community Survey (ACS), 75.3 % of Arkansas's total voting-age population is white and 15.0% are black.  The complaint alleges, without citation, that a significant portion of Arkansas's black population lives in Little Rock or in the eastern and southeastern Delta region of the state.

Regarding the Arkansas Supreme Court, the complaint states that the seven justices of the Arkansas Supreme Court are elected from the state at large pursuant to Amendment 80, §2 of the Arkansas Constitution. They are elected on a nonpartisan basis and serve for a term of eight years.  The Supreme Court elections are subject to a majority-vote requirement.  Midterm vacancies are filled by appointment by the Governor of Arkansas; justices that have been appointed to finish out a term are not eligible to run for election to succeed themselves.  No black candidate has ever been elected to the Arkansas Supreme Court, but black justices have served by appointment.

The Arkansas Court of Appeals has twelve judges elected from seven electoral districts. Two of the electoral districts (Districts 5 and 7), are single-member districts that elect one judge each.  The remaining five electoral districts (Districts 1-4 and 6) are multimember districts that elect two judges each (for Position 1 and Position 2). The voting-age population of District 7 is approximately 49% black.  The voting-age population of the other six districts is "overwhelmingly" white.  Like with the Supreme Court, midterm vacancies are filled by appointment by the Governor of Arkansas; judges that have been appointed to finish out a term are not eligible to run for election to succeed themselves.  Judges on the Court of Appeals also

are elected on a norpartisan basis by majority vote for staggered, renewable eight-year terms. The Court of Appeals has one black judge, Judge Waymond Brown, who was elected in 2008 to District 7, wining his seat in a contested election against another black candidate.  While other judges have been appointed to fill interim vacancies, Judge Brown is the only black judge to have ever been elected to a seat on the Court of Appeals.

Regarding the *Gingle* preconditions, Plaintiffs generally allege that Arkansas's black population is "sufficiently numerous and geographically compact to provide for the creation of single-member districts for electing members of the Arkansas Supreme Court in which black voters in at least one district would constitute a majority of the voting-age population."  As to the Arkansas Court of Appeals, Plaintiffs allege that Arkansas's black population is "sufficiently numerous and geographically compact to provide for the creation of two single-member districts" in which black voters would be a majority of the voting-age population in each of the two districts.  Plaintiffs allege that black voters are consistently politically cohesive across judicial elections and that the white voting majority is sufficiently cohesive to defeat candidates preferred by black voters.

Specifically, Plaintiffs allege that black candidate Wendell Griffen lost the 2004 Arkansas Supreme Court race for Position 1 to a white candidate although he earned "a majority of the Black voter support." Griffen lost the 2006 race for Position 5 of the Arkansas Supreme Court to a white candidate, again having earned a "significant majority of Black voter support." In 2008, Griffen again lost to a white candidate in a race for the Arkansas Court of Appeals in which he was the incumbent.

Plaintiffs also allege that no black candidate has been elected to any statewide office in Arkansas in spite of several black candidates running.  They cite to the defeat of black candidate

Anthony Bland by a white candidate in the 2018 Lieutenant Governor race, alleging that Bland received a "significant majority of Black voter support" but a low percentage of white votes. Plaintiffs also cite to the loss by black candidate Regina Stewart Hampton to a white candidate in the 2014 election for the position of State Auditor although she received "overwhelming support from Black voters."

Turning to the totality-of-the-circumstance factors, Plaintiffs rely on a consideration of two factors to support their claim:  the extent to which voting in Arkansas elections is racially polarized, and the extent to which blacks have been elected to public office in the jurisdiction.  In addition to the allegations addressed *supra*, Plaintiffs assert that Arkansas has a "thoroughly documented and judicially recognized of official racial discrimination against Black voters," citing *Taylor v. Howe*, 225 F.3d 993, 1003 (8th Cir. 2000) ("There has been a 'long history of racial discrimination in the electoral process in Arkansas.'"); *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1390 (8th Cir. 1995) (*en banc*) ("No one party to the litigation denies the long history of racial discrimination in the electoral process in Arkansas."); *Jeffers v. Beebe*, 895 F. Supp. 2d 920, 940 (E.D. Ark. 2012) ("'[T]here is a history of racial discrimination in the electoral process in Arkansas.'"); *Jeffers v. Clinton*, 730 F. Supp. 196, 204 (E.D. Ark. 1989) (three-judge court), aff'd mem., 498 U.S. 1019 (1991) (noting that it was necessary for the Court "to reckon with the present effects of past racial discrimination, much of it official and governmental"); *Jeffers v. Clinton*, 740 F. Supp. 585, 595 (E.D. Ark. 1990) (stating that the Arkansas legislature's enactment of majority-vote requirements for municipal and county offices was part of a "systematic and deliberate attempt to reduce black political opportunity."); *Smith v. Clinton* (where the Court found that the at-large voting for two seats in the Arkansas House of Representatives deprived Black Arkansans an equal opportunity to participate in the political

process and to elect candidates of their choice; the Court further held that "[c]andidates favored

by blacks can win, but only if the candidates are white.").  Finally, Plaintiffs rely on *Hunt v. State*

*of Arkansas*, No. PB-C-89-406, 1991 WL 12009081 (E.D. Ark. Nov. 7, 1991), in which

plaintiffs challenged Arkansas's system for the election of state-level trial judges through at-large

elections in multimember districts pursuant to Section 2. The State of Arkansas admitted liability

and the court issued a decree that created new judicial subdistricts within five districts with

substantial black populations which resulted in eight new black trial judges being elected.

With respect to the totality of the circumstances, the amended complaint concludes:

65. The methods for electing the Supreme Court and Court of Appeals employ practices

and procedures, such as at-large and multimember districts, majority-vote requirements,

numbered places, and staggered terms, that enhance the opportunity for racial discrimination

because Black-preferred candidates, even with cohesive Black voter support, cannot win a

majority of the total vote without white crossover voting, which does not occur at

meaningful levels in Arkansas elections.

66. Black Arkansans bear the effects of discrimination in areas of life such as education,

the environment, employment, criminal justice, and health, which hinder their ability to

participate equally in the political process.

(Doc. No. 9, p.19).  The remaining paragraphs of this section put forth statistics regarding

desegregation in schools, socioeconomic disparities, and prison populations.

### III. <u>Sovereign Immunity</u>

The State of Arkansas, the Board of Election Commissioners, and the Board of

Apportionment Defendants ("the Arkansas Defendants") argue that Plaintiffs' claims against

them are barred by sovereign immunity pursuant to the Eleventh Amendment. "The Eleventh

Amendment immunizes an unconsenting State from damage actions brought in federal court,

except when Congress has abrogated that immunity for a particular federal cause of action."
*Hadley v. N. Arkansas Cmty. Tech. Coll.*, 76 F.3d 1437, 1438 (8th Cir. 1996) (citations omitted).
The Supreme Court has set forth a "simple but stringent test" to determine whether a federal
statute abrogates a state's immunity: "Congress may abrogate the States' constitutionally secured
immunity from suit in federal court only by making its intention unmistakably clear in the
language of the statute." *Dellmuth v. Muth*, 491 U.S. 223, 228 (1989) (quoting *Atascadero State
Hospital v. Scanlon,* 473 U.S. 234, 242 (1985)).  "[I]n this area of the law, evidence of
congressional intent must be both unequivocal and textual." *Id.* at 230.

In *Dellmuth*, the act at issue was The Education of the Handicapped Act (EHA)—now
the Individuals with Disabilities Education Act (IDEA).[3]  The Supreme Court held that Act did
not abrogate the states' sovereign immunity under the Eleventh Amendment.  Reaffirming its
holding in *Atascadero State Hospital v. Scanlon*, 473 U.S. 234 (1985), the Court made clear that
"[it] will conclude Congress intended to abrogate sovereign immunity only if its intention is
"unmistakably clear in the language of the statute."  *Id.* at 230 (quoting *Atascadero* at 242). The
Court went on to state: "Lest *Atascadero* be thought to contain any ambiguity, we reaffirm today
that in this area of the law, evidence of congressional intent must be both unequivocal and
textual." *Id.*

In reaching its conclusion, the Court explained:

We recognize that the EHA's frequent reference to the States, and its delineation
of the States' important role in securing an appropriate education for handicapped
children, make the States, along with local agencies, logical defendants in suits
alleging violations of the EHA. This statutory structure lends force to the
inference that the States were intended to be subject to damages actions for
violations of the EHA. But such a permissible inference, whatever its logical
force, would remain just that: a permissible inference. It would not be the

---

[3] The Education for the Handicapped Act (EHA) was passed in 1970, was amended as the Education for All
Handicapped Children Act in 1975, and subsequently redesignated the IDEA in 1990.

> unequivocal declaration which, we reaffirm today, is necessary before we will
> determine that Congress intended to exercise its powers of abrogation.

*Id.* at 232.

Ten years later in the case of *Little Rock Sch. Dist. v. Mauney*, 183 F.3d 816 (8th Cir. 1999), the Eighth Circuit considered the same issue, whether Congress had abrogated the state's sovereign immunity when it enacted the IDEA.  As the Court pointed out, following the Supreme Court's decision in *Dellmuth*, Congress amended the Act to make "patent" Congress' intent to abrogate state immunity *Id.* at 822. The following language appears in the amended Act in a section titled "Abrogation of State sovereign immunity:" "A State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this chapter."  20 U.S.C.A. § 1403.  *Id.*  The amendment specified that it covered "violations that occur in in whole or in part after October 30, 1990." §1403 (c).  As result of this "unmistakable language," the Eighth Circuit held that Congress had abrogated the state's sovereign immunity at the time of the alleged violations. *Id.*

The Eighth Circuit has recognized that Congress created a private right of action for Section 2 claims for "aggrieved persons" when it amended the VRA in 1975.  *Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989).  However, neither the Supreme Court or the Eighth Circuit has addressed the issue of whether the VRA abrogated the states' Eleventh Amendment sovereign immunity. The three circuits to address this issue have each found that it did.  In *Mixon v. State of Ohio*, 193 F.3d 389 (6th Cir. 1999), the Sixth Circuit held that "[w]ith respect to whether Congress intended to abrogate the States' sovereign immunity under the Voting Rights Act, we believe the language and purpose of the statute indicate an affirmative response. The language of Section 2 of the Act, 42 U.S.C. § 1973, specifically prohibits "any State or political subdivision" from discriminating against voters on the basis of race." *Id.* at 398.  Citing

*Mixon*, the Fifth Circuit summarily concluded that the VRA validly abrogated state sovereign immunity without analysis.  *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017). Likewise, the Eleventh Circuit adopted the Sixth Circuit's analysis in finding that Congress "clearly intended" the VRA to be enforceable by private action directly against the states. *Lewis v. Governor of Alabama*, 896 F.3d 1282, 1293 (11th Cir. 2018), *reh'g en banc granted,* 914 F.3d 1291 (11th Cir. 2019), and *on reh'g en banc,* 944 F.3d 1287 (11th Cir. 2019).  It recently affirmed its position in *Alabama State Conference of Nat'l Ass'n for the Advancement of Colored People v. Alabama*, No. 17-14443, 2020 WL 525153 (11th Cir. Feb. 3, 2020).

After a close study of the language of the VRA, however, the Court declines to find that the Act abrogated the states' sovereign immunity under the Eleventh Amendment.  Section 2 of the VRA states as follows:

> **(a)** No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

Section (b) sets out how a plaintiff establishes a violation of §2:

> **(b)** A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* [t]hat nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C.A. § 10301 (West)

While, as in *Dellmuth*, the Act's "frequent reference to the States" and prohibitions on

state actions make the States "logical defendants" in suits alleging violations of the VRA, this "statutory structure" only leads to a "permissible inference" that the States were intended defendants. *Dellmuth* at 232. This does not chin the high bar set by the Supreme Court of expressing an "unmistakably clear" intention to abrogate the States' right of immunity such as was found patent by the Eighth Circuit after Congress amended the IDEA.  *Mauney* at 822.

> Legislative history generally will be irrelevant to a judicial inquiry into whether Congress intended to abrogate the Eleventh Amendment. If Congress' intention is "unmistakably clear in the language of the statute," recourse to legislative history will be unnecessary; if Congress' intention is not unmistakably clear, recourse to legislative history will be futile, because by definition the rule of *Atascadero* will not be met.

*Dellmuth* 491 U.S. at 230.

For these reasons, the Arkansas Defendants' motion to dismiss the claims against them on the basis of sovereign immunity is granted.

## IV.  Failure to State a Claim

Defendants argue that the amended complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failing to satisfy the *Iqbal* and *Twombly*[4] standards as to each of the three *Gingles* preconditions.

To state a plausible claim for the first precondition, plaintiffs must allege sufficient factual matter to show that the minority group is both large enough and geographically compact enough that it would be a majority in a single-member district.  *Gingles, 478 U.S.* at 50.  The purpose of the first precondition is "to establish whether a workable solution is possible . . . the Supreme Court [at this stage] requires only a simple majority of eligible voters in the single-member district." *Bone Shirt*, 461 F.3d at 1019 (citations omitted).

---

[4]  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009).

In responding to the sufficiency of their allegations as to the first precondition, Plaintiffs

refer to Court to the following paragraphs of their amended complaint:

      21. According to the 2010 Census, the total population of Arkansas is 2,915,918 people. Of this total population, 77.0 percent are non-Hispanic white and 15.4 percent are non-Hispanic Black.

      22. According to the 2017 American Community Survey (ACS), Arkansas' total voting-age population is 2,295,846 (76.4 percent), of whom 1,728,701 are white (75.3 percent), and 345,445 (15.0 percent) are Black.

      23. A significant portion of Arkansas' Black population lives in either the state capital, Little Rock, or in the eastern and southeastern Delta region of the state.

. . .

      34. The Court of Appeals consists of a mix of seven single and multimember districts. Districts 1, 2, 3, 4, and 6 are multimember districts that elect two judges from numbered places (Position 1 and 2). Districts 5 and 7 are single-member districts that elect one judge each.

      35. The voting-age population of District 7 is approximately 49 percent Black. The population of voters in the other six districts is overwhelmingly white.

. . .

      41. Arkansas' Black population is sufficiently numerous and geographically compact to provide for the creation of single-member districts for electing members of the Arkansas Supreme Court in which Black voters in at least one district would constitute a majority of the voting-age population. A majority-Black single-member district for electing a member of the Supreme Court can be drawn that satisfies traditional redistricting principles.

      42. Arkansas' Black population is sufficiently numerous and geographically compact to provide for the creation of two single-member districts for electing members of the Arkansas Court of Appeals in which Black voters would constitute a majority of the voting-age population in each district. Two majority-Black single-member districts for electing two members of the Court of Appeals can be drawn that satisfy traditional redistricting principles.

The Court agrees with Defendants that the amended complaint fails allege sufficient facts

which, if true, would satisfy the first *Gingles* precondition.  The statistics given from the 2010

Census and the 2017 ACS demonstrate that the racial make-up of Arkansas's total population

compared with the racial make-up of its total voting age population (VAP) closely correspond, with approximately 77% of each being white and 15% being black.  The allegation that "a significant portion" of Arkansas's black population lives in either Little Rock or "in the eastern and southeastern Delta region of the state" does not lead to a reasonable inference that Arkansas's black population is geographically compact enough to be a majority in a single-member district for appellate judicial elections.   The comparison in paragraph 35 of the black "voting age population" of District 7 ("approximately 49%") to the "population of voters" of the other six districts ("overwhelmingly white") likewise does provide factual matter to support the conclusions drawn in paragraphs 41 and 42.  While Section 2 claims are highly fact-intensive,[5] Plaintiffs still have the burden to satisfy the *Iqbal* and *Twombly* pleading standards.  They have failed to do so as to the first precondition.

Defendants also argue that Plaintiffs failed to allege a "potentially viable and stable solution" as to the Arkansas Supreme Court elections, which is necessary to satisfy the first precondition.  Plaintiffs have proposed that the Court enjoin at-large elections of the Arkansas Supreme Court and to apportion it into single-member districts or to require Arkansas to adopt a cumulative-voting scheme for electing supreme court justices.  Defendants argue that these are legally impermissible solutions. The Court disagrees.  The State's strong interest in linking the Supreme Court's jurisdictional boundaries with the electoral base and with not using cumulative voting are important factors for the Court to consider in evaluating the totality of the circumstances or at the remedial stage. *Houston Lawyers' Ass'n v. Attorney Gen. of Texas*, 501

---

[5] "[T]the question of vote dilution is 'peculiarly dependent upon the facts of each case,' and 'requires an 'intensely local appraisal' of the challenged district.'" *Thomas v. Bryant*, 919 F.3d 298, 308 (5th Cir. 2019) (internal citations to *Gingles* and *LULAC* omitted).

U.S. 419, 427 (1991).  "The court may consider, at the *remedial* stage, what type of remedy is possible .... But this difficulty should not impede the judge at the liability stage of the proceedings." *B Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) (quoting *Dickinson v. Ind. State Election Bd.,* 933 F.2d 497, 503 (7th Cir.1991)).

The second and third *Gingles* preconditions address the issue of racial polarization.  The second precondition requires Plaintiffs to allege sufficient facts to allow the inference that the black minority is politically cohesive. *Gingles*, 478 U.S. at 51.  Defendants argue that the amended complaint does nothing more than track the *Gingles* language with bare, conclusory allegations.  While the amended complaint does make some "threadbare recitals" and "conclusory statements" that the Court is not required to consider under *Twombly* and *Iqbal*, the Court finds that the remaining allegations in paragraphs 44 through 55 of the amended complaint sufficiently plead enough facts to make the claim of a politically cohesive minority plausible. Likewise, the third precondition—that the white majority votes sufficiently as a bloc to enable it to defeat the black voters preferred candidate, *Id.*—is sufficiently pleaded with the allegations in these same paragraphs (Doc. No. 9, ¶45-55).

The Court notes that at trial, proof of these allegations alone would be insufficient proof of racially polarized voting.[6]  But at this stage in the proceedings, drawing all inferences in favor of Plaintiffs as required by *Twombly*, there is a reasonable expectation that discovery will reveal evidence to support these claims. Defendants argue that because the amended complaint only makes allegations about elections where there was a white candidate and a black candidate— ignoring the fact that a white candidate can be minority voters' preferred candidate—"it is

---

[6] For example, the Supreme Court has held that "loss of political power through vote dilution is distinct from the mere inability to win a particular election," or, in Judge Griffin's case, even three elections by a single candidate.  *Gingles*, 478 U.S. at 57 (internal citation omitted).

impossible to conclude that minority voters 'have less opportunity than other members of the electorate . . . to elect representatives of their choice.'"  (Doc. 22, p. 13).  The Court does not disagree---but Plaintiffs' do not have to prove their ultimate burden at this stage in the litigation.  "[T]he factual allegations may be circumstantial and need only be enough to nudge the claim 'across the line from conceivable to plausible.'" *McDonough v. Anoka Cty.*, 799 F.3d 931, 945 (8th Cir. 2015) (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955) (other internal citation omitted).

## V.  Conclusion

For the reasons stated above, the Court finds as follows:

1.  The complaint against Defendants State of Arkansas, the Board of Election Commissioners, and the Board of Apportionment is barred by sovereign immunity; and the complaint against these defendants is dismissed with prejudice.

2.  Plaintiffs failed to allege sufficient facts to satisfy the first of the three *Gingles* preconditions.  The Court will allow Plaintiffs ten days from the date of this order for Plaintiffs to amend their complaint to cure this deficiency or the complaint will be dismissed without prejudice.

3.  The motion to stay discovery (Doc. No. 33) is denied as moot.

IT IS SO ORDERED this 21st day of February, 2020.

_____
James M. Moody Jr.
United States District Judge