IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

THE CHRISTIAN MINISTERIAL ALLIANCE , *et al.*,

PLAINTIFFS,

v.                                  Case No. 4:19-CV-00402-JM

ASA HUTCHINSON, in his official capacity as
Governor of the State of Arkansas, *et al.*

DEFENDANTS.

BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Table of Contents ............................................................................................................... i

Table of Authorities ........................................................................................................ iii

Introduction ...................................................................................................................... 1

Background ....................................................................................................................... 2

    A.  Arkansas's Appellate Courts ............................................................................... 2

    B.  Success of Black Voters' Preferred Candidates ................................................. 6

Summary-Judgment Standard ........................................................................................ 15

Argument ........................................................................................................................ 16

  I.  The Governor and Attorney General are entitled to summary judgment
     because they are not proper defendants. ............................................................. 16

  II.  Plaintiffs have failed as a matter of law to satisfy any of the *Gingles*
      preconditions. ...................................................................................................... 20

    A.  Plaintiffs have not satisfied the first *Gingles* precondition. ........................... 22

        1.  Plaintiffs have combined distinct communities of interest on the
           basis of race, which cannot prove group compactness under
           *Gingles*. .......................................................................................................22

        2.  Because Plaintiffs have not respected traditional redistricting
           principles, their proposed districts are not geographically compact
           under *Gingles*. ............................................................................................29

        3.  The Court should not consider Plaintiffs' untimely supplemental
           disclosure. ...................................................................................................33

    B.  Plaintiffs have not satisfied the second and third *Gingles*
      preconditions, because black voters do not vote cohesively in Arkansas
      appellate judicial elections, and because their preferred candidates
      usually win. ........................................................................................................ 34

        1.  The Court must consider and equally weigh all the judicial
           elections in evidence. ..................................................................................36

        2.  Considering all judicial elections, black voters do not vote
           cohesively. ...................................................................................................40

        3.  Considering all appellate judicial elections, black voters' preferred
           candidates are not usually defeated by white bloc voting.....................................45

        4.  Plaintiffs' evidence of cohesion and polarized voting is
           insufficient. .................................................................................................48

            i.  Plaintiffs' rationale for ignoring elections between white
               candidates is unpersuasive. ............................................................... 48

       ii.  Even if the Court only or primarily considered elections involving black candidates, Plaintiffs would still fail to prove racially polarized voting. ............................................................... 53

III. Were the Court to reach the totality of the circumstances, Defendants would still be entitled to judgment as a matter of law. ..................................... 60

   A.  In elections for the Arkansas Supreme Court and the Arkansas Court of Appeals, voting is not racially polarized.  (Factor 1) ............................................. 61

   B.  There is no evidence that white voters are unreceptive to black candidates for appellate judgeships.  (Factor 7)......................................................... 64

   C.  There have been no racial appeals in judicial elections.  (Factor 6) ........................... 65

   D.  The policies underlying the State's challenged practices are not tenuous.  (Factor 9) ..................................................................... 67

Conclusion ......................................................................................................... 72

**TABLE OF AUTHORITIES**

**Cases**

*Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*,
851 F.3d 507 (5th Cir. 2017) .................................................................................. 17

*Ala. Legislative Black Caucus v. Alabama*,
575 U.S. 254 (2015) ................................................................................................. 32

*Ala. State Conf. of NAACP v. Alabama,* — F. Supp. 3d —, No. 2:16-CV-731-WKW,
2020 WL 583803 (M.D. Ala. Feb. 5, 2020) ............................................ 23, 26, 27, 28, 33, 67

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................. 15

*Bartlett v. Strickland*,
556 U.S. 1 (2009) ................................................................................. 21, 22, 41, 42, 43, 44

*Bone Shirt v. Hazeltine*,
336 F. Supp. 2d 976 (D.S.D. 2004) ....................................................................... 41

*Bone Shirt v. Hazeltine*,
461 F.3d 1011 (8th Cir. 2006) ................................................................................ 60

*Calzone v. Hawley*,
866 F.3d 866 (8th Cir. 2017) .................................................................................. 16

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................ 15, 16

*Chisom v. Roemer*,
501 U.S. 380 (1991) ................................................................................................. 32

*Church v. Missouri*,
913 F.3d 736 (8th Cir. 2019) .................................................................................. 17

*Clay v. Bd. of Ed. of City of St. Louis*,
90 F.3d 1357 (8th Cir. 1996) ...................................................................... 38, 39, 49

*Cooper v. Harris*,
137 S. Ct. 1455 (2017) ........................................................................... 21, 29, 30, 32

*Cottier v. City of Martin*,
445 F.3d 1113 (8th Cir. 2006) ("*Cottier I*") ........................... 25, 26, 29, 30, 41, 45

*Cottier v. City of Martin*,
551 F.3d 733 (8th Cir. 2008) ("*Cottier II*") ........................................................ 71

*Cottier v. City of Martin*,
604 F.3d 553 (8th Cir. 2010) (en banc) ("*Cottier III*") .................................... *passim*

*Cousin v. Sundquist*,
145 F.3d 818 (6th Cir. 1998) ...................................................... 67, 68, 69, 70

*Davis v. Chiles*,
139 F.3d 1414 (11th Cir. 1998) .............................................................................. 67

iii

*Dig. Recognition Network, Inc. v. Hutchinson,*
   803 F.3d 952 (8th Cir. 2015) ........................................................ 16, 17, 18, 19, 20

*Ex parte Young,*
   209 U.S. 123 (1908) ................................................................................ 16, 17

*Fitts v. McGhee,*
   172 U.S. 516 (1899) ...................................................................................... 18

*Griffen v. Ark. Judicial Discipline & Disability Comm'n,*
   130 S.W.3d 524 (Ark. 2003) ......................................................................... 54

*Growe v. Emison,*
   507 U.S. 25 (1993) .................................................................................. 21, 40

*Harvell v. Blytheville Sch. Dist. No. 5,*
   71 F.3d 1382 (8th Cir. 1995) (en banc) ................................. 29, 38, 39, 49, 51, 52

*Johnson v. DeGrandy,*
   512 U.S. 997 (1994) .......................................................................... 21, 37, 52

*L.A. Cnty. Bar Ass'n v. Eu,*
   979 F.2d 697 (9th Cir. 1992) ........................................................................ 17

*Lewis v. Alamance Cnty.,*
   99 F.3d 600 (4th Cir. 1996) .......................................................................... 38

*Lopez v. Abbott,*
   339 F. Supp. 3d 589 (S.D. Tex. 2018) ........................................................... 67

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ..................................................................................... 20

*LULAC v. Clements,*
   999 F.2d 831 (5th Cir. 1993) (en banc) ......................................................... 67

*LULAC v. Perry,*
   548 U.S. 399 (2006) .................................................... 22, 23, 24, 26, 27, 29

*Marylanders for Fair Representation, Inc. v. Schaefer,*
   849 F. Supp. 1022 (D. Md. 1994) .................................................................. 42

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986) ..................................................................................... 15

*Miller v. Johnson,*
   515 U.S. 900 (1995) ..................................................................................... 29

*Milwaukee Branch of the NAACP v. Thompson,*
   116 F.3d 1194 (7th Cir. 1997) ................................................................. 67, 68

*Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.,*
   894 F.3d 924 (8th Cir. 2018) ................................................. 50, 53, 60, 61

*Nipper v. Smith,*
   39 F.3d 1494 (11th Cir. 1994) (en banc) ................................ 67, 68, 69, 70, 71

*Shaw v. Reno*,
    509 U.S. 630 (1993) ................................................................................. 69

*So. Christian Leadership Conference of Ala. v. Sessions*,
    56 F.3d 1281 (11th Cir. 1995) ................................................. 67, 69, 70

*Stabler v. Cnty. of Thurston*,
    129 F.3d 1015 (8th Cir. 1997) .................................................... 29, 30

*Texas Democratic Party v. Abbott*,
    961 F.3d 389 (5th Cir. 2020) ............................................................ 20

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ............................................................... *passim*

*Torgerson v. City of Rochester*,
    643 F.3d 1031 (8th Cir. 2011) (en banc) .......................................... 15

*United States v. Charleston Cnty.*,
    365 F.3d 341 (4th Cir. 2004) ............................................................ 66

*United States v. Vill. of Port Chester*,
    704 F. Supp. 2d 411 (S.D.N.Y. 2010) ............................................. 70

*Uno v. City of Holyoke*,
    72 F.3d 973 (1st Cir. 1995) ............................................................. 66

*Wells v. Edwards*,
    347 F. Supp. 453 (M.D. La. 1972) .................................................. 32

**Constitutions, Statutes, & Court Rules**

Ark. Const. art. VI (1836) ................................................................... 2, 3

Ark. Const. art. VII (1868) ....................................................................... 3

Ark. Const. art. VII (1874) ....................................................................... 3

Ark. Const. amend. 80 (2001) ................................................................ 3, 6

Ark. Const. art VI ................................................................................... 17

4 U.S.C. 101 ........................................................................................... 19

52 U.S.C. 10301 ................................................................... 20, 21, 36, 37

Act of Admission of the State of Arkansas, ch. 100, 5 Stat. 50 (June 15, 1836) ........................... 3

Act 208, 1979 Ark. Acts 467 (Feb. 23, 1979) ...................................... 3, 4

Act 1812, 2003 Ark. Acts 6955 (May 6, 2003) ......................................... 4

Ark. Code Ann. 16-12-201 ........................................................................ 4

Ark. Code Ann. 16-12-202 ........................................................................ 4

Ark. Code Ann. 7-4-101 ........................................................................... 18

Ark. Code Ann. 7-7-203 ............................................................................. 5

Ark. Code Ann. 7-10-102 ................................................................................................ 5

Fed. R. Civ. P. 56 ......................................................................................................... 15

**Other Authorities**

Allan J. Lichtman & J. Gerald Hebert, *A General Theory of Vote Dilution*, 6 La Raza L.J. 1
    (1993) ...................................................................................................................... 42

## INTRODUCTION

A year and a half ago, this Court wrote that if Plaintiffs only proved the allegations they made in their complaint, they would not be able to prevail at trial.  (Order, Doc. 36 at 14 ("MTD Order") ("The Court notes that at trial, proof of these allegations alone would be insufficient proof of racially polarized voting.").)  Specifically, the Court wrote it agreed with Defendants that if Plaintiffs only proved polarized voting in "elections where there was a white candidate and a black candidate—ignoring the fact that a white candidate can be minority voters' preferred candidate," it would be "impossible to conclude that minority voters have less opportunity than other members of the electorate to elect representatives of their choice."  (MTD Order at 14-15 (alterations omitted) (internal quotation marks omitted).)  And more specifically still, the Court wrote that evidence of defeat in "three elections involving a single candidate," namely "Judge Griffen[]," would not suffice.  (MTD Order at 14 n.6.)

A year-and-a-half later, after ample discovery, Plaintiffs have been able to muster nothing beyond the very allegations that the Court said would be insufficient proof at trial.  And contrary to this Court's prior instructions, Plaintiffs retained a political scientist who only analyzed "elections where there was a white candidate and a black candidate," just four in total between the Arkansas Supreme Court and Court of Appeals.  And that political scientist found no polarized voting in one of those elections, but still purported to find polarized voting based on "three elections involving a single candidate"—Judge Griffen.

The Court has already held that these facts do not, as a matter of law, prove a violation of Section 2 of the Voting Rights Act.  Yet on the basis of these facts, Plaintiffs would impose a districting scheme on the Arkansas Supreme Court for the first time in the State's history, and to racially gerrymander the Court of Appeals to create two narrowly majority-black districts.  Judge Griffen's defeats do not justify restructuring Arkansas's appellate courts.

More than that, nothing in the Voting Rights Act requires this Court to consider only elections featuring Judge Griffen or another minority candidate.  For the Act guarantees only the opportunity of minority voters "to elect representatives of *their choice*," not representatives of *their race*.  52 U.S.C. 10301(b) (emphasis added).  And the en banc Eighth Circuit has held that courts must consider the success of minority voters' candidates of choice in *all* elections, even elections between two non-minority candidates.  Considering all contested elections for appellate judgeships over the last 20 years (since these offices became nonpartisan), the candidates pre-ferred by black voters in Arkansas usually win.  In fact, the success of black voters' preferred candidates has only been increasing.  Today, of the six Arkansas Supreme Court Justices who won their positions in contested elections, five were black voters' candidates of choice.

The undisputed evidence proves that black voters in Arkansas do not "have less oppor-tunity than other members of the electorate to participate in the political process and to elect rep-resentatives of their choice."  52 U.S.C. 10301(b).  Plaintiffs' Section 2 claim thus fails as a mat-ter of law.  For these reasons, and others detailed below, the Court should grant Defendants' mo-tion for summary judgment.

**BACKGROUND**

### A.    Arkansas's Appellate Courts

In the first few decades of Arkansas's statehood, it tried a few different selection methods for Arkansas Supreme Court Justices.  But it soon settled on statewide, at-large elections.  That remains the rule today.  Thus, for nearly a century-and-a-half, Arkansans have elected all mem-bers of the Arkansas Supreme Court in statewide, at-large elections.

The Supreme Court was established in 1836, the year Arkansas attained statehood.  *See* Ark. Const. art. VI, sec. 2 (1836), *reprinted in* Ark. Code Ann. (2019 replacement); *see also* Act

2

of Admission of the State of Arkansas, ch. 100, 5 Stat. 50-52 (June 15, 1836).  As originally established, its justices were elected by both houses of the General Assembly.  Ark. Const. art. VI, sec. 7 (1836).  In 1868, after the Civil War, Arkansas adopted a new Constitution under which the Supreme Court's chief justice was appointed by the governor, while its associate justices were elected statewide.  Ark. Const. art. VII, sec. 3 (1868), *reprinted in* Ark. Code. Ann. (2019 replacement).  Finally, in 1874, Arkansas adopted statewide election for all Arkansas Supreme Court justices.  *See* Ark. Const. art. VII, sec. 6 (1874) (providing that "[t]he judges of the Supreme Court shall be elected by the qualified electors of the State"), *repealed*, Ark. Const. amend. 80, sec. 22(A) (2001).  One hundred and forty-seven years later, that remains the law today.  *See* Ark. Const. amend. 80, sec. 2(A) ("The Justices of the Supreme Court shall be selected from the State at large.").

By holding statewide elections for each member of the Arkansas Supreme Court, Arkansas fits squarely in the mainstream of American judicial elections.  Of the 22 States that elect their supreme courts, 18, including Arkansas, elect them statewide; only four opt for districting. (*See* Depo. of Dr. Peyton McCrary 49:5-51:2;[1] Am. Judicature Soc'y, *Judicial Selection in the States – Methods of Judicial Selection* (2021), Ex. 2 to Depo. of Dr. Peyton McCrary.[2])

The Arkansas Court of Appeals, an intermediate appellate court with statewide jurisdiction, was created in 1979.  *See* Act 208, sec. 1, 1979 Ark. Acts 467, 468 (Feb. 23, 1979).  Since its creation, judges of the Court of Appeals have been elected from districts.  *See id.*  The current districts were established in 2003.  *See* Act 1812, sec. 2, 2003 Ark. Acts 6955, 6956-57 (May 6,

---

[1] Excerpts from the McCrary Deposition are attached to Defendants' Motion for Summary Judgment as Exhibit A.

[2] This American Judicature Society article is attached to Defendants' Motion for Summary Judgment as Exhibit B.

2003).  Each district consists of a number of whole counties.  *See* Ark. Code Ann. 16-12-201; *cf.* Act 208, sec. 1, 1979 Ark. Acts at 468 (requiring establishment of 6 districts "using judicial district boundaries").  Five of the seven districts elect two judges to numbered positions.  *See* Ark. Code Ann. 16-12-202(1)-(3), (5)-(8), (10)-(12).  The other two of the seven districts elect one judge.  *See id.* 16-12-202(4), (9).

Of these seven districts, one of the two single-member districts, District 7, is majority-black.  District 7 was originally formed as a minority-influence district.  According to the 2000 Census, its population was 48.6% black, and its voting-age population was 44.4% black.  (Revised Decl. of William S. Cooper at 15, Figure 5, Ex. 4 to Depo. of William S. Cooper ("Revised Cooper Decl.");[3] *see* Depo. of William S. Cooper at 95:12-96:2 (introducing exhibit).[4])  Because of the General Assembly's plan for a gradual transition into the Court of Appeals districts adopted in 2003, the first election was not held in District 7 until 2008.  *See* Act 1812, sec. 3(9), 2003 Ark. Acts at 6958.  By the 2010 Census, two years after that first election, District 7's citizen voting-age population was 49.2% black.  (Revised Cooper Decl. at 16, Figure 6.)  Today, according to Plaintiffs' demographer, its citizen voting-age population is 50.9% black.  (*Id.* at 17, Figure 7.)  Since its inception, District 7 has elected just one judge, Judge Waymond Brown, and he is black.  (*See* Decl. of Peyton McCrary ¶ 52, Ex. 17 to Depo. of Dr. Peyton McCrary ("McCrary Decl.");[5] *see also* McCrary Depo. at 14:8-16:14 (introducing exhibit).)  *See also* Ark. Sup. Ct. Hist. Soc'y, *Justices, Judges and Officers of the Courts (Continued)*, https://www.arcourts.gov/courts/supreme-court/historical-society/background-pg-3.

---

[3] The Revised Cooper Declaration is attached to Defendants' Motion for Summary Judgment as Exhibit C.

[4] Excerpts from the Cooper Deposition are attached to Defendants' Motion for Summary Judgment as Exhibit D.

[5] The McCrary Declaration is attached to Defendants' Motion for Summary Judgment as Exhibit E.

Beside the populations from which Arkansas's appellate courts are elected, there are two features of Arkansas judicial elections that have an important bearing on this case. First, candidates cannot win judgeships in Arkansas unless they receive a majority of the votes. Ark. Code Ann. 7-10-102(c)(1). Accordingly, Arkansas holds two types of judicial elections: general elections, and if necessary, runoffs. General elections for nonpartisan offices, such as judgeships, are held on the same date as primary elections for partisan elections, which are called the "preferential primary elections" in the Arkansas election code. *See id.* 7-10-102(b)(1); *see also id.* 7-7-203(b) (setting this date in March during presidential elections, and in May during midterm elections). Nonpartisan runoff elections, by contrast, take place "on the same date and at the same times and places as the November general election." *Id.* 7-10-102(c)(2).

Whether a judicial runoff occurs in a given election year depends, of course, on the outcome of the general election. If any judicial candidate receives a majority of the votes during the general election (in May or March, depending on the election cycle), that candidate wins the election for the judicial office outright. *See id.* 7-10-102(c)(1). There will be no runoff for that office in November. But if—as often occurs in elections where more than two candidates run for the same position—no candidate receives a majority of the votes, the two candidates who received the greatest shares of votes are certified to a runoff election, which takes place on the same date as the November general election for partisan offices. *Id.* 7-10-102(c)(2). As explained in detail below, *see infra* pp. 45-48, the consequence of this majority-vote requirement has not been, as Plaintiffs will argue, to submerge minority preferences below an unsurmountable 50% threshold. Rather, by narrowing the field, it has enhanced black voters' ability to coalesce around a single judicial candidate, who frequently wins the runoff election.

Second, since 2001, Arkansas's judicial elections have been nonpartisan.  *See* Ark. Const. amend. 80, secs. 17(A), 18(A).  Nonpartisanship has had a profound effect on judicial voting behavior.  Absent this reform, Arkansas's judicial elections, like elections for other offices, might be polarized along party lines.  But with partisanship removed from the equation, Republicans and Democrats—and black voters and white voters—have frequently come together to support the same candidates, and black voters have elected judicial candidates of their choice at rates far in excess of their share of the population.  (*See* Expert Report of John R. Alford, Ph.D. ("Alford Report"), ¶ 36, Ex. 101 to Depo. of John Alford ("[P]articularly when the focus is on the best evidence in this case, the ten Supreme Court contests in the last ten years, the preferred candidate of Black voters is usually successful (the winner, or one of the candidates that advances in the case that a runoff is required).");[6] Depo. of John Alford at 10:4-25.[7])

## B.    Success of Black Voters' Preferred Candidates

In 2010, according to Plaintiffs' demographer, 16.07% of Arkansans were "Any Part Black," a demographic that includes voters who identify as only "some part Black, including Hispanic Black."  (Decl. of William S. Cooper ("Cooper Decl.") App'x 3 at 1, Ex. 2 to Depo. of William S. Cooper;[8] *see* Cooper Depo. at 15:25-18:7 (introducing exhibit).)  By 2019, he says that number had risen slightly to 16.60%, or almost exactly one out of six.  (Cooper Decl., App'x 3 at 1.)  There are many ways to measure the rates at which black voters' preferred candidates succeed in Arkansas's judicial elections.  But by any measure they are extremely successful, having won a majority of contested elections for appellate judgeships over the last 20 years.

---

[6] The Alford Report is attached to Defendants' Motion for Summary Judgment as Exhibit F.

[7] Excerpts from the Alford Deposition are attached to Defendants' Motion for Summary Judgment as Exhibit G.

[8] The Cooper Declaration is attached to Defendants' Motion for Summary Judgment as Exhibit H.

Before diving into the statistics, a word should be said about where they come from. Election returns, of course, do not tabulate votes by voters' race, nor even reveal how many voters of each race voted.  But election results do show how voters voted in particular places—precincts; or, as precinct-level data becomes unavailable in older elections, counties—and the Census establishes the demographics of those places.  By matching precinct- or county-level returns to the demographics of those precincts and counties, political scientists can use a statistical technique called "ecological inference," often shortened to "EI," to estimate the percentages of white and black voters that voted for particular candidates.  (*See* Alford Report ¶¶ 7-12 (explaining how EI works).)  Both Plaintiffs and Defendants retained political scientists who used the EI technique to estimate white and black voters' preferences in elections for the Arkansas Supreme Court and Court of Appeals.

The two political scientists used the same basic methodology.  But they did not analyze the same elections.  Plaintiffs' political scientist, Dr. Baodong Liu, analyzed just four judicial elections, the most recent of which took place over a decade ago, in 2010, and three of which involved Judge Wendell Griffen.  (Expert Report of Baodong Liu, Ph.D., Ex. 1 to Depo. of Baodong Liu ("Liu Report"), at 10-11;[9] *see* Depo. of Baodong Liu at 14:6-13 (introducing exhibit).[10])  Defendants' political scientist, Dr. John Alford, analyzed 30.  (*See* Alford Report at 15, 19 (Table 1 & Table 2).)  For the four judicial elections Dr. Liu analyzed, he reached very similar results to Dr. Alford.  (*Compare* Liu Report at 10-11, *with* Alford Report at 15, 19 (Table 1 & Table 2); *see* Liu Depo. at 96:2-20 (acknowledging that Dr. Alford's "results are just like my re-

---

[9] The Liu Report is attached to Defendants' Motion for Summary Judgment as Exhibit I.

[10] Excerpts from the Liu Deposition, are attached to Defendants' Motion for Summary Judgment as Exhibit J.

sults," and that "the bottom line is his results are very similar to mine").)  For the other 26 judicial elections that Dr. Alford analyzed, Dr. Liu did not criticize Dr. Alford's results.  (*See, e.g.*, Liu Depo. 104:21-106:12, 114:4-115:1 (stating that he disagreed with Dr. Alford's choice to analyze all contested elections over the last 20 years, instead of just four elections, but offering no criticism of Dr. Alford's conclusions).)

These differences in the elections each political scientist analyzed led to differences in the quality of their analyses.  Dr. Alford's analysis offers a comprehensive picture over the last 20 years of the success of black voters' preferred candidates across all appellate judicial elections in Arkansas.  Dr. Liu's analysis, by contrast, presents only a dated snapshot—how one candidate, Judge Griffen, performed over the span of a few elections more than a decade ago.

Beginning with the Arkansas Supreme Court, Dr. Alford analyzed *every* contested Arkansas Supreme Court election since Arkansas judicial elections became nonpartisan—15 races in all, going back to 2004.  (Alford Report ¶ 28.)  Of these 15 races, 12 were two-way races, whether general elections with only two candidates, or runoff elections.  (*Id.*)  The other three elections featured three candidates, none of whom won a majority.  In these three-way races, success was advancing to the runoff.  (*See id.* ¶ 30.)  The following table, **Table 1**, details Dr. Alford's results (and is a reproduction of a table from his report):

## Table 1: Contested Supreme Court Elections

| Year | | Contest | Candidate | Estimated Black Vote | 95% Confidence Interval | Estimated non-Black Vote | 95% Confidence Interval | Overall Vote Share | Black Preference Prevails |
|---|---|---|---|---|---|---|---|---|---|
| 2020 Primary | | S. Court | Webb | 62% | (59-65%) | 53% | (52-53%) | 54% | Yes |
| | | Place 4 | Welch | 38% | (35-41%) | 47% | (47-48%) | 46% | |
| | | | | | | | | | |
| 2018 Primary | | S. Court | Goodson | 40% | (38-43%) | 37% | (36-37%) | 37% | Yes |
| | | Place 3 | Hixson | 30% | (28-33%) | 28% | (28-29%) | 29% | |
| | | | Stirling | 29% | (27-32%) | 35% | (35-35%) | 34% | |
| | | | | | | | | | |
| 2018 Primary | Runoff | S. Court Place 3 | Goodson | 60% | (58-63%) | 55% | (55-55%) | 56% | Yes |
| | | | Sterling | 40% | (37-42%) | 45% | (45-45%) | 44% | |
| | | | | | | | | | |
| 2016 Primary | | S. Court | Good | 58% | (36-77%) | 41% | (38-44%) | 42% | No |
| | | Place 1 | Kemp | 42% | (23-64%) | 59% | (56-62%) | 58% | |
| | | | | | | | | | |
| | | S. Court | Womack | 57% | (40-75%) | 69% | (66-73%) | 68% | Yes |
| | | Place 5 | Mason | 43% | (25-60%) | 31% | (27-34%) | 33% | |
| | | | | | | | | | |
| 2014 Primary | | S. Court | Wynne | 64% | (45-81%) | 50% | (46-54%) | 52% | Yes |
| | | Place 2 | Cullen | 36% | (19-55%) | 50% | (46-54%) | 48% | |
| | | | | | | | | | |
| 2012 Primary | | S. Court | Abramson | 52% | (32-75%) | 31% | (27-35%) | 35% | No |
| | | Place 4 | Hart | 48% | (25-68%) | 69% | (65-73%) | 65% | |
| | | | | | | | | | |
| 2010 Primary | | S. Court | Henry | 47% | (29-65%) | 60% | (55-63%) | 58% | No |
| | | Place 3 | Fogleman | 53% | (35-71%) | 40% | (37-45%) | 42% | |
| | | | | | | | | | |
| | | S. Court | **Moorehead** | 30% | (16-42%) | 12% | (10-15%) | 15% | Yes |
| | | Place 6 | Baker/Fox | 70% | | 88% | | 85% | |
| | | | Baker | 34% | (19-47%) | 51% | (49-55%) | 48% | |
| | | | Fox | 36% | (22-52%) | 37% | (34-40%) | 37% | |
| | | | | | | | | | |
| 2010 Primary | Runoff | S. Court Place 6 | Baker | 67% | (47-84%) | 59% | (56-62%) | 60% | Yes |
| | | | Fox | 33% | (16-53%) | 41% | (38-44%) | 40% | |
| | | | | | | | | | |
| 2006 Primary | | S. Court | Corbin | 62% | (42-81%) | 63% | (59-67%) | 0.63 | Yes |
| | | Place 2 | Harrod | 38% | (19-58%) | 37% | (33-41%) | 0.37 | |
| | | | | | | | | | |
| | | S. Court | **Griffen** | 67% | (52-81%) | 38% | (34-41%) | 0.43 | No |
| | | Place 5 | Danielson | 33% | (19-48%) | 62% | (59-66%) | 0.57 | |
| | | | | | | | | | |
| 2004 Primary | | S. Court | **Griffen** | 58% | (39-77%) | 33% | (29-37%) | 37% | No |
| | | Place 1 | Hannah | 42% | (23-61%) | 67% | (63-71%) | 63% | |
| | | | | | | | | | |
| | | S. Court | Gunter | 43% | (27-62%) | 37% | (33-41%) | 38% | Yes |
| | | Place 4 | Kilgore | 40% | (18-56%) | 29% | (24-34%) | 31% | |
| | | | Daniel | 17% | (8-28%) | 34% | (31-38%) | 31% | |
| | | | | | | | | | |
| 2004 Primary | Runoff | S. Court Place 4 | Gunter | 55% | (30-76%) | 57% | (55-60%) | 0.57 | Yes |
| | | | Kilgore | 45% | (24-70%) | 43% | (40-45%) | 0.43 | |

(Alford Report at 15.)  (Note: Where a name appears in **bold**, this candidate is black.)

9

Across the contested supreme-court races over the last 20 years, all of which are reported in **Table 1**, black voters' preferred candidates were successful a majority of the time, a pattern that has become more pronounced in recent years.  To start, consider the 12 two-way races.  In 7 of the 12, or 58%, the candidate who received a majority of black voters' support won the election.  This success rate, already high, has only improved in more recent elections.  In races prior to 2010, black voters' preferred candidates had a 50% success rate (2 out of 4).  Since 2010, however, their preferred candidates have won 62% (5 out of 8) of the races.  And in the 5 races since 2014, black voters' preferred candidates have won 4, for an 80% success rate.  Black voters in Arkansas have had increasing success in recent years at electing their preferred supreme-court candidates in two-way races.

Their preferred candidates have been even more successful in three-way races.  There have been three races for the Arkansas Supreme Court since 2001 that included three candidates, and in each of these races the candidate who received the greatest support from black voters advanced to the runoff.  *See supra* **Table 1**.  Black voters' second choices have also been successful.  In two of the races (the 2010 race for Place 6, and the 2004 race for Place 4), black voters had a clear second-choice candidate.  In each race, black voters supported two different candidates at essentially the same level (Justice Baker and Judge Fox, in 2010, and former Justice Gunter and former Judge Kilgore, in 2004), with only about 2–3% difference in black voters' support for each candidate.  That margin is so close that there is a decent chance the second-choice candidate was, in fact, black voters' preferred candidate.  In these two races, the second choice also advanced to the nonpartisan runoff election.  Put differently, in these two three-way

races for the Arkansas Supreme Court, black voters' least favorite candidates were defeated, and their first and second choices advanced to the nonpartisan runoff election.[11]

Not only have black voters' preferred candidates in three-way races been successful in advancing to runoffs, they have also ultimately been successful in winning those runoffs.  In two of the three elections (the 2018 race for Place 3, and the 2004 race for Place 4), black voters' preferred candidate in the nonpartisan general election (Justice Hudson in 2018, and former Justice Gunter in 2004) remained their preferred candidate in the nonpartisan runoff, and that candidate won the seat.  In the third election (the 2010 race for Place 6), black voters' close second choice in the general election, now-Justice Baker, became their overwhelmingly preferred candidate in the runoff.  Presumably, this resulted from supporters of the third candidate, who had been eliminated in the nonpartisan general election and did not advance to the runoff, transferred their support to Justice Baker instead of her opponent.  And Justice Baker prevailed in the runoff.

Converting the data reported in **Table 1** to a few bullet points helps to summarize the success of black voters' preferred candidates for the Arkansas Supreme Court:

- Over the last 20 years, combining two-way races (which, by definition, pick a winner) and three-way races (which have historically picked participants in a runoff, rather than an outright winner), black voters' first choices were successful 10 out of 15 times, or 67%.

- Adding close second-choice candidates to the mix, black voters' preferred candidates were successful 12 out of 17 times, or 71%.

- Since 2010, black voters' first choices have been successful in 7 out of 10 races, or 70%.

- Including close second-choice candidates, black voters' preferred candidates have been successful in 8 out of 11 races, or 73%.

---

[11] The third three-way race since 2001 is different, but only because black voters' most-preferred candidate (Justice Hudson) received 10% more support from black voters than black voters' second- and third-choice candidates, who were statistically tied.

- And since 2014, black voters' preferred candidates have been successful in 5 out of 6 races, or 83%.

The result is a state supreme court dominated by candidates preferred by black voters.  Of the court's seven justices, five were black voters' strongly preferred candidates, winning majorities of black voters' support between an estimated 57% and 67%: Justices Baker, Hudson, Webb, Womack, and Wynne.  A sixth, Justice Wood, ran unopposed.[12]  Only one of the court's members, Chief Justice Kemp, defeated a candidate preferred by black voters.

Moving to the Arkansas Court of Appeals, black voters' preferred candidates have still usually prevailed, although at slightly lower rates than for the Arkansas Supreme Court.  Again, Dr. Alford analyzed every contested Arkansas Court of Appeals election since Arkansas judicial elections became nonpartisan—fifteen elections, dating back to 2008.  (Alford Report ¶ 32 (introducing Dr. Alford's Table 2).)  Thirteen of these were two-way elections, whether general elections with only two candidates or runoffs.  Two elections featured three candidates, none of whom won a majority; in those races, success was advancing to the runoff.  (*See id.* ¶ 30 (discussing what success means in a three-way election, where no candidate obtains a majority).)  The following table, **Table 2**, details Dr. Alford's analysis:

---

[12] *See* Alford Report ¶ 28 (noting that Dr. Alford included all contested elections over the last 20 years for the Arkansas Supreme Court); *id.* at 15 (Table 1) (excluding Justice Wood's 2016 election from consideration).

Table 2:  Court of Appeals Elections

| Year | | Contest | Candidate | Estimated Black Vote | 95% Confidence Interval | Estimated non-Black Vote | 95% Confidence Interval | Overall Vote Share | Black Preference Prevails |
|---|---|---|---|---|---|---|---|---|---|
| 2020 | Primary | C. of Appeals | Klappenbach | 54% | (46-63%) | 70% | (68-72%) | 67% | Yes |
| | | Dist 5 | McMenis | 46% | (37-54%) | 30% | (28-32%) | 33% | |
| | | | | | | | | | |
| | | C. of Appeals | Barrett | 63% | (52-72%) | 57% | (56-57%) | 57% | Yes |
| | | Dist 4 P2 | White | 37% | (28-48%) | 43% | (43-44%) | 43% | |
| | | | | | | | | | |
| 2018 | Primary | C. of Appeals | Virden | 72% | (59-81%) | 52% | (52-53%) | 53% | Yes |
| | | Dist 2 P1 | Copeland | 28% | (19-41%) | 48% | (47-48%) | 47% | |
| | | | | | | | | | |
| 2016 | Primary | C. of Appeals | Hiland | 55% | (16-90%) | 43% | (38-47%) | 44% | No |
| | | Dist 2 P 2 | Murphy | 45% | (10-84%) | 57% | (53-62%) | 56% | |
| | | | | | | | | | |
| | | C. of Appeals | Robertson | 57% | (26-86%) | 44% | (36-50%) | 46% | No |
| | | Dist 1 P 2 | Whiteaker | 43% | (14-74%) | 56% | (50-64%) | 54% | |
| | | | | | | | | | |
| | | C. of Appeals | McMenis | 41% | (18-61%) | 43% | (26-58%) | 42% | Yes |
| | | Dist 5 | Klappenbach | 38% | (16-59%) | 40% | (24-56%) | 39% | |
| | | | Serebrov | 21% | (8-36%) | 18% | (8-30%) | 19% | |
| | | | | | | | | | |
| | Primary | C. of Appeals | Klappenbach | 52% | (18-82%) | 60% | (40-79%) | 57% | Yes |
| | Runoff | Dist 5 | McMenis | 48% | (18-82%) | 40% | (21-60%) | 43% | |
| | | | | | | | | | |
| 2012 | Primary | C. of Appeals | Robertson | 36% | (14-57%) | 31% | (22-41%) | 32% | Yes |
| | | Dist 1 P2 | Lusby | 35% | (15-56%) | 27% | (15-36%) | 29% | |
| | | | Whiteaker | 29% | (13-47%) | 43% | (35-52%) | 38% | |
| | | | | | | | | | |
| | | C. of Appeals | Wood | 69% | (37-91%) | 61% | (55-66%) | 63% | Yes |
| | | Dist 2 P2 | Cash | 31% | (9-63%) | 39% | (34-45%) | 37% | |
| | | | | | | | | | |
| | | C. of Appeals | Cung | 51% | (10-90%) | 48% | (44-53%) | 48% | No |
| | | Dist 3 P2 | Hixon | 49% | (10-90%) | 52% | (47-56%) | 52% | |
| | | | | | | | | | |
| | | C. of Appeals | Looney | 51% | (21-84%) | 46% | (33-58%) | 47% | No |
| | | Dist 4 P1 | Harrison | 49% | (16-79%) | 54% | (42-67%) | 53% | |
| | | | | | | | | | |
| | Primary | C. of Appeals | Robertson | 57% | (26-86%) | 44% | (36-50%) | 46% | No |
| | Runoff | Dist 1 P2 | Whiteaker | 43% | (14-74%) | 56% | (50-64%) | 54% | |
| | | | | | | | | | |
| 2008 | Primary | C. of Appeals | Williams | 54% | (11-90%) | 32% | (30-35%) | 33% | No |
| | | Dist 3 P2 | Henry | 46% | (10-89%) | 68% | (65-70%) | 67% | |
| | | | | | | | | | |
| | | C. of Appeals | Brown | 53% | (19-84%) | 59% | (21-90%) | 57% | Yes |
| | | Dist 7 | Hunt | 47% | (16-81%) | 41% | (10-79%) | 43% | |
| | | | | | | | | | |
| | | C. of Appeals | **Griffen** | 87% | (81-92%) | 22% | (17-27%) | 40% | No |
| | | Dist 6 P1 | Gruber | 13% | (8-19%) | 78% | (73-83%) | 60% | |

(Alford Report at 19.)  (Note: Where a name appears in **bold**, this candidate is black.)

13

Across these races, depending on how one analyzes the data, **Table 2** shows that black voters' preferred candidates were successful nearly a majority to a majority of the time, a pattern that has become more pronounced in recent years.  Beginning with the 13 two-way races, in 6 out of 13, or 46%, the candidate who received a majority of the support of black voters won the election.  What began as a 33% success rate (1 out of 3) in the races before 2010 rose to a 50% success rate (5 out of 10) in the races from 2010 to today.  And since 2014, black voters' preferred candidates have won 4 out of 6 contests, or 67%.  Just like with the Arkansas Supreme Court, then, black voters' preferred candidates in two-way races for the Arkansas Court of Appeals have enjoyed substantial success—success that has been improving in recent years.

Black voters' preferred candidates have also been successful in three-way races.  There have been two three-way races for the Arkansas Court of Appeals since 2001 (in 2016 for District 5, and in 2012 for District 1, Place 2).  *See supra* **Table 2**.  In both these races, the candidate who received the greatest support from black voters (McMenis in 2016, and Robertson in 2012) advanced to the runoff.  Also in both races, black voters had a clear second-choice candidate (Judge Klappenbach in 2016, and Lusby in 2012).  And in one out of two, the second-choice candidate advanced to the runoff (Judge Klappenbach in 2016).  In the two ensuing runoffs, black voters' preferred candidates went one for two, with Judge Klappenbach prevailing in 2016.

Again, a few bullet points help to summarize the data in **Table 2**, regarding the success of black voters' preferred candidates for the Arkansas Court of Appeals:

- Over the last 20 years, combining contested two- and three-way races, black voters' first choices were successful 8 out of 15 times, or 53%.

- Including second-choice candidates, black voters' preferred candidates were successful 9 out of 17 times, or 53%.

- Since 2010, black voters' first choices have been successful in 7 out of 12 races, or 58%.

14

- Including second-choice candidates since 2010, black voters' preferred candidates have been successful in 8 out of 14 races, or 57%.

- Since 2014, black voters' first-choice candidates have been successful in 5 out of 7 races, or 71%.

- And including second-choice candidates, black voters' preferred candidates have been successful in 6 out of 8 races, or 75%.

Since judicial elections became nonpartisan in Arkansas, black voters' preferred candidates for the Arkansas Court of Appeals have won over half of the contested elections. In the most probative elections, *i.e.*, the most recent ones (*see* Alford Report ¶ 48), that success rate has been greater than two-thirds of contested elections—by some metrics even approaching three-quarters of those elections.

Combined with the 83% success rate for black voters' preferred candidates for the Arkansas Supreme Court since 2014, the data for the Arkansas Court of Appeals makes clear that voting in Arkansas's elections for appellate judgeships is not racially polarized.

### SUMMARY-JUDGMENT STANDARD

This Court should grant summary judgment to Defendants, because the evidence demonstrates that there is no genuine dispute as to any material fact, and that Defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Defendants have carried their initial burden as the movant of demonstrating the absence of a genuine factual dispute for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Plaintiffs must therefore come forward with specific facts that establish a genuine dispute of material fact, which they cannot do. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Plaintiffs have failed to create any genuine dispute of material fact, because the evidence shows that no reasonable factfinder could rule for them. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Plaintiffs' failure to present evidence

sufficient to create a triable issue on multiple essential elements of their claim—elements on

which they bear the burden of proof at trial—entitles Defendants to judgment as a matter of law.

*Celotex Corp.*, 477 U.S. at 322-23.

ARGUMENT

**I.     The Governor and Attorney General are entitled to summary judgment because they are not proper defendants.**

Plaintiffs seek injunctive relief against three defendants, the Governor of Arkansas, the

Arkansas Attorney General, and the Arkansas Secretary of State.  They do so under the excep-

tion to sovereign immunity announced in *Ex parte Young*, 209 U.S. 123, 155-56 (1908), which

allows citizens of a State to sue officials of that State if they allege an ongoing violation of fed-

eral law and seek prospective relief.  The Governor and the Attorney General, however, do not

fall under this exception, because they have no connection to the policies and practices Plaintiffs

challenge.  For similar reasons, Plaintiffs lack standing to bring this lawsuit against the Governor

or the Attorney General.

*A.*     Under the *Ex parte Young* exception, a "state official is amenable to suit to enjoin

the enforcement of an unconstitutional state statute only if the officer has 'some connection with

the enforcement of the act.'"  *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 960

(8th Cir. 2015) (quoting *Ex parte Young*, 209 U.S. at 157); *see also Calzone v. Hawley*, 866 F.3d

866, 869 (8th Cir. 2017) (requiring "some connection to the enforcement of the challenged

laws").  "Without that connection, the officer would be sued merely 'as a representative of the

state' in an impermissible attempt 'to make the state a party.'"  *Dig. Recognition Network*, 803

F.3d at 960 (quoting *Ex parte Young*, 209 U.S. at 157).

First, Plaintiffs do not allege that the Governor has any concrete role in enforcing the

state constitutional provisions and statutes they challenge.  They only allege two things about the

16

Governor.  (1) They note that under the Arkansas Constitution, he has ultimate law-enforcement authority, including to enforce the Constitution itself.  (Second Am. Compl., Doc. 37 ¶ 12.) (2) They note that he has the power to sign laws that would change the Arkansas Court of Appeals' electoral system.  (*Id.*)  Neither of these allegations suffices to make out the requisite connection between Governor Hutchinson and the policies Plaintiffs challenge.

As to the Governor's general-enforcement authority under the Arkansas Constitution, it is well-settled that a "governor's general-enforcement authority is not 'some connection' to enforcement" of a particular law, unless "that authority gives the governor *methods* of enforcement" for that law.  *Church v. Missouri*, 913 F.3d 736, 749 (8th Cir. 2019).  Plaintiffs cite no method the Governor has to enforce the laws they challenge; they cite only the Governor's enforcement authority itself.  But neither "a broad duty to uphold state law," nor "general supervisory power over the persons responsible for enforcing the challenged provision will . . . subject an official to suit."  *Id.* (quotation marks omitted) (quoting first, *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 517 (5th Cir. 2017), and second, *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)).  Indeed, the Eighth Circuit has specifically held that "the executive authority of the [Arkansas] governor" under the Arkansas Constitution is not the sort of connection to challenged state law or policy that *Ex parte Young* requires.  *Dig. Recognition Network*, 803 F.3d at 960 (citing Ark. Const. art VI, secs. 2, 7).  The Governor's general-enforcement authority does not make him a proper defendant to this lawsuit.

As for the Governor's power to simply sign a new law modifying Arkansas's existing districts for the Arkansas Court of Appeals, that does not support Plaintiffs' claims against the Governor either.  Understandably, Plaintiffs do not seek an injunction against the Governor to sign some as-yet unwritten and unenacted law, and if the Governor's signing authority sufficed,

then "the constitutionality of every act passed by the legislature could be tested by a suit against the governor." *Cf. Dig. Recognition Network*, 803 F.3d at 961 (quoting *Fitts v. McGhee*, 172 U.S. 516, 530 (1899)).  Not only has the Eighth Circuit rejected, as a general matter, such a broad approach to suing governors, but it has *specifically held* that the Governor of Arkansas was not a proper defendant in a suit challenging an Arkansas law because he lacked enforcement authority under that statute.  *Id.* at 960-62.  If signing authority were sufficient to make the Governor a proper *Ex parte Young* defendant, *Digital Recognition Network* would have come out the other way.

Second, the Attorney General is also immune from Plaintiffs' claims.  Plaintiffs allege only three things about the Attorney General: that she has general law-enforcement authority; that she is required to support the U.S. Constitution, including the Fourteenth and Fifteenth Amendments, which the Voting Rights Act implements; and that she has a statutory obligation to provide "legal assistance to the State Board of Election Commissioners [by] answering questions regarding election laws."  (Second Am. Compl. ¶ 14 (quoting Ark. Code Ann. 7-4-101(g)).) None of these powers and obligations allow Plaintiffs to sue the Attorney General.

As explained above, general law-enforcement authority does not make an official a proper *Ex parte Young* defendant.  Indeed, in *Digital Recognition Network*, the Eighth Circuit also held the Arkansas Attorney General was not a proper defendant in a challenge to an Arkansas statute, because the Attorney General lacked authority to enforce it.  *Dig. Recognition Network*, 803 F.3d at 962.  Plaintiffs do not allege that the Attorney General plays any role in the implementation of Arkansas's at-large system for electing the Arkansas Supreme Court, or of the Arkansas Court of Appeals' districts.  Just like the Governor, the Attorney General's general-enforcement authority does not make her a proper *Ex parte Young* defendant.

18

The Attorney General's oath to support the Constitution provides even less basis for an *Ex parte Young* lawsuit against her.  (*See* Am. Compl. ¶ 14 (citing 4 U.S.C. 101).)  As an initial matter, Plaintiffs are incorrect to suggest that the Constitution and the Voting Rights Act are synonymous.  *Cf. Thornburg v. Gingles*, 478 U.S. 30, 35 (1986) (explaining important differences between constitutional and VRA analyses).  In any event, even a broader oath to follow other federal laws like the VRA would only mean the Attorney General must exercise her own state-law duties in accordance with federal law.  It would not confer powers on her that she otherwise lacks.  And Plaintiffs cite nothing empowering her to enforce the laws they challenge.

Finally, the Attorney General's duty to answer the State Board of Election Commissioners' questions about election law does not make her a proper defendant.  This question, too, was answered in *Digital Recognition Network*.  There the Eighth Circuit held that "[t]he Arkansas attorney general's authority to advise state officials on the constitutionality of [a state statute], by itself, does not suffice to establish 'some connection with the enforcement' of [that state statute]."  803 F.3d at 962.  Likewise, the Attorney General's power to advise the State Board of Election Commissioners that some state law conflicts with the Voting Rights Act does not entail a power to enforce that same law.  Nor does it have anything to do with the relief Plaintiffs seek.  For Plaintiffs do not seek an injunction against the Attorney General to make her advise the Board that the current methods of electing the Arkansas Supreme Court and the Arkansas Court of Appeals violate the Voting Rights Act.  They do not seek such an injunction, because such advice from the Attorney General would be ineffective to alter those methods.

Like the Governor, the Attorney General lacks any connection to enforcing Arkansas law governing the election of appellate judges.  Therefore, neither official is a proper defendant under *Ex parte Young*.

**B.**      Similarly, Plaintiffs lack standing to bring this lawsuit against both the Governor and the Attorney General. *See Dig. Recognition Network*, 803 F.3d at 957 ("In a case like this one, the questions of Article III jurisdiction and Eleventh Amendment immunity are related."); *see also Texas Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020) ("[T]here is 'significant overlap' between [the] standing and *Young* analyses."). Because the Governor and the Attorney General lacked a connection with enforcement of the law in *Digital Recognition Network*, the Eighth Circuit held there was no "'causal connection' between the injury and the defendant[s'] conduct." 803 F.3d at 957 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The same is true here. Neither the Governor nor the Attorney General has any role in enforcing the laws that Plaintiffs challenge. So just as in *Digital Recognition Network*, "the injury of which [Plaintiffs] complain[] is not 'fairly traceable' to either official." *Id.* "For the same reasons, it is not likely that [Plaintiffs'] injury would be 'redressed by a favorable decision.'" *Id.* at 958 (quoting *Lujan*, 504 U.S. at 561). Because the Governor and the Attorney General "do not enforce" any of the relevant laws, a judgment against them "would not meet the requirement of redressability." *Id.* at 959.

Whether treated as a failure to satisfy *Ex parte Young* or Article III's standing requirements, the undisputed facts demonstrate that Plaintiffs have failed to prove that the Governor and the Attorney General have a sufficient connection with enforcement of the laws they challenge. As a result, they are not proper defendants and are entitled to judgment as a matter of law.

**II.      Plaintiffs have failed as a matter of law to satisfy any of the *Gingles* preconditions.**

Plaintiffs claim that Arkansas's at-large system for electing supreme court justices, and its configuration of districts for electing court of appeals judges, violates Section 2 of the Voting Rights Act. That provision prohibits voting practices that "result[] in a denial or abridgment of the right . . . to vote on account of race or color." 52 U.S.C. 10301(a). Under Section 2, such a

denial or abridgment "is established if" the members "of a class of citizens . . . have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* 10301(b).

To decide whether that standard is met, the Supreme Court has established three "necessary preconditions" for proving that an electoral structure "operate[s] to impair minority voters' ability to elect representatives of their choice." *Gingles*, 478 U.S. at 50.  These preconditions do not, "standing alone, . . . prove dilution." *Johnson v. DeGrandy*, 512 U.S. 997, 1012 (1994).  But they are "necessary preconditions for a claim that the use of multimember districts constitute[s] actionable vote dilution under § 2." *Bartlett v. Strickland*, 556 U.S. 1, 11 (2009) (plurality op.).  Indeed, "unless *each* of the three *Gingles* prerequisites is established, 'there neither has been a wrong nor can be a remedy.'" *Cooper v. Harris*, 137 S. Ct. 1455, 1472 (2017) (quoting *Growe v. Emison*, 507 U.S. 25, 41 (1993)).  Thus, failure to prove any one of the preconditions is fatal.

The undisputed material facts here prove that Plaintiffs have, as a matter of law, failed to establish any of the three, necessary *Gingles* preconditions.  Regarding the first precondition, Plaintiffs have not proved that black voters in Arkansas are a "sufficiently large and geographically compact" minority group "to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50.  Regarding the second and third preconditions, which look to the same underlying facts, Plaintiffs have not proved that black voters in Arkansas are "politically cohesive" when voting for nonpartisan judicial candidates, nor "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* at 51.  Just the opposite is true.  Black voters' preferred judicial candidates usually prevail.

Because Plaintiffs have failed to prove any of the *Gingles* preconditions, their claim must fail, and this Court should grant Defendants' motion for summary judgment.

A.      **Plaintiffs have not satisfied the first *Gingles* precondition.**

The first *Gingles* precondition, again, requires Plaintiffs to show that black voters in Arkansas are a group that "is sufficiently large and geographically compact to constitute a majority in a single-member district." 478 U.S. at 50.  And "majority," the Supreme Court later clarified, means a majority of the district's voting-age population, not its population overall.  *Bartlett*, 556 U.S. at 12, 25 (plurality op.).  As to the Arkansas Supreme Court, Plaintiffs only need show that Arkansas's black population is large and compact enough to constitute a majority in one district. But as to the Court of Appeals, where there is already a majority-black, single-member district and Plaintiffs seek a second, Plaintiffs must show it is possible to draw two majority-black single-single-member districts.

Plaintiffs have not carried their burden if they have shown only that it is mathematically and geographically possible to draw a contiguous district where a minority group makes up a majority of the voting-age population.  Rather, they must also show that the district is "reasonably compact."  *See LULAC v. Perry*, 548 U.S. 399, 430 (2006) ("[T]here is no § 2 right to a district that is not reasonably compact.").  The reasonable-compactness inquiry takes at least two forms:  (1) the *minority population* within the proposed district must be reasonably compact; and, (2) the *geography* of the district itself must be reasonably compact.  Plaintiffs' proposed districts fail both forms of the compactness inquiry.  Because of these failures, the Court should grant Defendants' motion for summary judgment.

1.      **Plaintiffs have combined distinct communities of interest on the basis of race, which cannot prove group compactness under *Gingles*.**

At one level, the "first *Gingles* condition refers to the compactness of the *minority population*, not to the compactness of the contested district."  *LULAC*, 548 U.S. at 433 (quotation

marks omitted) (emphasis added).  The minority population in a proposed district is not reasona-bly compact—and the district thus does not satisfy *Gingles*'s first precondition—where that dis-trict "combines two farflung segments of a racial group with disparate interests."  *Id.*  In *LULAC*, for example, the Court considered a Texas district that combined "the Latino community near the Mexican border and the one in and around Austin."  *Id.* at 434.  It highlighted "the different char-acteristics, needs, and interests" of these two communities—differences that "should not be dis-regarded in the interest of race."  *Id.*  Based on these differences, *LULAC* held that this proposed district was not reasonably compact.  *Id.* at 435.

Plaintiffs' proposed majority-minority districts for the Arkansas Supreme Court and the Arkansas Court of Appeals suffer from similar flaws that cause them to fail, as a matter of law, the group compactness aspect of *Gingles*'s first precondition.  Their proposals come from de-mographer William Cooper.  Mr. Cooper's proposals would combine different communities of black voters in Arkansas (voters in Central Arkansas with voters in the Delta) on the primary ba-sis of their race, without regard to whether these communities actually share any "characteristics, needs, and interests."  *LULAC*, 548 U.S. at 434.

In a similar case about Alabama's appellate courts, Mr. Cooper's proposed maps suffered from this same flaw.  *See Ala. State Conf. of NAACP v. Alabama,* — F. Supp. 3d —, No. 2:16-CV-731-WKW, 2020 WL 583803, at *24 (M.D. Ala. Feb. 5, 2020) (faulting Mr. Cooper for "not discuss[ing] the regional, cultural, social, economic, or political ties, if any, among the African-American communities" that he had combined).  The district court in Alabama concluded that Mr. Cooper's proposed districts were not "sufficiently compact."  *Id.* at *25.  The undisputed facts in this case prove, as a matter of law, that this Court should reach the same conclusion.

*i.*    Mr. Cooper has proposed two illustrative majority-black Supreme Court districts. (Revised Cooper Decl. at 30, 32 (Figure 15 & Figure 17).)  They only differ in that one contains Mississippi County and the other does not.  Both are "anchored in the Delta and Little Rock," the State's two leading areas of black population.  (*Id.* ¶ 65.)  But besides both including many black residents, these two parts of the State have little in common.  Mr. Cooper could not explain his justification for combining the communities in these two disparate regions of Arkansas.  In fact, when asked what black voters in Little Rock had in common with those in the Delta, Mr. Cooper could come up with nothing other than the fact they live in Arkansas:

> Q:  What do the voters in Little Rock that you've included in District 7 have in common with the voters in Dallas, Chicot or Crittenden Counties?
>
> A:  Well, the[y']re Arkansans and they live in the South and they are familiar even in Pulaski County with the Delta and its traditions and vice versa.  Most people who live in the Delta realize that Little Rock is the capital and probably visit it, have family there because it's a big county, populous county.  So there are bound to be multiple avenues of communication between people who live along the Mississippi River and the traditional Delta with people who live in Jefferson and Pulaski Counties.  There's just nothing unusual or absurd about dividing up the state of Arkansas in the way I have, but certainly there would be many other options, many other configurations that one could conjure up.  This is just an illustrative plan, demonstrative plan, not intended to be a remedial plan.

(*See* Cooper Depo. at 90:17-91:9.)  Because Mr. Cooper has "fail[ed] to account for the differences between people of the same race," the minority population in his proposed districts is not reasonably compact.  *LULAC*, 548 U.S. at 434.

While Little Rock is Arkansas's urban capital city, the Delta is one of "[t]he three Rural regions of Arkansas."  University of Arkansas System Division of Agriculture, *Rural Profile of Arkansas* 7 (2021).[13]  (*See* Cooper Depo. at 71:8-16, 87:24-88:3.)  Although he was tentative in his answer, Mr. Cooper agreed that there would not be "much in the way of agriculture within

---

[13] https://www.uaex.edu/publications/pdf/MP564.pdf.

the city of Little Rock." (*Id.* at 88:7-8.)  Yet he conceded that the Delta counties on which his

proposed districts relied were just the opposite of Little Rock.  For instance, he agreed that Dal-

las, Crittenden, and Chicot Counties were all predominantly rural, instead of urban or suburban

like Little Rock.  (*See id.* at 88:13-15 (Chicot); *id.* at 89:7-9 (Crittenden); *id.* at 89:25-90:2 (Dal-

las).)  And regarding the role of agriculture in the Delta, he agreed for example that agriculture

"would have to be" of "greater" significance to black voters in Crittenden County than in Little

Rock and Pulaski County.  (*Id.* at 89:15-21.)  Regarding the role of agriculture in other Delta

counties, he was more equivocal, but he nonetheless agreed that they likely relied more heavily

on agriculture than Central Arkansas.  (*See id.* at 88:20-23 (speaking of Chicot County: "I don't

know that for a fact, though, but it seems rational and reasonable to assume it does."); *id.* at 90:3-

16 (admitting that joining Dallas County with Little Rock would require "joining some urbanized

areas with rural areas").)  When asked about "the role of agriculture" in the Delta counties, he

summed it up:  "I don't know what else people would necessarily do in some of these Missis-

sippi River counties other than light industry or agriculture."  (*Id.* at 89:18-21.)

Despite these concessions about the differences between Central Arkansas and the Delta,

Mr. Cooper never justified his choice to combine voters in these regions.  As an initial matter, his

equivocation about the culture and economy of the counties in his proposed majority-minority

districts is evidence that "race [wa]s the predominant factor motivating the placement of a signif-

icant number of voters within or without a particular district." *Cottier v. City of Martin*, 445

F.3d 1113, 1117 (8th Cir. 2006) ("*Cottier I*"), *overruled on other grounds*, *Cottier v. City of*

*Martin*, 604 F.3d 553 (8th Cir. 2010) (en banc) ("*Cottier III*").  Plaintiffs retained Mr. Cooper to

attempt to satisfy *Gingles*'s first precondition.  (Revised Cooper Decl. ¶ 9.)  To satisfy that pre-

condition, "[l]egitimate yet differing communities of interest should not be disregarded in the interest of race." *LULAC*, 548 U.S. at 434. Yet Mr. Cooper was unable to give definitive answers to even basic questions about whether black voters in urban/suburban Pulaski County had the same "characteristics, needs, and interests" as black voters in the Delta. *Id.* Indeed, this is a pattern in Mr. Cooper's opinions in Section 2 cases. Part of the reason that the court in *Alabama State Conference of the NAACP* rejected his proposed plans was that he "did not discuss the regional, cultural, social, economic, or political ties, if any, among the African-American communities in" the disparate regions he had combined to form a proposed district. 2020 WL 583803, at *24.

In addition to Mr. Cooper's unfamiliarity with the communities in his proposed districts, his deposition answers left no doubt that "race [wa]s the predominant factor" in his thinking. *Cottier I*, 445 F.3d at 1117, *overruled on other grounds*, *Cottier III*, 604 F.3d 553. He was asked what the black voters in Little Rock that he included in his proposed Supreme Court districts "have in common with the voters in Dallas, Chicot, or Crittenden Counties." (Cooper Depo. at 90:17-19.) He answered: "Well, the[y're] Arkansans and they live in the South and they are familiar even in Pulaski County with the Delta and its traditions and vice versa." (*Id.* at 90:20-22.) In other words, when asked about what black voters in Little Rock and the Delta have in common, Mr. Cooper could think of nothing but their home State.

Mr. Cooper's answer continued but it did not become any more specific. He said that "[m]ost people who live in the Delta realize that Little Rock is the capital and probably visit it, have family there because it's a big county, populous county." (*Id.* at 90:22-25.) And because Little Rock is the capital, "there are bound to be multiple avenues of communication between

people who live along the Mississippi River and the traditional Delta with people who live in Jefferson and Pulaski Counties." (*Id.* at 90:25-91:4.)  Evidence that black voters in the Delta know that Little Rock is the capital of Arkansas is no reason to presume that these voters comprise a "shared community of interest." *Ala. State Conf. of NAACP*, 2020 WL 583803, at \*24.

Finally, Mr. Cooper admitted that there was no way to draw a majority-black district for the Arkansas Supreme Court without combining these disparate communities.  He suggested that "there would be many other options, many other configurations that one conjure up." (Cooper Depo. at 91:6-8.)  But he conceded that it is almost certainly impossible to draw one majority-black district out of seven without connecting Little Rock and Pine Bluff to the Delta, and he acknowledged that "no matter what kind of plan you draw for the Supreme Court, you're probably going to be joining some urbanized areas with rural areas." (*Id.* at 90:5-16.)  As in the Alabama case, this "explanation reveals that maintaining communities of interest, if considered at all, was subordinated to the necessity of creating an African-American, voting-age population in [his proposed districts] with a 50% plus one voting-age population." *Ala. State Conf. of NAACP*, 2020 WL 583303, at \*24.

In sum, Plaintiffs can only draw a single-member majority-black district for the Arkansas Supreme Court by connecting two geographically disparate black communities, one urbanized, the other rural, whose "only common index is race." *LULAC*, 548 U.S. at 435.  This noncompact population does not become reasonably compact simply because Little Rock residents and Delta residents all "live in the South," and are "familiar" with other parts of Arkansas. (Cooper Depo. at 90:20-91:9.)  Nor does it suffice that "people who live in the Delta realize that Little Rock is the capital." (*Id.* at 90:23-24.)  These same facts would have been true in *LULAC*, "of the Latino community near the Mexican border and the one in and around Austin," the capital of Texas.

548 U.S. at 434.  Just like the district in *LULAC* that connected "disparate communities" on the basis of race, *id.*, Plaintiffs' proposed districts for the Arkansas Supreme Court do not contain a reasonably compact minority population, and thus do not satisfy *Gingles*'s first precondition.

  ***ii.***  Plaintiffs' proposed districts for the Arkansas Court of Appeals suffer from the same infirmity.  Both illustrative plans, in order to form two majority-black districts, propose a district that connects Pine Bluff to the Delta, District 7.  (Revised Cooper Decl. 20, 25 (Figure 8 & Figure 12).)  Meanwhile, in the second illustrative plan, a second majority-black district, District 8, connects a piece of Pulaski County to a series of rural counties—Calhoun, Cleveland, Dallas, Ouachita—via a narrow "land bridge" through Jefferson County.  (*Id.* at 25 (Figure 12); Cooper Depo. at 71:22-72:5 (acknowledging these counties are rural).)  Because Mr. Cooper's proposed districts rely on this land bridge, they again resemble the flawed districts that Mr. Cooper proposed in the Alabama case about judicial elections.  *See Ala. State Conf. of NAACP*, 2020 WL 583803, at *21-22 (describing how Mr. Cooper proposed a majority-minority district with an "appendage" through one county).

  Regarding District 7, Mr. Cooper's acknowledged purpose for including a portion of Jefferson County is that "if you don't include Jefferson County in District 7, then there's not enough population to create a majority Black District 7, so Jefferson County will have to be split in order to create two majority Black districts."  (Cooper Depo. at 52:8-15.)  Here too, the only thing that connects geographically and socially disparate groups of black voters is race.  And yet again, this flaw echoes Mr. Cooper's proposals in the Alabama case.  *See Ala. State Conf. of NAACP*, 2020 WL 583803, at *22 ("[W]ithout splitting Jefferson County[, Alabama,] to take in its African-American population, Mr. Cooper is unable to configure a district in the AC Plans with an African-American, voting-age population that exceeds 50%.").

Because Mr. Cooper's plans require combining disparate communities of black voters solely on the basis of their race, District 7 in both illustrative plans and District 8 in his second illustrative plan do not include reasonably compact minority populations.  *See LULAC*, 548 U.S. at 432-35.

2.    **Because Plaintiffs have not respected traditional redistricting principles, their proposed districts are not geographically compact under** *Gingles*.

In addition to the compactness of the minority group in a proposed district, Section 2's compactness inquiry also looks at the geography of a district.  "[N]o precise rule has emerged governing § 2 compactness" in this geographical sense.  *LULAC*, 548 U.S. at 433.  But the Supreme Court requires consideration of "traditional districting principles."  *Id.* (quoting *Abrams v. Johnson*, 521 U.S. 74, 92 (1997)).  Those principles include "maintaining communities of interest and traditional boundaries."  *Id.* (quoting *Abrams*, 521 U.S. at 92).  And the Eighth Circuit has made clear that a proposed district is not geographically compact if it is a racial gerrymander, *i.e.*, if "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district."  *Miller v. Johnson*, 515 U.S. 900, 916 (1995); *see Stabler v. Cnty. of Thurston*, 129 F.3d 1015, 1025 (8th Cir. 1997); *see also Cooper*, 137 S. Ct. at 1469 (reaffirming that drawing district borders to "tak[e] in tens of thousands of additional African-American voters" in order to hit a racial target is racial gerrymandering).  "Any remedy drawn in order to correct a § 2 violation should 'steer clear of the type of racial gerrymandering proscribed in *Miller*.'"  *Stabler*, 129 F.3d at 1025 (quoting *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1391 (8th Cir. 1995) (en banc)).

Therefore, in the Eighth Circuit, "if race is the predominant factor motivating the placement of a significant number of voters within or without a particular district," that proposed district is an impermissible racial gerrymander.  *Cottier I*, 445 F.3d at 1117, *overruled on other*

*grounds*, *Cottier III*, 604 F.3d 553.  Such a district would not be geographically compact or a

permissible Section 2 remedy, and thus could not satisfy *Gingles*'s first precondition.  *See Stabler*, 129 F.3d at 1025 (rejecting proposed remedial districts because "race was the predominant

factor in drawing [them]").

Plaintiffs' proposed district boundaries are not compact.  Beginning with their proposed

districts for the Arkansas Supreme Court, both proposed plans split Pulaski County along a jag-

ged line northwest to southeast, with the southeastern half of Pulaski County placed in Plaintiffs'

proposed District 7, their illustrative remedial district.  (Revised Cooper Decl. at 30, 32 (Figure

15 & Figure 17).)  The stated purpose of splitting Pulaski County in this fashion is that "in order

to have a majority Black Supreme Court district, you must include the Black population in Little

Rock as well as adjacent areas in the south and central part of Pulaski County," while leaving

white voters in the county out.  (Cooper Depo. at 85:10-13.)  Accordingly, Plaintiffs admit that

race was the predominant (indeed, sole) factor motivating their choice to place a substantial

number of voters within—and another substantial number of voters without—their proposed dis-

tricts.  *See Cottier I*, 445 F.3d at 1117, *overruled on other grounds*, *Cottier III*, 604 F.3d 553.

Making matters worse, race not only motivated which Pulaski County voters were placed in pro-

posed District 7; it did so in a way that violated traditional districting criteria, namely avoiding

splitting counties.  *See Cooper*, 137 S. Ct. at 1469 n.3 (describing district that "*did* conflict with

traditional redistricting principles—for example, by splitting numerous counties and precincts").

Turning to Plaintiffs' proposed Court of Appeals districts, both include a proposed Dis-

trict 8 that would be majority-minority but that splits Pulaski County—again along northwest-to-

southeast lines—while splitting Jefferson County in such a way as to include Pine Bluff within

proposed majority-black District 7 and leaving essentially the rest of the county out.  (Revised

Cooper Decl. 20, 22, 24, 25 (Figure 8, Figure 10, Figure 11, & Figure 12).)  One of the two pro-

posals for District 7, meanwhile, also splits Mississippi County.  (*Id.* ¶ 56.)

The purpose for these county splits was the race of the voters within these counties.  (*See,*

*e.g.*, Cooper Depo. at 51:9-53:12, 54:13-55:24, 58:5-12.)  As to Pulaski County, Mr. Cooper ex-

plained his motives as follows: "most of the population that lives in the North Central, West

Central, and Western part of Pulaski County are white and most of the population in the areas

around Little Rock and further South and East is Black, so the county is divided in that fashion."

(*Id.* at 51:12-20.)  The purpose of including a chunk of Jefferson County, while excluding the

rest, in District 7 is likewise racial:  "if you don't include Jefferson County in District 7, then

there's not enough population to create a majority Black District 7, so Jefferson County will have

to be split in order to create two majority Black districts."  (*Id.* at 52:11-15.)  Mr. Cooper even

added that he was "fairly certain that Jefferson County had to be split" to achieve that end.  (*Id.*

at 52:21-23.)  And the purpose of splitting Mississippi County in the second proposed District 7,

too, was "[p]rimarily to ensure that District 7 is majority black of the voting age population," by

dividing Mississippi County between its "majority black" precincts, and "areas that are over-

whelmingly white."  (*Id.* at 54:13-55:1.)

Both of Plaintiffs' proposed remedial districts, then, in both plans, place a large number

of voters within and without their boundaries solely because of those voters' race.  In both plans,

District 7 includes Pine Bluff but excludes the rest of Jefferson County for the sake of the dis-

trict's racial composition; and District 8 includes Little Rock and other black neighborhoods in

Pulaski County, while excluding less black neighborhoods for the sake of the district's racial

composition.  And in one of the plans, District 7 splits Mississippi County in order to encompass

the county's black voters and exclude its white voters.  These choices are confessed racial gerry-

manders that flout traditional districting principles.  *See Cooper*, 137 S. Ct. at 1469 n.3.  Plain-

tiffs' proposed remedial districts are thus unacceptable for satisfying *Gingles*'s first precondition.

Mr. Cooper attempted to neutralize the predominance of race in his method for drawing

proposed districts by pointing to the need to equalize population among the districts.  (*See, e.g.*,

Cooper Depo. at 58:25-59:9; *see also* Revised Cooper Decl. ¶ 15 (claiming Plaintiffs' proposed

districts "adhere to one-person one-vote").)  There are two problems with that defense.  The first

is that even when equalizing population is actually necessary, the Supreme Court has instructed

courts to set it aside when deciding if race was the predominant motive for placing voters in a

particular district.  It "is a background rule against which redistricting takes place," "not a factor

to be treated like other nonracial factors when a court determines whether race predominated

over other, 'traditional' factors in the drawing of district boundaries."  *Ala. Legislative Black

Caucus v. Alabama*, 575 U.S. 254, 273 (2015).  As Mr. Cooper acknowledged, there are likely

"many other configurations that one could conjure up" to equalize the population between dis-

tricts.  (Cooper Depo. at 91:6-7.)  Because he chose to equalize his proposed districts on the basis

of race, race is still the predominant factor in his methodology.

The second problem with Mr. Cooper's defense of his race-based districts is that, in judi-

cial districting, equalizing population between districts is not required.  *See Chisom v. Roemer*,

501 U.S. 380, 389 (1991) ("'[T]he concept of one-man, one-vote apportionment does not apply

to the judicial branch of the government.'" (quoting *Wells v. Edwards*, 347 F. Supp. 453, 454

(M.D. La. 1972), *summarily aff'd*, 409 U.S. 1095 (1973))).  And Arkansas has never made any

attempt to perfectly equalize its Court of Appeals districts.  (*See* Revised Cooper Decl. 10, 15

(Figure 2 & Figure 5) (claiming that, when Arkansas's two Court of Appeals district maps were

drawn, they contained population deviations of 12 to 17%).)  Thus, in seeking to equalize district population, Plaintiffs have unnecessarily pursued a districting criterion that Arkansas has never chosen for itself, at the cost of traditional districting criteria that Arkansas has pursued, like avoiding county splits and drawing districts that connect similar communities.  As the court said in the Alabama case, "Mr. Cooper's adherence to the principle of one-person, one-vote, without explanation for doing so, is problematic."  *Ala. State Conf. of NAACP*, 2020 WL 583803, at *24.

This Court should come to the same conclusion as the Alabama court:  Mr. Cooper's proposed districts do not carry Plaintiffs' burden on *Gingles*'s first precondition.  *Id.* at *21 ("Plaintiffs have not proven that [Mr. Cooper's proposed districts] . . . ha[ve] an African-American population that is geographically compact.").

### 3.      The Court should not consider Plaintiffs' untimely supplemental disclosure.

Because the undisputed facts demonstrate, as a matter of law, that Plaintiffs have failed to satisfy *Gingles*'s first precondition, they will likely point to an additional, untimely disclosure by Mr. Cooper in an attempt to defeat summary judgment.  The Court should not permit this.

On February 23, 2021, this Court issued a revised scheduling order that ended discovery on August 23 and set September 16 as the dispositive-motion deadline.  (Am. Final Scheduling Order, Doc. 54 ¶¶ 2-3.)  A couple weeks later, the parties agreed to stipulate to additional deadlines for disclosing expert witnesses: May 25 for case-in-chief experts and July 9 for rebuttal experts.  (Stipulation, Doc. 55 at 1.)  Despite these clear deadlines, on Thursday, September 9, Plaintiffs' counsel first informed Defendants' counsel that they intended to serve a supplemental report by Mr. Cooper.  They did not serve that report until Monday, September 13, which was 21 days after the close of discovery—not to mention *just three days* prior to the dispositive-motion deadline.

Defendants object to this supplemental report as untimely.  It purports to update Mr. Cooper's analysis with data from the 2020 Census.  Allowing Plaintiffs to defeat Defendants' motion for summary judgment on the basis of Mr. Cooper's supplemental analysis would unfairly prejudice Defendants.  Given the timing of Plaintiffs' disclosure of Mr. Cooper's new analysis, Defendants have not had time to prepare summary-judgment arguments based on it, let alone time to coordinate with Defendants' own expert demographer, Dr. Peter Morrison, to determine whether additional rebuttal evidence is necessary.  As a result of this prejudice, Defendants respectfully request that the Court exclude Mr. Cooper's supplemental report from the summary-judgment record.

**B.**      **Plaintiffs have not satisfied the second and third *Gingles* preconditions, because black voters do not vote cohesively in Arkansas appellate judicial elections, and because their preferred candidates usually win.**

Both the second and third *Gingles* factors look to the same underlying evidence: estimates of how black and white voters voted in the relevant elections, here for appellate judgeships.  A crucial question in this case is which of those elections to consider.  Defendants' political scientist, Dr. Alford, analyzed every contested election for the offices in question for the last 20 years, when Arkansas's judicial elections first became nonpartisan—30 contests in all.  In those 30 elections, Dr. Alford found that 18 out of 30 of black voters' top choices were successful, and that black voters gave about 56% of their support, on average, to their top choices.

In contrast to Dr. Alford's data-rich analysis, Plaintiffs' political scientist, Dr. Liu, analyzed only four contests—all of which occurred between 2004 and 2010, and 3 of which involved the same candidate, Judge Wendell Griffen.  By considering "only four contests, all of which are over ten years old, and three of which feature the same minority candidate," Dr. Liu has "little" to "say with confidence about current voting patterns in the judicial elections at issue here."  (Alford Report ¶ 24.)

Which elections to consider doesn't decide this case, because even if the only elections that were relevant were the ones Dr. Liu analyzed, Plaintiffs would still fail, as a matter of law, to prove racially polarized voting.  (*See id.* ("Dr. Liu's analysis of endogenous elections provides little information directly relevant to the analysis of racially polarized voting in Arkansas judicial elections today.").)  Judge Griffen's electoral failures cannot prove the second and third *Gingles* preconditions.  (*See* MTD Order at 14 n.6 ("[T]he Supreme Court has held that 'loss of political power through vote dilution is distinct from the mere inability to win a particular election,' or, in Judge Griffen's case, even three elections by a single candidate." (quoting *Gingles*, 478 U.S. at 57)).)  But placing Judge Griffen's unsuccessful candidacies in the context of other appellate judicial elections makes the flaws in Plaintiffs' case more apparent.  Unlike Judge Griffen, other minority-preferred candidates have seen considerable success, as Dr. Alford's in-depth analysis demonstrates.

Because the undisputed facts show that Plaintiffs have failed to satisfy *Gingles*'s second and third preconditions, Defendants are entitled to judgment as a matter of law.  This brief will now detail the steps leading to this conclusion, in the following order:  (1) It will explain why the Court should consider all the appellate judicial elections in evidence, and not limit itself to Dr. Liu's four handpicked elections.  With all the relevant elections under consideration, this brief will then show (2) that black voters do not vote cohesively in Arkansas appellate judicial elections, and (3) that black voters' preferred candidates are not usually defeated by white bloc voting.  (4) Finally, this brief will explain why Plaintiffs' approach to these issues cannot defeat Defendants' motion for summary judgment.

1.     **The Court must consider and equally weigh all the judicial elections in evidence.**

The text of the Voting Rights Act, the Supreme Court's decision in *Gingles*, and subsequent Eighth Circuit precedent applying that decision all dictate that this Court must consider all the judicial elections in evidence, not just the four in which black candidates ran, the only four elections considered by Dr. Liu.  (*See* Alford Report ¶ 24.)  His analysis "ignor[es] the fact that a white candidate can be minority voters' preferred candidate."  (MTD Order at 14.)  Because Dr. Liu's analysis contravenes the VRA itself and binding precedent interpreting it, this Court should grant summary judgment for Defendants.

Section 2 prohibits electoral practices that cause a protected class's members to "have less opportunity than other members of the electorate . . . to elect representatives of their choice." 52 U.S.C. 10301(b).  Under any ordinary understanding of that language, a court can only decide if that is true by considering a representative sample of elections.  In a case like this one, where there are only four elections between black and white candidates out of 30 total contested appellate judicial elections, considering only those four elections is incomplete evidence of whether black voters have less opportunity than white voters to elect "representatives of their choice."  A representative sample here requires considering more elections for appellate judgeships than the four considered by Dr. Liu.  (*See* Alford Report ¶¶ 26-27.)

Making matters clearer still, Section 2 expressly provides that "[t]he extent to which members of a protected class have been elected to office in the State or political subdivision" is not the *sine qua non* of a Section 2 case, but just "one circumstance which may be considered." 52 U.S.C. 10301(b).  It then provides that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."  *Id.*

These provisions are inconsistent with a rule limiting courts to considering only elections involving minority candidates.  Section 2 guarantees a protected class a right to have at least the opportunity to elect representatives of choice in proportion to the class's share of the population.  *See De Grandy*, 512 U.S. at 1012-16 (holding that drawing a number of majority-minority districts in proportion to a minority's share of the population, though not an absolute safe harbor, will typically satisfy Section 2).  If minorities' opportunity to elect representatives of choice were judged only from elections involving minority candidates, then courts would generally find a violation of Section 2 as long as minorities could not elect a proportionate share of minority candidates, which Section 2 does not allow.  *See* 52 U.S.C. 10301(b).

Turning from the statute, *Gingles* asks two questions about voting, neither of which can be meaningfully answered by limiting the analysis to a handful of elections involving minority candidates.  First, it asks "the minority group . . . to show that it is politically cohesive." *Gingles*, 478 U.S. at 51.  A court cannot decide whether that is true—and a minority group cannot prove that it is—only by looking at elections involving minority candidates.  No one would say, for example, that standing alone, black voters' strong support for President Obama in the 2008 presidential primary shows that black voters are politically cohesive in presidential primaries.  Rather, it merely shows cohesive support for President Obama.  To know whether black voters are politically cohesive in presidential primaries, one would need to evaluate more primaries.  Likewise, black voters may have supported for Judge Griffen with a fair degree of cohesion in 2004, 2006, and 2008, but that is no evidence that black voters are politically cohesive in elections for appellate judgeships; it merely demonstrates that over a decade ago, black voters cohesively supported Judge Griffen.

*Gingles*'s other question about voting is similarly impossible to answer with evidence de-
rived only from elections involving minority candidates.  It requires the minority to "demonstrate
that the white majority votes sufficiently as a bloc to enable it . . . *usually* to defeat the minority's
preferred candidate." *Gingles*, 478 U.S. at 51 (emphasis added).  This Court cannot decide
whether the minority's preferred candidate is "usually" defeated if it ignores—as Plaintiffs ask
this Court to do—almost 90% of the relevant elections, knowing that in over half of these elec-
tions the minority-preferred candidate *actually won*.  Using such a limited sample of elections to
draw conclusions about what "usually" happens is akin to reporting on what Little Rock's sum-
mer weather is "usually" like based only on the weather from September 10 through September
21.  As the Fourth Circuit has put it, "[b]y focusing exclusively on elections in which a minority
candidate appeared on the ballot, it can only be determined whether the 'minority candidate' is
usually defeated, not, as required by Section 2, whether the 'minority-preferred candidate' is usu-
ally defeated." *Lewis v. Alamance Cnty.*, 99 F.3d 600, 608-09 (4th Cir. 1996).

If Section 2 and *Gingles* were not clear enough on the point, the Eighth Circuit has
squarely held that courts must review *all* elections (not just those between minority and nonmi-
nority candidates) to decide whether minority cohesion and racially polarized voting exist.  Three
propositions that court has adopted, building on each other, require this Court to review and
equally weigh all elections.

First, in *Harvell v. Blytheville School District, No. 5*, 71 F.3d 1382 (8th Cir. 1995) (en
banc), the Eighth Circuit "specifically rejected the presumption . . . that only African-American
candidates can be preferred by African-American voters." *Clay v. Bd. of Ed. of City of St. Louis*,
90 F.3d 1357, 1361 (8th Cir. 1996) (citing *Harvell*, 71 F.3d at 1386).  "Such stereotyping," it
held, "runs afoul of the principles embodied in the Equal Protection Clause." *Harvell*, 71 F.3d at

1386.  Rather, "[t]he preferences of the minority voters must be established on an election-spe-

cific basis, viewing all the relevant circumstances."  *Id.*

Second, in *Clay*, the Eighth Circuit clarified that the "definition of minority preferred

candidate" is simply "the candidates receiving the highest number of African-American votes."

*Clay*, 90 F.3d at 1361-62.  (*Compare* Alford Depo. 101:23-102:3 ("The minority-preferred can-

didate is the candidate that gets the most votes from the minority."), *with* Liu Report at 5 (argu-

ing that black voters cannot have a "candidate of their choice" in "elections involving only white

candidates").)  "Absent a showing that minority preferred candidates are, for some reason, ex-

cluded from the ballot," the Eighth Circuit directed courts to presume that all elections feature

*some* minority-preferred candidate and that that candidate is the one who receives the highest

number of minority votes.  *Clay*, 90 F.3d at 1362.  Likewise, in *Harvell*, the Eighth Circuit re-

jected an argument that a series of candidates who had received minority support were not mi-

nority-preferred candidates.  Saying it "cannot accept" the proposition that "the black voters of

Blytheville have gone five consecutive years . . . without stating a preference," the en banc court

wrote that a minority-preferred candidate "should generally be one able to receive [minority]

votes, not some idealized figure whose absence from the ballot keeps a disappointed electorate at

home."  *Harvell*, 71 F.3d at 1387.

Third, if courts cannot presume that minority voters never prefer white candidates, but

instead must presume that in each election minority voters state a preference and that their pre-

ferred candidate is simply whomever receives the highest share of minority votes, it logically fol-

lows that courts must review all elections, whether minority candidates run or not.  And indeed,

sitting en banc, the Eighth Circuit has held just that.

In *Cottier III* the en banc Eighth Circuit considered a challenge by Native Americans, in a city with a significant Native American population, to the way their city council was drawn. They offered compelling evidence that in elections where Native American candidates ran, Native Americans' preferred candidates were regularly defeated; in those elections, minority-preferred candidates lost six out of seven times. *See* 604 F.3d at 560. But that was not the whole story. In 28 elections with "white-only candidates," Native Americans' preferred candidates won 16 times. *Id.* Rather than exclude these races, or even place less weight on them, the Eighth Circuit simply added the two types of races up. Having done so, it observed that "taken as a whole" they "show[ed] almost equal numbers of victories for Indian-preferred candidates and non-Indian-preferred candidates," and concluded that those results did not support "a finding that a white majority in [the city] votes sufficiently as a bloc usually to defeat the Indian-preferred candidate." *Id.*

The law, then, in this Circuit is clear: Courts must consider all the relevant elections and not limit themselves to elections involving minority candidates. In this case, therefore, this Court must consider and give equal weight to all elections, not just the handful involving black candidates.

### 2. Considering all judicial elections, black voters do not vote cohesively.

The second *Gingles* precondition requires minority voters to vote cohesively. Absent cohesive voting, "it cannot be said" that a jurisdiction's electoral structure "thwarts distinctive minority group interests." *Gingles*, 478 U.S. at 51. And unless a minority votes cohesively, it cannot "establish that the minority has the potential to elect a representative of its own choice in some single-member district"—at least, not without substantial support for its preferred candidates from white voters. *Growe v. Emison*, 507 U.S. 25, 40 (1993). A minority whose prefer-

ences are not cohesive enough to elect candidates without substantial white support has no Section 2 claim. *See Bartlett*, 556 U.S. at 14-15 (plurality op.). Here, black voters' preferences in appellate judicial elections are not cohesive enough to give them electoral potential of the kind *Gingles* demands. To be sure, even in elections between white candidates, black voters generally express reasonably clear preferences (contrary to Plaintiffs' assumption that black voters are categorically indifferent to white candidates). But there is not, as a matter of law, sufficient cohesion to satisfy *Gingles*'s second precondition.

Over the thirty Arkansas Supreme Court and Arkansas Court of Appeals races that Dr. Alford analyzed, black voters supported their top choice by an average of 56.2%.[14] The number varies little depending on the court: 55.6% for black voters' top supreme-court choices, and 56.7% for their top court-of-appeals choices. In races since 2010, black voters have voted even slightly less cohesively: 54.8% support for their top choices in the aggregate, 54.9% support for their top supreme-court choices, and 54.6% for their top court-of-appeals choices. And even counting only two-way races, where black voters are mathematically forced to support one candidate or another by a majority, black voters still do not vote very cohesively. In these, black voters give, on average, 59.6% of their vote to their favorite, and 58.6% since 2010.

These levels of cohesion are below the 60% level that the Eighth Circuit and other courts have recognized in the past as "a guideline, [though] not an absolute threshold," for finding cohesion. *Cottier I*, 445 F.3d at 1119 (quotation marks omitted), *overruled on other grounds*, *Cottier III*, 604 F.3d 553; *see also Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 999 (D.S.D. 2004)

---

[14] The percentages in this paragraph are based on the data in **Table 1** and **Table 2**. They are determined by averaging the column entitled "Estimated Black Vote" for the candidate in each election who received the highest support from black voters.

(holding that "cohesion exists at 60% and may exist, albeit more weakly, at lower levels"); *Marylanders for Fair Representation, Inc. v. Schaefer*, 849 F. Supp. 1022, 1056 (D. Md. 1994) (three-judge court) (treating 60% as a presumptive minimum); *cf.* Allan J. Lichtman & J. Gerald Hebert, *A General Theory of Vote Dilution*, 6 La Raza L.J. 1, 5-6 (1993) (article by leading voting rights plaintiff-side expert and leading voting rights lawyer, arguing that 60% presumptively establishes cohesion).  And after the Supreme Court's decision in *Bartlett*, even that number is likely not demanding enough.

In *Bartlett*, the Supreme Court held that to satisfy *Gingles*'s first precondition, plaintiffs must show that it is possible to draw a district with at least a bare majority of minority voters. 556 U.S. at 26 (plurality op.); *see id.* (Thomas, J., concurring in the judgment).  The Court reasoned that Section 2 provides minority voters—when they are unable to elect their preferred candidates under existing structures—only the right to "elect [a preferred] candidate based on their own votes and without assistance from others." *Id.* at 14 (plurality op.).  It does not, the Court held, grant minorities the "right to form political coalitions." *Id.* at 15.

A district with less than a 50% minority population could reliably elect minority-preferred candidates only if white voters provided significant support for minority-preferred candidates.  And if white voters support minority-preferred candidates in significant numbers, then the district cannot have racially polarized voting.  Indeed, the *Bartlett* Court was "skeptical" that plaintiffs could show racially polarized voting sufficient to meet *Gingles*'s third precondition even with a relatively low showing of support from white voters for minority-preferred candidates. *See id.* at 16 (noting that "support from almost 20 percent of white voters" for minority-preferred candidate likely defeated *Gingles*'s third precondition).  Thus, even if a 49% minority district would reliably remedy a minority's lack of electoral opportunity, and even if no district

with a majority of minority voters could be drawn, the Court held Section 2 does not require that

49% minority district.  Recognizing a right to such a district would "guarantee minority voters an

electoral advantage," forcing States to craft districts that would optimize minorities' ability to

form coalitions with others.  *Id.* at 20.

The logic of *Bartlett* requires a high cohesion threshold.  The Court held there is no right

to a 49% minority district that reliably elects minority-preferred candidates because there is no

right to form coalitions with white voters.  But just as surely as a minority-preferred candidate

would need at least some support from white voters in a 49% minority district to succeed, a mi-

nority-preferred candidate in a narrow majority-minority district with low cohesion would need

much more support from white voters to succeed.  For example, Plaintiffs' illustrative remedial

districts for the Arkansas Court of Appeals districts would have a black voting-age population of

only 50.2% to 51.1%.  (*See* Revised Cooper Decl. at 21, 26 (Figure 9 & Figure 13) (providing

data for, *inter alia*, proposed Districts 7 and 8).)  In the last decade, black voters have given, on

average, only 58.2% of their support to their preferred Court of Appeals candidates in two-way

races.  *See supra* p. 13, **Table 2**.  In a 51% black district, assuming equal turnout between black

and white voters, a candidate with 58.2% of the vote from black voters would need 41.4% of the

vote from white voters to win the election.[15]

Similarly, Plaintiffs' illustrative remedial Supreme Court districts would have a black

voting-age population of only 51.6% to 53.6%.  (*See* Revised Cooper Decl. at 31, 33 (Figure 16

& Figure 18) (providing data for, *inter alia*, proposed district 7).)  In the last decade, black voters

---

[15] At these rates, black voters would only provide such a candidate about 29.7% of the total vote
(58.2% * 51% = 29.7%).  This candidate would thus need to look to white voters for the remaining 20.3%
of the total vote necessary to be elected (50% − 29.7% = 20.3%).  Obtaining that would require this candi-
date to get 41.4% of the votes from white voters (41.4% *49% = 20.3%).  (Note that 49% is the percent-
age of white voters in this hypothetical district.)

have only given, on average, 59.1% of their support to their preferred Supreme Court candidates in two-way races. *See supra* p. 9, **Table 1**. Assuming a 53.6% black district, with equal levels of turnout among black and white voters, a candidate with support from 59.1% of black voters would need support from 39.4% of white voters to win the election.[16]

That math disproves the existence of a Section 2 violation, for two reasons, given *Bartlett*. First, because political cohesion among black voters in judicial elections is so low, Plaintiffs could only elect their preferred candidates with significant support from white voters. *Bartlett*, however, held that Section 2 does not guarantee the right for minority voters to combine with white voters to elect a minority-preferred candidate. *See, e.g.*, 556 U.S. at 15 ("Nothing in § 2 grants special protection to a minority group's right to form political coalitions."). Section 2 is only violated when an electoral scheme deprives minorities of the ability to elect their preferred candidates on their own. *See id.* at 20 ("Minority groups in crossover districts cannot form a voting majority without crossover voters . . . [and] have the same opportunity to elect their candidate as any other political group with the same relative voting strength.").

Second, if Plaintiffs' proposed districts were capable of electing black voters' preferred candidates, that would mean that voting was not remotely racially polarized in the first place. *Bartlett* was "skeptical" that the "majority-bloc-voting requirement" could be satisfied when 20% of white voters supported minority-preferred candidates. *Id.* at 16. Here, for minority-preferred candidates to prevail, white voters would have to support minority-preferred candidates at rates doubling *Bartlett*'s 20% figure.

---

[16] Similar arithmetic applies here. Black voters would provide this candidate 31.7% of the total vote (59.1% * 53.6% = 31.7%). Thus, this candidate would need to obtain 18.3% of the total vote from white voters (50% − 31.7% = 18.3%). And obtaining that would require achieving support from 39.4% of white voters (39.4% *46.4% = 18.3%). (Note that 46.4% is the percentage of white voters in this hypothetical district.)

In other words, results from past elections show that minority-preferred candidates will not prevail in Plaintiffs' proposed districts *unless* voting in those districts is never racially polarized to begin with.  This demonstrates why courts have held, as just explained, that support from fewer than 60% of minority voters for a minority-preferred candidate is insufficient to show cohesion amongst minority voters.  *See, e.g.*, *Cottier I*, 445 F.3d at 1119, *overruled on other grounds*, *Cottier III*, 604 F.3d 553.  Because the undisputed facts show that fewer than 60% of black voters usually support candidates for appellate judgeships, Plaintiffs have failed as a matter of law to satisfy *Gingles*'s second precondition, which requires them to demonstrate political cohesion among black voters in elections for Arkansas's appellate judgeships.  Therefore, this Court should grant Defendants' motion for summary judgment.

### 3. Considering all appellate judicial elections, black voters' preferred candidates are not usually defeated by white bloc voting.

The third *Gingles* precondition requires Plaintiffs to "demonstrate that the white majority votes sufficiently as a bloc to enable it . . . *usually* to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (emphasis added).  Reviewing all the recent contested elections, as the Eighth Circuit's precedent requires, it is clear that white voters do not usually defeat black voters' preferred candidates.  To the contrary, it would be more accurate to say that black voters' preferred candidates usually win.

The numbers have been presented above. *See supra* pp. 9, 13, **Table 1 & Table 2**.  To recap, Dr. Alford analyzed 15 Arkansas Supreme Court contests and 15 Arkansas Court of Appeals contests—every contested election in the last 20 years for these courts.  Dr. Liu refused to analyze 26 of those elections because a black candidate did not run.  (*See* Alford Report ¶ 26 ("The very small set of endogenous elections, including the lack of any endogenous elections in the most recent ten years, is a limitation of Dr. Liu's own making.  He decided to focus *only* on

biracial contests.").)  But in the only 4 judicial elections that Dr. Liu analyzed, he and Dr. Alford reached nearly identical conclusions.  Dr. Alford's more extensive analysis—unrebutted by Dr. Liu's limited analysis—proves that black voters' preferred candidates in elections for both courts had a robust success rate, which has steadily risen in recent years.  (*Compare* Liu Report at 10-11, *with* Alford Report at 15, 19 (Table 1 & Table 2); *see, e.g.*, Liu Depo. at 96:2-20, 104:21-106:12, 114:4-115:1.)

Starting with the Arkansas Supreme Court, black voters' preferred candidates have won 7 out of 12 two-way contests, or 58%.  *See supra* p. 9, **Table 1**.  Winning half (2 out of 4) the contests before 2010, they have won 62.5% (5 out of 8) of the contests since 2010, and 80% (4 out of 5) of the contests since 2014.  Including three-way contests that decided the participants in a runoff, black voters' preferred candidates were successful—winning, or advancing to the runoff—67% of the time (10 out of 15).  Since 2010, their success rate has been 70% (7 out of 10), and since 2014, 83% (5 out of 6).  The result is that 5 out of 7 justices of the Arkansas Supreme Court were black voters' preferred candidate.  Just one was not.  And even that justice, Chief Justice Kemp, received 42% of the votes from black voters, meaning his opponent received less than the 60% threshold for showing cohesive support.  (Recall that the seventh justice, Justice Wood, ran unopposed.)

In the Arkansas Court of Appeals, black voters' preferred candidates have been nearly as successful.  *See supra* p. 13, **Table 2**.  In two-way races, their preferred candidates have won 6 out of 13 elections, or 46%.  And over time, those candidates' fortunes have improved dramatically.  In pre-2010 elections, only 1 out of 3 won.  But since 2010, half (5 out of 10) have won.  And since 2014, two-thirds (4 out of 6) have won.  Including three-way contests that narrowed

the field, black voters' preferred candidates have succeeded—winning, or advancing to the run-

off—9 out of 17 times, or 53%.  And since 2014, their success rate has risen to 75%, or 6 out of

8 contests.

At bottom, these numbers simply do not show that white voters usually vote as a bloc to

defeat black voters' preferred candidates.  Consider these undisputed facts:

- Since 2014, black voters' preferred candidates have been successful 75% of contested elections for the Arkansas Court of Appeals, and 83% of contested elections for the Arkansas Supreme Court.

- Even limiting that to two-way contests since 2014, black voters' preferred candidates have won 67% of elections to the Arkansas Court of Appeals, and 80% to the Arkansas Supreme Court.

- Even considering all contested elections over the last 20 years, black voters' preferred candidates have been successful in 53% of the elections for the Arkansas Court of Appeals (46% of two-way races), and 67% of the elections to the Arkansas Supreme Court (58% of two-way races).

To put it mildly, such numbers do not amount to "usual" defeat.  Just the opposite:  In the last

four election cycles, minority-preferred candidates have *usually won*.

When the Eighth Circuit was presented with a stronger fact pattern of polarized voting in

*Cottier III*—almost invariable defeat of minority-preferred candidates in over half-a-dozen bira-

cial elections, but almost a 50% success rate for minority-preferred candidates (including those

who were white) overall—it held, sitting en banc, that the plaintiffs had not proved racially po-

larized voting.  *Cottier III*, 604 F.3d at 560.  The evidence of racially polarized voting is weaker

here in every way.  Minority-preferred candidates succeed far more often than they lose.  Even

considering every contested election over the last two decades, minority-preferred candidates

succeed at rates comparable to the rates in *Cottier III*, which the en banc Eighth Circuit held

were insufficient to satisfy *Gingles*'s third precondition.  *See id.* (holding that "almost equal

numbers of victories for Indian-preferred candidates and non-Indian-preferred candidates" did

"not compel a finding that a majority . . . vote[d] sufficiently as a bloc usually to defeat the In-dian-preferred candidate").  And unlike Plaintiffs here, the *Cottier III* plaintiffs offered strong evidence that minority-preferred candidates in biracial contests were usually defeated.  *See id.* (noting that the non-minority-preferred candidate won 3 out of 4 such contests for countywide office, and 3 out of 3 for statewide office).  Here, Plaintiffs can muster only three examples—all three involving the same candidate, Judge Griffen, the most recent of which occurred 13 years ago.  (*See* Alford Report ¶ 24 (explaining why, based only on these four elections, "there is little we can say with confidence about current voting patterns").)

Ultimately, Plaintiffs' only evidence of polarized voting is that white voters opposed one minority-preferred candidate over a decade ago.  Dr. Liu claims this suffices to carry Plaintiffs' burden on the second and third *Gingles* preconditions.  (*See* Liu Depo. 68:19-20 ("The fact that Griffen was defeated repeatedly satisfied *Gingles*").)  But this Court has already rejected this claim.  As this Court said when Plaintiffs *alleged* polarized voting on that basis, "proof of these allegations alone would be insufficient proof of racially polarized voting."  (MTD Order at 14; *see id.* at 14 n.6 ("'[L]oss of political power through vote dilution is distinct from the mere ina-bility to win a particular election,' or, in Judge Griffen's case, even three elections by a single candidate." (quoting *Gingles*, 478 U.S. at 57).)  Two years later, Plaintiffs have proved "these allegations alone."  Therefore, they have failed, as a matter of law, to prove racially polarized voting, and this Court should grant Defendants' motion for summary judgment.

### 4.   Plaintiffs' evidence of cohesion and polarized voting is insufficient.

#### i.   *Plaintiffs' rationale for ignoring elections between white candidates is un-persuasive.*

Plaintiffs have a very different theory of how to measure cohesion and racially polarized voting than Defendants—and indeed, the Eighth Circuit.  Dr. Liu analyzed only the four judicial

elections since 2000 in which a black candidate ran, along with partisan elections for other of-fices in which black candidates ran.  That is because, in his view, only "these elections satisfy the necessary conditions in which Black voters and non-Black voters had a realistic opportunity to vote for the candidate of their choice which is not available in uni-racial elections involving only white candidates."  (Liu Report at 5.)  According to Dr. Liu, only elections with black candidates give black voters "a real choice," because without a black candidate on the ballot, black voters "have no racial cue whatsoever."  (Liu Depo. at 36:5-15, 38:11-39:3.)  Analyzing elections be-tween white candidates, he avers, "will only lead to misleading results."  (*Id.* at 39:1-3.)  Having limited his analysis in this fashion, Dr. Liu concludes that Plaintiffs have satisfied *Gingles*'s sec-ond and third preconditions on the basis of three elections from 2004 to 2008, all involving Judge Wendell Griffen, which he tries to back up with certain non-judicial elections.

There are a number of grave problems with this approach to estimating political cohesion and racially polarized voting.  The first and most important is that, even if it made sense, it is ir-reconcilable with binding circuit precedent—on multiple levels.  First, the Eighth Circuit has in-structed courts not to presuppose that only minority candidates can be minority voters' candi-dates of choice.  *See Clay*, 90 F.3d at 1361; *Harvell*, 71 F.3d at 1386.  On Dr. Liu's view, unless black voters are presented with a black candidate, they have no choice at all.

Next, the Eighth Circuit has instructed courts to presume that, absent some special show-ing, each contested election features a candidate of choice—whichever candidate receives the most minority votes.  *Clay*, 90 F.3d at 1361-62.  And in the one Eighth Circuit case where a liti-gant argued that a long stretch of elections featured no candidate of choice, it said it "cannot ac-cept" the proposition that "the black voters of Blytheville have gone five consecutive years . . . without stating a preference."  *Harvell*, 71 F.3d at 1387.  Here, Dr. Liu's theory would mean that

black voters have not had a single candidate of choice in an Arkansas Court of Appeals election, over seven districts and twelve seats, since 2008.  Similarly, it would mean that they have not had a single candidate of choice in an Arkansas Supreme Court election, over seven seats, since 2010.  Dr. Liu's approach is irreconcilable with *Harvell* and other Eighth Circuit precedent.

Finally, in *Cottier III*, the en banc Eighth Circuit, solely on the basis of elections between white candidates, held that the plaintiffs had not proved racially polarized voting, despite minority-preferred candidates' consistent electoral failure in biracial contests.  *See* 604 F.3d at 560.  And in its most recent Section 2 case, the Eighth Circuit reviewed "all 12 of the contested elections between 2000 and 2015," irrespective of candidate race.  *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 935 (8th Cir. 2018).  Yet Dr. Liu says that elections between white candidates can only yield misleading results.  On his view—which this Court must accept to rule for Plaintiffs—*Cottier III* was decided incorrectly.  This Court is not at liberty to accept Dr. Liu's approach.

Even if the Eighth Circuit had not rejected analyses like Dr. Liu's, his analysis would still have nothing to recommend it.  At times, Dr. Liu suggests that the reason to exclusively look at elections featuring black candidates is that otherwise, "there's no way to know" whether black voters would prefer black candidates to the white candidates they vote for in elections between white candidates.  (Liu Deposition at 42:21-43:16.)  Of course that is true.  But the same argument could be made to disregard any election.  It might be argued, for example, that elections between judicial candidates with prosecutorial experience do not reveal whether black voters prefer judicial candidates who have been defense attorneys.  That fact would be no reason to claim that black voters never have a preferred candidate in elections between former prosecutors.

50

Dr. Liu's reason for excluding elections between white candidates, while including elections that do not present black voters with a choice along other dimensions, is not just that they cannot reveal whether black voters prefer black judicial candidates.  It is that he presumes that black voters in fact prefer black judicial candidates—and accordingly is skeptical that elections between white candidates reveal black voters' true preferences.  The entire point of discarding elections between only white candidates is, as Plaintiffs' counsel said during Dr. Alford's deposition, that such elections present black voters with "effectively the lesser of two evils."  (Alford Depo. at 146:8-13.)  Elsewhere, Plaintiffs' counsel compared elections between two white candidates to a choice between "any flavor of ice cream as long as it's vanilla."  (*Id.* at 150:3-7.)

This assumption—that black voters have little interest in white candidates and, indeed, care about candidate race to the exclusion of all other characteristics—is nothing more than a racial stereotype.  Indeed, the Eighth Circuit has said that "[s]uch stereotyping runs afoul of the principles embodied in the Equal Protection Clause."  *Harvell*, 71 F.3d at 1386.  Moreover, it is inconsistent with the facts of this case.  Plaintiffs have offered no evidence that black voters turnout in lower numbers for judicial elections between white candidates.  Black voters regularly express distinct—if on average less than cohesive—preferences between white candidates, in several instances supporting one white candidate over another by landslide margins.  (For example, in 2020, black voters supported Justice Webb by a margin of 2–1.  *See supra* p. 9, **Table 1**.)  And as discussed in greater detail below, in partisan elections black voters attach far more importance to candidates' party than their race, strongly opposing black Republicans while voting for black Democrats and white Democrats in identical numbers.

Finally, Plaintiffs' presumption that black voters invariably prefer black candidates over white candidates has no bearing on the legal analysis. Section 2 does not guarantee minority voters the right to elect candidates who "represent perfection to every minority voter," *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994), or "some idealized figure whose absence from the ballot keeps a disappointed electorate at home," *Harvell*, 71 F.3d at 1387. It simply affords minorities a right to equal opportunity to elect "representatives of their choice." 52 U.S.C. 10301(b). And those representatives need not be the candidates the minority would elect in an ideal world, or without the participation of non-minority voters. For "minority voters are not immune from the obligation to pull, haul, and trade to find common political ground," even under Section 2. *De Grandy*, 512 U.S. at 1020. Indeed, if Section 2 conferred on minorities the right to elect their ideal candidates, it would not grant minority voters merely equal opportunity, but a right that no one in the political system enjoys. For white voters, no less than minority voters, are often faced with choices between candidates whom they find less than ideal.

Indeed, if Section 2 conferred on minorities the right to elect their ideal candidates, it would grant minority voters a right that no one in the political system enjoys. White voters and minority voters alike are often faced with choices between candidates whom they find less than ideal. And if Section 2 and *Gingles* were about equalizing white voters' and minority voters' opportunity to elect ideal candidates, the *Gingles* framework would require an extra step. Instead of only asking whether white bloc voting defeats minorities' candidates of choice, courts would also need to tally how often whites elect *their own* idealized candidates of choice—discarding elections where courts suspected whites were not enthusiastic about their choices, just as Plain-

tiffs would have the Court do for black voters.  That there is no such step in *Gingles* demonstrates that the test is not about equalizing the opportunity to vote for ideal candidates, but simply equalizing the opportunity to vote for winners, however enthusiastic about them voters may be.

ii.     *Even if the Court only or primarily considered elections involving black candidates, Plaintiffs would still fail to prove racially polarized voting.*

The bedrock assumption of Plaintiffs' case is that black voters have not had a candidate of choice in a single Arkansas Supreme Court or Arkansas Court of Appeals election since Judge Wendell Griffen ran for reelection to the Court of Appeals in 2008.  As explained above, this assumption is foreclosed by precedent, rests on racial stereotypes, and assumes a definition of candidate of choice that is contrary to how the Voting Rights Act uses the term.  But even if Plaintiffs were right, they would still fail to satisfy *Gingles*'s third precondition.  That is because special circumstances explain Judge Griffen's repeated defeats.  And Plaintiffs' evidence of election results from partisan races, though it shows that black and white voters in Arkansas prefer different parties, does not show that they prefer candidates of different races.  So it does not show that black and white voters would likely vote different ways in nonpartisan elections between black and white candidates.

"The third *Gingles* precondition . . . requires that the district court analyze the 'special circumstances' that attend elections to make sure that there are no non-racial factors at play that would appear to *either defeat* or demonstrate a section 2 violation."  *Mo. State Conf. of the NAACP*, 894 F.3d at 936 (emphasis added) (quoting *Gingles*, 478 U.S. at 51).  That is, courts must consider whether special circumstances, besides a general antipathy to minority-preferred candidates, explain a minority-preferred candidate's defeat.  Here, a series of unique events and controversial remarks preceded each of Judge Griffen's three defeats.

The first election on which Plaintiffs rely is Judge Griffen's unsuccessful run for the Arkansas Supreme Court in 2004.  Two years before that election, Judge Griffen was admonished by the Judicial Discipline and Disability Commission for urging the Arkansas General Assembly to defund the University of Arkansas on the ground that it had, in his view, too few black students and faculty members.  (Jake Bleed & Linda Satter, *Decision on judges hits close to home*, Ark. Democrat-Gazette, Aug. 5, 2005, Ex. 8 to McCrary Depo.;[17] *see* McCrary Depo. 20:19-21:2, 61:20-63:15, 66:7-68:25 (introducing exhibit).)  One year before the election, the Arkansas Supreme Court vacated the admonishment in a high-profile 4–3 decision.  (Bleed & Satter, *supra*, *Decision on judges hits close to home*.)  *See Griffen v. Ark. Judicial Discipline & Disability Comm'n*, 130 S.W.3d 524, 526 (Ark. 2003) (declaring disciplinary action invalid, but describing Judge Griffen's comments as a "call[] upon the legislators to engage in economic retaliation during the legislative session" against the University of Arkansas).

Another judicial-discipline investigation, not dismissed until after the 2004 election, considered charges that Judge Griffen had, supposedly in his capacity as pastor, advocated for the release of a convicted robber before the parole board.  (James Jefferson, *Commission tosses complaint against appeals judge*, Ark. Democrat-Gazette, Nov. 20, 2004, Ex. 10 to McCrary Depo.;[18] *see* McCrary Depo. 71:10-73:24 (introducing exhibit).)  Then, during the 2004 campaign itself, Judge Griffen went on a radio show and, in response to a caller's asking about his views on abortion, declared himself "one of those pro-choice ministers" who did not "like the idea of government telling women how to handle their pregnancies."  (Michael R. Wickline, *High court hopeful sees no problem in voicing his opinion*, Ark. Democrat-Gazette, May 15,

---

[17] This August 5, 2005 article is attached to Defendants' Motion for Summary Judgment as Exhibit K.

[18] This November 20, 2004 article is attached to Defendants' Motion for Summary Judgment as Exhibit L.

2004, Ex. 7 to McCrary Depo.;[19] *see* McCrary Depo. 59:11-60:25 (introducing exhibit).) His opponent, Jim Hannah, by contrast, refused to publicly air his views, saying that doing so would violate judicial ethics rules. (Wickline, *supra*, *High court hopeful sees no problem in voicing his opinion*.) Judge Griffen proceeded to lose by a landslide margin to Hannah, receiving only an estimated 58–61% of black voters' support and 32–33% of white voters' support. (Liu Report at 10; Alford Report at 15.)

Dr. McCrary, whom Plaintiffs retained to consider the historical evidence relevant to Arkansas's judicial elections, admitted "that Judge Griffen openly identified as pro-choice around the time of the elections at issue." (McCrary Depo. 59:7-10.) But he made no effort to analyze whether Judge Griffen's views on abortion or any other issue affected his lack of electoral success.

Next, Judge Griffen again sought elevation to the Arkansas Supreme Court in 2006. During that election, Judge Griffen was the subject of three separate judicial misconduct investigations. (Jake Bleed, *Griffen at risk of impeachment*, Ark. Democrat-Gazette, May 3, 2006, Ex. 13 to McCrary Depo.;[20] *see* McCrary Depo. 78:14-80:17 (introducing exhibit).) One of the investigations grew out of a 2005 speech in which Judge Griffen called prominent evangelical leaders "pimps of piety" who called themselves "the Christian right" but were "not Christian or right"; criticized then-President George W. Bush, then-Vice President Dick Cheney, and Associate Justice of the U.S. Supreme Court Clarence Thomas; and claimed that people who came to assist with relief efforts after Hurricane Katrina were "hypocrites" who "had nothing to do with poor people before Katrina." (Debra Hale-Shelton, *In NAACP speech, judge blasts storm response*,

---

[19] This May 15, 2004 article is attached to Defendants' Motion for Summary Judgment as Exhibit M.

[20] This May 3, 2006 article is attached to Defendants' Motion for Summary Judgment as Exhibit N.

Ark. Democrat-Gazette, Sept. 11, 2005, Ex. 11 to McCrary Depo.;[21] *see* McCrary Depo. 73:25-76:22 (introducing exhibit).)   In spite of all this, Judge Griffen received, by both Plaintiffs' and Defendants' experts' estimation, 38% of white voters' support.  (Liu Report at 10.)  *See supra* p. 9, **Table 1**.  But it was not enough, and Judge Griffen was again defeated.

Finally, in 2008 Judge Griffen set his sights on reelection to his own position on the Arkansas Court of Appeals.  But by then he was an intensely controversial figure.  Running in his home district, which encompassed Pulaski, Perry and Saline Counties, his support from black voters rose to 85–87%, but his share of the vote from white voters dropped to 22–23%.  (Liu Report at 11.)  *See supra* p. 13, **Table 2**.  When he lost to Judge Rita Gruber, both he and Judge Gruber attributed the loss, in part, to his history of controversial statements.  Judge Griffen remarked to the press, "I am sure there were people who didn't like what I said and people who didn't mind what I said but didn't like the idea of a judge talking."  (Seth Blomeley, *Gruber unseats Griffen on court*, Ark. Democrat-Gazette, May 21, 2008, Ex. 16 to McCrary Depo.;[22] McCrary Depo. 85:10-87:6 (introducing exhibit).)  Judge Gruber, for her part, told reporters that though she had not run on Judge Griffen's judicial-discipline investigations, voters had asked her about them anyway.  (Blomeley, *supra*, *Gruber unseats Griffen on court*.)

In 2010, the election cycle immediately following Judge Griffen's defeat, Evelyn Moorehead, a black candidate, ran for a position on the Supreme Court.  In a field of three candidates, she only received between 30% and 36% of the vote from black voters.  (Liu Report at 11.)  *See supra* p. 9, **Table 1**.  Dr. Liu's particular approach to ecological inference is unable to estimate the levels of support more than two candidates received.  (*See* Alford Depo. at 50:2-51:7.)  He,

---

[21] This September 11, 2005 article is attached to Defendants' Motion for Summary Judgment as Exhibit O.

[22] This May 21, 2008 article is attached to Defendants' Motion for Summary Judgment as Exhibit P.

then, simply estimated the percentage of black voters who voted for Moorehead and the percentage that voted for one of her opponents.  (Liu Report at 11.)  Dr. Alford's method of ecological inference can estimate vote shares of more than two candidates at once, and he estimated that Moorehead came in third among black voters, behind two white candidates, now-Justice Baker and Judge Fox.  *See supra* p. 9, **Table 1**.  But even if Dr. Liu's slightly higher estimate of black support for Moorehead is correct, the low level of support for her rebuts any inference from Judge Griffen's candidacies that black voters prefer black judicial candidates generally, rather than supporting Judge Griffen specifically.

Perhaps recognizing the questionable evidentiary value of Judge Griffen's troubled campaigns, Plaintiffs attempt to prove that white voters would reliably vote against future black judicial candidates—and that black voters would reliably support them—by analyzing partisan races for other offices.  But their evidence does not show this.  It merely reveals that black voters prefer black Democrats (like Barack Obama) to white Republicans (like John McCain and Mitt Romney), while white voters express the opposite preferences.  (Liu Report at 13.)  When black voters were offered a choice between a black Republican and a white Democrat, in the 2006 State Treasurer race, they overwhelmingly chose the white Democrat, by a margin of 88% to 12%.  (*Id.*)

Making matters worse for Plaintiffs, when contests in the same years between white Democrats and white Republicans are analyzed, the voting patterns are identical.  As with the judicial elections in Arkansas, Dr. Alford considered many more partisan elections than Dr. Liu.  His detailed analysis is included on the following two pages as **Table 3**:

## Table 3: Partisan General Statewide Elections

| Year | | Contest | Candidate | Estimated Black Vote | 95% Confidence Interval | Estimated non-Black Vote | 95% Confidence Interval | Overall Vote Share |
|---|---|---|---|---|---|---|---|---|
| 2020 | General | President | Biden (Dem) | 94% | (93-95%) | 28% | (28-28%) | 35% |
| | | | Trump (Rep) | 6% | (5-7%) | 72% | (72-72%) | 62% |
| | | | | | | | | |
| 2018 | General | Governor | Henderson (Dem) | 87% | (86-88%) | 24% | (24-24%) | 32% |
| | | | Hutchinson (Rep) | 10% | (8-11%) | 73% | (73-73%) | 65% |
| | | | West (Lib) | 3% | (3-4%) | 3% | (3-3%) | 3% |
| | | | | | | | | |
| | | Lt. Governor | **Bland (Dem)** | 88% | (87-89%) | 25% | (25-25%) | 33% |
| | | | Griffin (Rep) | 7% | (6-8%) | 72% | (72-73%) | 64% |
| | | | LIB | 5% | (4-5%) | 3% | (3-3%) | 3% |
| | | | | | | | | |
| | | Attorney Gen. | Lee (Dem) | 89% | (88-90%) | 28% | (27-28%) | 35% |
| | | | Rutledge (Rep) | 7% | (6-8%) | 70% | (69-70%) | 62% |
| | | | LIB | 4% | (4-5%) | 3% | (3-3%) | 3% |
| | | | | | | | | |
| | | Sec. of State | Inman (Dem) | 89% | (87-90%) | 29% | (28-29%) | 37% |
| | | | Thurston (Rep) | 7% | (6-9%) | 69% | (68-69%) | 61% |
| | | | LIB | 4% | (4-5%) | 3% | (3-3%) | 3% |
| | | | | | | | | |
| | | Comm. Lands | Williams (Dem) | 90% | (89-91%) | 29% | (28-29%) | 37% |
| | | | Land (Rep) | 6% | (5-7%) | 68% | (68-68%) | 60% |
| | | | LIB | 4% | (4-5%) | 3% | (3-3%) | 3% |
| | | | | | | | | |
| 2016 | General | President | Clinton (Dem) | 85% | (77-93%) | 24% | (23-26%) | 34% |
| | | | Trump (Rep) | 12% | (5-21%) | 69% | (67-71%) | 61% |
| | | | Other | 2% | (1-6%) | 6% | (6-7%) | 5% |
| | | | | | | | | |
| | | US Senator | Eldridge (Dem) | 81% | (69-91%) | 29% | (27-31%) | 36% |
| | | | Boozman (Rep) | 15% | (6-28%) | 67% | (65-69%) | 60% |
| | | | Other | 3% | (1-6%) | 4% | (4-5%) | 4% |
| | | | | | | | | |
| 2014 | General | US Senator | Pryor (Dem) | 83% | (74-91%) | 31% | (29-34%) | 39% |
| | | | Cotton (Rep) | 13% | (6-23%) | 64% | (62-67%) | 57% |
| | | | Other | 3% | (1-6%) | 4% | (4-5%) | 4% |
| | | | | | | | | |
| | | Governor | Ross (Dem) | 86% | (76-93%) | 33% | (31-35%) | 41% |
| | | | Hutchinson (Rep) | 12% | (5-22%) | 64% | (62-66%) | 55% |
| | | | Other | 2% | (1-4%) | 3% | (3-3%) | 4% |
| | | | | | | | | |
| | | Lt. Governor | Burkhhalter (Dem) | 79% | (63-90%) | 32% | (29-34%) | 39% |
| | | | Griffin (Rep) | 18% | (7-35%) | 64% | (61-66%) | 57% |
| | | | Other | 3% | (1-5%) | 4% | (4-5%) | 4% |
| | | | | | | | | |
| | | Attorney Gen. | Steel (Dem) | 81% | (68-93%) | 37% | (35-39%) | 43% |
| | | | Rutledge (Rep) | 16% | (5-29%) | 58% | (55-60%) | 52% |
| | | | Other | 3% | (1-6%) | 6% | (5-6%) | 5% |
| | | | | | | | | |
| | | Sec. of State | Inman (Dem) | 79% | (62-90%) | 27% | (24-30%) | 35% |
| | | | Martin (Rep) | 18% | (7-34%) | 68% | (66-71%) | 61% |
| | | | Other | 3% | (1-7%) | 4% | (4-5%) | 4% |
| | | | | | | | | |
| | | Treasurer | Garcia (Dem) | 81% | (67-90%) | 29% | (27-32%) | 37% |
| | | | Milligan (Rep) | 16% | (7-31%) | 64% | (61-66%) | 56% |
| | | | Other | 3% | (1-7%) | 7% | (6-7%) | 6% |
| | | | | | | | | |
| | | Auditor | **Hampton (Dem)** | 82% | (70-91%) | 30% | (27-32%) | 37% |
| | | | Lea (Rep) | 15% | (5-27%) | 65% | (62-67%) | 57% |
| | | | Other | 3% | (1-6%) | 6% | (5-6%) | 5% |
| | | | | | | | | |
| | | Comm. Lands | Robertson (Dem) | 80% | (68-90%) | 29% | (27-32%) | 37% |
| | | | Thurston (Rep) | 17% | (7-29%) | 64% | (61-66%) | 57% |
| | | | Other | 3% | (1-6%) | 7% | (6-7%) | 6% |

(Alford Report at 21.)  (Note: Where a name appears in **bold**, this candidate is black.)

Table 3 (cont.)

| Year | | Contest | Candidate | Estimated Black Vote | 95% Confidence Interval | Estimated non-Black Vote | 95% Confidence Interval | Overall Vote Share |
|---|---|---|---|---|---|---|---|---|
| 2010 General | US Senator | | Lincoln (Dem) | 79% | (63-90%) | 30% | (27-32%) | 37% |
| | | | Boozman (Rep) | 18% | (7-33%) | 65% | (63-67%) | 58% |
| | | | Other | 4% | (1-7%) | 5% | (5-6%) | 5% |
| | | Governor | Beebe (Dem) | 91% | (82-95%) | 60% | (59-62%) | 64% |
| | | | Keet (Rep) | 6% | (2-15%) | 38% | (36-39%) | 34% |
| | | | Other | 3% | (1-5%) | 2% | (2-2%) | 2% |
| | | Lt. Governor | Broadway (Dem) | 82% | (69-93%) | 43% | (40-46%) | 49% |
| | | | Darr (Rep) | 18% | (7-31%) | 57% | (54-60%) | 51% |
| | | Sec. of State | O'Brien (Dem) | 84% | (69-93%) | 42% | (40-46%) | 49% |
| | | | Martin (Rep) | 16% | (7-31%) | 58% | (54-60%) | 51% |
| | | Comm. Lands | Bryant (Dem) | 82% | (67-93%) | 41% | (39-44%) | 47% |
| | | | Thurston (Rep) | 18% | (7-33%) | 59% | (56-61%) | 53% |
| 2012 General | President | | Obama (Dem) | 83% | (72-91%) | 28% | (26-31%) | 37% |
| | | | Romney (Rep) | 15% | (6-26%) | 69% | (67-71%) | 61% |
| | | | Other | 2% | (1-4%) | 3% | (2-3%) | 2% |
| 2008 General | President | | **Obama (Dem)** | 84% | (68-94%) | 33% | (31-35%) | 39% |
| | | | McCain (Rep) | 14% | (4-29%) | 62% | (62-66%) | 59% |
| | | | Other | 2% | (1-4%) | 2% | (2-3%) | 2% |
| 2006 General | Governor | | Beebe (Dem) | 85% | (73-93%) | 52% | (50-54%) | 56% |
| | | | Hutchinson (Rep) | 11% | (4-22%) | 45% | (43-47%) | 41% |
| | | | Other | 5% | (2-9%) | 4% | (3-4%) | 3% |
| | | Lt. Governor | Halter (Dem) | 83% | (70-93%) | 54% | (52-56%) | 57% |
| | | | Holt (Rep) | 17% | (7-30%) | 46% | (44-48%) | 43% |
| | | Attorney Gen. | McDaniel (Dem) | 80% | (64-91%) | 56% | (54-58%) | 58% |
| | | | DeLay (Rep) | 14% | (5-31%) | 40% | (38-42%) | 37% |
| | | | Other | 6% | (2-11%) | 4% | (4-5%) | 4% |
| | | Sec. of State | Daniels (Dem) | 83% | (69-92%) | 59% | (57-61%) | 62% |
| | | | Lagrone (Rep) | 13% | (4-26%) | 38% | (37-40%) | 35% |
| | | | Other | 4% | (2-7%) | 3% | (3-3%) | 3% |
| | | Treasurer | Shoffner (Dem) | 85% | (70-93%) | 56% | (55-59%) | 60% |
| | | | **Morris (Rep)** | 11% | (4-26%) | 40% | (38-41%) | 37% |
| | | | Other | 4% | (2-9%) | 4% | (3-4%) | 4% |
| 2004 General | President | | Kerry (Dem) | 80% | (66-92%) | 40% | (38-42%) | 45% |
| | | | Bush (Rep) | 18% | (6-32%) | 59% | (57-60%) | 54% |
| | | | Other | 2% | (1-3%) | 1% | (1-1%) | 1% |
| | | US Senator | Lincoln (Dem) | 88% | (75-96%) | 52% | (50-54%) | 56% |
| | | | Holt (Rep) | 12% | (4-25%) | 48% | (46-50%) | 44% |
| 2002 General | Governor | | Fisher (Dem) | 70% | (48-90%) | 44% | (41-47%) | 47% |
| | | | Huckabee (Rep) | 30% | (10-52%) | 56% | (53-59%) | 53% |
| | | Lt. Governor | **Sheffield** | 73% | (53-91%) | 36% | (33-38%) | 40% |
| | | | Rockefeller | 27% | (9-47%) | 64% | (62-67%) | 60% |

(Alford Report at 22.)  (Note: Where a name appears in **bold**, this candidate is black.)

59

The results reproduced in **Table 3** show partisan polarization.  For example, Dr. Alford found that black voters supported the black Democratic candidate (Anthony Bland) for Lieutenant Governor by a margin of 88% to 7%, while white voters opposed him by a margin of 72% to 25%.  *See supra* p. 58, **Table 3** (2018 Lt. Gov. election).  But he found that black voters also supported the white Democratic candidate (Jared Henderson) for Governor in the same year by a margin of 87% to 10%, while white voters also opposed that white candidate by a margin of 73% to 24%.  *Id.* (2018 Gov. election).  Dr. Liu estimated that 95% of black voters voted for President Obama over Mitt Romney, while only 30% of white voters supported President Obama.  (Liu Report at 13.)  But Professor Alford found that the voting pattern in the Biden–Trump election was the same: 94% of black voters supporting President Biden, compared to only 28% of white voters.  *See supra* p. 58, **Table 3** (2020 Presidential election).

In sum, what polarization there is in Arkansas's partisan elections arises from the party preferences of black and white voters, not any supposed preference for candidates of their own race.  The partisan elections that Plaintiffs analyzed offer no evidence that when given a choice between black and white nonpartisan judicial candidates, black and white voters would vote differently.

### III.  Were the Court to reach the totality of the circumstances, Defendants would still be entitled to judgment as a matter of law.

Even if Section 2 plaintiffs satisfy each of the *Gingles* preconditions, they still do not automatically win.  Rather, "plaintiffs must still show that the 'totality of the circumstances' demonstrates a section 2 violation."  *Mo. State Conf. of the NAACP*, 894 F.3d at 937-38.  That is, they must "prove that the totality of the circumstances indicates minority voters ha[ve] less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice."  *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1021 (8th Cir. 2006)

(internal quotation marks omitted).  To decide if that is the case, a court performs "a searching practical evaluation of the past and present reality," typically reviewing a number of nonexhaustive factors derived from the Senate Report accompanying the passage of the 1982 amendments to Section 2.  *Gingles*, 478 U.S. at 45, *see id.* at 44-45; *Mo. State Conf. of the NAACP*, 894 F.3d at 931.  Following the cue of the Court in *Gingles*, *see Gingles*, 478 U.S. at 48-49 n.15, the Eighth Circuit has long held that two of those factors "predominate the totality-of-the-circumstances analysis":  Factor 1, the extent to which voting in the jurisdiction is racially polarized, and Factor 7, the extent to which members of the minority group have been elected to office in the jurisdiction.  *Mo. State Conf. of the NAACP*, 894 F.3d at 938 (quoting *Bone Shirt*, 461 F.3d at 1022).  Absent a strong showing on these factors, a plaintiff cannot succeed.  *See Gingles*, 478 U.S. at 48-49 n.15 ("recognizing the primacy" of these factors and deeming them "*essential to*" a Section 2 claim).

### A.    In elections for the Arkansas Supreme Court and the Arkansas Court of Appeals, voting is not racially polarized.  (Factor 1)

As discussed at length above, voting in Arkansas's appellate judicial elections, which are nonpartisan, is hardly ever racially polarized.  *See supra* pp. 34-60.

To recap the numbers again, black voters' preferred candidates have won 58% of two-way supreme-court contests in the last twenty years, and 80% since 2014.  Their preferred candidates have won 46% of two-way court-of-appeals contests in the last twenty years, and 67% since 2014.  Over all races, black voters' preferred supreme-court candidates have won or advanced to the runoff 67% of the time in the last twenty years, and 83% of the time since 2014. And their preferred court-of-appeals candidates have won or advanced to the runoff 53% of the time in the last twenty years, and 75% of the time since 2014.  The result is an Arkansas Supreme Court dominated by black-preferred candidates: five out of seven Justices, with one of the

other two elected unopposed. Voting in Arkansas judicial elections is only becoming less racially polarized as partisan judicial elections recede further into the past. And whatever polarized voting there may be in partisan elections, it cannot predict polarized voting in future judicial elections, because the feature of those elections that causes polarization—diverging party preferences—has no effect on judicial elections that are the subject of this case.

The only appellate judicial elections in which notable racial polarization has occurred are Judge Griffen's three unsuccessful campaigns in 2004, 2006, and 2008. It is worth pausing to consider why that might be the case. Plaintiffs contend that Judge Griffen's campaigns are the only elections in which black voters had a true candidate of choice for the Arkansas Supreme Court or Arkansas Court of Appeals, that they demonstrate that black voters prefer black judicial candidates, and that his defeats augur likely failure for any black candidate who may run in the future. (*See, e.g.*, Liu Report at 5.) Defendants have already explained why the identity of black voters' "true" preferences in some idealized sense is beside the point, and why Plaintiffs must prove more than the defeat of their (supposedly) favorite candidate in the last 20 years to satisfy *Gingles*. *See supra* pp. 36-40, 48-53. But taking Plaintiffs' theory on its own terms, it overstates what Judge Griffen's defeats show.

Judge Griffen is not the typical judicial candidate, black or white. He is a well-known pastor in black churches who publicly denounces what he perceives as "racism and classism in society." (Hale-Shelton, *supra*, *In NAACP speech, judge blasts storm response*, at 5B.) It is not surprising that he would develop unusually enthusiastic support among black voters. (*See* Depo. of Hon. Marion Humphrey, Sr. at 66:19-67:19.[23]) By the same token, it is not surprising that

---

[23] Excerpts from the Humphrey Deposition are attached to Defendants' Motion for Summary Judgment as Exhibit Q.

Judge Griffen—a sitting judge who advocated defunding the University of Arkansas on the basis of charges of racism; who publicly described prominent white evangelical leaders as "pimps of piety"; who attacked the sitting Republican President and Vice President; and who declared himself as against government regulation of abortion—would prove a divisive candidate among Arkansans in general.  (Hale-Shelton, *supra*, *In NAACP speech, judge blasts storm response*, at 5B.)  Because of Judge Griffen's unique characteristics, his campaigns are not evidence that black voters generally support black judicial candidates.  Nor are they evidence that white voters generally oppose black judicial candidates and would vote against them were more to run in the future.

Indeed, immediately after his last defeat, a black candidate, Evelyn Moorehead, ran for the Arkansas Supreme Court and did not polarize the electorate.  Both black and white voters preferred Justice Baker and Judge Fox over her.  *See supra* p. 9, **Table 1**.  Even Plaintiffs' expert, Dr. Liu, agrees with this point.  (*See* Liu Report at 11.)

In short, the undisputed facts show that Arkansas's judicial elections generally are not racially polarized.  What little polarized voting has historically occurred in Arkansas's judicial elections is limited to Judge Griffen's campaigns for a seat on Arkansas's appellate courts, the most recent of which was 13 years ago.  But the "'loss of political power through vote dilution is distinct from the mere inability to win a particular election,' or, in Judge Griffen's case, even three elections by a single candidate."  (MTD Order at 14 n.6 (quoting *Gingles*, 478 U.S. at 57).)  And the results of elections in 2004, 2006, and 2008 cannot prove that *today* black voters in Arkansas have less opportunity than white voters to elect candidates of their choice in appellate judicial elections.  (*See* Alford Report ¶ 24.)  The undisputed facts demonstrate that Plaintiffs have failed to show racially polarized voting.

**B.      There is no evidence that white voters are unreceptive to black candidates for appellate judgeships.  (Factor 7)**

The other of the two predominant Senate factors, Factor 7, asks to what extent members of the minority group have been elected in the jurisdiction.  This factor may superficially appear to cut in favor of the Plaintiffs.  But if few black jurists have been elected to the Arkansas Supreme Court and Arkansas Court of Appeals, it is more for lack of trying than evidence that white voters are unreceptive to them.

To begin with, as Plaintiffs acknowledge, one black judge has been repeatedly elected to the Court of Appeals: Judge Waymond Brown in District 7.  (*See* McCrary Decl. ¶ 52.)  Plaintiffs attempt to minimize his success as a result of the district's population.  But when District 7 was drawn in 2003, its voting-age population was only 44% black, a figure that rose to 49%, still a minority, by 2010, two years after Judge Brown's first election.  (Revised Cooper Decl. at 15-16 (Figure 5 & Figure 6).)  Even today, the voting-age population in Judge Brown's district is only 51% black.  (*Id.* at 17 (Figure 7).)  Yet not only did Judge Brown win election in 2008 (and continue to win since), no white candidate even ran against him in his majority-white district.  He instead was opposed by Eugene Hunt, a black candidate.  (McCrary Decl. ¶ 52.)  If white voters in Arkansas were opposed to black judicial candidates, it is difficult to see how this could have taken place.

Likewise, Plaintiffs' theory of white antipathy to black judicial candidates cannot explain how three black judges have been appointed to the Court of Appeals and then reelected *unopposed* in majority-white districts:  Judge Olly Neal, Judge Griffen, and Judge Andree Roaf, at one point making up a quarter of the Court of Appeals.  (*Id.* ¶ 50.)  If white voters were opposed to electing black judges, white voters would likely have sponsored a white candidate, and aspiring white judges would have recognized an opportunity to pick off a vulnerable incumbent.

Outside District 7, it is true, no black candidate has won a contested election to the Arkansas Court of Appeals or the Arkansas Supreme Court. But only two have tried: Judge Griffen, and Evelyn Moorehead. Judge Griffen's shortcomings as a candidate have already been explored, and Moorehead did not even win the support of black voters. Plaintiffs may contend that more black candidates have not run because Judge Griffen's defeats have discouraged others. But that hardly seems likely. Any prospective candidate can see what the Court can see: that Judge Griffen was an extremely controversial figure whose stances alienated more Arkansans than they attracted. Prospective candidates can also see that Judge Brown has repeatedly won election in a majority-white district that has only recently become narrowly majority-black, and that three black appointees to the Arkansas Court of Appeals did not even draw an opponent in their campaigns for reelection in majority-white districts. So too, they can see that 15% of the members of the Arkansas House of Representatives are black, a number roughly equal to the black population in Arkansas. (McCrary Decl. ¶ 55.)

In sum, there is little reason to think that the rarity of black candidates for the Arkansas Supreme Court and the Arkansas Court of Appeals is permanent—especially as Judge Griffen's failures fade further into the past. Nor is there any reason to blame Arkansas's system for electing appellate judges for even Judge Griffen's failures. The existing system has produced more electoral successes for black candidates than defeats.

### C.       There have been no racial appeals in judicial elections.  (Factor 6)

The sixth Senate factor asks whether political campaigns in the jurisdiction "have been characterized by overt or subtle racial appeals." *Gingles*, 478 U.S. at 37. The most important campaigns, of course, are the ones for the offices at issue. This is an important factor that helps courts get at whether polarized voting—to the extent it exists—is motivated by racial prejudice

and is likely to persist in future campaigns, or whether it is better attributed to other, more transient factors.  Indeed, some courts go so far as to hold that "plaintiffs cannot prevail on a VRA § 2 claim if there is significantly probative evidence that whites voted as a bloc for reasons wholly unrelated to racial animus."  *Uno v. City of Holyoke*, 72 F.3d 973, 981 (1st Cir. 1995).  Though the Court need not go that far, it is uncontroversial that "the reason for polarized voting is a critical factor in the totality analysis."  *United States v. Charleston Cnty.*, 365 F.3d 341, 349 (4th Cir. 2004).

With that said, it is telling that Plaintiffs acknowledge there have been no racial appeals in Arkansas judicial elections whatsoever.  (McCrary Decl. ¶¶ 43-45.)  Indeed, even Judge Griffen's opponents refrained from criticizing him on racial or other terms.  In 2008, his successful opponent, Judge Gruber, "offer[ed] no criticism of Griffen and g[ave] no reason why voters shouldn't re-elect him," focusing on her own qualifications instead.  (Seth Blomeley, *Outspoken judge faces challenger*, Ark. Democrat-Gazette, May 4, 2008, Ex. 15 to McCrary Depo.;[24] McCrary Depo. 83:22-85:9 (introducing exhibit).)  The only example of anything arguably racist Plaintiffs can point to *anyone* saying about a black judicial candidate is an editorial page cartoon in the Arkansas Democrat-Gazette in 2006 depicting Judge Griffen in a clown costume.  (McCrary Decl. ¶ 45.)

Plaintiffs similarly lack evidence of racial appeals in non-judicial elections.  Dr. McCrary at first claimed otherwise, pointing to a flyer from Representative French Hill's campaign.  (*Id.* ¶ 44)  According to Dr. McCrary's report, that flyer said that a vote for Joyce Elliot was a vote for the "Racial Left."  (*Id.*)  But in his deposition, he admitted that this description of Rep. Hill's

---

[24] This May 4, 2008 article is attached to Defendants' Motion for Summary Judgment as Exhibit R.

flyer was a mistake on his part.  Instead, the flyer referred to the "Radical Left."  (*See* McCrary Depo. at 52:9-54:16.)

With this misreading of the evidence corrected at Dr. McCrary's deposition, it becomes clear that there have been no racial appeals in Arkansas elections.

### D.     The policies underlying the State's challenged practices are not tenuous. (Factor 9)

Another Senate factor, sometimes numbered as the ninth factor, asks "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."  *Gingles*, 478 U.S. at 37.  It is at this stage in the analysis that courts consider States' interest in having at-large elections, and in particular, it is at this stage that courts presented with a challenge to at-large elections of state supreme courts consider States' interests in electing those courts at-large.  *See Lopez v. Abbott*, 339 F. Supp. 3d 589, 617 (S.D. Tex. 2018).

Regarding Plaintiffs' request that this Court create districts for the Arkansas Supreme Court, every court of appeals and district court to consider the question has declined to fashion districts for courts that States choose to elect at-large.  *See Cousin v. Sundquist*, 145 F.3d 818, 827-28 (6th Cir. 1998); *Davis v. Chiles*, 139 F.3d 1414, 1421-22 (11th Cir. 1998); *Milwaukee Branch of the NAACP v. Thompson*, 116 F.3d 1194, 1200-01 (7th Cir. 1997); *So. Christian Leadership Conference of Ala. v. Sessions*, 56 F.3d 1281, 1296-97 (11th Cir. 1995); *Nipper v. Smith*, 39 F.3d 1494, 1543-45 (11th Cir. 1994) (en banc) (plurality opinion); *id.* at 1547 (Edmondson, J., concurring in the opinion in part and concurring in the result); *LULAC v. Clements*, 999 F.2d 831, 868-74 (5th Cir. 1993) (en banc); *Lopez*, 339 F. Supp. 3d at 617-19; *Ala. State Conf. of NAACP*, 2020 WL 583803, at *63-73.

That is because, as those courts have consistently explained, States indisputably have a "powerful, indeed dispositive" interest in "matching the boundaries of a court's jurisdiction to the boundaries of the judges' electoral base"—an interest often called linkage.  *Thompson*, 116 F.3d at 1200.  In other words, States have an interest in linking the territory from which judges are elected to the territory over which they have jurisdiction.  At-large electoral systems, like Arkansas's system for electing supreme court justices, provide for such linkage.  Each justice has statewide jurisdiction, which is linked to each justice's statewide electoral territory.  By contrast, districting would sever the link between justices' statewide jurisdiction and the large majority of the State, meaning that justices would be elected by only a fraction of the voters over whom they have jurisdiction.

Courts find that linking judges' jurisdiction to the voters who elect them simultaneously promotes the goals of accountability and judicial independence.  Linkage makes judges accountable to everyone over whom they have jurisdiction.  *See, e.g.*, *Cousin*, 145 F.3d at 827 ("[L]inkage ensures that . . . the entire electorate which will be subject to [a] judge's jurisdiction has the opportunity to hold him or her accountable at the polls.").  And while promoting accountability, linkage also promotes judicial independence.  "Larger jurisdictions . . . free the judge to follow the law dispassionately" by "diluting the reaction to individual decisions."  *Thompson*, 116 F.3d at 1201.  Electing judges from smaller districts, by contrast, "increase[s] the potential for 'home cooking'" in cases that particularly affect a judge's local constituency.  *Nipper*, 39 F.3d at 1544.

The particular remedy that Plaintiffs propose that this Court devise—a supreme-court district designed to elect a justice of a particular race—would uniquely harm the accountability and judicial independence that linkage serves.  Under Plaintiffs' proposed system, one justice would be primarily accountable to black voters; the other six justices would be accountable primarily to

white voters.  The "*announced purpose*" of this system "would be to assist a predominantly

black section of the [State] in electing black judges."  *Nipper*, 39 F.3d at 1544.  The Supreme

Court has described the effect that systems like the one Plaintiffs propose would have on elected

officials:  "When a district obviously is created solely to effectuate the perceived common inter-

ests of one racial group, elected officials are more likely to believe that their primary obligation

is to represent only the members of that group, rather than their constituency as a whole."  *Shaw*

*v. Reno*, 509 U.S. 630, 648 (1993).  With judicial elections in particular, such a system would

"send[] the message . . . that race matters in the administration of justice."  *So. Christian Leader-*

*ship Conf.*, 56 F.3d at 1297.  This Court should not take Plaintiffs' invitation to so fundamentally

alter the administration of justice in Arkansas.

Additionally, Arkansas has the right to choose linkage over districting because it has the

right to define what sort of office its supreme court justices hold.  "The decision to make juris-

diction and electoral bases coterminous is more than a decision about how to elect state judges.

It is a decision of what *constitutes* a state court judge."  *Cousin*, 145 F.3d at 827 (quoting *Clem-*

*ents*, 999 F.2d at 872).  An Arkansas Supreme Court Justice elected by one of seven districts

would no longer be an *Arkansas* Supreme Court Justice; she would be a Supreme Court Justice

of District Y or Z.  The Voting Rights Act regulates *how* States elect members of a particular of-

fice, but it does not regulate what a State's offices *are*.  It can no more require Arkansas to trans-

form state supreme court justices as a whole into justices of seven individual districts than it can

require Arkansas to replace the office of governor with a board of district governors.  In short,

while the "Voting Rights Act covers judicial elections . . . [a State] as a matter of law has the

right . . . to structure its judicial branch pretty much as [it] thinks best."  *So. Christian Leadership*

*Conf.*, 56 F.3d at 1298 (Edmondson, J., concurring).  Plaintiffs have asked this Court to redefine the nature of the Arkansas Supreme Court.

As an alternative remedy to creating districts for the Arkansas Supreme Court, Plaintiffs briefly suggest a system of cumulative voting.  (Second Am. Compl. at 22 (prayer for relief).)  In a cumulative-voting system, using the Arkansas Supreme Court as an example, each voter would cast seven votes and all seven seats on the court would be up for election at once.  A voter could vote for seven candidates, or cast all her votes for just one, or otherwise allocate her votes however she wanted.  *See Nipper*, 39 F.3d at 1545.  This Court lacks the power to order that radical change in how Arkansas conducts its judicial elections.  No court has ever ordered cumulative voting in judicial elections under Section 2; indeed, one of the few courts to ever have ordered cumulative voting as a remedy in a Section 2 case about non-judicial-elections did so only because it was *the defendant's preferred remedy*.  *See United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 447-48, 451-52 (S.D.N.Y. 2010) (acknowledging that cumulative voting was so unknown to American voters that the court had to order defendant to adopt an educational program to teach voters how to cumulatively vote, but nevertheless ordering cumulative voting out of "deference" to the defendant jurisdiction's preference).

Besides the remedy's novelty, Arkansas has powerful interests in not using cumulative voting.  As a "practical effect of this remedy," "judicial colleagues who previously ran for designated positions" would have to "run against each other," which would in turn "undermin[e] the treasured institution of judicial collegiality."  *Cousin*, 145 F.3d at 830; *accord Nipper*, 39 F.3d at 1546.  In rejecting cumulative-voting remedies for judicial elections, courts have also found that because a cumulative-voting system would require judges seeking reelection to "compete against

every [other] judge up for reelection," cumulative voting would "adversely affect the independence of the judiciary" and "dampen lawyer interest in a judicial career" by making reelection much tougher. *Nipper*, 39 F.3d at 1546. A system where judges seek reelection in a single seat against a single opponent, like Arkansas's current system, gives a strong advantage to incumbents, strengthening judicial independence, making judicial offices more attractive, and most importantly, ensuring some measure of institutional continuity. *See id.* Plaintiffs' proposed cumulative-voting system, by contrast, would open up the possibility that the entire Arkansas Supreme Court could turn over every eight years, leaving Arkansans with no continuity from election to election.

For all these reasons, Defendants have a powerful interest in adhering to the State's current system for electing the Arkansas Supreme Court and not adopting Plaintiffs' proposed remedies. What Plaintiffs seek is nothing less than to ask this Court "to abolish a particular form of government" in Arkansas "and to use its imagination to fashion a new system." *Cottier v. City of Martin*, 551 F.3d 733, 748 (8th Cir. 2008) ("*Cottier II*") (Colloton, J., dissenting), *vacated on rehearing en banc*, 604 F.3d 553 (2010). At a minimum, then, this Court should enter summary judgment on Plaintiffs' claims with respect to the Arkansas Supreme Court as an impermissible attack on how Arkansas has elected its Supreme Court for 145 years.

CONCLUSION

For these reasons, Defendants respectfully request that the Court grant this motion and render summary judgment in their favor.

Dated:  September 16, 2021                 Respectfully submitted,

                                           LESLIE RUTLEDGE
                                             Attorney General

                                           VINCENT M. WAGNER (2019071)
                                             Deputy Solicitor General
                                           ASHER STEINBERG (2019058)
                                             Assistant Solicitor General
                                           JENNIFER L. MERRITT (2002148)
                                             Senior Assistant Attorney General
                                           MICHAEL MOSLEY (2002099)
                                             Assistant Attorney General
                                           OFFICE OF THE ARKANSAS
                                             ATTORNEY GENERAL
                                           323 Center Street, Suite 200
                                           Little Rock, Arkansas  72201
                                           (501) 682-8090
                                           vincent.wagner@arkansasag.gov

                                           *Counsel for Defendants*