Exhibit 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

THE CHRISTIAN MINISTERIAL
ALLIANCE, et al.,

                Plaintiffs,

     v.

ASA HUTCHINSON, et al.,

             Defendants.

Civil Case No. 4:19-cv-402-JM

## REVISED DECLARATION OF WILLIAM S. COOPER

WILLIAM S. COOPER, acting in accordance with 28 U.S.C. § 1746, Federal Rule of Civil Procedure 26(a) (2) (B), and Federal Rules of Evidence 702 and 703, does hereby declare and say:

## I.    INTRODUCTION

### A.       Redistricting Experience

1. My name is William S. Cooper.  I have a B.A. in Economics from Davidson College.  As a private consultant, I was retained as a demographic and redistricting expert for the Plaintiffs.  I am compensated at a rate of $150 per hour, and my compensation is not contingent on the outcome of this litigation.  I reserve the right to continue to supplement my reports in light of additional facts, testimony, and/or materials that may come to light.

2. I have qualified at trial as an expert witness on redistricting and demographics in federal courts in about 45 voting rights cases in 18 states. My testimony in these lawsuits almost always included a review of demographics and socioeconomic characteristics for the jurisdictions at issue.

3. Six of the 45 lawsuits resulted in changes to state legislative boundaries that were favorable to the Section 2 minority plaintiffs: In the 1990s—*Rural West Tennessee African-American Affairs v. McWherter*, Civ. A. No. 92–2407 (W.D. Tenn.); in the 2000s—*Old Person v. Cooney*, No. CV–S–96–04–GF–PMP (D.Mont.); and *Bone Shirt v. Hazeltine*, No. CIV.01–3032 (D.S.D); in the 2010s – *Alabama Legislative Black Caucus v. Alabama*, 2:12–CV–691 (M.D. Ala.) and *Thomas v. Bryant.* Approximately 30 of the 45 cases led to changes in local election district plans.

4. Since the release of the 2010 Census, I have developed nine state legislative plans (Alabama, Connecticut, Florida, Georgia, Kentucky, Mississippi, South Carolina, Texas, and Virginia) and about 150 local redistricting plans— primarily for organizations working to protect minority voting rights. In addition, I have prepared congressional plans for clients in nine states (Alabama, Florida, Georgia, Louisiana, Maryland, Ohio, Pennsylvania, South Carolina, and Virginia).

5. I have been retained as expert and consultant by both civil rights plaintiffs and government entities. Three plans that I developed for local government clients

during 2011—in Bolivar County, Miss., the City of Grenada, Miss., and Sussex County, Va.—were precleared under Section 5 of the Voting Rights Act by the U.S. Department of Justice.

6.   In 2013, I served as a redistricting consultant for the Claiborne County, Miss. Board of Supervisors and the Tunica County, Miss. Board of Supervisors.  In March 2014, I was retained by the City of Decatur, Ala. as a redistricting consultant in *Voketz v. City of Decatur*.

7.   In August 2018, the City Council in Wenatchee, Washington adopted a hybrid election plan that I developed in consultation with the Change of Government Study Committee.  The Wenatchee election plan is the first plan adopted under the Washington Voting Rights Acts of 2018.   In the summer of 2019, I developed redistricting plans for the Grand County (Utah) Change of Form of Government Study Committee.  And in May and June of 2020, I served as a consultant to the City of Quincy, Florida—the Defendant in a Section 2 lawsuit filed by two white voters (*Baroody v. City of Quincy*).

8.   For additional historical information on my testimony as an expert witness, see **Appendix 1** attached to this report.

**B.        Purpose of Report**

9.   Plaintiffs in this case have asked me to determine whether the Black population in Arkansas is "sufficiently large and geographically compact"[1] to allow for: (1) two single-member majority-Black districts for the Arkansas Court of Appeals and (2) one single-member majority-Black district for the Arkansas Supreme Court, which currently elects seven justices at large.

10.   In addition, Plaintiffs have asked me to review historical and current demographics (reported in the decennial Census and annual estimates published by the U.S. Census Bureau), as well as socioeconomic characteristics reported in the annual releases of the American Community Survey ("ACS") for African Americans and non-Hispanic whites.[2]

**C.        Expert Summary of Key Conclusions**

11.   Black people in Arkansas are sufficiently numerous and geographically compact to allow for:

---

[1] *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986).

[2] In this report, "Black" and "African American" are synonymous, as are "Latino" and "Hispanic," and "white" and "non-Hispanic white." Unless otherwise noted, beginning with the 2000 Census. "Black" refers to persons of all ages who are any part Black ("AP Black"), i.e., single-race Black or more than one race and some part Black. Prior to the 2000 Census, the AP Black count could not be derived from the PL-94-171 file used for redistricting.

The AP Black classification includes all persons who self-identified in the 2010 Census as single-race Black or some part Black, including Hispanic Black. It is my understanding that following the U.S. Supreme Court decision in *Georgia v. Ashcroft*, 539 U.S. 461 (2003), the "Any Part" definition is the appropriate Census classification to use in most Section 2 cases.

4

- **Two single-member majority-Black districts in a 12-district plan for the Court of Appeals**, based on population apportioned by either the 2010 decennial Census or the 2019 estimates published by the Census Bureau, **(pp**. **18-27** *infra*), both of which support my finding;

- **One single-member majority-Black district in a 7-district plan for the Supreme Court**, based on population apportioned by either the 2010 decennial Census or the 2019 estimates published by the Census Bureau. **(pp. 28-33** *infra*), both of which support my finding.

12. When the current Court of Appeals Plan was adopted in 2003, **Black people in Arkansas were sufficiently numerous and geographically compact to allow for at least one single-member majority-Black district (Appendix 4) or one 2-member majority-Black district.  (Appendix 4)**.  The Court of Appeals plan as implemented is extremely imbalanced in terms of total population by district, with a current total deviation of 70.78% according to the Census Bureau's 2019 population estimates.  **(p. 17** *infra*).

13. According to the 2010 Census, Arkansas has a total population of 2,915,918.  Non-Hispanic whites ("NH whites") are a majority of the population at 74.54%; **single-race Black Arkansans comprise 15.43%, any-part Black Arkansans comprise 16.07%**, while Latinos comprise 6.38%.  **Appendix 3** contains a demographic profile of Arkansas, according to the decennial Census and Census Bureau estimates, on which I base my opinions.

14. As reported in the 1-Year *2019 American Community Survey*, a demographic survey published by the U.S. Census Bureau in Arkansas **non-Hispanic**

**whites significantly outpace Black Arkansans across most key indicators of socioeconomic well-being**, including employment rates, household income, and homeownership. **(pp. 33-36 i*nfra*)**.

### D.    Organization of Report

15.   In this report I have prepared illustrative plans for the Arkansas Court of Appeals and State Supreme Court.  These plans adhere to one-person one-vote and the non-dilution of minority voting strength, as well as other traditional redistricting principles, including compactness, contiguity, and respect for communities of interest.

16.   **Section II** examines the 6-district Court of Appeals plan in effect for elections from 1980 to 2003, and the current 7-district Court of Appeals plan in place since the 2004 elections.

17.   **Section III** demonstrates that the Black population in Arkansas is sufficiently numerous and geographically compact to comprise a majority of the citizen voting-age population ("CVAP") in two districts of 12 for the Court of Appeals.

18. **Section IV** demonstrates that the Black population in Arkansas is sufficiently numerous and geographically compact to comprise a majority of the CVAP in one of seven districts for the Supreme Court.[3]

19. **Section V** provides data from the U.S. Census Bureau documenting that non-Hispanic white Arkansans outpace Black Arkansans across a broad range of socioeconomic indicators, as reported in the 1-Year *2019 American Community Survey*.

20. **Section VI** reiterates my conclusions.

21. **Appendix 2** describes the sources and methodology I employed in the preparation of this report. **Appendix 3** provides a contemporary demographic profile of Arkansas against a backdrop of regional population change since the 2000 Census. **Appendix 4** presents three hypothetical plans for the Court of Appeals that would have contained majority-Black districts based on the 2000 Census and 1990 Census.

## II.   COURT OF APPEALS PLANS:   HISTORICAL (1979) AND CURRENT (2003)

22. The Court of Appeals was created in 1979 with six judges covering six districts. Under the 1979 Plan, the distribution of Black voters across district lines prevented the Black population from having the ability to elect their candidates of

---

[3] It is my understanding that "50% plus 1" constitutes a majority—*Bartlett v. Strickland*, 556 U.S. 1 (2009) and that Black CVAP is an appropriate metric to use for determining that majority—*Perez v. Abbott* (WD. Texas, March 1, 2017).

choice.  That said, as I demonstrate in **Appendix 4**, a single-member majority-Black district (based on the 1990 Census) could have been drawn as early as 1997 when the number of judges on the Court of Appeals increased to 12.

23.   The Court of Appeals was redistricted in 2003 to account for the expanded court consisting of 12 judges.  Under the 2003 Plan, single-member "opportunity"[4] District 7 is not majority Black voting age ("BVAP") under either the 2000 Census or 2010 Census.  However, as I demonstrate in **Appendix 4**, at the time of the 2003 redistricting, a two-member majority-BVAP district could have been drawn (based on the 2000 Census).

24.   Below I review the demographics of the 1979 Plan and 2003 Plan in more detail.

**A.     1979 Court of Appeals Plan – 1980 and 2000 Census**

25.   Following the creation of the Court of Appeals in 1979, district elections were first held for appellate judges in 1980 under the 1979 Plan depicted in **Figure 1**.[5] Six judges were elected by district—one in each district.

---

[4] A minority "opportunity" district is one that provides minority voters with the opportunity to elect a candidate of their choice.

[5] Source: *1980 Arkansas Elections* (district maps on p.107 and p. 109) https://www.sos.arkansas.gov/uploads/elections/1980%20Election%20Results.pdf

**Figure 1: 1979 Court of Appeals Plan**



26.  The 1979 Plan was malapportioned from its inception.  The deviation in the 1979 Plan is higher than the 10% deviation rule-of-thumb threshold applied in other non-judicial redistricting cases.[6]  As shown in **Figure 2**, according to the 1980

_____

[6] In redistricting, "deviation" refers to the difference between the populations of electoral districts.  A deviation metric is calculated by summing the absolute value of the most underpopulated district deviation (a negative value representing the percentage by which a district population falls below the ideal size) plus the value of the most overpopulated district deviation (a

Census, the total deviation of the 1979 Plan was 16.97%.  This resulted in a total population difference of 64,659 between the highest and lowest populated districts—District 4 and District 6, respectively—meaning that a judge elected to District 4 presided in a district comprised of an additional sixty thousand persons, compared to a judge elected to District 6.

**Figure 2: 1979 Court of Appeals Plan – 1980 Census**

| District | # of Judges | 1980 Population | Dev | % Dev. | % SR Black |
|----------|-------------|-----------------|--------|--------|------------|
| 1 | 1 | 377524 | -3549 | -0.93% | 25.8% |
| 2 | 1 | 384810 | 3737 | 0.98% | 3.8% |
| 3 | 1 | 409398 | 28325 | 7.43% | 2.0% |
| 4 | 1 | 412538 | 31465 | 8.26% | 12.2% |
| 5 | 1 | 354286 | -26787 | -7.03% | 34.3% |
| 6 | 1 | 347879 | -33194 | -8.71% | 23.5% |

**Ideal size = 381,073**
**Total deviation =16.97%**

---

positive value representing the percentage by which a district population is above the ideal size). The resulting summation is usually referred to as "total deviation."

For example, in a plan with six districts, if District C is the most populated district and over-populated by 2.2% from the ideal district size and District B is the least populated and under-populated by 3.1%, then the total deviation of the plan is 5.3%.

The ideal district size is determined by dividing total population by the number of elected representatives or judges.  In Arkansas' 7-district hybrid appellate plan, the ideal district size for the five 2-member districts is two times the ideal district size of the two single-member districts.

Generally, a 10% total deviation is an appropriate maximum threshold.  The 10% rule-of-thumb traditional redistricting principle of nearly equal district population is not currently required in judicial districting.  However, a deviation of 70.78%, as found in the current Court of Appeals Plan, is an unusual population imbalance and would be characterized as extreme malapportionment in non-judicial election plans.

27. The 1979 Plan also fragmented or cracked[7] Black voters into Districts 1, 5, and 6, meaning that Black voters were compact enough so that they could have had greater voting strength with a different configuration of counties. Of the six districts, District 5 had the highest Black total population—34.3% single-race ("SR") Black (all ages), according to the 1980 Census.[8]

28. Regional population shifts within Arkansas during the 20 years between 1980 and 2000 exacerbated the imbalances in Court of Appeals districts. The population change was not uniform by race and ethnicity.

29. For example, in Pulaski County, between 1980 and 2000, the SR Black population increased by 33,502 (41%) while the NH white population fell by 25,503 (-10.1%). In neighboring Jefferson County, between 1980 and 2000, the NH white population fell by 12,515 (-23.6%), compared to a Black population gain of 4,960 (13.5%).

30. By 2000, as shown in **Figure 3**, the 1979 Plan had become severely malapportioned—with an extreme overall deviation of 64.19%, according to the 2000 Census. Five of the six districts had double-digit deviations. This resulted in a total population difference of 211,494 between the highest and lowest populated

---

[7] "Cracking" is a term used by redistricting practitioners to identify election districts that unnecessarily fragment or divide the minority population, resulting in an overall dilution of minority voting strength in the voting plan.

[8] Voting age by race and ethnicity was not reported in the 1980 PL-94 171 file.

districts—District 3 and District 5, respectively.  Black voters also continued to be cracked among three districts, diluting their voting strength.  Underpopulated District 5 had the highest Black voting age percentage at 34.52% AP BVAP.

**Figure 3: 1979 Court of Appeals Plan – 2000 Census**

| Dist. | # of Judges | Pop. | Dev | % Dev | % SR Black | 18+ Pop | % 18+ SR Black | % 18+ AP Black | % 18+ NH White |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 372422 | -73145 | -16.42% | 26.24% | 270655 | 22.60% | 22.76% | 83.81% |
| 2 | 1 | 503256 | 57689 | 12.95% | 3.79% | 382867 | 3.44% | 3.51% | 93.74% |
| 3 | 1 | 614060 | 168493 | 37.82% | 2.22% | 454657 | 2.00% | 2.11% | 89.02% |
| 4 | 1 | 483923 | 38356 | 8.61% | 10.45% | 363802 | 9.51% | 9.62% | 83.77% |
| 5 | 1 | 328056 | -117511 | -26.37% | 37.36% | 243163 | 34.31% | 34.52% | 69.94% |
| 6 | 1 | 371683 | -73884 | -16.58% | 31.04% | 277887 | 27.54% | 27.84% | 72.80% |

**Ideal district size= 445,567**
**Total deviation = 64.19%**

**B.     2003 Court of Appeals Plan – 2000 and 2010 Censuses, 2019 Estimates**

31. The Court of Appeals grew from six to nine appellate judges in 1996 and then to twelve in 1997.[9]

32. In 1999, an amendment was approved to realign the Court of Appeals districts in order to account for the population changes in Arkansas since 1980.[10] Viewed from the state level, there was modest total population growth (16.9%) over the 1980 to 2000 period.  The Black and NH white population grew in tandem (12%

---

[9] https://www.arcourts.gov/courts/court-of-appeals

[10] https://www.arcourts.gov/courts/court-of-appeals

and 11.7%, respectively), while the Latino population jumped significantly from a very small population base, growing by 385.2%.

33.  In recognition of regional population shifts, Act 1812 of the 2003 Arkansas Legislature reapportioned the Court of Appeals into seven electoral districts, beginning with the 2004 elections.[11]

34.  The map in **Figure 4** depicts the 2003 Court of Appeals Plan ("2003 Plan"), which remains in effect to this day.  The plan changed from six districts to seven districts.  The 2003 Plan features two single-member districts (District 5 and District 7), with each of the other five districts electing two judges.

---

[11] https://www.arcourts.gov/courts/court-of-appeals

**Figure 4: 2003 Court of Appeals Plan**



35. **Figure 5** provides the population data for each district created in the 2003 Plan. This plan, at the time of its creation, had a total deviation of 12.22%, according to the 2000 Census. Single-member District 7 was 48.58% SR Black, 44.14% SR BVAP, and 44.37% AP BVAP.

14

**Figure 5: 2003 Court of Appeals Plan – 2000 Census**

| Dist. | # of Judges | Pop. | Dev | % Dev | % SR Black | 18+ Pop | % 18+ SR Black | % 18+ AP Black | % 18+ NH White |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 433600 | -11967 | -2.69% | 15.60% | 317968 | 13.31% | 13.43% | 83.81% |
| 2 | 2 | 448529 | 2962 | 0.66% | 3.58% | 342919 | 3.25% | 3.32% | 93.74% |
| 3 | 2 | 444520 | -1047 | -0.23% | 1.15% | 328954 | 1.08% | 1.17% | 89.02% |
| 4 | 2 | 460151 | 14584 | 3.27% | 10.11% | 345489 | 9.12% | 9.26% | 83.77% |
| 5 | 1 | 228549 | 5765.5 | 2.59% | 29.69% | 170320 | 27.41% | 27.60% | 69.94% |
| 6 | 2 | 455212 | 9645 | 2.16% | 25.75% | 340140 | 22.87% | 23.11% | 72.80% |
| 7 | 1 | 202839 | -19944.5 | -8.95% | 48.58% | 147241 | 44.14% | 44.37% | 52.80% |

**Ideal district size = 445,567 (2-judges), 222,784 (1-judge)**
**Total deviation = 12.22%**

36. The 2003 Plan was an improvement over the 1979 plan because it substantially reduced the malapportionment from more than 60% to approximately 12% and created a Black "opportunity" district. According to the 2000 Census, single-member District 7 had an AP BVAP of 44.37%—about 10 percentage points higher than the BVAP percentage in District 5 under the 1979 Plan.

37. Still, it is clear based on the geographic distribution of the Black population under the 2000 Census, that the 2003 Plan continued to crack the Black population—ignoring the significant Black population in Little Rock and rural counties to the south. Indeed, as revealed in **Appendix 4**, a 2-member majority-Black district could have been drawn in 2003.

38. As shown in **Figure 6**, at the start of the 2010s, the 2003 Plan had a total deviation of 43.16%. District 7 was 52.44% AP Black (all ages), but remained below the voting-age majority threshold with an AP BVAP of 49.01% and a single-race

15

non-Hispanic citizen BVAP ("NH BCVAP") of 49.16%.[12]   **Exhibit A** reports

detailed population statistics for the 2003 Plan, according to the 2010 Census, as well

as CVAP estimates from the coincident 2008 – 2012 ACS.[13]

**Figure 6: 2003 Court of Appeals Plan – 2010 Census, 2008-12 ACS CVAP**

| Dist. | # of Judges | Pop. | Dev | % Dev | % AP Black | 18+ Pop | % 18+ AP Black | % 18+ NH White | %NH BCVAP | % NH WCVAP |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 464007 | -21979 | -4.52% | 16.63% | 344666 | 14.44% | 81.50% | 14.52% | 82.58% |
| 2 | 2 | 496750 | 10764 | 2.21% | 4.54% | 386254 | 3.93% | 91.24% | 3.91% | 92.43% |
| 3 | 2 | 573180 | 87194 | 17.94% | 2.25% | 422754 | 1.84% | 82.15% | 1.76% | 88.71% |
| 4 | 2 | 484986 | -1000 | -0.21% | 10.91% | 368707 | 9.77% | 80.37% | 9.96% | 83.78% |
| 5 | 1 | 214983 | -28010 | -11.53% | 29.93% | 164680 | 28.35% | 68.00% | 28.69% | 68.94% |
| 6 | 2 | 500311 | 14325 | 2.95% | 28.69% | 379585 | 25.87% | 66.99% | 26.28% | 68.95% |
| 7 | 1 | 181701 | -61292 | -25.22% | 52.44% | 137797 | 49.01% | 47.68% | 49.16% | 48.22% |

**Ideal district size 485,986 = (2 judges), 242,993 (1 judge)**
**Total deviation = 43.16%**

39.   Since   2010,   the   Black   population   percentage   has   increased   in

underpopulated District 7, which is estimated to be majority-Black (all ages) in 2019

at 53.43%.[14]   And the 2015-2019 ACS indicates that District 7 has also become

---

[12] Percent CVAP by race and ethnicity in **Figure 6** is based on the 5-Year 2008-2012 Special Tabulation of the American Community Survey.  The midpoint of the 2008-2012 survey period is July 1, 2010, roughly coincident with the April 1, 2010 decennial Census.  The ACS Special Tabulation does not provide an "Any Part" estimate, so the SR NH Black CVAP slightly understates AP Black CVAP.

[13] The 2015-2019 ACS is the most current 5-year Special Tabulation survey available, with a survey midpoint of July 1, 2017.  The 2016-2020 ACS is scheduled for release in February 2022.

[14] The Census Bureau Estimates Program does not publish sub-state annual estimates of the voting age population.

majority-Black citizen voting age (50.87% NH BCVAP)—up from 49.16% at the start of the decade.

40. As shown in **Figure 7**, the 2003 Plan has become even more malapportioned since 2010, with a total deviation of 70.78%, according to 2019 Census Bureau estimates.[15]

**Figure 7: 2003 Plan – 2019 Estimates, 2015-19 ACS CVAP**

| Dist. | # of Judges | 2019 Pop. | Dev | % Dev | % AP Black | %NH BCVAP | % NH WCVAP |
|---|---|---|---|---|---|---|---|
| 1 | 2 | 471906 | -31061 | -6.18% | 17.77% | 14.27% | 80.88% |
| 2 | 2 | 509043 | 6076 | 1.21% | 5.73% | 4.26% | 90.84% |
| 3 | 2 | 670834 | 167867 | 33.38% | 3.33% | 2.16% | 85.31% |
| 4 | 2 | 483317 | -19650 | -3.91% | 11.86% | 10.51% | 81.12% |
| 5 | 1 | 200479 | -51005 | 20.28% | 29.60% | 29.05% | 67.83% |
| 6 | 2 | 524803 | 21836 | 4.34% | 31.41% | 28.48% | 65.90% |
| 7 | 1 | 157422 | -94062 | 37.40% | 53.43% | 50.87% | 45.95% |

**Ideal district size = 502,967 (2 judges), 251,484 (1 judge)**
**Total deviation = 70.78%**

41. Just 16.6% of the 2019 total Black population in Arkansas resides in District 7. Put differently, about four of five Black voters statewide are submerged in overwhelmingly NH white districts, with most of those Black voters living in counties that are adjacent to or near current District 7. As demonstrated **in Section III** below, there is sufficient Black population in neighboring counties to create a second majority-Black district for the Court of Appeals.

---

[15] https://www.census.gov/newsroom/press-kits/2020/population-estimates-detailed.html

## III.  GINGLES 1 ILLUSTRATIVE PLANS:  APPELLATE COURTS

42.  The Court of Appeals has not been redistricted since the 2003 Plan.  This section presents two illustrative plan configurations for the Court of Appeals.  Both illustrative plans comply with one-person one-vote and non-dilution of minority voting strength, as well as other traditional redistricting principles, including compactness, contiguity, and respect for communities of interest.

43.  Specifically, I demonstrate that based on either the 2010 Census or 2019 Census Bureau estimates,[16] a 12-district Appellate Court plan can be drawn with two majority-Black districts

44.  The illustrative plans presented below meet the first *Gingles* precondition, i.e., the Black population is sufficiently numerous and geographically compact to allow for the creation of at least one single-member majority Black district.

45.  The illustrative plans also demonstrate that there are viable remedies for the Court of Appeals in this Section 2 lawsuit.  Alternative county configurations beyond those presented in the Plaintiffs' illustrative plans are possible.

---

[16] The 2020 Census PL94-171 redistricting file has been delayed by several months due to the pandemic.  Accordingly, in the absence of 2020 Census data, I rely on 2010 decennial Census or the 2019 estimates published by the Census Bureau.  Further, as explained in **Appendix 2,** for counties that are split between two districts, 2019 county-level estimates are disaggregated to the 2010 census block level.  The Census Bureau Estimates Program does not publish county-level or block-level voting age population estimates.

46. The illustrative plans are drawn to follow, to the extent possible, county boundaries. Where counties are split to ensure districts are equally apportioned, I have used whole 2010 Census VTDs[17] as sub-county components to determine boundary lines.

## A. Court of Appeals Gingles 1 Plans

### *(i)*     *Illustrative AC Plan 1 – 2010 Census*

47. The map in **Figure 8** depicts 12-district *Illustrative AC 1*, apportioned according to the 2010 Census. *Illustrative AC 1* features two majority-Black CVAP districts, according to the 2015-19 ACS – District 7 and District 8. *Illustrative AC 1* has a total deviation of 8.5% and splits three counties along Census VTD lines—Pulaski, Jefferson, and Washington—to allow for the districts to be substantially more balanced in population than the current 2003 Court of Appeals Plan.

---

[17] Voting Tabulation Districts ("VTDs") follow census block boundaries and are Census Bureau proxies for precincts which sometimes split census blocks.

**Figure 8: Appellate Court – Illustrative AC Plan 1 – 2010 Census**



48. **Figure 9** presents summary population statistics for *Illustrative AC 1*.

Detailed population statistics for *Illustrative AC 1* are in **Exhibit B-1.  Exhibit B-2**

is a high-resolution map depicting *Illustrative AC 1*.

20

**Figure 9: Illustrative AC Plan 1– 2010 Census, 2015-19 ACS CVAP**

| Dist. | Pop. | Dev | % Dev | % AP Black | 18+ Pop | % 18+ AP Black | % 18+ NH White | % NH BCVAP | % NH White CVAP |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 247019 | 4026 | 1.66% | 3.29% | 184107 | 2.73% | 80.67% | 3.17% | 84.12% |
| 2 | 239333 | -3660 | -1.51% | 1.62% | 172563 | 1.29% | 80.87% | 1.62% | 84.66% |
| 3 | 239929 | -3064 | -1.26% | 7.40% | 182041 | 6.56% | 86.37% | 7.41% | 86.75% |
| 4 | 246822 | 3829 | 1.58% | 7.04% | 188267 | 6.24% | 89.59% | 5.99% | 89.25% |
| 5 | 234609 | -8384 | -3.45% | 0.82% | 184408 | 0.61% | 94.27% | 0.61% | 93.94% |
| 6 | 247862 | 4869 | 2.00% | 10.39% | 187413 | 8.82% | 87.44% | 9.33% | 86.59% |
| 7 | 234287 | -8706 | -3.58% | 53.71% | 172598 | 50.23% | 46.46% | 50.80% | 44.76% |
| 8 | 243696 | 703 | 0.29% | 50.02% | 184304 | 46.11% | 45.93% | 51.12% | 43.95% |
| 9 | 233946 | -9047 | -3.72% | 12.16% | 178983 | 10.50% | 82.21% | 13.80% | 79.52% |
| 10 | 253918 | 10925 | 4.50% | 7.18% | 195685 | 6.18% | 88.73% | 7.39% | 87.77% |
| 11 | 254606 | 11613 | 4.78% | 10.61% | 190573 | 9.43% | 77.95% | 10.21% | 78.69% |
| 12 | 239891 | -3102 | -1.28% | 30.20% | 183501 | 28.38% | 67.07% | 29.34% | 67.10% |

**Ideal district size = 242,993 (1 judge)**
**Total deviation = 8.50%**

49.  District 7 (50.8% NH BCVAP) encompasses the seven Delta counties that border the Mississippi River, along with all of Lincoln County and a portion of Jefferson County.  Pine Bluff in Jefferson County is split between District 7 and District 8 along Census VTD lines.

50.  District 8 (51.12% NH BCVAP) covers the remainder of Jefferson County that is not in District 7, sharing Pulaski County with District 9.  District 8 includes portions of Little Rock, North Little Rock, and Jacksonville.

51. This method of splitting counties and/or cities is commonplace in Arkansas.  The map in **Figure 10** displays a closer view of Pulaski County under *Illustrative AC 1.  Illustrative AC 1* splits Pulaski County in a fashion similar to the way in which it is already divided for the Arkansas circuit courts.  Red lines show

circuit court boundaries.  Pulaski County is split between majority-Black Circuit Court

6.1 and majority-white Circuit Court 6. 2.

**Figure 10: Pulaski County – Illustrative AC 1 with Circuit Court Overlay**
**2010 Census**



52. In the **Figure 10** map, red labels and lines identify circuit court districts.

Blue labels and color blocked areas identify *Illustrative AC 1* districts.  Thin black

lines demarcate 2010 VTDs. Thick black lines show county boundaries where there

is no corresponding circuit court boundary (e.g., the Perry-Pulaski county line).

53. Under *Illustrative AC 1*, District 8 encompasses all of the 2010 VTDs in Pulaski County that are in Circuit Court District 6.1, along with several adjacent VTDs with significant Black populations that are assigned to Circuit Court District 6.2.

54. The map in **Figure 11**, in the same style as **Figure 10**, shows a closer view of Jefferson County under *Illustrative AC 1*.  Jefferson County is split between Circuit Court majority-Black 11W.1 and majority-white Circuit Court 11W.2.   Thus, *Illustrative AC 1* splits Jefferson County in a similar fashion to the way it is split for the circuit courts.

**Figure 11: Jefferson County – Illustrative AC 1 with Circuit Court Overlay 2010 Census**



***(ii)*** ***Illustrative AC Plan 2*** **– 2019 Census Estimates**

55. The map in **Figure 12** depicts 12-district *Illustrative AC 2*, based on 2019 Census estimates. Like *Illustrative AC 1*, *Illustrative AC 2* contains two-majority Black districts—District 7 (50.17% NH BCVAP) and District 8 (50.58% NH BCVAP), according to the 2015-2019 ACS.

**Figure 12: Appellate Court – Illustrative AC Plan 2
2019 Census Estimates**



56. Compared to *Illustrative AC 1*, predominantly rural *Illustrative AC 2* District 7 extends deeper into Jefferson County and adds Drew and Bradley Counties to the south. Rather than including Mississippi County in its entirety, as in *Illustrative AC Plan 1*, only the eastern part of Mississippi County (divided along 2010 Census VTD lines), is included in District 7. Majority-Black District 8 expands into Lower Arkansas, picking up four counties—Cleveland, Dallas, Calhoun, and Ouachita.

25

57. **Figure 13** presents summary population statistics for *Illustrative AC 2*.

**Exhibit C** is a high-resolution map of *Illustrative AC 2*.

**Figure 13: Illustrative AC Plan 2** – **2019 Census Estimates, 2015-19 ACS CVAP**

| Dist. | Pop. | Dev | % Dev | % AP Black | % NH BCVAP | % NH White CVAP |
|---|---|---|---|---|---|---|
| 1 | 263417 | 11933 | 4.75% | 4.47% | 3.34% | 82.57% |
| 2 | 254911 | 3427 | 1.36% | 2.82% | 1.70% | 85.08% |
| 3 | 255218 | 3734 | 1.48% | 8.99% | 7.41% | 86.75% |
| 4 | 254619 | 3135 | 1.25% | 8.10% | 6.55% | 88.78% |
| 5 | 254427 | 2943 | 1.17% | 1.56% | 0.65% | 94.12% |
| 6 | 244824 | -6660 | -2.65% | 12.09% | 8.54% | 86.97% |
| 7 | 242214 | -9270 | -3.69% | 53.49% | 50.17% | 45.51% |
| 8 | 246451 | -5033 | -2.00% | 54.94% | 50.58% | 45.12% |
| 9 | 260582 | 9098 | 3.62% | 14.80% | 15.07% | 78.31% |
| 10 | 240088 | -11396 | -4.53% | 9.00% | 6.85% | 88.24% |
| 11 | 251538 | 54 | 0.02% | 6.65% | 5.29% | 82.11% |
| 12 | 249515 | -1969 | -0.78% | 25.23% | 23.77% | 72.16% |

**Ideal size = 251,484 (1 judge)**
**Total deviation = 9.28%**

58. **Figure 14** displays Mississippi County under *Illustrative AC 2*.  Red lines show how Mississippi County is split between majority-Black Circuit Court 2.1 and majority-white Circuit Court 2.2.  The county is split in an east-west fashion similar to the circuit court boundaries.

**Figure 14: Mississippi County -- Illustrative AC 2 with Circuit Court Overlay 2019 Estimates**



### (iii)    Summary Finding

59.  To recap, as demonstrated by the above illustrative plans, which represent a sampling out of a range of possible alternatives, Arkansas' Black population is sufficiently large and geographically compact to allow for the creation of two single-member majority-Black districts for the Arkansas Court of Appeals.

## IV. GINGLES 1 ILLUSTRATIVE PLANS:  SUPREME COURT

60.  This section presents two illustrative plan configurations for the Arkansas Supreme Court, for which justices currently run at large.[18]  Both illustrative plans are comprised of a 7-district Supreme Court with one majority-Black district and comply with traditional redistricting principles, including compactness, contiguity, respect for communities of interest, and the non-dilution of minority voting strength, as well as ensuring districts are not malapportioned.

61.  The illustrative plans meet the first *Gingles* precondition, i.e., the Black population is sufficiently numerous and geographically compact to allow for the creation of at least one single-member majority Black district.  The illustrative plans also demonstrate that there are viable remedies in this Section 2 lawsuit.  Alternative plan configurations beyond those presented in the Plaintiffs' illustrative plans are possible.

62. The illustrative plans are drawn to follow, to the extent possible, county boundaries.  Only one county is split in both plans—Pulaski County—to ensure districts are equally apportioned.  I have used whole 2010 Census VTDs as sub-county components to determine district lines.

---

[18] An at-large election system is one in which all voters can vote for all candidates running for open seats in the jurisdiction and candidates run in an entire jurisdiction rather than from districts or wards in the area.

63. Given the delay of the 2020 Census PL94-171 redistricting file, I demonstrate that a 7-district plan for the Supreme Court can be drawn based on either the 2010 Census (*Illustrative SC 1*) or 2019 Census Bureau estimates (*Illustrative SC 2*).

64. The map in **Figure 15** depicts 7-district *Illustrative SC 1*, apportioned according to the 2010 Census.

**Figure 15: Supreme Court – Illustrative SC Plan 1**
**2010 Census**



65. Majority-Black District 7 (53.59% NH BCVAP) is anchored in the Delta and Little Rock. *SC Plan 1* encompasses a dozen whole counties plus the southern part of Pulaski County, which is split between District 7 and District 4 along 2010

30

VTD lines.  As I noted in describing the Illustrative Plans for the Court of Appeals, such a split of a county when creating districts is not uncommon in Arkansas.

66. **Figure 16** reports summary population statistics, under *Illustrative SC 1*. *Illustrative SC 1* has a total deviation of 6.68%.  Detailed population statistics for *Illustrative SC 1* are in **Exhibit D-1**.  **Exhibit D-2** is a high-resolution map depicting *Illustrative SC 1*.

**Figure 16: Supreme Court – Illustrative SC Plan 1**
**2010 Census, 2015-2019 ACS**

| Dist. | Pop. | Dev | % Dev | % AP Black | 18+ Pop | % 18+ AP Black | % 18+ NH White | % NH BCVAP | % NH White CVAP |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 401427 | -15133 | -3.63% | 12.68% | 300389 | 10.95% | 84.44% | 10.89% | 84.07% |
| 2 | 408932 | -7628 | -1.83% | 1.05% | 319685 | 0.79% | 94.50% | 0.94% | 94.16% |
| 3 | 424404 | 7844 | 1.88% | 2.58% | 311072 | 2.15% | 79.56% | 2.55% | 83.79% |
| 4 | 429281 | 12721 | 3.05% | 15.26% | 330397 | 13.43% | 80.49% | 16.36% | 78.08% |
| 5 | 424977 | 8417 | 2.02% | 20.82% | 324887 | 19.22% | 74.53% | 19.86% | 75.07% |
| 6 | 420850 | 4290 | 1.03% | 6.44% | 315247 | 5.60% | 83.97% | 6.27% | 84.61% |
| 7 | 406047 | -10513 | -2.52% | 54.55% | 302766 | 51.08% | 43.89% | 53.59% | 42.18% |

**Ideal size = 416,560 (1 judge)**
**Total deviation = 6.68 %**

*(ii)    Illustrative SC Plan 2 – 2019 Census Estimates*

67.  The map in **Figure 17** depicts 7-district *Illustrative SC 2*, apportioned according to 2019 Census estimates.  Majority-Black District 7 (51.55% NH BCVAP) expands from the Census 2010 *Illustrative SC 1* configuration to include Mississippi County.  Elsewhere, *Illustrative SC 2* encompasses the same set of counties as *Illustrative SC 1*.  Pulaski County is split between District 7 and District 4 along 2010 VTDs.

31

**Figure 17: Supreme Court – Illustrative SC Plan 2**
**2019 Estimates**



68. **Figure 18** reports summary population statistics under *Illustrative SC 2*.

*Illustrative SC 2* has a total deviation of 6.09%.  **Exhibit E** is a high-resolution map

depicting *Illustrative SC 2*.

**Figure 18: Supreme Court – Illustrative SC Plan 2
2019 Estimates, 2015-2019 ACS**

| Dist. | 2019 Pop. | Dev | % Dev | % 2019 AP Black | %NH BCVAP | %NH WCVAP |
|---|---|---|---|---|---|---|
| 1 | 427682 | -3433 | -0.80% | 10.13% | 7.36% | 88.05% |
| 2 | 444571 | 13456 | 3.12% | 5.83% | 4.40% | 90.43% |
| 3 | 435041 | 3926 | 0.91% | 2.33% | 1.32% | 87.59% |
| 4 | 428812 | -2303 | -0.53% | 16.74% | 15.95% | 78.38% |
| 5 | 433137 | 2022 | 0.47% | 21.26% | 20.08% | 74.93% |
| 6 | 430271 | -844 | -0.20% | 5.57% | 4.19% | 82.39% |
| 7 | 418290 | -12825 | -2.97% | 55.88% | 51.55% | 44.17% |

**Ideal size = 431,115 (1 judge)
Total deviation = 6.09%**

*(iii)    Summary Finding*

69.  To recap, as demonstrated by the above illustrative plans, which represent a sampling out of a range of possible alternatives, Arkansas' Black population is sufficiently large and geographically compact to allow for the creation of one single-member majority-Black district for the Arkansas Supreme Court.

**V.    SOCIOECONOMIC PROFILE OF ARKANSAS**

70.  As in most other Section 2 cases where I have served as an expert, I also reviewed the socioeconomic statistics for Arkansas as reported in the ACS.   In Arkansas, African Americans and Latinos trail NH whites across most key indicators of socioeconomic well-being.  This disparity is summarized in the charts in **Exhibit F-1** and the table in **Exhibit F-2**, as reported in Table S0201 from the 2019 ACS. Note that socioeconomic data from the 2020 ACS, which will take into account the impact of the pandemic, will not be available until the fall of 2021.

71.  The following items specifically compare African Americans (NH AP Black) and NH whites, according to the 1-Year 2019 ACS:

**A.  Income**

- Over a quarter (27.3%) of African Americans in Arkansas live in poverty, compared to 13.3% of whites.  (**Exhibit F-1 at p. 22 and Exhibit F-2 at p. 8**)

- About two in five (38.1%) African American children live in poverty, compared to 16.44% of white children.  (**Exhibit F-1at p. 22 and Exhibit F-2 at p. 8**)

- About half (48.3%) of African American female-headed households with children live in poverty, compared to a 33.1% poverty rate for white female-headed households.  (**Exhibit F-1 at p. 20 and Exhibit F-2 at p. 8**)

- African American median household income is $33,779, compared to $52,788 for white households.  (**Exhibit F-1 at p. 14 and Exhibit F-2 at p. 7**)

- Per capita income disparities in Arkansas track the disparities seen in median household income.  African American per capita income is $18,308, compared to white per capita income of $30,250.  (**Exhibit F-1 at p. 17 and Exhibit F-2 at p. 7**)

- Nearly one fourth (23.8%) of African American households rely on food stamps (SNAP)—about three times the 8.4% SNAP participation rate of white households.  (**Exhibit F-1 at p. 15 and Exhibit F-2 at p. 7**)

**B.  Education**

- Of persons 25 years of age and over, 13.0% of African Americans have not finished high school, compared to 10.1% of their white counterparts.  (**Exhibit F-1 at p. 5 and Exhibit F-2 at p. 3**)

34

- At the other end of the educational scale, for ages 25 and over, 17.3% of African Americans have a bachelor's degree or higher, compared to 24.9% of whites. (**Exhibit F-1 at p. 5 and Exhibit F-2 at p. 3**)

## C.    Employment

- The Black unemployment rate (for the population over 16 years old (expressed as a percent of the civilian labor force)) is 7.6%—compared to a 4.2% white unemployment rate. (**Exhibit F-1 at p. 11 and Exhibit F-2 at p. 5**)

- Of employed African Americans, 24.5% are in service occupations, compared the 15.5% rate of similarly employed whites. (**Exhibit F-1 at p. 13 and Exhibit F-2 at p. 6**)

## E.    Home Ownership

- Fewer than half of African-American householders (44.6%) are homeowners, while 71.1% of white households are owner-occupied. (**Exhibit F-1 at p. 21 and Exhibit F-2 at p. 9**)

- Median home value for African-American homeowners is $85,900, compared to the $143,600 median home value for Whites. (**Exhibit F-1 at p. 25 and Exhibit F-2 at p. 9**)

## F.    Health

- About two in five African Americans (43.1%) aged 65 and over have a disability, compared to 40.7% of their white cohorts. (**Exhibit F-1 at p. 7 and Exhibit F-2 at p. 4**)

- 8.6% of African Americans have no health insurance coverage, compared to 7.2% of Whites. (**Exhibit F-1 at p. 18 and Exhibit F-2 at p. 7**)

### G.   Transportation/Communication

- About one in six African American households (14.2%) lacks access to a vehicle, while 4.9% of white households are without a vehicle.  (**Exhibit F-1 at p. 23 and Exhibit F-2 at p. 9**)

- About 11.8% of African Americans carpool or take public transportation to work, compared to 9.4% of whites.  (**Exhibit F-1 at p. 12 and Exhibit F-2 at p. 5**)

- There is a 6-point Black-white gap in households with a computer, smartphone, or tablet—84.7% versus 90.3%. (**Exhibit F-1 at p. 27 and Exhibit F-2 at p. 9**)

- Nearly one fourth (24.9%) of African American households do not have a broadband internet connection, compared to 19.2% of white households.  (**Exhibit F-1 at p. 27 and Exhibit F-2 at p. 9**)

72.  Based on 2019 Census Bureau estimates, about 31% of the African American population in Arkansas lives in Pulaski County—a county that is excluded from opportunity District 7 under the 2003 Court of Appeals Plan.  Socioeconomic disparities by race in Pulaski County generally mirror the statewide disparities. **Exhibit G** contrasts socioeconomic characteristics of NH whites and African Americans in Pulaski County, according to the 5-Year *2015-2019 ACS*.

## VI. SUMMARY

73. From the preceding analysis, I reach the following conclusions:

- Black people in Arkansas are sufficiently numerous and geographically compact, consistent with the *Gingles 1* precondition, to comprise a majority of the citizen voting-age population in at least one Supreme Court district under a 7-district plan and two Court of Appeals districts under a 12-district plan.

- Plaintiffs' illustrative plans respect one-person one-vote and the non-dilution of minority voting strength, as well as other traditional redistricting criteria, including compactness, contiguity, and communities of interest.

- As reported in the *American Community Survey*, in Arkansas, white people significantly outpace Black people across most indicators of socioeconomic stability.

Executed on June 15, 2021

*William S. Cooper*

WILLIAM S. COOPER