**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

| | |
|---|---|
| THE CHRISTIAN MINISTERIAL ALLIANCE, et al., | |
| Plaintiffs, | Civil Case No. 4:19-cv-402-JM |
| v. | |
| ASA HUTCHINSON, et al., | |
| Defendants. | |

**PLAINTIFFS' POST-TRIAL**
**PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

PROPOSED FINDINGS OF FACT ........................................................................................1

    Plaintiffs' Standing .............................................................................................................6

    Proper Defendants.............................................................................................................7

    *GINGLES I* .....................................................................................................................11

        Plaintiffs' Illustrative Plans ........................................................................................11

        Numerosity of the Black Population ...........................................................................15

        Compactness of the Black Population...........................................................................16

        Overall Conclusion .....................................................................................................21

    *GINGLES II* AND *III* ..................................................................................................21

        Dr. Baodong Liu's Racially Polarized Voting Analysis ............................................21

        Dr. John Alford's Racially Polarized Voting Analysis..............................................27

        Overall Conclusion .....................................................................................................30

    TOTALITY OF CIRCUMSTANCES.................................................................................31

        Senate Factor 1: History of Voting Discrimination in Arkansas..........................................32

        Senate Factor 2: Racially Polarized Voting ...............................................................37

        Senate Factor 3: Enhancing Factors............................................................................39

        Senate Factor 4: Informal Candidate Slating...............................................................42

        Senate Factor 5: Discrimination in Areas of Life that Hinder Political Participation ...........43

        Senate Factor 6: Racial Appeals .................................................................................48

        Senate Factor 7: Lack of Black Electoral Success......................................................50

        Senate Factor 9: Tenuousness......................................................................................52

Overall Conclusion ...................................................................................................56

CONCLUSIONS OF LAW ..............................................................................................56

Jurisdiction ...............................................................................................................56

Overall Legal Framework ........................................................................................60

*GINGLES I* ................................................................................................................ 63

Numerosity ...............................................................................................................64

Compactness .............................................................................................................65

*GINGLES II* AND *III* .................................................................................................. 75

TOTALITY OF CIRCUMSTANCES ...............................................................................85

Senate Factor 1: History of Voting Discrimination in Arkansas ...........................86

Senate Factor 2: Racially Polarized Voting ...........................................................87

Senate Factor 3: Enhancing Factors .......................................................................87

Senate Factor 4: Informal Candidate Slating..........................................................89

Senate Factor 5: Discrimination in Areas of Life that Hinder Political Participation ..........89

Senate Factor 6: Racial Appeals .............................................................................90

Senate Factor 7: Lack of Black Electoral Success..................................................91

Senate Factor 9: Tenuousness..................................................................................93

Overall Conclusion on on Totality of the Circumstances .......................................94

REMEDY ........................................................................................................................95

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
138 S. Ct. 2305 (2018) ...........................................................................................79

*African Am. Voting Rights Legal Defense Fund v. Villa*,
54 F.3d 1345 (8th Cir. 1995) ................................................................................82

*Ala. Black Legislative Caucus v. Alabama*,
575 U.S. 254 (2015) ........................................................................................72, 75

*Baker v. Carr*,
369 U.S. 186 (1962) ...............................................................................................66

*Balt. Cnty. Branch of the NAACP v. Balt. Cnty.*,
No. 21-cv-3232, 2022 WL 657562 (D. Md. Feb. 22, 2022).................................79

*Bartlett v. Strickland*,
556 U.S. 1 (2009) .......................................................................................61, 64, 73

*Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788 (2017) ..................72, 74, 75

*Black Political Task Force v. Galvin*,
300 F. Supp. 2d 291 (D. Mass. 2004)..............................................................25, 81

*Bone Shirt v. Hazeltine*,
336 F. Supp. 2d 976 (D.S.D. 2004)..............................................................*passim*

*Bone Shirt v. Hazeltine*,
461 F.3d 1011 (8th Cir. 2006) .....................................................................*passim*

*Brown v. Board of Education*,
347 U.S. 483 (1954) ...............................................................................................44

*Brown v. Thomson*,
462 U.S. 835 (1983) ...............................................................................................67

*Buckanaga v. Sisseton Indep. Sch. Dist. No. 54-5, S. Dakota*,
804 F.2d 469 (8th Cir. 1986) ................................................................................88

*Campos v. City of Baytown, Tex.*,
840 F.2d 1240 (5th Cir. 1988) ..............................................................................76

*Chisom v. Roemer*,
501 U.S. 380 (1991) .......................................................................................61, 62, 67

*Church v. Missouri*,
    913 F.3d 736 (8th Cir. 2019) ...........................................................................58

*Cisneros v. Pasadena Ind. Sch. Dist.*,
    No. 4:12-CV-2579, 2014 WL 1668500 (S.D. Tex. Apr. 25, 2014) ...................................81

*Citizens for a Better Gretna v. City of Gretna*,
    834 F.2d 496 (5th Cir. 1987) ................................................................76, 83

*Citizens for Equal Protection v. Bruning*,
    455 F.3d 859 (8th Cir. 2006) ................................................................58, 59

*Clark v. Calhoun Cnty.*,
    21 F.3d 92 (5th Cir. 1994) ...........................................................................63

*Clark v. Calhoun Cnty.*,
    88 F.3d 1393 (5th Cir. 1996) ................................................................63, 73

*Clerveaux v. E. Ramapo Cent. Sch. Dist.*,
    984 F.3d 213 (2d Cir. 2021) .......................................................................89

*Cooper v. Harris*,
    137 S. Ct. 1455 (2017) .......................................................................72, 74, 75

*Cottier v. City of Martin*,
    445 F.3d 1113(8th Cir. 2006) .......................................................................85

*Cottier v. City of Martin*,
    604 F.3d 553 (8th Cir. 2010) ................................................................64, 77, 80

*Davis v. Chiles*,
    139 F.3d 1414 (11th Cir. 1998)....................................................................73

*Digital Recognition Network v. Hutchinson*
    803 F.3d 952, 958 (8th Cir. 2015)....................................................................58

*Drennen v. Bennett*,
    230 Ark. 330 (1959) ................................................................................9, 59

*Fairley v. Hattiesburg*,
    584 F.3d 660 (5th Cir. 2009) .......................................................................71

*Fusilier v. Landry*,
    963 F.3d 447 (5th Cir. 2020) .......................................................................67

*Ga. State Conference of the NAACP v. Fayette Cnty. Bd. of Comm'rs*,
    775 F.3d 1336 (11th Cir. 2015)....................................................................86

*Georgia v. Ashcroft,*
    539 U.S. 461 (2003) ................................................................................. 64

*Giron v. City of Alexander,*
    693 F. Supp. 2d 904 (E.D. Ark. 2010) ............................................. 65, 66, 68, 69

*Gonzalez v. Harris Cnty.,*
    601 F. App'x 255 (5th Cir. 2015) ......................................................... 68

*Goosby v. Town Bd. of Hempstead, N.Y.,*
    180 F.3d 476 (2d Cir. 1999) ................................................................. 84

*Harris v. Ariz. Indep. Redistricting Comm'n,*
    578 U.S. 253 (2016) ............................................................................. 66

*Harvell v. Blytheville Sch. Dist. No. 5,*
    71 F.3d 1382 (8th Cir. 1995) ....................................................... *passim*

*Hopman v. Union Pac. R.R.,*
    No. 4:18-cv-74, 2022 WL 963662 (E.D. Ark. Mar. 30, 2022) ............................ 80

*Houston Lawyers' Ass'n v. Att'y Gen. of Tex.,*
    501 U.S. 419 (1991) ............................................................................. 93

*Houston v. Lafayette Cnty,*
    56 F.3d 606 (5th Cir. 2009) ................................................................. 71

*Hunt v. Arkansas,*
    No. PB-C-89-406, 1991 WL 12009081 (E.D. Ark. Nov. 7, 1991) ................... 6, 51

*Jeffers v. Beebe,*
    895 F. Supp. 2d 920 (E.D. Ark. 2012) ............................................... 64, 87

*Jeffers v. Clinton,*
    730 F. Supp. 196 (8th Cir. 1989) ................................................ 33, 65, 90

*Jeffers v. Clinton,*
    756 F. Supp. 1195 (E.D. Ark. 1990) ................................................ 33, 52

*Jeffers v. Tucker,*
    847 F. Supp. 655 (E.D. Ark. 1994) .......................................................... 33

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.,*
    4 F.3d 1103 (3d Cir. 1993) ............................................................ 76, 78

*Johnson v. De Grandy,*
    512 U.S. 997 (1994) ...................................................................... 63, 92

*Jones v. Jefferson County Board of Education*,
  No. 2:19-CV-01821-MHH, 2019 WL 7500528 (N.D. Ala. Dec. 16, 2019)..........................22

*Kemp v. State*,
  324 Ark. 178 (1996) ...........................................................................................................55

*Large v. Fremont Cnty.*,
  709 F. Supp. 2d 1176 (D. Wyo. 2010) ...............................................................................81

*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006) ......................................................................................................*passim*

*Luna v. Cnty. of Kern*,
  291 F. Supp. 3d 1088 (E.D. Cal. 2018) .................................................................. 68, 70, 71

*McDaniel v. Precythe*,
  897 F.3d 946 (8th Cir. 2018) ..................................................................................... 57, 60

*McMillan v. Escambia County*,
  748 F.2d 1037 (11th Cir. 1984)......................................................................... 25, 92, 93, 94

*Miller v. Johnson*,
  515 U.S. 900 (1995) .....................................................................................................*passim*

*Missouri State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*,
  201 F. Supp. 3d 1006 (E.D. Mo. 2016) ................................................................. 76, 78, 89

*Missouri State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*,
  894 F.3d 924 (8th Cir. 2018) .......................................................................................*passim*

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ...........................................................................................................59

*Montes v. City of Yakima*,
  40 F. Supp. 3d 1377 (E.D. Wash. 2014)..............................................................................70

*NAACP v. City of Columbia*,
  33 F.3d 52 (4th Cir. 1994) ..................................................................................................63

*Nipper v. Smith*,
  39 F.3d 1494 (11th Cir. 1994) ............................................................................................93

*Perkins v. City of W. Helena, Ark.*,
  675 F.2d 201 (8th Cir. 1982) .........................................................................................40, 90

*Pope v. County of Albany*,
  94 F. Supp. 3d 302 (N.D.N.Y. 2015) .................................................................................22

*Prejean v. Foster*,
    227 F.3d 504 (5th Cir. 2000) ................................................................. 61, 67, 93

*Quern v. Jordan*,
    440 U.S. 332 (1979) .................................................................................57

*Rangel v. Morales*,
    8 F.3d 242 (5th Cir. 1993) ........................................................................79

*Rogers v. Lodge*,
    458 U.S. 613 (1982) .................................................................................88

*Shaw v. Reno*
    509 U.S. 630 (1993) ............................................................................. 65, 66

*Smith v. Clinton*,
    687 F. Supp. 1310 (E.D. Ark. 1988) ................................................... 78, 87, 90

*Taylor v. Howe*,
    225 F.3d 993 (8th Cir. 2000) ......................................................................87

*Teague v. Attala Cnty., Miss.*,
    92 F.3d 283 (5th Cir. 1996) ........................................................................84

*Theriot v. Parish of Jefferson*,
    185 F.3d 477 (5th Cir. 1999) ......................................................................70

*Thomas v. Bryant*,
    366 F. Supp. 3d 786 (S.D. Miss. 2019) .........................................................79

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) .........................................................................*passim*

*Trost v. Trek Bicycle Corp.*,
    162 F.3d 1004 (8th Cir. 2008) ....................................................................80

*United States v. City of Euclid*,
    580 F. Supp. 2d 584 (N.D. Ohio 2008) ..........................................................81

*United States v. Marengo Cnty. Comm'n*,
    731 F.2d 1546 (11th Cir. 1984)....................................................................89

*United States v. Vill. of Port Chester*,
    No. 06 CIV. 15173 (SCR), 2008 WL 190502 (S.D.N.Y. Jan. 17, 2008) ...................83

*Wells v. White*,
    274 Ark. 197 (1981) .................................................................................69

*Westwego Citizens for Better Gov't v. City of Westwego*,
    872 F.2d 1208 (5th Cir. 1989) ............................................................. 78, 83, 91

*Westwego Citizens for Better Gov't v. City of Westwego*,
    946 F.2d 1109 (5th Cir. 1991) ............................................................. 86

*Whitfield v. Democratic Party*,
    890 F.2d 1423 (8th Cir. 1989) ............................................................. 86

*Wis. Legislature v. Wis. Elections Comm'n*,
    142 S. Ct. 1245 (2022) ............................................................. 75

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
    979 F.3d 1282 (11th Cir. 2020) ............................................................. 77

**Statutes**

52 U.S.C. § 10301 ............................................................. 1, 95

52 U.S.C.§ 10301(a) ............................................................. 60

52 U.S.C. § 10301(b) ............................................................. 60, 62, 85

Act 208, § 1, 1979 Ark. Acts 467 ............................................................. 1

Ark. Code Ann. 16-118-105(b)(1 ............................................................. 59

Ark. Code Ann. §§ 7-5-203 ............................................................. 7

Ark. Code Ann. § 7-10-102(c)(1) ............................................................. 4

Ark Code Ann. § 7-10-102(c)(2) ............................................................. 4

Ark. Code Ann. § 14-42-206 ............................................................. 39

Ark. Code Ann. § 16-12-202 ............................................................. 3

Ark, Code Ann. § 16-12-202 (1)-(12) ............................................................. 3

Ark. Code Ann. § 16-118-105(b)(1) ............................................................. 9, 59

Ark. Code. Ann. §25-16-702 ............................................................. 9

Ark. Code Ann. § 25-16-706 ............................................................. 9

Ark. Code Ann. § (b)(3)(B) ............................................................. 9

Ark. Laws Act 889 § 5(2) ............................................................. 3

Ark. Laws Act 1085 § 4(b) (1993) ............................................................................3

Ark Laws Act 1323 § 1 ............................................................................................3

Ark. Laws Act 1323 § 1(b)(1995) ...........................................................................67

**Constitutional Provisions**

Ark. Const. amend. XXIX ....................................................................................4, 42

Ark. Const. amend. XXIX, § 5 .................................................................................4

Ark Const. amend. LXXX, §2 ..................................................................................1

Ark. Const. amend. LXXX, §2(A) ..........................................................................50

Ark. Const. amend. LXXX, §5 .................................................................................2

Ark. Const. amend. LXXX, §16 ...............................................................................1

Ark. Const. amend. LXXX, § 18 ..............................................................................4

Ark. Const. amend. LXXX § 18(B) ........................................................................58

Ark. Const. amend. LXXX, § 22(A) .......................................................................50

Ark. Const. art. VI, § 2 (1836) .................................................................................1

Ark. Const. Art. VI. § 2 ......................................................................................8, 73

Ark. Const. Art. VI. §§ 2, 7 ...............................................................................8, 58

Ark. Const. art. VI § 15 ...........................................................................................8

Ark. Const. art. VII, § 6 (1874) .............................................................................50

Ark. Const. § I amend. XXIX ..................................................................................4

Ark Const. § II amend. XXIX ..................................................................................4

Ark. Const. § IV amend. XXIX ...............................................................................4

**Other Authorities**

Ark. S. Ct. Rule 1-2(a) .............................................................................................1

Ark. S. Ct. Rule 1-2(c) .............................................................................................1

Ark. S. Ct. Rule 5-2I ....................................................................................2, 53, 94

Ark. Sup. Ct. R. 1-2 ...................................................................................................................2

1.      Plaintiffs challenge Arkansas's use of at-large voting for the Arkansas Supreme Court and the current district configuration for the Arkansas Court of Appeals because these methods dilute Black voting strength in violation of Section 2 of the Voting Rights Act of 1965 ("Section 2"), 52 U.S.C. § 10301. The Court held a bench trial on these claims from April 25 to 28, 2022, and May 2, 2022. Plaintiffs' Proposed Findings of Fact and Conclusions of Law are as follows:

## PROPOSED FINDINGS OF FACT

2.      In 1836, Arkansas established the Arkansas Supreme Court. *See* Ark. Const. art. VI, § 2 (1836). The Supreme Court's jurisdiction includes interpretation or construction of the State's Constitution; appeals involving the death penalty or life imprisonment; and election procedures. Joint Stipulations ¶ 38, ECF No. 163; Ark. S. Ct. Rule 1-2(a). The Supreme Court also has authority to review an appeal that involves an issue it determines to be of "significant public interest or a legal principle of major importance." Joint Stipulations ¶ 39; Ark. S. Ct. Rule 1-2(c).

3.      To qualify for a seat on the Arkansas Supreme Court, a candidate must have been a licensed attorney in Arkansas for at least eight years and must be a "qualified elector" within the State of Arkansas. Joint Stipulations ¶ 40; Ark. Const. amend. LXXX, §16. In 1874, Arkansas adopted a statewide election model for all Arkansas Supreme Court justices, which remains the current system. Joint Stipulations ¶ 41; Ark Const. amend. LXXX, §2. The Arkansas Supreme Court currently consists of seven Justices. Joint Stipulations ¶ 42; PTX 465 (Bellamy Dep. Tr. Desig. & Counterdesig.) at 51:5-13; PTX 004 (Running for Public Office - A "Plain English" Handbook) at SOS0158.

4.       In 1979, the Arkansas General Assembly established the Court of Appeals. Act

208, § 1, 1979 Ark. Acts 467, 468 (Feb. 23, 1979). The Court's jurisdiction is determined by the Arkansas Supreme Court. Ark. Sup. Ct. R. 1-2. Judges on the Court of Appeals are eligible to hear cases from anywhere within the Court of Appeals' jurisdiction, regardless of where the case arose. Trial Tr. vol. 3, 434:14–15 (Brown Direct). Decisions of the Court of Appeals are also precedential in any court in the state, just like decisions of the Arkansas Supreme Court. *See* Ark. S. Ct. Rule 5-2I. Merits decisions of the Court of Appeals are typically reached by three-judge panels. Trial Tr. vol. 3, 606:8-607:6 (McCrary Direct). Accordingly, it is common for judges to preside over cases that did not arise in the district from which they were elected.

5.     Court of Appeals Judges are held to the same qualification standard as Supreme Court Justices. Joint Stipulations ¶ 40; Ark. Const. amend. LXXX, §5. Judges of the Court of Appeals have been elected to districts since the Court's creation. In 1996 and 1997, the Arkansas General Assembly expanded the size of the Court of Appeals from six to twelve. PTX 166 (Arkansas Judiciary, Circuit Courts, www.arcourts.gov/courts/court-of-appeals) at 1; *see also* Joint Stipulations ¶ 48.

6.     The Court of Appeals Apportionment Commission was the result of the General Assembly's expansion of the Court of Appeals from six judges to twelve judges. PTX 053 (Court of Appeals Apportionment Commission – Report to Arkansas General Assembly) (2003) at AOC_0000008. On three separate occasions, the Arkansas General Assembly created a Court of Appeals Apportionment Commission to assist with and recommend redistricting for the Arkansas Court of Appeals. Joint Stipulations ¶ 53. Act 1085 of 1993 created a Court of Appeals Apportionment Commission that met in 1994 and reported to the General Assembly in 1995. *Id*. at ¶ 52. Act 1323 of the 1995 General Assembly created the second commission, which reported to the General Assembly in 1997. *Id*. at ¶ 56. Finally, Act 889 of the 1999 General Assembly

created the third and apparently final Commission, which reported to the General Assembly in early 2003. *Id.* at ¶ 58; PTX 031 (Ark. Laws Act 1085 § 4(b) (1993)); Ark Laws Act 1323 § 1 (1995); PTX 040 (Ark. Laws Act 889 § 5(2) (1999)); PTX 053 at AOC_0000008–09; PTX 038 (Court of Appeals Apportionment Commission – Report to the Arkansas General Assembly) (1997) at SOS0902–03; PTX 032 (Court of Appeals Apportionment Commission – Report to the Arkansas General Assembly) (1995) at SOS0950–51. .

7.      Since the First Commission, apportionment commissions had a directive to explore opportunities to create at least one majority-Black district, if not two or three. PTX 032 at SOS0951–52. Indeed, former Assistant Attorney General Tim Humphries, a central figure and advisor throughout the Commission's work, acknowledged that representation of Black voters was "sorely lacking" as there had been "no Black appeals judges," since Reconstruction. *See* PTX 467 (Humphries Dep. Tr. Desig. & Counterdesig.) at 164:2-15. The third and most recent Commission heard testimony from Black Court of Appeals judges and voters about the need to draw a map that would provide Black voters opportunities to elect their candidate of choice. PTX 053 at AOC_0000053–86.

8.      The current Court of Appeals districts were established in 2003. Act 1812, § 2, 2003 Ark. Acts 6955, 6956–57 (May 6, 2003). The Arkansas Court of Appeals currently has twelve judges elected from seven districts. Joint Stipulations ¶ 46; Ark. Code Ann. § 16-12-202; PTX 465 at 52:24–53:8. Five of the seven districts each elect two judges to numbered positions, and the other two districts each elect one judge. Joint Stipulations ¶ 47; Ark, Code Ann. § 16-12-202 (1)-(12); PTX 468 (Walker Dep. Tr. Desig. & Counterdesig.) at 54:11-14. One of the current single-member districts, District 7, is now a majority-Black district, following population changes after its creation. PTX 075 (Revised Cooper Decl.) ¶ 39. This means Black voters can

elect only one candidate of choice in a twelve-member court.

9.      Since the 1938 passage of Amendment 29, candidates have been required to win with a majority rather than plurality of the vote. Ark. Const. amend. XXIX, § 5; *see also* Joint Stipulations ¶ 30. Candidates for the Supreme Court and the Court of Appeals have run in nonpartisan primary elections since the enactment of Amendment 80 in 2000, which changed all state judicial elections to nonpartisan contests. Ark. Const. amend. LXXX, § 18. If any judicial candidate receives a majority of the votes during the nonpartisan general election (in May or March, depending on the election cycle), that candidate wins the election for the judicial office outright, and there will be no nonpartisan runoff election for that office in November. Joint Stipulations ¶ 34; Ark. Code Ann. § 7-10-102(c)(1). If no candidate receives a majority of the votes, the two candidates who received the greatest shares of the votes are certified to a runoff election, which takes place on the same date as the November general election for partisan offices. Joint Stipulations ¶ 35; Ark Code Ann. § 7-10-102(c)(2).

10.      Midterm vacancies on the Supreme Court are filled via interim appointment by the Governor of Arkansas. Ark. Const. § I amend. XXIX; PTX 466 (Casteel Dep. Tr. Desig. & Counterdesig.) at 74:9–21, 75:3–21. An interim justice serves during the remainder of the unexpired term if the vacancy was to be filled at the next general election, or otherwise serves until the next general election taking place four or more months following the occurrence of the vacancy. Ark. Const. § IV Amendment 29. Arkansas's Constitution prohibits persons appointed to office by the Governor, including the judiciary, from seeking election to that office when their appointive terms expire. Joint Stipulations ¶ 36; Ark Const. § II Amendment 29.

11.      To date, the only Black lawyers who have served on the Supreme Court have been appointed: George Howard Jr., Richard Mays Sr., P.A. Hollingsworth, Andree Layton Roaf,

Lavenski Smith, and Ron Sheffield. *See* PTX 160; *see also* Trial Tr. vol. 1, 57:1-9 (Humphrey Direct) ("Historically is it true that the only way African Americans have served on that court is if they were appointed to fill a term by the governor? Absolutely. Is that true even today? Yes.").

12.     According to the U.S. Census Bureau, Arkansas had a total population of 2,915,918 in 2010 and a total population of 3,011,524 in 2020. Joint Stipulations ¶ 1; PTX 075 ¶ 13; PTX 076 (Cooper Supp. Decl.) at 6. Arkansas is comprised of seventy-five counties. PTX 073 (Cooper Decl.) at 58.

13.     The decennial Census makes available several different categories of race, including the: (1) non-Hispanic single-race Black category; (2) non-Hispanic Black category, which counts as "Black" individuals who self-identify as Black alone or Black and white; and (3) Any-Part Black category, which counts as "Black" any person who self-identifies as Black alone or Black in combinations with any other race or ethnicity, including those who self-identify as Hispanic. PTX 07 at ¶10, n.2.

14.     According to the 2010 Census, Any-Part Black Arkansans comprised 16.07% of the state. *Id*. ¶ 13; Joint Stipulations ¶ 2. According to Census Bureau estimates, by 2019, Arkansas's Any-Part Black population had risen to 16.60% of the State's population, or almost exactly one out of six. *Id*. ¶ 41; Joint Stipulations ¶ 3. According to the 2020 Census any-part Black Arkansans comprise 16.47%. PTX 076 at 6; Joint Stipulations ¶ 6.

15.     Three of Arkansas's counties are majority-Black: Crittenden (52.1%), Phillips (51.5%), and Jefferson (50.2%). PTX 073 at Appendix 3, ¶ 7. An additional five counties have Black population percentages in the 40s: S.t Francis, Lee, Desha, Chicot, and Pulaski *Id*. Pulaski County, the most populous county in the State, is home to an estimated 153,000 African Americans. *Id*. According to 2019 Census Bureau estimates, about 31% of Arkansas's Black

population lives in Pulaski County. PTX 007 at ¶ 72; Joint Stipulations ¶ 4.

**Plaintiffs' Standing**

16.    Plaintiff Christian Ministerial Alliance ("CMA" or "Ministerial Alliance") is a nonprofit, nonpartisan, interfaith coalition of religious leaders from Pulaski County and neighboring areas founded in 1968. Trial Tr. vol. 2, 332:22–335:14 (Allen Direct). The Ministerial Alliance seeks to further racial equality and justice in Arkansas. *Id*. at 332:22–336:5 (Allen Direct). Its membership includes approximately thirty to thirty-five faith leaders who represent twelve faith communities located in Pulaski and Jefferson Counties. *Id*. at 332:22–334:24. Reverend Maxine Allen has been a member of the Ministerial Alliance since 1979; served as Chair from 2014 to 2018; and has served as Immediate Past President since 2018. *Id*. at 332:14-15; 334:18-21. The Ministerial Alliance has long advocated for minority voting rights, including their involvement in litigation such as *Hunt v. Arkansas*, No. PB-C-89-406, 1991 WL 12009081 (E.D. Ark. Nov. 7, 1991) (challenging the dilution of Black voting strength under the method of electing Arkansas's trial court judges). Trial Tr. vol. 2, 335:12-25. (Allen Direct).

17.    Plaintiff Arkansas Community Institute ("ACI") is a nonprofit, nonpartisan membership-based organization. Trial Tr. vol 2, 311:6-12 (Sealy Direct). ACI is devoted to empowering low- to moderate-income Arkansans, and its work includes addressing barriers to economic empowerment and advancement, such as combatting disparities in household debt, conditions in housing, and access to healthcare. *Id*. at 311:13-17; 313:14-24 (Sealy Direct). ACI has over 600 members in various counties, primarily in Little Rock, North Little Rock, and Jefferson County, particularly Pine Bluff. *Id*. at 312:8-9; 312:18-25 (Sealy Direct). Most of ACI's members are Black and live in low-income neighborhoods, and most are also registered voters. *Id*. at 312:13-17 (Sealy Direct). Neil Sealy has been a member of ACI since 2010 and served as

Executive Director since 2010. *Id.* at 310-22–311:2 (Sealy Direct). In his capacity as Executive

Director, Mr. Sealy oversees ACI's operations. *Id.* at 310:22-25 (Sealy Direct).

18.     Individual Plaintiff, retired Judge Marion Humphrey, is a Black registered voter

and resident of Pulaski County. Trial Tr. vol. 1, 30:17-18, 56:15-19, 59:9-14 (Humphrey Direct).

Individual Plaintiff Kymara Seals is a Black registered voter and resident of Jefferson County

who commutes to work in Pulaski County. Trial Tr. vol. 2, 236:1-11; 241:7-10 (Seals Direct).

19.     Plaintiffs allege that the current electoral methods for the Arkansas Supreme

Court and the Court of Appeals deny each individual Plaintiff of the equal opportunity to elect

their candidates of choice. Trial Tr. vol. 1, 83:22-84:18 (Humphrey Direct); Trial Tr. vol. 2,

267:11-269:21 (Seals Direct).

### Proper Defendants

20.     The Secretary of State ("Secretary") is a defendant in his official capacity. Second

Am. Compl. ¶ 13, ECF No. 37. The Secretary is responsible for (1) preparing and certifying the

ballots for all Arkansas elections; (2) overseeing the certification of votes for all Arkansas

elections; (3) promulgating all election returns; (4) certifying all ballot measures submitted to

voters; (5) certifying the results of all ballot measures, including amendments to the Arkansas

Constitution; (6) publishing all measures approved by Arkansas voters; and (7) publishing all

laws enacted by the legislature, including laws establishing the electoral process for the Arkansas

Court of Appeals. Ark. Code Ann. §§ 7-5-203; 7-5-707; 7-5-704(a); 7-5-204; 7-9-119(c); 7-9-

120(a); 25-16-403; PTX 465 at 36:14-24, 38:3-22, 39:17-19, 41:9–42:7, 43:9-13, 55:9–56:13,

62:7–66:19, 94:3-12, 94:22–95:8, 96:8–97:13, 100:13-15, 101:19-22, 110:17-19; *see also* PTX

001 (Ark. Sec'y of State – Policies & Procedures, Elections Divisions Manual); PTX 004

(Running for Public Office – A "Plain English" Handbook); PTX 005 (Sec'y of State Mark

Martin, Redistricting 101); PTX 077 (Arkansas Board of Apportionment, "Redistricting Standards and Requirements"). Contrary to the Secretary's Office's assertion that the Office was not involved in deciding Court of Appeals districts, *id*. at 57: 3-13, the Court finds that the Secretary's Office was materially involved in the redistricting of the Court of Appeals, alongside the Attorney General's Office and the Governor's Office. *See, e.g.*, PTX 053; PTX 467 at 197:25–198:10, 198:13-22, 210:11-18.

21.     The Governor of Arkansas ("Governor") is a defendant in his official capacity. ECF No. 37 at ¶ 12. Under the Arkansas Constitution, the Governor has the "supreme executive power of the State" and must "see that the laws are faithfully executed." Ark. Const. Art. VI. §§ 2, 7. The Governor enforces the Arkansas Constitution, including the provisions that require at-large elections for the Arkansas Supreme Court. *See* Ark. Const. Art. VI. § 2; PTX 466 at 86:17-20. The Governor considers the legality of legislation before signing it into law. PTX 466 at 109:20–110:6. And the Governor's Office is empowered to propose legislation to the General Assembly (and has done so for legislation concerning the methods of electing justices to the Supreme Court); to sign legislation into law that would change the electoral method for the Arkansas Court of Appeals; and to call a special session of the state legislature to consider changes to Arkansas's electoral systems. *Id*.– at 52:24–53:12, 53:17-19, 90:3-25; Ark. Const. art. VI § 15; PTX 466 at 100:15-24.

22.     The Governor's Office designated an individual to participate in each of the Court of Appeals Apportionment Commissions, as well as appointed an individual to the Commission to represent the interests of minority voters. Acts of 1999, Act 889. *See, e.g.*, PTX 032 (Court of Appeals Apportionment Commission – Report to the Arkansas General Assembly) (1995) at SOS0951; PTX 038 at SOS_0904; PTX 053 at AOC_0000016; PTX 466 at 51:22–52:6, 54:16–

25, 60:5–25. The Governor's Office routinely received updates on what the Court of Appeals Apportionment Commission considered during their deliberations and the Governor's designee participated in Commission discussions, including public hearings. *See, e.g.*, PTX 053 at AOC_0000053–62; PTX 466 at 59:18–22,18:24, 67:15–68:13; *see also id.* at 139:5-9 (acknowledging that "former governors' administrations played a part" in redistricting the Court of Appeals and that the Governor had to "supplement" prior interrogatory responses denying such involvement). The Governor wants to change the system of electing justices to the Supreme Court, worked with the General Assembly on it, and would support amending the Arkansas Constitution to change the current at-large voting system for Supreme Court justices. *See* PTX 466 at 93:25–94:8; 97:24–100:8.

23.     The Attorney General of Arkansas ("AG") is a defendant in her official capacity. ECF No. 37 at ¶ 14. The AG is the attorney for all state officials, departments, institutions, and agencies. Ark. Code. Ann. §25-16-702. The AG has the duty to support the U.S. Constitution. 4. U.S.C. § 1. State law gives the Attorney General authority to sue when state offices have been "usurped." Ark. Code Ann. § 16-118–105(b)(1), (b)(3)(B); *Drennen v. Bennett*, 230 Ark. 330 (1959). The AG issues both formal and informal legal opinions to the state legislature and state and local officials, including on matters of federal and state election law. Ark. Code Ann. § 25-16-706; PTX 468 at 13:13-19, 18:12-22, 25:4–26:13, 27:8–28:19, 33:10-17, 34:19-24, 37:9-25, 40:12-25, 41:7-17, 62:24–63:14; 71:25–73:2, 77:17–78:1, 168:15–169:7; PTX 467 at 31:22–32:3, 32:7-14, 35:5-19, 36:8-13; *see also* PTX 061 (Ltr. From Wendy K. Michaelis to Joseph D. Rich). The Attorney General has issued official opinions concerning the method of electing Court of Appeals judges, including in response to a question from the Secretary of State's office regarding the districts in which appointed Court of Appeals judges whose terms were expiring

could run for election to the Court. PTX 062 (Arkansas Attorney General Opinion No. 97-198); PTX 468 at 42:10-18; PTX 467 at 25:9–15; *see also* PTX 093 (Arkansas Attorney General Opinion No. 2002-016) (opining on methods of election for Circuit Court judges). The Attorney General's Office represented and advised the Court of Appeals Apportionment Commission and was actively involved in its work. *See, e.g.*, PTX 468 at 100:1-21, 109:7-17; PTX 467 at 22:10–23:7, 64:17–65:12, 66:18–67:4, 110:9-20, 113:5-16, 208:1-7, 208:14-23.

24.    The Commissions, in close collaboration with the Attorney General's and Governor's Offices, discussed a need to increase opportunities for Black voters to elect judicial candidates of their choice. *See, e.g.*, PTX 032 at SOS0951–52; PTX 038 at SOS0905; PTX 053 (Court of Appeals Apportionment Commission – Report to the Arkansas General Assembly) (2003) at AOC_0000009–18; *id.* at AOC_0000083–85. The first Court of Appeals Apportionment Commission ("the First Commission") initially met on June 16, 1994, and tasked Tristan Greene, a Redistricting Planner with the Attorney General's Office, with explicitly creating a map that contained "two, or if possible, three" majority-Black districts. *Id.* The First Commission did not ultimately submit such a plan, but instead submitted a plan with only one majority-Black district at the suggestion of former Assistant Attorney General Tim Humphries. *See* PTX 032 at SOS0958; PTX 467 at 141:19–142:6, 291:1–9.

25.    For both the 1995 and 1997 Court of Appeals Apportionment Commissions, the Attorney General's Office educated the Commission on the controlling federal law concerning the creation of majority-minority districts. *See, e.g.*, PTX 467 at 45:12–46:4, 62:6–63:4. After those discussions, the Commission decided that understanding the federal law was "the first step in [the Commission's] deliberations." PTX 038 at SOS0904–05.

26.    Tim Humphries was the Attorney General's Office voting expert and was

integrally involved in each of the Court of Appeals Apportionment Commissions. PTX 467 at 15:18-22, 19:12-25, 22:10–23:7, 36:23–37:6; PTX 468 at 86:6–11, 125:24–126:12. When Mr. Humphries transitioned to the Secretary of State's Office, his work remained the same. PTX 467 at 12:3–13:4, 19:15–19, 27:11–15, 197:25–198:10; PTX 468 at 28:24–29:7, 87:21–88:8.

27.    Representatives of both the Governor's Office and the Attorney General's Office were heavily involved with each iteration of the Court of Appeals Apportionment Commission, attending Commission meetings and guiding the redistricting process. *See generally* PTX 053; PTX 038; PTX 032. When the Court of Appeals Apportionment Commission met to develop redistricting recommendations to the 2003 legislative session, the Attorney General's Office and the Governor's Office not only "explained . . . past efforts to draw new districts," but also "presented an overview of litigation under the Voting Rights Act as it relate[d] to the creation [of] judicial districts." PTX 053 at AOC_0000009–16.

### *GINGLES I*

### **Plaintiffs' Illustrative Plans**

28.    Plaintiffs' expert, William S. Cooper, developed *Illustrative Plans* to assess whether the Black population in Arkansas is sufficiently large and geographically compact to allow for: (1) two single-member majority-Black districts for the Arkansas Court of Appeals and (2) one single-member majority-Black district for the Arkansas Supreme Court, which currently elects seven justices at large. Trial Tr. vol. 1, 97:17-20 (Cooper Direct); PTX 075 (Revised Cooper Decl.) at 4. Mr. Cooper also reviewed current and historical demographics of Arkansas, including the socio-economic, employment, education, and health characteristics of the Black and non-Hispanic white populations. Trial Tr. vol. 1, 126:9-21 (Cooper Direct); PTX 075 at 4.

29.    Mr. Cooper is qualified to serve as an expert witness in redistricting and

demographics. Since 1986, Mr. Cooper has prepared redistricting maps for hundreds of jurisdictions in Section 2 cases, comment letters under Section 5 of the Voting Rights Act, and other efforts to comply with the Voting Rights Act ("VRA"). Trial Tr. vol. 1, 102:22-105:3 (Cooper Direct); PTX 075 at 2–3, Appendix 1. Since the release of the 2010 Census, Mr. Cooper has developed statewide redistricting plans in nine states, as well as over 150 local redistricting plans in approximately thirty states. PTX 075 at 2. Mr. Cooper has qualified as an expert witness on redistricting and demographics in federal courts in approximately forty-five voting rights cases in 18 states, having been retained by both civil rights plaintiffs and government entities. Trial Tr. vol. 1, 100:5-17 (Cooper Direct); PTX 075 at 2. The Court finds Mr. Cooper to be eminently qualified and the below testimony of Mr. Cooper to be credible.

30.    To develop the *Illustrative Plans*, Mr. Cooper used (1) population and geographic data from the 1980 to 2020 Censuses, (2) the 2019 U.S. Census Bureau population estimates, and (3) geographic boundary files created from the U.S. Census and 1990, 2000, 2010, and 2020 Topologically Integrated Geographic Encoding and Referencing (TIGER) files. Trial Tr. vol. 1, 116:3-5 (Cooper Direct); PTX 075 at 4; PTX 076 at 2. He used *Maptitude for Redistricting*, a geographic information system ("GIS") software that many local and state bodies employ for redistricting. Trial Tr. vol. 1, 117:6-9 (Cooper Direct).

31.    Mr. Cooper used population data from the U.S. Census 1980, 1990, 2000, 2010, and 2020 PL 94-171 data files. PTX 075 at 8–10, PTX 076 (Supplemental Expert Report of Bill Cooper) at 2. The PL 94-171 dataset is the complete count population file designed by the Census Bureau for use in legislative redistricting. Trial Tr. vol. 1, 117:10-23 (Cooper Direct). It is published in electronic format. *Id.*

32.    As is standard redistricting practice, Mr. Cooper disaggregated block group

citizen voting age estimates to the block level by race and ethnicity based on the distribution of block group level voting age population ("VAP") by race and ethnicity from the 2015-19 American Community Survey ("ACS"). PTX 075 at 16.

33.     To develop the *Illustrative Plans*, Mr. Cooper also obtained (1) a PDF map depicting the 1979 Court of Appeals Plan online, (2) a geographic shapefile for the 2003 Court of Appeals Plan adopted by the Arkansas Legislature online, (3) 2019 population estimates from the U.S. Census Bureau online, and (4) data from the ACS – specifically, the 5-year 2008-2012 and 2015-2019 ACS Special Tabulation of citizen population and voting age population by race and ethnicity. PTX 075 at 8, 12, 16, 17.

34.     Mr. Cooper developed the *Illustrative Plans* in accordance with traditional redistricting principles, including compactness; contiguity; one person, one vote; communities of interest; traditional boundaries; and non-dilution of minority voting strength. Trial Tr. vol. 1, 158:20-159:13 (Cooper Direct); PTX 075 at 18, 28; *see also* Trial Tr. vol. 1, 118:12–120:19, 123:18–129:3, 138:14–21 (Cooper Direct). The traditional redistricting principles Mr. Cooper applied and the manner in which he applied them were consistent with the established approach to redistricting that has been used to draw both legislative and judicial districts in Arkansas.

35.     The following uncontested record evidence shows this accordance between the principles that Mr. Cooper applied and established redistricting practice in Arkansas. **Compactness:** *Compare* Trial Tr. vol. 1, 106:4-14 (Cooper Direct), *and* PTX 073 at ¶¶ 15, 42, 60 (Cooper Decl.), *with* PTX 077 at 3 (Board of Apportionment, "Redistricting Standards and Requirements"), *and* PTX 467 at 280:14-15 . **Contiguity:** *Compare* Trial Tr. vol. 1, 106:4-14, *and* PTX 073 at ¶¶ 15, 42, 60, *with* PTX 077 at 3. **Population equality:** *Compare* Trial Tr. vol. 1, 120:17–19, *and* PTX 073 at ¶¶ 15, 42, 60, *with* PTX 077 at 2, *and* PTX 467 at 280:2-4.

**Nondilution of Minority Voting Strength:** *Compare* Trial Tr. vol. 1, 128:18–129:3, *and* PTX 073 at ¶¶ 15, 42, 60, *with* PTX 077 at 2, *and* PTX 467 at 280:12-13. **Communities of Interest:** *Compare* Trial Tr. vol. 1, 107:2-3, 125:12-15, *and* PTX 073 at ¶¶ 15, 42, 60, *with* PTX 077 at 3, *and* PTX 467 at 280:10–11. **Maintaining Traditional Boundaries:** *Compare* Trial Tr. vol. 1, 106:10-24, *with* PTX 077 at 3, *and* PTX 467 at 280:5-9.

36.     As Mr. Cooper persuasively explained, and as corroborated by other evidence concerning the theory and practice of redistricting in Arkansas, traditional redistricting criteria are a "balancing act" and most criteria are not ironclad requirements. Trial Tr. vol. 1, 143:20-25 (Cooper Direct); *see also, e.g.*, PTX 077 at 3 (explaining that it is "preferable" and "better" to maintain political subdivisions; that districts should maintain communities of interest "[w]here possible"; and that while compactness is "ideal" nevertheless "most districts have some irregularity in shape"); PTX 467 at 194:21–195:2, 289:9-10 (explaining that the principle of maintaining whole counties "was not a priority at all" and that dividing counties "wouldn't be a problem" "as long as you split them on precinct lines"). Trade-offs inevitably arise in the process.

37.     While some of this evidence about redistricting principles refers to legislative districting, Defendants' own prior redistricting expert, former Assistant Attorney General Tim Humphries, testified that Arkansas applies the same principles to both legislative and judicial redistricting. PTX 467 at 285:1-8. Defendants have not disputed that testimony, and I find it credible.

38.     Indeed, Defendants have not contested any of Plaintiffs' evidence concerning the nature of traditional redistricting principles as they have been applied in the state of Arkansas. Particularly in light of that failure to dispute any of this evidence, I credit Plaintiffs' and Mr. Cooper's description of the relevant redistricting principles to be applied here.

14

39.     The *Illustrative Plans*' inclusion of (1) two single-member majority-Black districts for the Arkansas Court of Appeals and (2) one single-member majority-Black district for the Arkansas Supreme Court confirms that the Black population in Arkansas is sufficiently numerous and geographically compact to allow for additional majority-Black districts for Arkansas's appellate courts. PTX 075 at 4.

40.     Mr. Cooper created three *Illustrative Plans* for the Court of Appeals. In all three plans ("Illustrative AC Plan 1", "Illustrative AC Plan 2", "Illustrative AC Plan 3"), Districts 7 and 8 are single-member majority-Black districts. *Id.* at 21, 26; PTX 076 at 8. Illustrative AC Plan 1 relies upon 2010 Census data. PTX 075 at 21. Illustrative AC Plan 2 relies upon 2019 Census estimates. *Id.* at 26. Illustrative AC Plan 3 relies upon 2020 Census data. PTX 076 at 8.

41.     Mr. Cooper created three *Illustrative Plans* for the Supreme Court. In all three plans ("Illustrative SC Plan 1", "Illustrative SC Plan 2", "Illustrative SC Plan 3"), District 7 is a single-member majority-Black district. PTX 075 at 31, 33; PTX 076 at 6. Illustrative SC Plan 1 relies upon 2010 Census data. PTX 075 at 31. Illustrative SC Plan 2 relies upon 2019 Census estimates. *Id.* at 33. Illustrative SC Plan 3 relies upon 2020 Census data. PTX 076 at 6.

42.     Because Illustrative AC Plan 3 and Illustrative SC Plan 3 are based on the most current data derived from the 2020 Census, those plans are the operative ones and will be the focus of these findings of fact and conclusions of law. Except as otherwise noted, *Illustrative Plans* as used below refers to Illustrative AC Plan 3 and Illustrative SC Plan 3.

**Numerosity of the Black Population**

43.     District 7 in Illustrative AC Plan 3 has an Any-Part Black VAP of 50.30%. Trial Tr. vol. 1, 139:20-25 (Cooper Direct); PTX 076 at 8. District 8 in Illustrative AC Plan 3 has an Any-Part Black VAP of 50.19%. PTX 076 at 8.

44.    The Black populations in Illustrative AC Plan 3, as measured by the non-Hispanic Black citizen VAP and Any-Part Black VAP, are sufficiently numerous to constitute the majority of the voting age population in two single-member, majority-Black districts for the Arkansas Court of Appeals. Trial Tr. vol. 1, 139:20-25 (Cooper Direct); PTX at 21, 26; PTX 076 at 8.

45.    District 7 in Illustrative SC Plan 3 has an Any-Part Black VAP of 50.75%. Trial Tr. vol. 1, 138:7-18 (Cooper Direct); PTX 076 at 6.

46.    The Black populations in Illustrative SC Plan 3, as measured by the non-Hispanic Black citizen VAP and Any-Part Black VAP, are sufficiently numerous to constitute the majority of the voting age population in a single-member, majority-Black district for the Arkansas Supreme Court. Trial Tr. vol. 1, 138:7-13 (Cooper Direct); PTX 075 at 31, 33; PTX 076 at 6.

**Compactness of the Black Population**

47.    A visual estimation and comparison to current Arkansas Court of Appeals districts confirms that the majority Black districts in Plaintiffs' *Illustrative Plans* are geographically compact. Trial Tr. vol. 1, 118:15-119:13 (Cooper Direct).

48.    Moreover, as noted above, they also comport with traditional redistricting principles as they have been applied in Arkansas. In fact, the *Illustrative Plans* perform as well as—or in some cases, much *better* than—districting plans of the State's own design when measured against Arkansas's own traditional redistricting criteria. *See* Trial Tr. vol. 1, 120:20–121:17, 124:1-5, 125:4-11 (Cooper Direct).

49.    The districts in the *Illustrative Plans* are contiguous. Trial Tr. vol. 1, 119:14-17 (Cooper Direct).

50.    The districts in the *Illustrative Plans* have reasonably equal populations, within plus or minus five percent. Trial Tr. vol. 1, 119:18-20 (Cooper Direct).

51.     The districts largely follow traditional boundaries, and the boundaries in the *Illustrative Plans* correspond to existing voting tabulation districts. Trial Tr. vol. 1, 117:24–118:2; 140:18-24 (Cooper Direct); PTX 075 at 19. Moreover, Plaintiffs' *Illustrative Plans* also adhere to Arkansas's traditional principle of keeping counties and other political subdivisions intact "[w]hen possible." PTX 077 at 3. For both the Supreme Court and Court of Appeals, Plaintiffs' *Illustrative Plans* maintained most county boundaries and split just a small handful of counties. *See* Trial Tr. vol. 1, 123:22-25, 140:1-12 (Cooper Direct). In the few instances where Plaintiffs' *Illustrative Plans* do split counties, Mr. Cooper had multiple reasons for doing so as part of a broader "balancing" act; he split counties to better equalize population, preserve minority voting power, or both. *See, e.g.*, Trial Tr. vol. 1, 106:20-24, 124:6-18, 140:1-17 (Cooper Direct); *id.* at 159:2-21, 168:25–169:6 (Cross). Mr. Cooper also made sure not to split precincts, which is a best practice that simplifies administration for election officials. *See id.* at 140:18-24. All of that is consistent with traditional redistricting principles as applied in Arkansas, as evidenced by the testimony of Defendants' former redistricting expert, Tim Humphries, who credibly explained that keeping counties intact "was not a priority at all." PTX 467 at 289:9-10. Mr. Humphries also testified that county splitting "wouldn't be a problem" "as long as you split them on precinct lines," as Mr. Cooper did in this case. *Id.* at 194:21–195:2. Moreover, the few county splits in the *Illustrative Plans* mirror the legislature's own recently enacted legislative and congressional maps, which confirms the general permissibility and consistency of the county splits in the *Illustrative Plans* with Arkansas redistricting principles. *See* PTX 469 (Map of 2021 Senate Boundaries), 470 (2021 House Boundaries); Trial Tr. vol. 1, 124:1-18, 128:4-12, 140:9-12 (Cooper Direct).

52.     Moreover, the Court of Appeals Apportionment Commission historically

17

considered plans that split as many or more counties than the *Illustrative Plans*. *See* PTX 057 at SOS1030; PTX 467 at 155:9–156:10; PTX 406 (Fax Transmission from Tim Humphries to Scott Stafford, attaching Court of Appeals Apportionment Commission Minutes (Dec. 1994)) at SOS1595 (noting that "plans A-F" all "split Pulaski County between districts."). And other pronouncements by Defendants evince an understanding that county-splitting is commonplace. The Secretary of State's "Redistricting 101" guide shows that "changes within" a county are commonplace and familiar to deal with as a technical matter during redistricting. *See* PTX 005 at SOS0335–37, SOS0362–66, SOS0393–94. For all these reasons, I find that Mr. Cooper is correct that county splits are "very common," both in districting generally and in Arkansas specifically. Trial Tr. vol. 1, 125:4-11 (Cooper Direct).

53.     The districts in the *Illustrative Plans* respect communities of interest. Trial Tr. vol. 1, 125:12- 128:17. The Black residents of the districts share demographic commonalities that span counties in the Delta and Lower Arkansas, as well as Jefferson and Pulaski Counties, including socio-economic status, employment status, educational attainment, and health outcomes. Trial Tr. vol. 1, 140:25–142:23; PTX 075 at 33, 35. Moreover, the Black residents of the districts have substantially overlapping familial, civic, and religious interests. Trial Tr. vol. 1, 81:5-83:7, 83:11-20 (Humphrey Direct) (describing his own experience moving from the Delta to Little Rock, and listing clubs and churches with membership that extend across both areas); *id*. at 126:2-8 (Cooper Direct) (describing common socioeconomic indicators connecting the Delta and Greater Little Rock area), Trial Tr. vol. 2, 237:10–238:8 and 270:2-271:7 (Seals Direct) (describing her own family ties across the Delta and Pulaski County); 312:18-315:8 (Sealy Direct) (describing ACI's work and membership spanning Little Rock and the Delta); 341:13-344:22 (Allen Direct) (describing how patterns of pushout, redlining, and gentrification have

determined housing patterns among congregants of CMA membership spanning from Little Rock to the Delta); 711:15-713:20 (Elliott Direct) (describing shared cultural and historic experiences of Black Arkansans in Little Rock and the Delta). Although the proposed districts in the *Illustrative Plans* combine rural and urban voters to some degree, I find that this is permissible and indeed common practice in Arkansas districting, and does not undermine the conclusion that the *Illustrative Plans* respect communities of interest. *See* Trial Tr. vol. 1, 127:19–128:12 (Cooper Direct); Trial Tr. vol. 4, 710:24–711:17 (Elliott Direct).

54.    Mr. Cooper's proposed map for the Supreme Court combines regions of the Delta, Jefferson County, and parts of Pulaski County within his illustrative majority-minority district. *See* Trial Tr. vol. 1, 125:12–126:8 (Cooper Direct); PTX 076 at fig. 19 (Cooper Suppl. Decl.). Mr. Cooper's illustrative map for the Court of Appeals creates two districts that (i) encompass the Delta region as well as parts of Central Arkansas, including parts of Pine Bluff, and (ii) encompass parts of Pulaski County (including Little Rock) and Jefferson County, as well as Dallas, Cleveland, Ouachita, and Calhoun Counties. *See* Trial Tr. vol. 1, 138:22–139:4 (Cooper Direct); PTX 076 at fig. 21.

55.    District 7 in Illustrative AC Plan 3 encompasses the Delta counties that border the Mississippi River, part of Mississippi County, and part of Jefferson County. PTX 076 at 7. District 8 in Illustrative AC Plan 3 encompasses the remainder of Jefferson County, part of Pulaski County, and all of Dallas, Cleveland, Ouachita, and Calhoun counties. *Id.*

56.    District 7 in Illustrative SC Plan 3 includes the six Delta counties that border the Mississippi River, all of Arkansas, Jefferson, Lincoln, Cleveland, Dallas, and Monroe, and St. Francis Counties, and part of Pulaski County. PTX 076 at 5.

57.    Census and American Community Survey data show that Black residents in rural

19

counties in river-adjacent Delta and Lower Arkansas, as well as in Jefferson and Pulaski Counties, share similar socio-economic characteristics, educational attainment rates, unemployment rates, home ownership rates, levels of access to health insurance, and levels of access to transportation. Trial Tr. vol. 1, 141:3-142:23 (Cooper Direct); PTX 073 at Exhibits F-1, G; PTX 075 at 33, 35.

58.    The socio-economic, educational, employment, and health disparities between Black and white Arkansans in Pulaski County—the county with the highest Black population in the state—are substantially similar to the relative disparities in these metrics between Black and white Arkansans statewide. Trial Tr. vol. 1, 127:4-18 (Cooper Direct); PTX 073 at Exhibits F-1, G.

59.    At trial, Defendants did not call their expert witness, Dr. Peter Morrison, to testify, nor did they seek to have Dr. Morrison's report or deposition transcript admitted into evidence. Thus, Mr. Cooper's testimony is unrebutted.

60.    For all the reasons described above—including Mr. Cooper's eminent qualifications and extensive expertise, his credibility while testifying in court, and the unrebutted nature of his testimony and supporting evidence offered by Plaintiffs—I credit Mr. Cooper's testimony and his findings that Plaintiffs' *Illustrative Plans* comply with the requirements of *Gingles I*.[1]

---

[1] Because Mr. Cooper was cognizant of racial demographics when he drew the *Illustrative Plans*, Defendants have argued that race "predominated" in the creation of these maps, in support of their claim that these plans are impermissible racial gerrymanders. In addition to the legal error of this argument as described *infra*, the factual premise of this argument is unsound. Race did not predominate over other traditional redistricting principles in Mr. Cooper's methodology or the resulting plans. Trial Tr. vol. 1, 143:3-12 (Cooper Direct). If Mr. Cooper had employed the race-above-all approach that Defendants suggest, the resulting maps would have looked very different. As he explained, a mapdrawer who was willing to subordinate traditional redistricting principles to race would have produced districts with "significantly" larger Black populations, which would have entailed "split[ting] precincts

**Overall Conclusion**

61.     The Black population is sufficiently numerous and geographically compact to comprise a majority of the voting age population in two Court of Appeals districts and one Supreme Court district in Plaintiffs' *Illustrative Plans*.

### *GINGLES II* AND *III*

62.     The other two *Gingles* preconditions are that minority voters are "politically cohesive" and that "the white majority typically votes in a bloc to defeat the minority candidate." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1020 (8th Cir. 2006) (hereinafter "*Bone Shirt II*"). Plaintiffs typically rely on expert testimony to establish that these preconditions are satisfied. *See id.*

**Dr. Baodong Liu's Racially Polarized Voting Analysis**

63.     Plaintiffs retained Dr. Baodong Liu to provide expert testimony on *Gingles II* and *III*. Dr. Liu is qualified to serve as an expert witness on racially polarized voting ("RPV") and election systems and their impact on minority voters. Dr. Liu is a political scientist and a Professor of Political Science and Ethnic Studies. Trial Tr. vol. 3, 442:1-11 (Liu Direct). Dr. Liu has spent his entire academic career studying racial politics and racial issues as they play out in the voting arena. *Id.* at 442:14-22. He has done extensive research regarding voters' decision-making processes and election systems. *Id.* at 442:23–443:3. He has published more than twenty peer-reviewed articles and several books about racial voting patterns. *Id.* at 443:21-24.

64.     Dr. Liu has previously provided expert opinions on federal voting rights on more

---

willy-nilly" and splitting many more counties. *Id.* By contrast, Mr. Cooper credibly testified that the illustrative district boundaries track the racial demographics of certain counties *only to an extent that* was consistent with traditional redistricting principles, and that he did not seek to maximize the Black population of any district. *See id.* at 143:3-25 (Cooper Direct).

than twenty occasions. *Id.* at 444:25–445:4. Two recent cases in which he provided expert testimony include *Jones v. Jefferson County Board of Education*, No. 2:19-CV-01821-MHH, 2019 WL 7500528 (N.D. Ala. Dec. 16, 2019) and *Pope v. County of Albany*, 94 F. Supp. 3d 302, 331 (N.D.N.Y. 2015).

65.     To assess RPV in this case, Dr. Liu analyzed all biracial elections for the Arkansas Supreme Court and Court of Appeals, as well as all biracial statewide general and primary elections in Arkansas for the last twenty years. Trial Tr. vol. 3, 467:4-11 (Liu Direct).

66.     Biracial elections are generally considered the most probative for assessing RPV. *Id.* at 448:2-6. When there are only white candidates for Black voters to choose from, it is practically unavoidable that certain white candidates would be supported by a larger percentage of Black voters than other white candidates. Further, uniracial elections lack a racial cue for voters to use as a proxy. *Id.* at 448:21–449:2. Thus, an analysis of uniracial elections is not of much use when testing for the presence of RPV. *See, e.g.*, Trial Tr. vol. 2, 346:22–354:21 (Allen Direct) (discussing polarized voting patterns and her own experience as a Black voter feeling uniracial elections did not present a true choice). Defendants' expert, Dr. John Alford, agreed with Dr. Liu that biracial elections are the most probative because "as a cuing matter, biracial endogenous elections" can "provide a higher quality of information." Trial Tr. vol. 5, 825:3-9. Moreover, as Dr. Liu explained, including uniracial elections in the analysis can lead to a "misleading conclusion." Trial Tr. vol. 3, 450:17-24. While elections for the offices at issue in the case—endogenous elections—are also considered more probative than elections for the offices not at issue, biracial exogenous elections also can be probative. *Id.* at 452:16-453:3. Accordingly, the Court finds biracial elections most probative for assessing RPV based on the facts of this case.

67.     Dr. Liu used the Ecological Inference ("EI") technique to estimate the percentage of votes candidates received from Black and non-Black Arkansas voters. *Id.* at 456:5-9.[2] The EI technique is regularly employed in cases of this nature. *See, e.g.*, *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1003 (D.S.D. 2004), *aff'd*, 461 F.3d 1011 (8th Cir. 2006) (hereinafter "*Bone Shirt I*) ("[T]he court finds that EI is a reliable method of analysis.").

68.     Between 2001 and 2021, the following four biracial endogenous elections were held in Arkansas: (1) the 2004 Supreme Court election for Position 1; (2) the 2006 Supreme Court election for Position 5; (3) the 2008 Court of Appeals Election for District 6, Position 1; and (4) the 2010 Supreme Court election for Position 6. Dr. Liu analyzed each of these four elections to determine the extent of RPV. Trial Tr. vol. 3, 468:23–496:1, 470:3-5, 471:19-22, 472:16-23 (Liu Direct); PTX 074 at 10–11(Liu Expert Report).

69.     An election for the Supreme Court Position 1 was held in 2004. The candidates were Judge Wendell Griffen and Jim Hannah. In Dr. Liu's analysis, 61.79% of Black voters supported Judge Griffen, and he was the candidate of choice of Black voters. Approximately 32% of non-Black voters supported Judge Griffen, and he was defeated. Dr. Liu determined that voting in this election was racially polarized. Trial Tr. vol. 3, 468:23– 469:16 (Liu Direct); PTX 074 at 10.

70.     An election for the Supreme Court Position 5 was held in 2006. The candidates were Judge Griffen and Paul Danielson. On Dr. Liu's analysis, 72.78% of Black voters supported Judge Griffen, and he was the candidate of choice of Black voters. Only 37.9% of non-Black

---

[2] Dr. Liu and Dr. Alford both look at Black versus non-Black support for the candidates in the elections they analyzed. They both agree that this approach is appropriate for assessing RPV in Arkansas, and any difference between non-Black and white voting is immaterial. *See* Trial Tr. vol. 3, 469:10-13 (Liu Direct) ("[I]n Arkansas, [B]lacks and whites are the two by far largest racial groups, so the non-[B]lack for practical purpose[s] is white voters.").

voters supported Judge Griffen, and he was defeated. Dr. Liu determined that voting in this election was racially polarized. Trial Tr. vol. 3, 470:3-13 (Liu Direct); PTX 074 at 10.

71.    An election for the Court of Appeals District 6, Position 1 was held in 2008. The candidates were Wendell Griffen and Rita Gruber. On Dr. Liu's analysis, 84.7% of Black voters candidates were Judge Griffen and Rita Gruber. On Dr. Liu's analysis, 84.7% of Black voters. However, only 22.9% of non-Black voters supported Judge Griffen, and he was defeated. Dr. Liu determined that voting in this election was racially polarized. Trial Tr. vol. 3, 471:19–472:15 (Liu Direct); PTX 074 at 11.

72.    Dr. Liu's opinion that Black voters cohesively supported Judge Griffen in his unsuccessful campaigns is corroborated by the testimony of multiple fact witnesses. *See, e.g.*, Trial Tr. vol. 1, 49:15-22 (Humphrey Direct); Trial Tr. vol. 2, 265:17–267:10 (Seals Direct); *id.* at 350:24-351:19 (Allen Direct). For example, Ms. Seals testified to "[t]he qualities" she looks for in a typical judicial candidate—including their "values," their "qualifi[cations]," and their "character"—and stated that Judge Griffen possessed each of those qualities, in addition to a "passion for the people" and a "passion for justice." Trial Tr. vol. 2, 266:9–267:10 (Seals Direct).

73.    An election for the Supreme Court Position 6 was held in 2010. The candidates were Evelyn Moorehead, Karen Baker, and Tim Fox. In this election, 36.71% of Black voters supported Ms. Moorehead. Only 12.17% of non-Black voters supported Ms. Moorehead. Trial Tr. vol. 3, 472:19–473:2 (Liu Direct); PTX 074 at 11. Dr. Liu saw evidence of RPV in several individual counties, but he could not conclude that voting in this election was racially polarized. *Id.* at 473:3–4; PTX 074 at 11 n.12.

74.    Although there were only four biracial endogenous elections in Arkansas over the past 20 years, this itself is evidence of racial discrimination. Trial Tr. vol. 3, 592:2-4, 14-16

(McCrary Direct) (explaining that racially polarized voting can "affect the way that minority candidates view their chances of winning election. . . . And that would play into the calculations as to whether to run for office or not."); *see also See McMillan v. Escambia County*, 748 F.2d 1037, 1045 (11th Cir. 1984).

75.     Because of this, Dr. Liu supplemented his analysis by looking at all biracial statewide exogenous elections in Arkansas over the same time frame. Trial Tr. vol. 3, 467:7-11 (Liu Direct); PTX 074 at 5 n.3. This is consistent with the usual practice in this field. *See also Black Political Task Force v. Galvin*, 300 F. Supp. 2d 291, 307 (D. Mass. 2004) ("In the absence of a sufficient number of useful multi-race endogenous elections, the next most fertile field is composed of multi-race exogenous elections.").

76.     Dr. Liu analyzed the following seven biracial exogenous elections in Arkansas from 2001 to 2021: (1) 2002 Lieutenant Governor; (2) 2006 State Treasurer; (3) 2008 Presidential; (4) 2008 Presidential (democratic primary); (5) 2012 Presidential; (6) 2014 State Auditor; and (7) 2018 Lieutenant Governor. Dr. Liu analyzed these elections to determine the extent of RPV.[3] Trial Tr. vol. 3, 473:20–22, 473:25–474:2, 474:6–7, 474:11–13, 16–17, 20–21, 474:24–475:1 (Liu Direct); PTX 074 at 13.

77.     An election for Lieutenant Governor was held in 2002. The candidates were Ron Sheffield and Win Rockefeller. On Dr. Liu's analysis, 65.24% of Black voters supported Mr. Sheffield, and he was the candidate of choice of Black voters. Still, only 37.47% of non-Black voters supported Mr. Sheffield, and he was defeated. Voting in this election was racially polarized. Trial Tr. vol. 3, 473:20:24 (Liu Direct); PTX 074 at 13.

---

[3] There were two additional biracial statewide exogenous primaries, but Dr. Liu determined that Black voter turnout for those elections was too low to merit inclusion in his analysis.

78.    An election for State Treasurer was held in 2006. The candidates were Chris Morris, Martha Shoffner, and Brock Carpenter. For this election, Dr. Liu did not find evidence that voting was racially polarized. Trial Tr. vol. 3, 473:25-474:5 (Liu Direct); PTX 074 at 13.

79.    A Democratic Presidential primary election was held in 2008. The candidates included Barack Obama and Hillary Clinton. On Dr. Liu's analysis, 71.92% of Black voters supported Mr. Obama, and he was the candidate of choice of Black voters. Only 17.44% of non-Black voters supported Mr. Obama, and he was defeated in Arkansas. Dr. Liu determined that voting in this election was racially polarized. Trial Tr. vol. 3, 474:11-15 (Liu Direct); PTX 074 at 13.

80.    A Presidential election was held in 2008. The candidates were Barack Obama and John McCain. On Dr. Liu's analysis, 75.38% of Black voters supported Mr. Obama, and he was the candidate of choice of Black voters. Only 31.74% of non-Black voters supported Mr. Obama, and he was defeated in Arkansas. Dr. Liu determined that voting in this election was racially polarized. Trial Tr. vol. 3, 474:6-10 (Liu Direct); PTX 074 at 13.

81.    A Presidential election was also held in 2012. The candidates were President Obama (the incumbent) and Mitt Romney. On Dr. Liu's analysis, 94.72% of Black voters supported President Obama, and he was the candidate of choice of Black voters. Only 30.09% of non-Black voters supported President Obama, and he was defeated in Arkansas. Dr. Liu determined that voting in this election was racially polarized. Trial Tr. vol. 3, 474:16-19 (Liu Direct); PTX 074 at 13.

82.    A State Auditor election was held in 2014. The candidates were Regina Hampton, Andrea Lead, and Brian Leach. On Dr. Liu's analysis, 81.16% of Black voters supported Ms. Hampton, and she was the candidate of choice of Black voters. Only 30.47% of non-Black voters

supported Ms. Hampton, and she was defeated. Dr. Liu determined that voting in this election was racially polarized. Trial Tr. vol. 3, 474:20-23 (Liu Direct); PTX 074 at 13.

83.    A Lieutenant Governor election was held in 2018. The candidates were Anthony Bland, Frank Bilbert, and Tim Griffin. On Dr. Liu's analysis, 90.62% of Black voters supported Mr. Bland, and he was the candidate of choice of Black voters. Only 27.04% of non-Black voters supported Mr. Bland, and he was defeated. Dr. Liu determined that voting in this election was racially polarized. Trial Tr. vol. 3, 474:24–475:3 (Liu Direct); PTX 074 at 13.

84.    I credit Dr. Liu's analysis as reliable and persuasive, corroborated by the other record evidence in this case, and as discussed below, methodologically superior to the analysis performed by Defendants' expert Dr. Alford. Dr. Liu's analysis demonstrates that Black voters vote cohesively in elections in Arkansas, and non-Black voters vote as a bloc to usually defeat the preferred candidates of Black voters. In nine of the eleven elections that Dr. Liu analyzed, Black support for the Black candidate was 60% or higher.

85.    In each of these elections—nearly 82% of the elections analyzed—the Black candidate of choice was defeated.

**Dr. John Alford's Racially Polarized Voting Analysis**

86.    Defendants' expert, Dr. John R. Alford, also conducted an analysis of RPV. His estimates of voter cohesion and candidate preferences among Black and non-Black voters in biracial endogenous elections are similar to those of Dr. Liu. Dr. Alford estimates that: (a) in the 2004 Supreme Court election for Position 1, Judge Griffen obtained 58% of Black voter support and only 38% of non-Black voter support; (b) in the 2006 Supreme Court election for Position 5, Judge Griffen obtained 67% of Black voter support and only 38% of non-Black voter support; and (c) in the 2008 Court of Appeals election for District 6, Position 1, Judge Griffen obtained

87% of Black voter support and only 22% of non-Black voter support. DX 1 (Expert Report of John R. Alford, Ph.D.) at 15, 19. For these three elections, Dr. Alford's analysis is consistent with Dr. Liu's conclusions that there is evidence of voter cohesion in endogenous elections and that non-Black voters usually vote as a bloc to defeat the Black-preferred candidate.

87.    Dr. Alford's estimates of voter cohesion and candidate preferences among Black and non-Black voters in in biracial exogenous elections are also similar to those of Dr. Liu. Dr. Alford estimates that: (a) in the 2002 Lieutenant Governor election, Mr. Sheffield obtained 73% of Black voter support and only 36% of non-Black voter support; (b) in the 2008 Democratic Presidential primary election, Mr. Obama obtained 69% of Black voter support and only 17% of non-Black voter support; (c) in the 2008 Presidential election, Mr. Obama obtained 84% of Black voter support but only 33% of non-Black voter support; (d) in the 2012 Presidential election, President Obama obtained 83% of Black voter support and only 28% of non-Black voter support; (e) in the 2014 Auditor race, Ms. Hampton obtained 82% of Black voter support and only 30% of non-Black voter support; (f) in the 2018 Lieutenant Governor election, Mr. Bland received 88% of Black voter support and only 25% of non-Black voter support. DX 1 (Expert Report of John R. Alford, Ph.D.) at 21-22, 28. For these six elections, Dr. Alford's analysis is consistent with Dr. Liu's conclusions that there is evidence of voter cohesion in exogenous elections and that non-Black voters usually vote as a bloc to defeat the Black-preferred candidate.

88.    Dr. Alford and Dr. Liu agreed that, after endogenous elections, the most probative *exogenous* elections to consider for both the Supreme Court and the Court of Appeals were statewide election results—not any local or county-by-county election results of the sort Defendants belatedly sought to rely on after the close of evidence in this case.

89.    The strikingly similar findings of both Drs. Liu and Alford demonstrate a

28

consistent and stark pattern of RPV across two decades in Arkansas.

90.    Although Dr. Alford also analyzed *uniracial* elections, his analysis with respect to those elections fails to alter the conclusion compelled by both parties' analysis of the biracial elections.

91.    Here, where Dr. Liu's analysis reveals strong evidence of RPV in 9 out of 11 elections, there is no need to look further to the less probative uniracial elections, and in fact considering those uniracial elections would be inappropriate given the universe of available data that both experts analyzed under the circumstances of this case. As Dr. Liu credibly and persuasively explained, uniracial elections are potentially misleading data points and therefore not proper to include in analysis of racially polarized voting patterns here. Trial Tr. vol. 3, 502:23-25 (Liu Cross) ("using uniracial elections would dilute the results and make misleading conclusions"); *id.* at 450:13–452:2 (Liu Direct) (explaining that using uniracial elections as data points would be like trying to determine travelers' preferred way to get from Point A to Point B while giving them an incomplete set of options).

92.    Based on Dr. Liu's persuasive explanation for not including uniracial election results in his analysis, I find that Dr. Liu's methodology appropriately focused only on biracial elections and represents the more persuasive analysis given the facts presented here. By contrast, I find that Dr. Alford's methodology of considering a large number of uniracial elections alongside the relatively few biracial elections is less persuasive and more likely to produce misleading results.

93.    Moreover, a closer look at Dr. Alford's analysis of the uniracial elections reveals a fundamental problem. For more than 80% of the uniracial endogenous elections he analyzed, Dr. Alford's confidence intervals are so wide that the data is unreliable. That is, in 21 out of 26

of those elections, Dr. Alford was unable to determine with 95% confidence who the Black-preferred candidate was. DX 1 (Expert Report of John R. Alford, Ph.D.) at 15 tbl. 1, 19 tbl. 2; Trial Tr. 5, 856:1–857:3, 858:23–859:7 (Alford Cross). And for all those elections—including the five where he was able to determine who the Black-preferred candidate was with 95% confidence—he provided no persuasive explanation for why they should outweigh the strong evidence of RPV among biracial elections.

94.     Finally, as to the uniracial exogenous elections he analyzed, Dr. Alford found that in the past ten years, Black voter cohesion was 79% or higher—and in *every single one of those elections*, the Black-preferred candidate was defeated. DX 1 (Expert Report of John R. Alford, Ph.D.) at 20-21; Trial Tr. vol. 5, 866:19–868:3; (Alford Cross). So even if one were to consider Dr. Alford's use of uniracial elections appropriate and reliable, his analysis of those elections actually provides support for *Plaintiffs'* position that voting in Arkansas is racially polarized.

95.     The Court also does not find persuasive Dr. Alford's claim that Dr. Liu's exogenous election analysis should be disregarded because Dr. Liu cannot eliminate party affiliation, rather than race, as the cause of the polarization shown therein. Although it is not Plaintiffs' burden to disprove every potential cause besides race, witnesses testified that race rather than party is the driving factor in Arkansas elections. *See* Trial Tr. vol. 1, 78:2–79:2 (Humphrey Direct); Trial Tr. vol. 2, 292:6-13 (Seals Redirect) (when asked if race or party play a bigger role in Arkansas politics, she stated "Race is huge."). Moreover, Dr. Alford conceded that he did no analysis to demonstrate that party was the cause of voter choices independent of race. Trial Tr. vol. 5, 865:20–866:4; (Alford Cross).

### **Overall Conclusion**

96.     In sum, the parties and their experts agree that biracial elections are the most

probative data. Defendants and their expert assert that a large of uniracial elections between only white candidates should also be considered in assessing racially polarized voting. But Plaintiffs' expert Dr. Liu persuasively explained that his established methodology for assessing racially polarized voting looks only to the most probative biracial elections, and that including uniracial elections in the analysis would risk misleading results. *See supra.*

97.     The expert evidence has shown that elections in Arkansas are characterized by stark patterns of RPV—*i.e.*, Black voters are politically cohesive (*Gingles II*), and non-Black voters vote sufficiently as a bloc to enable them to usually defeat the minority's preferred candidate (*Gingles III*).

## TOTALITY OF CIRCUMSTANCES

98.     In addition to the *Gingles* preconditions, courts look to the factors identified in the Senate Report accompanying the 1982 amendments to Section 2 of the Voting Rights Act (*i.e.*, "Senate Factors") to assess an alleged Section 2 violation. The Senate Factors include: (1) the history of voting discrimination in the state or political subdivision, (2) the extent of RPV, (3) enhancing factors, (4) access to candidate slating, (5) discrimination in education, employment, health, and other areas of life that hinder participation in the political process, (6) racial campaign appeals, (7) minority electoral success in the jurisdiction, (8) the responsiveness of elected officials, and (9) the tenuousness of the justification for the voting practice. *Thornburg* v. *Gingles*, 478 U.S., 36–37, 44–45 (1986).

99.     Plaintiffs' expert, Dr. Peyton McCrary, considered whether the methods of electing Arkansas Supreme Court justices and Court of Appeals judges interact with social and historical factors to have the effect of causing inequality in the political process for Black voters. Dr. McCrary is qualified to serve as an expert historian. Dr. McCrary has extensive experience

in voting rights litigation and expertise in historical research and empirical analysis. For sixteen years, Dr. McCrary was a social science analyst in the Voting Section, Civil Rights Division, of the U.S. Department of Justice. *See* PTX 078 (McCrary Decl.) ¶¶ 3-7. Prior to government service, Dr. McCrary presented courtroom testimony as an expert witness in seventeen voting rights cases. *Id*. Dr. McCrary has also presented sworn written testimony in fifteen cases. *Id*. Since retiring from the Department of Justice, Dr. McCrary has served as an expert in several voting rights cases. *Id.*

100.    Dr. McCrary drew upon sources standard in historical and social scientific analysis, including, but not limited to: scholarly books, articles, and reports; newspaper and other articles; demographic information; election information; court opinions, briefs, and expert reports; government documents; letters; and scientific surveys. PTX 078 at ¶¶ 8-9.

101.    Numerous fact witnesses also testified at trial to their direct experiences facing discrimination and observing racial disparities in Arkansas. *See infra*. The testimony of various fact witnesses corroborates and reinforces Dr. McCrary's highly credible expert testimony with respect to the Senate Factors, as well as Mr. Cooper's and Dr. Liu's testimony with respect to the *Gingles* preconditions.

### **Senate Factor 1: History of Voting Discrimination in Arkansas**

102.    Arkansas has a long and extensive history of racial discrimination that has touched upon the rights of Black voters to register, vote, and otherwise participate in the political process, as Defendants have acknowledged. *See, e.g*., PTX 459 at 122:9-17 ("[A]re there continued effects of the history of discrimination in Arkansas today?" "Yes.").

103.    Multiple federal courts have taken judicial notice of the history of prior racial discrimination affecting voting in Arkansas. *See* PTX 078 ¶ 19 (citing *Smith v. Clinton*, 687 F.

Supp. 1310, 1317 (E.D. Ark. 1988) (citing *Perkins v. City of West Helena*, 675 F.2d201, 211 (8th Cir. 1982), *aff'd* 459 U.S. 801 (1982) (finding intentional discrimination in a local at-large election system)); *Jeffers v. Clinton*, 730 F. Supp. 196, 204 (8th Cir. 1989)(hereinafter "*Jeffers I*"); and *Jeffers v. Tucker*, 847 F. Supp. 655, 659 (E.D. Ark. 1994)).

104.    While Arkansas was not originally under the jurisdiction of the preclearance provision of the Voting Rights Act, the State was opted into a limited preclearance requirement after the court in *Jeffers v. Clinton* found majority-vote schemes across the state were enacted with discriminatory intent. 756 F. Supp. 1195, 1199, *aff'd*, 498 U.S. 1019 (1991) (hereinafter "*Jeffers II*"); *see also* Trial Tr. vol. 3, 584:21–585:14 (McCrary Direct).

105.    Moreover, prior to passage of the Voting Rights Act, there was a significant racial disparity in voter registration in Arkansas. In lieu of a voter registration list to determine who was eligible to vote in each election, Arkansas used the list of people who had paid their poll tax for the current year. Black voters' participation was limited by the need to pay a poll tax in advance and bring a receipt to the polls on Election Day. PTX 078 at ⁋ 18. Based on poll tax receipts reported by the State Auditor as of October 1963, 65.5% of white Arkansans were eligible to vote compared to only 40.4% of Black Arkansans. *Id*.

106.    Reverend Allen testified to her family's experience confronting the poll tax. "As a child, I can remember my parents arguing about [the] poll tax. Poll tax was $2. My daddy made $17 a week…as a janitor," she said. "I can remember discussion about who was going to get to vote because they couldn't afford the $4 for both of them to vote." Trial Tr. vol. 2, 376:21-377:5 (Allen Direct).

107.    State Senator Joyce Elliott similarly described early memories of learning of the poll tax in her community, stating "I had seen my family, people in my church, [B]lack people

all around, who would whisper about voting and were afraid to talk about it out loud. The first time I heard the word 'poll taxes' I had no idea what it was, but I could tell from their voices they were -- that it was a frightening thing." Trial Tr. vol. 4, 705:8-21 (Elliott Direct).

108.    This persuasive testimony shows the continued legacy of the poll tax and other mechanisms that were long used to disenfranchise Black Arkansans in the present day. This living history continues to affect how Black Arkansans experience the political process, including the electoral methods for appellate courts at issue in this case.

109.    Senator Elliott expanded upon how limitations on voting access have evolved in more recent years with continued and disproportionate effects on Black voters. She explained how Black people who have been denied "a legacy of voting, where they've always known it was going to be easy for them to access voting" are uniquely deterred in Arkansas because "it's not [easy to vote], because Arkansas is in the bottom of the states that make it harder, make it really, really difficult to vote." Trial Tr. vol. 4, 741:24–743:12 (Elliot Direct). She listed bills recently passed that reduce the amount of time voters can return their ballots, add signature matching requirements, and prohibit gestures like providing voters with bottled water within 100 feet of a polling site. *Id*. at 742:13-21 (Elliot Direct). *See also* Trial Tr. vol. 2, 247:10-248:16 (Seals Direct) (describing recent voter suppression bills).

110.    Other fact witnesses recounted experiences of disparate treatment when voting. Reverend Allen described being asked for her photo identification at her polling site despite the facts that the poll worker knew her personally and there was no ID requirement under law at the time. Trial Tr. vol. 2, 355:10–356:10 (Allen Direct). The poll worker did not make the same ask of white voters. *Id.*

111.    Ms. Seals recalled how New Town Missionary Baptist, "one of the oldest [B]lack

voting sites" in her community, was closed shortly before the 2020 election. Trial Tr. vol. 2, 246:12-20. It took an "uproar" from the community and a lawsuit for the site to be restored. *Id.* She also described an earlier instance in Chicot County, when Black community members were targeted with rumors that "if they went to vote and they had an outstanding warrant or they were behind on child support, they would be arrested immediately." *Id.* at 248:17–249:7 (Seals Direct).

112.    Judge Victor Hill discussed his experience working to draft an affidavit to the Department of Justice on behalf of an elderly Black woman who was threatened at the polls in Mississippi County. He recounted that when the woman he was assisting went to the polls to vote, she was "told that she couldn't vote there," despite her stating that it was where she always voted. "[She] was driven from the polls at gunpoint by one of the—a white poll worker," he said. Trial Tr. vol. 2, 389:16–390:4 (Hill Direct).

113.    In addition to accounts of Black voters encountering discrimination when attempting to vote, fact witnesses described threats made to Black candidates. For example, Neil Mr. Sealy, recounted his own experience knocking on doors on behalf of a Black candidate and being told "pointblank, this candidate is [B]lack, I'm not voting for that person." Trial Tr. vol. 2, 318:8-12 (Sealy Direct). He recalled a separate occasion during which he sat at a table among other white men, one of whom said, "if we're not careful, we're going to elect an [n]-word mayor here in Pine Bluff." *Id.* at 316:23-25 (Sealy Direct). More recently, he recounted an instance where a Black candidate for state representative in Little Rock was threatened with gunfire and had the police called on him by white neighbors. *Id.* at 317:12–318:7 (Sealy Direct).

114.    Black Arkansans seeking judicial office have faced unique hurdles to ascending within the legal profession in the state and have faced discrimination on the campaign trail when seeking judicial office.

115.    Judge Hill testified to discrimination he faced during his undergraduate years at University of Arkansas Little Rock when professors denied him and other Black students from tutoring sessions available to white students. Trial Tr. vol. 2, 383:2-19 (Hill Direct). He contemplated dropping out of school after facing threats of violence from police when walking to campus. *Id*. at 384:1–385:25 (Hill Direct). Attorney Eugene Hunt similarly reflected on his time at the University of Arkansas School of Law at Fayetteville, mentioning he "never had the opportunity of being engaged with a professor outside of a classroom," despite professors otherwise "position[ing] themselves outside of their classrooms to receive the [white] students as they were leaving." Trial Tr. vol. 4, 648:9–649:12 (Hunt Direct). He said his experience as a Black law student, "was uncomfortable" because of the "differences in terms of the socialization with the students [and] the law professors." *Id*.

116.    Dr. McCrary discussed at length the history of discrimination in admission and support for Black students at the University of Arkansas School of Law at Fayetteville, impeding the pipeline of Black jurists in the State. *See, e.g.*, Trial Tr. vol. 3, 585:22–590:2 (McCrary Direct); *see also* PTX 078 at ¶¶ 20-25. Specifically, Black law students were not let into the University of Arkansas until 1948 and then faced discrimination and segregated resources on campus. *Id*. No Black law students attended between 1955-1968, and between 1968-1990, no more than five Black students matriculated in any year. *Id*.

117.    After Attorney Hunt was able to graduate law school as one of few Black students in his class, he faced discrimination in his legal practice that his white peers did not. Trial Tr. vol. 4, 647:21–648:6 (Hunt Direct). At trial, he was brought to tears detailing when he was attacked by a white judge and threatened with arrest for questioning his treatment. *Id*. at 656:3–659:20 (Hunt Direct).

118.    Multiple judges testified to discrimination they faced when running for and sitting on the bench in Arkansas. Judge Humphrey testified that his impartiality as a judge was questioned because he was elected to a seat from a majority-Black subdistrict, created in the wake of the *Hunt* litigation. Trial Tr. vol. 1, 71:17-72:22 (Humphrey Direct). Judge Waymond Brown testified that even after overcoming hostility throughout his campaigns for judicial office, including being called the n-word by a voter while door-knocking, he continued to face racial hostility from his white peers after ascending to the Court of Appeals. For example, fellow judges have taunted him with analogies to "taming monkeys" and called him "a three-fifths person." Trial Tr. vol. 3, 417:3-20; 434:16-436:16 (Brown Direct).

119.    The Court finds the testimony of the foregoing witnesses credible and highly persuasive.

**Senate Factor 2: Racially Polarized Voting**

120.    As detailed thoroughly above in relation to *Gingles* II and III, Arkansas elections are characterized by stark patterns of RPV. *See supra*. Moreover, as Dr. McCrary noted, the same courts that took judicial notice of a history of official discrimination as related to Senate Factor 1 also made findings about RPV. *See* PTX 078 at ⁋ 32.

121.    Witness testimony corroborated the statistical evidence and precedential findings of RPV in Arkansas. For example, multiple witnesses testified to the steep barriers to Black candidates' success in districts where Black voters were a minority due to lack of crossover support from the white voters. Judge Hill stated, "[in] my experience white voters don't vote for Black judges," and discussed how he took advice to focus on turning out Black voters instead. Trial Tr. vol. 2, 394:13-24 (Hill Direct). Judge Brown described declining to run for a vacant Court of Appeals seat, saying "I couldn't win that district, it was too white. I knew that." Trial

Tr. vol. 3, 422:4-6 (Brown Direct). *See also* Trial Tr. vol. vol. 4, 672:4-13 (Hunt Direct) (explaining that to run in a district that did not have a majority of Black voters "would have been nonsensical. It would have been totally impractical. It would have been a waste of money."). The Court finds the witness testimony based on their experiences with racially polarized voting to be both credible and persuasive.

122.     The patterns of polarized voting described by fact witnesses could not be explained solely by correlated party preferences across racial groups, as similar patterns of polarized voting manifested within—not merely between—parties. Judge Humphrey described polarized voting he observed in the Democratic primary for a sheriff's race in Pulaski County, and Ms. Seals spoke to the emotional revelation she had when Ron Sheffield, a Black candidate for Lieutenant Governor, lost by larger margins than other white statewide candidates in the same party. Trial Tr. vol. 1, 62:22–63:5 (Humphrey Direct); Trial Tr. vol. 2, 254:5-23 (Seals Direct). "[T]he difference in the vote," she said, "is like white people are not going to vote for us, they're just not going to do it." Trial Tr. vol. 2, 254:14-16.

123.     Dr. Peyton McCrary provided historical context for the statistical and qualitative observations of RPV, noting persistent trends of RPV regardless of which party held political power in the state. PTX 078 at ¶¶ 31–35. He noted at trial, as well, the deterrent effects of RPV for the pipeline of Black political candidates. Trial Tr. vol. 3, 591:25–596:16 (McCrary Direct). "The impact is not only to prevent the election of minority candidates, but to affect the way that minority candidates view their chances of winning election." *Id*. Where RPV is observed, as in Arkansas, it sends a message to potential candidates that they do not have a chance. RPV thus both suppresses Black representation in elected office and limits the amount of data available to prove and challenge RPV since fewer Black candidates even enter the race.

**Senate Factor 3: Enhancing Factors**

124.    Arkansas's systems of electing appellate judges exhibit features explicitly identified in the 1983 Senate Report as likely to "enhance the opportunity for discrimination against the minority group," including "majority vote requirements, anti-single shot provisions," and other practices. *Gingles*, 478 U.S. at 37.

125.    For example, the electoral systems for both the Arkansas Supreme Court and the Court of Appeals feature a majority-vote requirement. Ark. Code Ann. § 14-42-206; *see also* Act 905 of 1989 (subjecting municipal offices in all cities and towns to a majority-vote requirement). This ensures that a Black candidate cannot win by a plurality of votes but must instead compete in a runoff election. Notably, Judge Humphrey testified that in reaction to his success in a municipal court election, the white Democratic legislative majority changed the law from a plurality to a majority-. vote requirement. Trial Tr. vol. 1, 46:19-47:22 (Humphrey Direct).

126.    A hallmark of runoff elections when there is racially polarized voting is that white voters coalesce behind the white-preferred candidate who makes it into the runoff, thus ensuring defeat of minority voters' candidate of choice. The majority-vote requirement thus enhances the opportunity for discrimination against Black voters. *See* Trial Tr. vol. 3, 593:24–595:14 (McCrary Direct) (describing how majority-vote requirements "adds to the discriminatory potential of at-large elections").

127.    Indeed, multiple fact witnesses testified to the exclusionary effects of the State's at-large systems on Black voters' representation. *See, e.g.*, Trial Tr. vol. 1, 56:21-25 (Humphrey Direct) ("[T]he African-American vote, my vote is diluted in the way that we vote for Supreme Court justices [at-large]. And I know that based upon what I've observed from Louisiana that you can have districts a part of the election of the Supreme Court justices."); Trial Tr. vol. 2,

267:23–268:22 (Seals Direct) (testifying that while the *Hunt* decree gave an opportunity to elect their candidate of choice, Black candidates in "these at-large positions, these at-large positions, we don't stand a chance."); Trial Tr. vol. 4, 660:17–667:6 (Hunt Direct) (describing impact of *Hunt* litigation increasing representation for Black voters by removing at-large system of electing trial court judges); *see also id.* at 675:14-676:4 ("With the election being at large, an individual running from numbered positions, an at-large system would be just a total waste of money."); Trial Tr. vol. 3, 465:3-10 (Liu Direct) ("Yes, at-large elections that has been recognized by the Court as a way to dilute minority voter strength.").

The electoral system for the Arkansas Supreme Court also features numbered post and staggered term requirements in addition to at-large voting. PTX 466 at 50:15–23, 51:5–13; PTX 468 at 42:22–43:15. In a pure at-large system without numbered posts or staggered terms, all candidates compete against one another for the seats at issue; all voters may cast as many votes as there are seats; and the seven candidates with the most votes win in a seven-seat election. In such a system, Black voters may engage in single-shot voting, in which they cast one vote for their candidate of choice and withhold their remaining votes. By concentrating their vote on one candidate and withholding the rest of their votes, Black voters can give their preferred candidate a better chance of coming in among the top seven vote recipients. Single-shot voting thus provides Black voters with a better opportunity to elect candidates of their choice. *See* Trial Tr. vol. 3, 592:17-593:23 (McCrary Direct); *see also , Perkins v. City of W. Helena, Ark.*, 675 F.2d 201, 212 (8th Cir. 1982) *aff'd sub nom. City of W. Helena v. Perkins*, 459 U.S. 801, 103 S. Ct. 33, 74 L. Ed. 2d 47 (1982) ("Single-shot voting enables a minority group to win some at-large seats by concentrating the votes of its members behind a limited number of candidates while the vote of the majority is dividing among a number of candidates.").

128.    Court finds that the combination of staggered terms, numbered posts, and at-large voting precludes Black voters from engaging in single-shot voting in Arkansas Supreme Court elections. .

129.    The electoral system for the Court of Appeals is also characterized by multi-member districts that use numbered posts and staggered terms. PTX 468 at 54:11–19; *see also* Trial Tr. vol. 3, 465:3-10 (Liu Direct) In contrast, where multi-member districts have been replaced by single-member alternatives, Black voters have achieved greater representation across multiple realms of elected office, both legislative and judicial. *See, e.g.*, Trial Tr. vol. 3, 605:5-21 (McCrary Direct).

130.    In the absence of numbered post requirements, staggered terms reduce, but do not necessarily eliminate, the opportunity for single-shot voting. When more than one white candidate competes against a minority-preferred candidate, the minority-preferred candidate might win a plurality of the votes cast by using single-shot voting, but not usually a majority. PTX 078 at n.69.

131.    By precluding single-shot voting, numbered posts enhance the opportunity for discrimination against Black voters. Numbered posts prevent Black Arkansans from increasing the mathematical weight of their votes by using single-shot voting because numbered posts turn all multi-seat elections into "head-to-head contests." Trial Tr. vol. 3, 592:17–593:23 (McCrary Direct). For the Court of Appeals, the combination of multi-member districts and numbered posts operate to dilute minority voting strength given the racially polarized voting patterns in Arkansas's judicial elections.

132.    Additionally, a statewide election imposes a greater burden on Black candidates to run their campaigns and to fundraise because of the significant socio-economic disparities that

exist between white and Black residents in Arkansas. Trial Tr. vol. 3, 595:5–596:2 (McCrary Direct); *see also infra* (facts regarding Senate Factor 5); Trial Tr. vol. 2, 255:9–256:8 (Seals Direct) (discussing economic disparities across racial groups and difficulties Black candidates face for fundraising). The at-large structure of the Supreme Court thus creates a deterrent effect for Black candidates even entering the race. Trial Tr. vol. 4, 675:14–676:4 (Hunt Direct) (describing his decision as a Black candidate to avoid election for statewide office because "[w]ith the election being at large, an individual running from numbered positions, an at-large system would be just a total waste of money"); Trial Tr. vol. 2, 329:3-9 (Sealy Direct) ("[I]t is very difficult, if not impossible, to run a candidate in Arkansas statewide – a [B]lack candidate statewide."). The Court finds this witness testimony as to the challenges of at-large elections to be credible.

133.    Finally, under Arkansas's constitution, individuals appointed to the judiciary by the Governor are prohibited from seeking election to that office when their appointive terms expire. Ark. Const. Amend. XXIX. This prohibition enhances the discriminatory impact of the electoral systems for both the Arkansas Supreme Court and the Court of Appeals; Black lawyers who are appointed to the appellate bench are ineligible to run again for the same position and are unable to access any potential incumbency advantage. Trial Tr. vol. 3, 596:3–597:6 (McCrary Direct).

**Senate Factor 4: Informal Candidate Slating**

134.    While formal slating processes for judicial candidates have not been recorded in Arkansas, there are prevalent trends in the allocations of endorsements and campaign contributions, which have not been equally afforded to Black candidates.

135.    Explaining the influence of endorsements from groups like the Chamber of Commerce, which is predominantly white, Ms. Seals testified "I don't see a lot of my people getting those big endorsements." Trial Tr. vol. 2, 257:19-22 (Seals Direct).

136.    Judge Humphrey—who has extensive experience as both a candidate and campaign manager spanning many decades—testified that he does not see "corporate people contributing very much to African-American candidates." Trial Tr. vol. 1, 62:14-15 (Humphrey Direct).

137.    At trial, Mr. Sealy discussed the influence of contributions from "developers," "contractors," "realtors," and "wealthy people" in local political races, stating it was "rare" for their contributions to be directed to Black candidates. Trial Tr. vol. 2, 327:25–328:15 (Sealy Direct).

138.    Judge Brown shared from his own experience as a candidate that white people often did not want to donate high amounts that had to be disclosed because they did not want it to be known publicly that they were supporting a Black judicial candidate. Trial Tr. vol. 3, 418:5-419:4 (Brown Direct). He also described approaching the chairman of the Chamber of Commerce in Forrest City to solicit contacts for donations within the white community and "was shut out of the white community completely". *Id.* at 428:19–430-8.

139.    Judge Brown also described the significance of the Gillett Coon Supper for political fundraising. While open to Black candidates and community members, he noted "Black folks don't like to go to a coon supper. So it's difficult." *Id.* at 429:16-22.

140.    The Court finds the aforementioned witness testimony to be credible and persuasive.

**Senate Factor 5: Discrimination in Areas of Life that Hinder Political Participation**

141.    Arkansas's history of *de jure* and *de facto* discrimination against Black people

extends beyond voting to virtually every aspect of economic and social life. These historic inequalities have continued effects today and impact access to the political process. *See, e.g.*, PTX 466 at 122:9-17 ("[A]re there continued effects of the history of discrimination in Arkansas today?" "Yes."); *see also* PTX 078 at ¶ 38 ("racial disparities in education provide important evidence of racial disparities affecting voting.").

142.    For decades, the segregated public schools of Arkansas provided underfunded and inferior public education for Black students. *See, e.g.*, PTX 466 at 130:6-13. Following *Brown v. Board of Education*, 347 U.S. 483 (1954), Arkansas still maintained segregated schools. *See* PTX 468 at 176:7-9. In fact, the Little Rock School District was one of the national focal points for desegregation efforts after the *Brown* decision. Notably, issues have persisted in the Little Rock School District and in school districts throughout the state. "There is no getting around the fact that certain rural, poor, and predominately [B]lack school districts have been underfunded in the past, and that those schools, their teachers, and their students have suffered as a result." PTX 028 (Memo from Tim Gauger to Butch Reeves re: Lake View Settlement) at SOS3182. *See also* PTX 466 at 122:7–17 (conceding that there is ongoing litigation regarding segregation and discrimination in Arkansas's school system); Trial Tr. vol. 4 738:11–740:21 (Elliott Direct) (discussing disparities in resources, and segregated patterns in education and housing in Little Rock).

143.    Arkansas has been no less resistant to efforts to desegregate its system of higher public education, and Black students attending integrated colleges faced significant barriers in pursuing higher public education. *See, e.g.*, Trial Tr. vol. 2, 383:2–386:15. (Judge Hill testifying about discrimination in college experiences and limited Black student representation in law school in Arkansas).

144.    A 1943 Arkansas state law provided tuition grants to Black students who wished to attend graduate or professional schools not offered by state institutions to Black students. PTX 078 at ¶¶ 20-25. These tuition grants allowed Black students to attend law (and other graduate) schools in *other* states. Arkansas eventually allowed Black students to be admitted to the law school at the University of Arkansas in 1948, but once enrolled, Black students were subjected to segregated classes, study rooms, libraries, and restrooms. *Id.* Moreover, students were subjected to bigoted comments and threats of physical violence. *Id.* No Black students graduated from the School of Law between 1955 and 1968, and the Arkansas Bar Association did not admit Black lawyers until the 1964 Civil Rights Act was passed. *Id.*

145.    There are significant disparities between Black and white Arkansans with respect to other key indicators that implicate access to the political process. According to the 1-Year 2019 American Community Survey:

- 27.3% of Black Arkansans live in poverty, compared to 13.3% of white Arkansans. Joint Stipulations ¶ 7.

- 38.1% of Black children in Arkansas live in poverty, compared to 16.44% of white children. *Id.* at ¶ 8.

- 48.3% of Black female-headed households with children in Arkansas live in poverty, compared to a 33.1% poverty rate for white female-headed households. *Id.* at ¶ 9.

- Black Arkansans' median household income is $33,779, compared to $52,788 for white Arkansans. *Id.* at ¶ 10.

- Black Arkansans' per capita income is $18,308, compared to white Arkansans' per capita income of $30,250. *Id.* at ¶ 11.

- 23.8% of Black households in Arkansas rely on food stamps (Supplemental Nutrition Assistance Program, or "SNAP")—about 2.8 times the 8.4% SNAP participation rate of white households. *Id.* at ¶ 12.

- Of persons 25 years of age and over, 13.0% of Black Arkansans have not completed high school, compared to 10.1% of their white counterparts. *Id.* at ¶ 13.

- 17.3% of Black Arkansans ages 25 and over have a bachelor's degree or higher, compared to 24.9% of white Arkansans in that cohort. *Id.* at ¶ 14.

- The Black unemployment rate for the population over 16 years old (expressed as a percent of the civilian labor force) is 7.6%, compared to a 4.2% white unemployment rate. *Id.* at ¶ 15.

- 24.5% of employed Black Arkansans work in service occupations, compared to 15.5% of employed white Arkansans. *Id.* at ¶ 16.

- 44.6% of Black Arkansan householders are homeowners, while 71.1% of white householders are homeowners. Median home value for Black Arkansan homeowners is $85,900, compared to the $143,600 median home value for white Arkansan homeowners. *Id.* at ¶¶ 17–18.

146.    These profound disadvantages in socioeconomic wellbeing and health adversely impact Black people's ability to participate in the political process and the ability of Black candidates to compete effectively in at-large elections.

147.    Multiple fact witnesses credibly and persuasively spoke to their individual experiences and observations of discrimination. For example, Judge Humphrey testified that he grew up in "a very segregated" Pine Bluff where he was subjected to laws that required "riding the back of the bus, drinking from a colored water fountain" at the department store, and

"attending segregated schools." Trial Tr. vol. 1, 31:15-25. It was not until after the 1964 Civil

Rights Act that any of these practices ended. Judge Humphrey was 15 years old at that time. *Id.*

at 32:1-9 (Humphrey Direct).

148.    Inequalities still followed Judge Humphrey through later life. He noted that "there

was no mixing of the races on a social basis," and Black people were not represented in positions

of leadership across the industries he entered, including his time working for a local newspaper

in the Delta. *Id.* at 32:19-20, 36:3-24 (Humphrey Direct) ("there were fewer African-Americans

who were in positions of leadership in those communities than their populations would suggest

that they should be.").

149. Judge Hill and Senator Elliott both described their direct experiences of

discrimination by educators, who denied them the same mentoring, resources, and academic

accolades as their white peers. Trial Tr. vol. 2, 383:2–19 (Hill Direct); Trial Tr. vol. 4, 693:20–

699:22 (Elliott Direct). And Reverend Allen discussed how schools "today in 2022 that were

completed in 2021," look drastically different in quality across the predominantly Black versus

predominantly white areas of Pulaski County. Trial Tr. vol. 2, 360:7-23.

150.    Ms. Seals and Mr. Sealy both described racial disparities along economic metrics,

including housing access and quality. Ms. Seals discussed the State's failure to enforce an implied

warranty of habitability and the disparate impact on Black renters. Trial Tr. vol. 2, 272:19–273:23.

Mr. Sealy discussed the Arkansas Community Institute's extensive research, work, and concerns

around racial disparities in household debt. *Id.* at 313:14-19. And Plaintiffs' expert Bill Cooper

cited Census data to support, quantitatively, the observations of fact witnesses about social and

economic disparities across the State. *See, e.g.*, Trial Tr. vol. 1, 126:12-21 (stating "whites outpace

African-Americans on key socioeconomic measures of well-being.").

151.    Senator Elliott testified that Arkansans continue to "live racially and economically segregated." Trial Tr. vol. 4, 734:17 (Elliott Direct). She, Neil Sealy, and Reverend Allen all discussed how I-630 in Little Rock demarcates a stark boundary line between resourced white neighborhoods and Black neighborhoods that lack basic services like grocery stores. Trial Tr. vol. 2, 318:3-7 (Sealy Direct); *id.* at 343:17-344:25 (Allen Direct); *id.* at 737:12-740:21 (Elliott Direct).

152.    Regarding disparities within the criminal legal system, Ms. Seals and Reverend Allen both described instances of racial profiling by police—Ms. Seals's son was pulled over without cause, as was Reverend Allen when she was wearing a hoodie in a rental car. Trial. Tr. 273:22-274:22 (Seals Direct); 359:1-21 (Allen Direct). Ms. Seals left a job at a prosecuting attorney's office because her work as a victim witness assistant coordinator was too "overwhelming" due to her numerous and persistent observations of racial inequities in the system. Trial Tr. vol. 2, 242:24–244:5 ("It became a lot, because at that time. . . I saw a lot that was wrong with the system . . . I saw a lot of inequities in the system…And when I say inequities, I saw [B]lack men overcharged intentionally so they could plea down. I saw bonds being set higher for [B]lack people . . .So after five years . . . it was too frustrating, it was overwhelming, and I realized I couldn't make a difference on the inside.").

**Senate Factor 6: Racial Appeals**

153.    Both overt racial appeals and subtle racialized references can be employed to influence voters and depress Black political participation and representation. *See* Senate Report at 206–07 ("whether political campaigns have been characterized by overt or subtle racial appeals."). Both have been recorded in Arkansas.

154.    In 2006, an editorial page cartoon in the Arkansas Democrat-Gazette depicted Judge Wendell Griffen in a clown costume with exaggerated features. PTX 158. Such imagery—

depicting a Black person as a fool—invokes an "historical trope from minstrel narratives," as described by Dr. McCrary. PTX 078 ¶ 45. Ms. Seals grew emotional at trial as she recalled her "disgusted" feeling when she first saw this cartoon, which she described as "pure racist." Trial Tr. vol. 2, 258:9–260:16 ("I kind of struggle with it. I don't want to see it. . . . It's racist.").

155.    Racial appeals have appeared in races for Arkansas's 2nd Congressional District, which encompasses Pulaski County. For example, the Court heard the audio of a radio ad supporting Representative French Hill in his 2018 Congressional race. *See* PTX 343. The ad featured caricatured Black women stating that his political opponents wanted to go back to "lynching black folks again" and would revert to "race verdicts" whenever a "white girl screams rape," among other racialized tropes and colloquialisms. *Id.* Reverend Allen explained that she understood this ad to target her and other Black voters, and that it made her feel "very angry" and "underestimated as a voter." Trial Tr. vol. 2, 374:2–375:24 (Allen Direct). As she explained, with palpable emotion: "It makes me feel like [B]lack voters are . . . taken for granted, that [B]lack voters are perceived as less educated and knowledgeable about voting . . ." *Id.* at 375:12–375:21

156.    In 2020, Representative French Hill's campaign widely distributed fliers depicting his challenger, Senator Elliot, a Black woman. PTX 321 (Mailer, "Liberal Activist Joyce Elliott, Too Divisive to Move Us Forward"). The flier distorted a photo of Senator Elliot, using it out of context to suggest she was part of "the anti-American Radical Left" and darkening her image. Trial Tr. vol. 4, 719:14–725:1 (Elliott Direct); Trial Tr. vol. 2, 260:21–262:14 (Seals Direct); *id.* at 368:3–371:24 (Allen Direct). As Senator Elliott herself recalled, "[t]here were some overt racist appeals in that race for sure." Trial Tr. vol. 4, 719:16-17. Ms. Seals, who recalled the imagery, discussed how the campaign's ads' misleading images were clearly designed to cast Senator Elliott as "a threat to the white man." Trial Tr. vol. 2, 260:17–262:14 (Seals Direct).

157.    At the statewide campaign level, Ms. Seals testified about how Mark Pryor, a white

Senator, suffered political attacks for his relationship with President Obama in a way she believed

had "everything to do with race." *Id*. at 263:11-22 (Seals Direct). Specifically, she mentioned an

attack ad released by supporters of Senator Tom Cotton that was designed to prompt racial cues

through references to the President. *Id*. at 278:6–279:21 (Seals Direct).

158.    The Court finds the witness testimony regarding racial appeals to be sincere,

credible, and highly persuasive.

### Senate Factor 7: Lack of Black Electoral Success

159.    Black candidates have been substantially underrepresented in elected public

offices in Arkansas, especially in positions elected at-large. *See, e.g.*, PTX 466 at 85:13-14, 86:5-

7, 122:7-11; PTX 467 at 163:22–165:24; PTX 468 at 49:16-20.

160.    Since 1874, Arkansas has elected justices of the Arkansas Supreme Court

statewide. *See* Ark. Const. art. VII, § 6 (1874) (providing that "[t]he judges of the Supreme Court

shall be elected by the qualified electors of the State"), *repealed*, Ark. Const. amend. LXXX, §

22(A) (2001); Ark. Const. amend. LXXX, §2(A) ("The Justices of the Supreme Court shall be

selected from the State at large."). For those nearly 150 years, *no* Black candidate has ever been

elected at-large to that court. PTX 466 at 86:5-7 ("Q: Has there ever been a black person who's

been elected to a statewide election in Arkansas? A: No."); PTX 467 at 164:16-24; PTX 468 at

49:16-20; Trial Tr. vol. 1, 57:1-9 (Humphrey Direct) ("Historically is it true that the only way

African-Americans have served on that court is if they were appointed to fill a term by the

governor? Absolutely. Is that true even today? Yes.").

161.    Only two Black candidates have run for the Supreme Court. There was ample

credible testimony at trial as to why so few Black candidates have attempted to run for these at-

large positions. For example, Attorney Hunt stated that he never considered running for statewide office because it "would be just a total waste of money" to run in a district where Black voters didn't have sufficient population to elect a candidate of their choice. Trial Tr. vol. 4, 675:14-676:4 (Hunt Direct). Similarly, when fundraising for a congressional seat, Senator Elliott was told "You're a [B]lack woman in the south and in Arkansas, and you're not going to win, so I'm not just going to waste my money." *Id.* at 716:13-23 (Elliott Direct). The Court credits this testimony as evidence of the deterrent effects of the current electoral system.

162.     Additionally, at least since Reconstruction, *no* Black candidate has ever been elected to any other statewide office (*e.g.*, Governor, Attorney General, etc.). PTX 466 at 86:5-7; *see also* Trial Tr. vol. 2, 264:10-12 (Seals Direct) ("Are you aware of any [B]lack candidate being elected to statewide office? No, never.").

163.     To date, *no* Black candidate who has faced opposition from a white candidate has ever been elected to the Court of Appeals. *See* PTX 467 at 163:22–164:21, 164:25–165:8. Judge Brown is the *only* Black judge elected to the Court of Appeals in an opposed election, and he ran against another Black candidate in a minority influence district. Trial Tr. vol. 3, 423:9–426:10 (Brown Direct). Three other Black judges who served on the Court of Appeals—Judges Olly Neal, Andree Roaf, and Wendell Griffe—were appointed by the Governor. Joint Stipulations ¶ 49.

164.     By contrast, Black judges at the Circuit Court level have been elected from majority-Black single-member districts/subdistricts. *Hunt*, 1991 WL 12009081 (challenging the dilution of Black voting strength under the method of electing Arkansas's trial court judges); *see also* PTX 078 at ¶ 30.

165.     Black candidates did not win election to the Arkansas legislature until 1972: three

in the house (out of 100) and one in the senate (out of 35). PTX 078 at ¶¶ 53–56. The number of house members remained at three during the 1970s. *Id.* From 1981-1988, there were four Black members of the house, and a fifth Black member served from 1989-1990. *Id.* In 1990, two more Black candidates won seats in the state senate, and the number of Black members of the house increased from five to nine. *Id.* From 1993 through 1998, there were ten Black house members, and two more were added for the 1999-2000 session. *Id.* The number of Black senators remained limited to two in 2001-2002, increasing to three from 2003 through 2005. *Id.* Black senate membership was four senators from 2007-2008 through 2011-2012. *Id.* From 2013-2014 through May 2021, the number of Black senators dropped to three per session. *Id.* In the state house, there were 12 Black representatives in 2001-2002 and 2003-2004, increasing to 13 in 2005-2006, but slipping back to 12 in 2007-2008. *Id.* For the next two sessions (2009-2010 and 2011-2012), the number of Black house members slipped to 11, but returned to 12 Black representatives in 2013-2014. *Id.* There were 13 Black representatives in the 2015-2016 and 2017-2018 sessions. In the 2020-2021 session, there were 15 Black members of the house. *Id.*

166.   The greater number of Black legislators in Arkansas since 1990 is partly attributable to the fact that Black members of both houses have been elected from single-member majority-Black districts that have been determined by federal courts to satisfy Section 2 of the Voting Rights Act. *See, id.*; *see also, e.g., Jeffers II*, 756 F. Supp. 1195 (E.D. Ark. 1990).

**Senate Factor 9: Tenuousness**

167.   Although Arkansas has argued in this litigation that it has a policy interest in maintaining an at-large system of election to the Arkansas Supreme Court in order to promote judicial accountability, the evidence shows that any such "linkage" interest claimed by Defendants is tenuous at best. *See* Defs.' Br. in Supp. of Mot. Summ. J. at 67–68, ECF No. 92.

The record does not establish that Arkansas would incur any significant harm to fundamental state interests from adopting an alternative system of election to its Supreme Court.

168.    As a preliminary matter, Defendants' alleged linkage interest would not be undermined by adopting an alternative electoral method that features a modified system of at-large election, such as cumulative voting. And Plaintiffs have proposed such a remedy in the alternative. *See* ECF No. 37, Prayer for Relief (d). However, the question of appropriate remedy is not before the Court at this stage.

169.    In Arkansas, lower court judges on both the Court of Appeals and trial courts are currently elected using systems of regional and local electoral districts and subdistricts, and they have been for decades.

170.    The twelve Court of Appeals judges are elected from seven distinct districts, two of which are single-member districts and five of which are multi-member districts. Joint Stipulations ¶¶ 46-47.

171.    The Court of Appeals exercises jurisdiction statewide. *See* Pls' Resp. to Defs' Statement of Material Facts ¶ 7, ECF No. 104; Trial Tr. vol. 3, 434:14-15 (Brown Direct). That statewide jurisdiction functionally mirrors the Supreme Court's jurisdiction. Arkansas nevertheless elects Court of Appeals judges using electoral districts.

172.    Judges on the Court of Appeals are all eligible to hear cases from anywhere within the Court of Appeals' jurisdiction, regardless of where the case arose or the district from which they are elected. *See* Trial Tr. vol. 3, 434:14-15 (Brown Direct). Decisions of the Court of Appeals are also precedential in any court in the state, just like decisions of the Arkansas Supreme Court. *See* Ark. S. Ct. Rule 5-2I.

173.    The geographic scope of a Court of Appeals member's authority is therefore

53

indistinguishable from that of the Supreme Court. Arkansas maintains this system even though no Court of Appeals judge is elected at-large by a statewide electorate.

174.    In addition, merits decisions of the Court of Appeals are typically reached by three-judge panels that necessarily include judges elected only from certain districts and not others. Therefore, judges on the Court of Appeals routinely make decisions that affect the entire state, including voters who did not vote for them.

175.    Defendants have not taken the position in this litigation—nor pointed to record evidence of having taken the position elsewhere—that the current Court of Appeals electoral system raises significant linkage or accountability concerns. One would expect Arkansas's claimed "linkage" concern as framed by Defendants to apply with equal or greater to the Court of Appeals as compared to the Supreme Court. This is because, as described above, the Court of Appeals typically acts through three-judge panels that represent only a subset of that court's membership, and thus do not include judges from every district. By contrast, the Arkansas Supreme Court typically deliberates and acts with input from all of its members.

176.    Given the similarities between the jurisdiction of the Supreme Court and the Court of Appeals, Arkansas's failure to raise linkage or accountability concerns regarding the current method for electing Court of Appeals judges strongly suggests that its asserted governmental interest in at-large election of the Supreme Court is nowhere near as profound as Arkansas has claimed.

177.    In addition, trial court judges in Arkansas are elected from geographically defined districts and, in some cases, from smaller subdistricts within those districts. This system has been in place since the early 1990s as a consequence of a consent decree agreed to by the State in the *Hunt* litigation. *See* PTX 401 (Memo from Tim Humphries to County Election Officials

regarding Judicial Redistricting); PX 403 (Memo from Tim Humphries to Governor, Secretary of State, State Treasurer, Legislative Leadership, and Chief Justice re: Amended Consent Decree in *Hunt v. State of Arkansas*).

178.    Following *Hunt*, the Arkansas Supreme Court affirmed that judges elected from *Hunt*-created subdistricts could properly exercise jurisdiction over matters beyond their electoral districts. *Kemp v. State*, 324 Ark. 178, 191–92 (1996) (citing *Caldwell v. State*, 322 Ark. 543, 548–49 (1995)) (holding that judges from "electoral subdistricts would exercise jurisdiction district-wide, and there was no requirement that each judge reside within the electoral district.").

179.    Trial judges often act and exercise their discretion unilaterally, unlike individual Supreme Court justices who must decide cases in concert with others. Logically, the State would place greater weight on linkage concerns at this level, yet Arkansas has not pointed to any such concerns. *See, e.g.*, Trial Tr. vol. 3, 606:8–607:6 (McCrary Direct) ("since there's no single judge making a decision in the Court of Appeals or the Supreme Court, the linkage argument that's offered by the state seems to have less empirical advantage than at the trial court level").

180.    Other states have notably used single-member districts to elect judges to their Supreme Courts. For example, neighboring Louisiana elects members of its Supreme Court from seven geographically distinct districts (one of which is majority-Black in both total population and voter registration). Louisiana has successfully used this method of election for many years even though its Supreme Court, like the Arkansas Supreme Court, exercises jurisdiction statewide. PTX 078 at ¶ 60.

181.    Experience has therefore shown that sub-district elections can be, and have been, a viable solution to ensure Black voters are not denied the opportunity to elect a candidate of their choice to a state's highest court.

182.    Plaintiffs presented extensive testimony about Black voters' perceptions of the current system of at-large Supreme Court elections as unfair and unrepresentative compared to a district-based alternative. For example, Ms. Seals said relief "would mean representation, it would mean I could see equity." Trial Tr. vol. 2, 277:2-3. Judge Humphrey stated that relief is important for the courts to be seen as institutions "people perceive . . . as being places where justice is administered." Trial Tr. vol. 1, 83:24–84:2. Reverend Allen stated that on the current Supreme Court, which is all white, "there is no assurance that my vote, that my representation is honored in this state." Trial Tr. vol. 2, 376:8-12.

183.    In sum, longstanding practice both within Arkansas and in other similarly situated states overwhelmingly refutes Arkansas's claimed interest. The assertion by Arkansas that its system of at-large election to the Supreme Court is necessary to promote a non-tenuous governmental interest in "linkage" is therefore unpersuasive and not credible. To the contrary, the record reflects that any interest that Arkansas may have is tenuous at best.[4]

**Overall Conclusion**

184.    Under the totality of the circumstances, Arkansas's Black voters have less opportunity than white voters to participate in the political process and elect judicial candidates of their choice.

**CONCLUSIONS OF LAW**

**Jurisdiction**

---

[4] Plaintiffs have also proposed an alternative remedy to the Supreme Court's at-large elections: cumulative voting. *See* Second Am. Compl., ECF No. 37 at 22; ECF No. 103 at 61–63. Defendants have not alleged that cumulative voting poses linkage concerns. In fact, former Assistant Attorney General Tim Humphries stated that cumulative voting is a "better way" to "ensur[e] that Black voters have the opportunity to elect their candidate [of choice]." PTX 467 at 243:18-244:22 This Court's decision is limited to liability and will address remedy in a subsequent order. However, the Court notes that the existence of this alternative remedy further supports a finding that a Section 2 violation outweighs the linkage interest here; this is so even if the Court were to assume—contrary to the aforementioned findings—that the linkage interest is not tenuous.

185.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), and 1357; 42 U.S.C. §§ 1983 and 1988; and 52 U.S.C. §§ 10301, 10302, 10308(f), and 10310(e). This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

**Proper Defendants**

186.    Courts can "enjoin state officials to conform their future conduct to the requirements of federal law." *Quern v. Jordan*, 440 U.S. 332, 337 (1979). It is undisputed that a state official who has "some connection with the enforcement of the act" is a proper defendant from whom to seek such relief. *McDaniel v. Precythe*, 897 F.3d 946, 952 (8th Cir. 2018) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). The requisite connection can be demonstrated where "a state official is giving effect to a state statute in a manner that allegedly injures a plaintiff and violates his constitutional rights." *Id.* Under these circumstances, "an action to enjoin implementation of the statute or for declaratory relief is available against the state official." *Id.*

187.    The parties do not dispute that the Secretary of State is a proper Defendant. As stated in the foregoing findings of fact, the Secretary of State is critically involved in the judicial election process. *See supra.* The Court finds that the Secretary of State is thus a proper defendant, which provides sufficient basis to turn to the merits of this claim.

188.    The Court also finds that the Governor and Attorney General are proper defendants. Based upon the foregoing findings of fact, the Governor and Attorney General play important roles in "giving effect to" the challenged electoral schemes. *Id.* The record shows that both these Defendants have active roles in maintaining and enforcing the method of elections for appellate judges in Arkansas. *See supra.*

189.    The Governor's Office has the ultimate authority to ensure that other executive

57

branch officials are faithfully executing the law under Arkansas's Constitution. *See* Ark. Const. Art. VI, §§ 2, 7. This is demonstrated by, for example, the Governor's duty to fill vacancies in the Supreme Court and Court of Appeals, Ark. Const. amend. LXXX § 18(B), as well as the Governor's representation on and close supervision of the Commission, and in the Governor's working with the General Assembly on proposed redistricting legislation. *See supra.* The Eighth Circuit has found analogous state constitutional provisions to support a Governor defendant in *Citizens for Equal Protection v. Bruning*, 455 F.3d 859 (8th Cir. 2006), *abrogated on other grounds by Obergefell v. Hodges*, 576 U.S. 644 (2015). There, the Eighth Circuit cited Art. IV, § 6 of the Nebraska Constitution in support of its holding that the Governor was a proper co-defendant under *Ex parte Young* in a challenge to Nebraska's constitutional prohibition on same-sex marriage. *Id.* at 864. Here, as in *Bruning*, the relevant state constitutional provision provides the Governor powers to enforce Arkansas's state constitution. This provides "some connection" between the challenged laws and the Governor's enforcement authority. *See Church v. Missouri*, 913 F.3d 736, 749 (8th Cir. 2019) ("The *Bruning* and [*Digital Recognition Network v.*] *Hutchinson* decisions mean that a governor's general-enforcement authority is 'some connection' if that authority gives the governor methods of enforcement."). [5]

190. The Attorney General likewise has been centrally involved in maintaining the electoral scheme in Arkansas. *See supra.* Defendants acknowledged that the Attorney General does have enforcement power over the composition of elected governmental bodies in

---

[5] In *Digital Recognition Network*, the enforcement scheme for the state laws relied on *possible* intervention by the Attorney General in private civil actions, 803 F.3d 952, 958 (8th Cir. 2015); whereas here, the Attorney General and Governor have been centrally involved in maintaining the challenged electoral schemes alongside the Secretary of State, *see supra. Digital Recognition Network* also concerned a pre-enforcement challenge, 803 F.3d at 957–58; whereas here, the foregoing facts indicate that the Defendant officials have *already* taken actions that are causing Plaintiffs *ongoing* harm.

Arkansas. *See* Defs' Reply in Supp. of Mot. Summ. J. 5, ECF No. 117 (discussing the authority

conferred by Ark. Code Ann. 16-118-105(b)(1) and *Drennen v. Bennett*, 230 Ark. 330, ( 1959).

Among other things, the Attorney General's authority under Ark. Code Ann. § 16-118-

105(b)(1) obliges the Attorney General to pursue corrective action if she determines that a

governmental body is unlawfully composed. *See Drennen v. Bennett*, 230 Ark. 330, 332 (1959)

(discussing the Attorney General's duty to initiate enforcement proceedings if the membership

of a state commission fails to comply with a requirement to include at least one representative

from each congressional district). This "broad power[] to enforce" qualifications for state

office, is analogous to the general power to "polic[e] compliance with" the state constitution

that the Eighth Circuit held was sufficient in *Bruning*, 455 F.3d at 864. That reasoning applies

with even greater force here, where there is a track record of extensive past involvement by the

Attorney General in maintaining and superintending the electoral scheme. *See supra*.

Accordingly, both the Governor and the Attorney General thus have "some connection" to

enforcing the challenged laws and neither are entitled to sovereign immunity in this case. *Id.*

### Plaintiffs' Standing

191.    This Court further holds that Plaintiffs have Article III standing for substantially

the same reasons. *See Dig. Recognition Network Inc.*, 803 F.3d at 957 ("In a case like this one,

the questions of Article III jurisdiction and Eleventh Amendment immunity are related."). A

plaintiff has Article III standing to bring a claim if the plaintiff has suffered a cognizable injury

that is "fairly traceable to the challenged action" and "redressable by a favorable ruling."

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). Here, Plaintiffs established at

trial that each of the individual and organizational plaintiffs have been injured by being denied

an equal opportunity to participate in elections for their state's highest courts. *See supra*.

192.    With respect to the second and third prongs of Article III standing, "[s]o long as a state official is giving effect to a state statute in a manner that allegedly injures a plaintiff and violates his constitutional rights, an action to enjoin implementation of the statute or for declaratory relief is available against the state official." *McDaniel*, 897 F.3d at 952. Taking together the facts found above—the Defendants' awareness of the need to increase Black voters' representation on the state's appellate benches, extensive involvement in the maintenance of the challenged apportionment systems, and failure to address that need—the Court finds that Plaintiffs' injuries are fairly traceable to Defendants, and would be redressed by any relief granted here binding them to implement a remedy for those injuries.

### Overall Legal Framework

193.    Section 2 of the Voting Rights Act prohibits States from applying or imposing any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C.§ 10301(a). A violation occurs, "if, based on the totality of circumstances, it is shown that the political processes leading to . . . election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by [this section] in that its members have *less opportunity* than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b) (emphasis added). A violation of Section 2 does not require proof of discriminatory intent and can "be proved by showing discriminatory effect alone." *Gingles*, 478 U.S. at 35. Thus, the essence of a Section 2-results claim is that an "electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [B]lack and white voters to elect their preferred representatives." *Id.* at 47.

194.    These requirements apply to judicial elections as well. *Chisom v. Roemer*, 501 U.S. 380, 384 (1991). It is a broadly accepted principle that judicial elections—at both the trial and appellate level—must be in compliance with the Voting Rights Act. *See id.* at 404 (holding "state judicial elections are included within the ambit of § 2 as amended" in case challenging electoral scheme for Louisiana Supreme Court); *Prejean v. Foster*, 227 F.3d 504, 515 (5th Cir. 2000) ("*Chisom* held that a Section 2 dilution claim is maintainable against an elected appellate bench").

195.    Plaintiffs "asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent" but that their vote is diluted based on race. *Bartlett v. Strickland*, 556 U.S. 1, 19–20 (2009).

***Discriminatory Result***

196.    All parties agree that this case is governed by Section 2 of the Voting Rights Act and the framework for Section 2 vote dilution claims established in *Thornburg v. Gingles*, 478 U.S. 30 (1986). Defendants have not challenged either the *Gingles* framework or the constitutionality of the statute.

197.    A Section 2 claim has two components. *First*, Plaintiffs must meet the three preconditions established in *Gingles*: (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district" (*Gingles I*); (2) the minority group is "politically cohesive" (*Gingles II*); and (3) the "white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate" (*Gingles III*). *Id.* at 50–51, 56.

198.    Notably, in *Gingles,* the Supreme Court interpreted Section 2 as it applied to an at-large electoral scheme. The Court found that at-large voting, may "operate to minimize or

cancel out the voting strength of racial [minorities in] the voting population." *Gingles*, 478 U.S. at 47 (alteration in original). "The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters." *Id.* at 48. (footnote omitted) (citation omitted). *See also Missouri State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 930 (8th Cir. 2018), *aff'd* 894 F.3d 924 (8th Cir. 2018) ("One manner in which a violation may occur is when districts that elect several at-large representatives 'operate to impair [Black voters'] ability to elect representatives of their choice.'") (quoting *Gingles*, 478 U.S. at 42).

199.    *Second*, Plaintiffs must, under the totality of circumstances "demonstrat[e] that a challenged election practice has resulted in the denial or abridgment of the right to vote based on color or race." *Chisom*, 501 U.S. at 394; *see also* 52 U.S.C. § 10301(b). Senate Factors are relevant to this inquiry. *Gingles*, 478 U.S. at 36–37, 44–45. The Senate Factors include: (1) the extent of any history of official discrimination in the state or political subdivision that touched the rights of the members of the minority group to register, to vote, or otherwise participate in the democratic process; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) whether minority candidates have been denied access to any candidate-slating process; (5) the extent to which minorities in the state or political subdivision bear the effects of discrimination in education, employment, and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by

overt or subtle racial appeals; and (7) the extent to which minority group members have been elected to public office. *See id*. at 36–37 (quoting S. Rep. 97-417 at 28–29, reprinted in 1982 U.S.C.C.A.N., 206–07).

200.    The Supreme Court has also recognized an additional deferential factor to the *Gingles* analysis: proportionality. In *Johnson v. De Grandy*, the Court explained that evidence indicating whether minority voters form voting majorities in districts proportional to their share of the population is a relevant consideration in the totality of the circumstances. 512 U.S. 997, 1012–17 (1994); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 436–37 (2006) (hereinafter "*LULAC*"); *NAACP v. City of Columbia*, 33 F.3d 52 (4th Cir. 1994) (unpublished) (citing *De Grandy*, 512 U.S. at 1000). This is one more factor within a "comprehensive" analysis of whether minority voters have less opportunity than other members of the electorate to elect representatives of their choice. *De Grandy*, 512 U.S. at 1011–12.

### ***GINGLES I***

201.    *Gingles I* requires a plaintiff to show that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. Plaintiffs typically satisfy *Gingles I* by drawing hypothetical majority-minority districts. *See Bone Shirt II*, 461 F.3d at 1018; *Clark v. Calhoun Cnty.*, 88 F.3d 1393, 1406 (5th Cir. 1996). While there is no universal benchmark that determines whether an illustrative district is compact, "the inquiry should take into account traditional districting principles." *LULAC*, 548 U.S. at 433 (citation omitted); *see* Pls' Mot. Partial Summ. J. 7–8, ECF No. 89.

202.    The "ultimate end of the first *Gingles* precondition is to prove that a solution is possible, and not necessarily to present the final solution to the problem." *Bone Shirt II*, 461 F.3d at 1019 (quotation omitted); *accord Clark v. Calhoun Cnty.*, 21 F.3d 92, 95 (5th Cir. 1994)

(holding a "plaintiffs' proposed district is not cast in stone"; its purpose is simply "to demonstrate that a majority-[B]lack district is feasible"). *Gingles I* sets a minimum threshold requirement to distinguish between colorable Section 2 claims and those that have no chance of success. *See Bartlett*, 556 U.S. at 21 ("[T]he *Gingles* requirements are preconditions, consistent with the text and purpose of § 2, to help courts determine which claims could meet the totality-of-the-circumstances standard for a § 2 violation.").

### Numerosity

203.    The Supreme Court in *Bartlett* held that a bright-line 50% plus one rule applies to numerosity. *See* 556 U.S. at 18; *see also Cottier v. City of Martin*, 604 F.3d 553, 571 (8th Cir. 2010) (hereinafter "*Cottier II*")(en banc) ("[A] minority need only make up more than *50 percent* of the voting-age population in the relevant geographic area [to satisfy the first Gingles factors]." (internal citation and quotation omitted) (emphasis in original)); *Jeffers v. Beebe*, 895 F. Supp. 2d 920, 931–32 (E.D. Ark. 2012) ("[A] party asserting [a] § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is *greater than 50 percent*. . . . [A] majority means it is a special wrong when a minority group has *50 percent or more* of the voting population and could constitute a compact voting majority *but*, despite racially polarized bloc voting, *that group is not put into a district*." (quoting *Bartlett*, 556 U.S. at 19–20) (emphasis in original)). Further, when Black voters are the only minority group whose exercise of the franchise is at issue, "it is proper to look at *all* individuals who identify themselves as [B]lack." *Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003) (emphasis in original). Accordingly, the proper demographic measure to use in assessing numerosity is "Any-Part Black VAP," the measure used by Mr. Cooper.

204.    In the alternative, because Defendants did not challenge Plaintiffs' satisfaction of

the numerosity requirement or the use of the Any-Part Black VAP at trial or in their post-trial

briefing, the Court concludes that Defendants have forfeited any argument that numerosity is not

satisfied or that a different demographic measure should have been used. *See Giron v. City of*

*Alexander*, 693 F. Supp. 2d 904, 936 (E.D. Ark. 2010) (noting waiver of arguments not raised by

parties at trial or in post-trial briefing).

205.  Based on the foregoing findings of fact, the Court concludes that the Black voting

age population in Arkansas is sufficiently numerous, as demonstrated principally by Plaintiffs'

*Illustrative Plans* AC3 and SC3.

**Compactness**

206.    The Eighth Circuit looks favorably upon proposed plans that are "consistent with

traditional districting criteria, including respect for political and administrative boundaries,

geographic considerations, and communities of interest." *Bone Shirt II*, 461 F.3d at 1019; *see*

*also LULAC*, 548 U.S. at 433 (considering traditional districting principles "such as maintaining

communities of interest and traditional boundaries" (citations omitted)); *Miller v. Johnson*, 515

U.S. 900, 916 (1995) (identifying contiguity as traditional districting principle); *Shaw v. Reno*

509 U.S. 630, 651–52 (1993) (identifying population equality as a traditional districting

principle). As found above, Plaintiffs' *Illustrative Plans* are consistent with traditional

redistricting principles, both in general and specifically as they have been defined and applied in

Arkansas redistricting. *See supra.*

*Geographical compactness*

207.    The Court may find geographic compactness if illustrative plans are not

"irregularly shaped," *Bone Shirt II*, 461 F.3d at 1019, "spread out," or "convoluted," *Jeffers I*,

730 F. Supp. at 264 (citation omitted). The Court concludes that Plaintiffs' *Illustrative Plans*

meet these criteria. On their face, each of Plaintiffs' proposed illustrative districts is regularly shaped and reasonably sized. There are no land bridges and they are not convoluted, rather, as will be discussed further below, combine communities with similar needs and interests.

208.    Indeed, Mr. Cooper's expert opinion that the *Illustrative Plans* are geographically compact stands unrebutted. The Court therefore concludes that Defendants have forfeited any argument that the traditional redistricting principle of geographic compactness is not satisfied by these districts. *See Giron*, 693 F. Supp. 2d at 936.

209.    Based upon the foregoing findings of fact, the Court concludes that the *Illustrative Plans* comport with the traditional redistricting principle of geographical compactness.

### Contiguity

210.    Contiguity is a traditional redistricting principle that requires districts to be contiguous, meaning that all parts of a district are connected to one another. *See Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 258 (2016) (citation omitted) (recognizing contiguity as a traditional redistricting principle). Based upon the foregoing findings of fact, the Court concludes that the *Illustrative Plans* comport with the traditional redistricting principle of contiguity.

211.    In the alternative, Mr. Cooper's expert opinion that the *Illustrative Plans* are contiguous stands unrebutted. The Court therefore concludes that Defendants have forfeited any argument that the traditional redistricting principle of contiguity is not satisfied by these districts. *See Giron*, 693 F. Supp. 2d at 936.

### Population Equality

212.    Population equality is also a traditional redistricting principle. *Baker v. Carr*, 369 U.S. 186 (1962); *Shaw*, 509 U.S. at 651–52. Even though this Court is not constitutionally

required to consider the principle of one-person, one-vote in the judicial redistricting context, *see Chisom*, 501 U.S. at 402–03 (population equality not required for judicial elections), for legislative districts, the Supreme Court's "decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10%" is consistent with the principle of one-person, one-vote, *Brown v. Thomson*, 462 U.S. 835, 842 (1983). The Court concludes that the plus or minus five percent deviation that Mr. Cooper applied in creating the *Illustrative Plans* is an appropriate measure of approximate population equality to apply for purposes of assessing the *Gingles I Illustrative Plans*. Other courts have also accepted judicial district plans that considered the principle of one-person, one-vote among other factors. *See Fusilier v. Landry*, 963 F.3d 447, 458 (5th Cir. 2020) (holding there was no clear error in the district court's finding that plaintiffs satisfied *Gingles I* and noting plaintiffs' remedial plan for judicial districts considered, *inter alia*, respect for the principle of one-person, one-vote); *Prejean*, 227 F.3d at 510 n.8 (district court found no error that proposed judicial district considered one-person, one-vote).

213.    Population equality is a particularly relevant principle here, where the record demonstrates that Arkansas has chosen to consider population deviation when drawing districts for the Court of Appeals. *See supra.* Indeed, the very Act that created the second Court of Appeals Apportionment Commission instructed the Commission to create districts of "substantially equal populations." Ark. Laws Act 1323 § 1(b)(1995). So, even assuming that population equality were not generally an appropriate consideration, the Court would still conclude that under the circumstances of this case it is appropriate to consider whether the *Illustrative Plans* address this traditional districting principle that has been historically prioritized by the drafters of judicial districts in Arkansas.

214.    In the alternative, Mr. Cooper's expert opinions that population equality should be accounted for in the design of the *Illustrative Plans*, and that the *Illustrative Plans* are roughly equal in population, both stand unrebutted. The Court therefore concludes that Defendants have forfeited any argument that the traditional redistricting principle of population equality is either not applicable or not satisfied here. *See Giron*, 693 F. Supp. 2d at 936.

215.    The Court concludes that, based upon the foregoing findings of fact, the *Illustrative Plans* comply with the traditional redistricting principle of population equality. Indeed, Plaintiffs' *Illustrative Plans* reduce the high population deviation under the current judicial districts to a level consistent with the principle of one-person, one-vote. The *Illustrative Plans* therefore do a better job of complying with the traditional redistricting principle of population equality than do the current districts.

### *Maintaining political subdivisions*

216.    The proposed districts maintain "traditional boundaries." *LULAC*, 548 U.S. at 433. The Court notes that Plaintiffs are not required to comply to the maximum extent possible with every one of a jurisdiction's stated goals. *See Gonzalez v. Harris Cnty.*, 601 F. App'x 255, 260–61 (5th Cir. 2015) (unpublished) (stating it would be "unfair to require Plaintiffs to draw maps in strict accordance with [a jurisdiction's] priorities) (citation omitted); *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1113 (E.D. Cal. 2018) (holding that plaintiffs need not prioritize redistricting principles in the same manner as a jurisdiction did when creating a challenged map). To the contrary, as discussed *supra*, traditional redistricting criteria must be balanced against one another.

217.    Plaintiffs' *Illustrative Plans* adequately follow traditional boundaries by minimizing split counties and avoiding split precincts entirely. The plans split a single county for

68

the Arkansas Supreme Court districts, and just two or three counties for the Court of Appeals districts. While Plaintiffs need not prioritize maintaining county lines to satisfy *Gingles I*, they have certainly minimized splitting counties here. Further, where Plaintiffs did split counties, they did not split any precincts.

218.    Here, uncontested record evidence shows that it is common practice in Arkansas redistricting to split counties along precinct lines in a redistricting plan. *See supra*. Indeed, splitting counties is sometimes *necessary* to further other redistricting priorities, such as population equality. The Arkansas Supreme Court has found that a requirement that county lines cannot be crossed would likely be unconstitutional. *Wells v. White*, 274 Ark. 197, 201 (1981), *cert. denied* 456 U.S. 906 (1982) (holding that the legislative body "may cross county lines in the formation of the districts" to achieve population equality, as constitutionally required). Compliance with the traditional redistricting principle of maintaining political subdivisions and other traditional boundaries is a secondary and malleable goal in Arkansas.

219.    In the alternative, Mr. Cooper's testimony that county-splitting is common and unproblematic in Arkansas stands unrebutted. So does his expert opinion that the *Illustrative Plans* comply with the traditional redistricting principle of maintaining political subdivisions and other traditional boundaries. The Court therefore concludes that Defendants have forfeited any argument that Plaintiffs' *Illustrative Plans* violate the traditional redistricting principle of maintaining traditional boundaries, or that there is any absolute requirement in Arkansas to avoid splitting counties along precinct lines. *See Giron*, 693 F. Supp. 2d at 936.

220.    For these reasons, the Court concludes that the *Illustrative Plans* comply with the traditional redistricting principle of maintaining traditional boundaries.

***Communities of Interest***

69

221.    Courts have recognized that "maintaining communities of interest" is a traditional redistricting principle. *LULAC*, 548 U.S. at 433. "A State is free to recognize communities that have a particular racial makeup" so long as there is "some common thread of relevant interests." *Miller*, 515 U.S. at 920.

222.    "[M]embers of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district." *LULAC*, 548 U.S. at 435; *see also Bone Shirt I*, 336 F. Supp. 2d at 993–94 (D.S.D. 2004) (finding Defendants' claim that Plaintiffs did not respect traditional redistricting principles when they included farmers and ranchers in the same district was not significant enough to constitute a failure to satisfy traditional redistricting principles). The inquiry thus is whether communities share relevant and sufficient characteristics, not whether they fall into the category of "rural" or "urban."

223.    These shared characteristics may include social and economic needs of the communities. For example, in *Theriot v. Parish of Jefferson*, the Fifth Circuit found that a majority-Black district for the Jefferson Parish Council included "low-income residents who are less-educated, more often unemployed, and more poorly-housed" and thus shared "common social and economic needs." 185 F.3d 477, 486 (5th Cir. 1999). The Court held that, "[g]iven the common thread which binds the [B]lack voters within [that district], they are entitled to an effective voice in the electoral process and to an influence over the outcome of elections." *Id.* at 487 (internal quotation and citation omitted).

224.    Furthermore, illustrative plans need not perfectly encompass every community of interest. *See Kern*, 291 F. Supp. 3d at 1110 ("Plaintiffs are . . .not required to accommodate every conceivable community of interest . . . in order to draw a sufficient illustrative map that satisfies the first *Gingles* precondition"); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1399 (E.D.

70

Wash. 2014) (holding that *Gingles I* does not require a "perfectly harmonized districting plan," as such a requirement "would put the cart before the horse."). Plaintiffs' burden under *Gingles* is not one "that requires plaintiffs to establish there are no identifiable differences between the communities joined in their illustrative map. It is simply too easy to identify at least some differences between any two communities." *Kern,* 291 F. Supp. 3d at 1116. Rather, "it is sufficient that a plaintiff show[s] that a workable plan for another minority-controlled working district is possible." *Fairley v. Hattiesburg*, 584 F.3d 660, 671 n.14 (5th Cir. 2009) (citing *Gingles*, 478 U.S. at 50 n.17 and *Houston v. Lafayette Cnty*, 56 F.3d 606, 611 (5th Cir. 2009)).

225.   Based upon the foregoing findings of fact, it is clear that there is a "common thread" that binds Black voters; this includes Black voters who reside in the Delta and Lower Arkansas, as well as in Jefferson and Pulaski Counties (including Little Rock). Moreover, for all of these reasons, the Court is unpersuaded by Defendants' arguments that the plans are comparable to those at issue in *LULAC*, where the Supreme Court found one district noncompact because of "the enormous [300 mile] geographical distance separating the Austin and Mexican-border communities, *coupled with* the disparate needs and interests of these populations." 548 U.S. at 435 (emphasis added). The uncontested trial record—the unrebutted expert opinion of Mr. Cooper, corroborated by the testimony of multiple fact witnesses*, see supra*—thoroughly refutes Defendants' analogy to and reliance on *LULAC*, by demonstrating that Black voters united by the *Illustrative Plans* share common history, common challenges, and deep civic, religious, and ancestral ties.

226.  For these reasons, the Court concludes that, based upon the foregoing findings of fact, the *Illustrative Plans* respect communities of interest.

Based upon the foregoing findings of fact, the Court concludes that the *Illustrative Plans*

71

comport with the traditional redistricting principle of geographical compactness.

***Defendants' Racial Gerrymandering Arguments***

227.    Defendants have argued that even if Plaintiffs' *Illustrative Plans* are reasonably compact and comply with all traditional redistricting criteria, they nevertheless cannot satisfy *Gingles I* because they are "racial gerrymanders." This argument fails for three independent reasons.

228.    *First,* the "racial gerrymandering" case law that Defendants rely on does not apply to Plaintiffs' burden under *Gingles I*. Only governmental *state action* implicates the Equal Protection Clause, and thus faces scrutiny for potential unlawful racial gerrymandering. *See Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 798 (2017) ("[T]he constitutional violation in racial gerrymandering cases stems from the racial purpose *of state action*.") (emphasis added) (internal quotation marks omitted). The racial gerrymandering standard that Defendants say should apply here comes from cases where plaintiffs challenged districting plans that were *enacted* into law—that is, created and enforced by state legislatures. *See Miller*, 515 U.S. at 900; *see also Bethune-Hill*, 137 S. Ct. at 797–99; *Cooper v. Harris*, 137 S. Ct. 1455, 1473–81 (2017); *Ala. Black Legislative Caucus v. Alabama*, 575 U.S. 254, 271–75 (2015). By contrast, under Section 2, the *Illustrative Plans* offered to satisfy the first *Gingles* precondition are created and proposed by private parties, and serve a merely *illustrative* purpose in the litigation. There is no state action.

229.    This distinction between the *Gingles I* inquiry and equal protection "racial gerrymandering" claims is well established. The Supreme Court has emphasized that the *Gingles I* inquiry "embraces different considerations" than equal protection racial gerrymandering case law. *LULAC*, 548 U.S. at 433–34. The *en banc* Eighth Circuit has *expressly foreclosed*

Defendants' position that racial gerrymandering doctrine should apply to Plaintiffs' Section 2 claim. *See Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1391 (8th Cir. 1995) (en banc) (hereinafter "*Harvell I*") ("*Miller* does not alter our analysis of the *Gingles* factors . . . . *Miller* analyzed the equal protection problems involved in drawing voting districts along race-based lines, but did not purport to alter our inquiry into the vote-dilution claim" under Section 2). Other courts of appeals have reached the same conclusion and explained at greater length why racial gerrymandering concepts are inapposite to the *Gingles* framework. *See Clark*, 88 F.3d at 1406–07 (holding that *Miller* and its progeny do not change the *Gingles I* inquiry); *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998) (holding that the "*Miller* and *Gingles* . . . lines [of cases] address very different contexts").

230.    Defendants ignore the purpose of the threshold *Gingles I* inquiry, which is incompatible with racial gerrymandering analysis. A *Gingles I* illustrative map is offered as *evidence* of liability, specifically to show that the existing electoral plan actually causes a dilution of voting power that minority voters could otherwise wield. *See Gingles*, 478 U.S. at 50 n.17. To do this, plaintiffs must demonstrate—"with objective, numerical precision"—that a reasonably compact "election district could be drawn in which minority voters form a majority." *Bartlett,* 556 U.S. at 18. That is a hypothetical inquiry that "necessarily classifies voters by their race." *Clark*, 88 F.3d at 1406. So it makes no sense "[t]o penalize [plaintiffs] . . . for attempting to make the very showing that *Gingles*" demands. *Davis*, 139 F.3d at 1425.

231.    *Second,* in the alternative, even if this Court were to apply racial gerrymandering standards to assess *Gingles I* reasonable compactness—which would be error for the reasons just discussed—Plaintiffs' *Illustrative Plans* would still pass muster because is not predominant in their design.

232.    In the equal protection cases that Defendants rely upon, the Supreme Court has held that a legislative redistricting plan triggers strict scrutiny as a potential racial gerrymander if "[r]ace was . . . the predominant, overriding factor" in the overall design of a district. *Miller*, 515 U.S. at 920; *see Bethune-Hill*, 137 S. Ct. at 800 (explaining "racial predominance" standard examines "the legislature's predominant motive for the design of the district as a whole"). Because some degree of race-consciousness is always permissible in the redistricting context, *Bethune-Hill*, 137 S. Ct. at 797, the standard is notoriously "demanding," *Cooper*, 137 S. Ct. at 1479 (internal quotation marks omitted). It ultimately requires an equal protection plaintiff to "prove that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations." *Bethune-Hill*, 137 S. Ct. at 797 (citation omitted); *see Cooper*, 137 S. Ct. at 1463–64. So only in the rarest cases can the standard be satisfied "without evidence that some district lines deviated from traditional principles." *Bethune-Hill*, 137 S. Ct. at 799.

233.    Plaintiffs' *Illustrative Plans* meet this standard. As Mr. Cooper explained, and as found above, Plaintiffs' *Illustrative Plans* reflect careful and appropriate "balancing" of traditional redistricting principles as Arkansas itself has defined them. *See supra*. Even if Mr. Cooper was aware of racial demographics in drawing the plans, that was because he had to take note of demographic consequences to perform his assigned function under the *Gingles* framework. However, the foregoing findings of fact confirm that race did not predominate over other traditional redistricting principles in Mr. Cooper's methodology or the *Illustrative Plans* he produced. Trial Tr. vol. 1, 143:3-12 (Cooper Direct).

234.    *Third,* in the alternative, even if "racial gerrymandering" doctrine applied here (which it does not), and even if race predominated in Mr. Cooper's methodology (which it did not), Plaintiffs' *Illustrative Plans* would *still* not be impermissible racial gerrymanders because

they would satisfy strict scrutiny. Even when a district is drawn for predominantly racial reasons, "a State can satisfy strict scrutiny if it proves that its race-based sorting of voters is narrowly tailored to comply with the VRA." *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022). Where a plaintiff's illustrative plan would rectify a Section 2 violation, that compelling justification plainly exists, and narrow tailoring is satisfied. *See, e.g.*, *Bethune-Hill*, 137 S. Ct. at 800–01 (upholding a challenged district as narrowly tailored to comply with the VRA); *Ala. Black Legislative Caucus*, 575 U.S. at 278 (narrow tailoring is met by "a strong basis in evidence" to conclude that race-based districting was required by the VRA); *Cooper*, 137 S. Ct. at 1463–64 (same).

### Overall Conclusion on *Gingles I*

235.    Based upon the foregoing findings of fact, the Court concludes that Plaintiffs have established *Gingles I*.

### *GINGLES II* AND *III*

236.    In *Gingles*, the Supreme Court explained that "[t]he purpose of inquiring into the existence of racially polarized voting is twofold: [1] to ascertain whether minority group members constitute a politically cohesive unit and [2] to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." 478 U.S. at 56. Racially polarized voting exists where there is a "consistent relationship between [the] race of the voter and the way in which the voter votes." *Id.* at 53 n.21 (alteration in original) (citation omitted). "A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim." *Id.* at 56. A showing that "in general, a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally

significant white bloc voting." *Id.*

237.    The case law interpreting and applying Section 2 provides several guiding principles for assessing racially polarized voting that are relevant to the Court's analysis of the record and the competing expert testimony in this case.

238.    *First*, biracial elections—in this case, meaning those which feature both Black and white candidates—are regarded as more probative than "uniracial" elections, or elections where the candidates are of the same race. *See Bone Shirt II*, 461 F.3d 1011, 1020–21 ("[biracial] elections are the best indicators of whether the white majority usually defeats the minority candidate"); *Missouri State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1040 (E.D. Mo. 2016), *aff'd* 894 F.3d 924 (8th Cir. 2018) (hereinafter "*Missouri NAACP*") (same); *see also, e.g.*, *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1128 (3d Cir. 1993) ("As a general matter . . . elections involving white candidates only are much less probative of racially polarized voting than elections involving both [B]lack and white candidates.").

239.    Moreover, this Court need not consider less-probative uniracial elections. This Court *may* consider uniracial elections alongside more probative biracial elections (if the factual record and expert testimony support doing so), but a court is not *required* to consider uniracial elections. *See Gingles*, 478 U.S. at 52–53 (relying exclusively on biracial contests to determine whether the Black vote was diluted); *Jenkins*, 4 F.3d at 1128–29 (holding that plaintiffs were not "required to present evidence on white[-]versus[-]white elections if they do not believe that those elections are probative"); *Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1248–49 (5th Cir. 1988) (upholding district court decision where "the inquiry of racially polarized voting properly focused only on those contests . . . that had a minority member as a candidate"); *Citizens for a*

*Better Gretna v. City of Gretna*, 834 F.2d 496, 503–04 (5th Cir. 1987) (hereinafter "*Gretna*")

("[I]mplicit in the *Gingles* holding is the notion that [B]lack preference is determined from

elections which offer the choice of a [B]lack candidate. The various *Gingles* concurring and

dissenting opinions do not consider evidence of elections in which only whites were candidates.

Hence, neither do we."); *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282,

1301 (11th Cir. 2020) (quoting *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1227 (11th

Cir. 2000) ("a court may assign more probative value to elections that include minority

candidates, than elections with only white candidates.")). This is in keeping with the general

principle that "[v]ote dilution claims are 'peculiarly dependent upon the facts of each case.'"

*Cottier II*, 604 F.3d at 559 (quoting *Gingles*, 478 U.S. at 79).

240.    Defendants argue that this Court is legally *compelled* to conduct an analysis that

gives weight to uniracial election results, even—or perhaps especially—in a case like this one

where there are more uniracial contests available to consider and fewer of the more probative

biracial elections. But Defendants' proposed rule that trial courts *must* consider elections

involving only white candidates cannot be squared with the case law discussed above. Defendants

rely on inapposite cases to support their proposed categorical rule. None of the authorities they

cite for their assertion that uniracial elections "must be considered" set forth a mandatory

directive for district courts to consider any particular elections (much less *all* elections) when

evaluating a Section 2 case. Nor do any of these cases address what elections are more probative

than others as a general matter—as *Bone Shirt* does, explaining that biracial elections are more

probative. *See Bone Shirt II*, 461 F.3d at 1020–21.

241.    Moreover, Defendants proposed rule would frustrate the purpose of Section 2 and

work injustice in cases like this one, because the right to equal electoral opportunity under the

Voting Rights Act is not satisfied where "[c]andidates favored by blacks can win, but only if the candidates are white." *Smith*, 687 F. Supp. at 1318 (Arnold, J.). As the Fifth Circuit has explained, "plaintiffs may not be denied relief simply because the absence of black candidates has created a sparsity of data on racially polarized voting in purely [endogenous] elections." *Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1208, 1209 (5th Cir. 1989). "To hold otherwise would allow voting rights cases to be defeated at the outset by the very barriers to political participation that Congress has sought to remove." *Id.* For all these reasons, the law is clear: Section 2 plaintiffs are not "required to present evidence on white versus white elections if they do not believe that those elections are probative." *Jenkins*, 4 F.3d at 1128.

242.    Consistent with this law, the Court concludes that Dr. Liu's analysis considering only biracial elections is the best and most reliable approach to analyzing racially polarized voting in this case.

243.    *Second*, endogenous elections are more probative than exogenous elections, but certain exogenous elections may still provide probative data. *See Missouri NAACP*, 201 F. Supp. 3d at 1040 (internal quotations and citations omitted) ("[E]ndogenous elections . . . are more probative than the results of exogenous elections."). Endogenous elections are those concerning the office at issue, in this case the Arkansas Supreme Court and Court of Appeals, while exogenous elections are those for other offices. *See Bone Shirt II*, 461 F.3d at 1020–21. While exogenous elections are less probative of racially polarized voting than endogenous elections, they are often used to supplement conclusions as to racially polarized voting. *See, e.g.*, *id.* at 1020–21; *Missouri NAACP*, 201 F. Supp. 3d at 1040 (observing that exogenous elections may "inform the inquiry").

244.    The question remains *which* exogenous elections should be considered. Here, the

expert analyses offered by both sides looked to *statewide* exogenous elections to supplement the endogenous data set. As set forth below, the case law supports this approach.

245.    With respect to the Supreme Court, Plaintiffs are challenging a *statewide* method of election. The relevant question therefore is whether there is racially polarized voting at the statewide level that results in Black voters having less opportunity to elect candidates of choice. After endogenous elections, it makes sense to next consider other elections that encompassed the same statewide electorate.

246.    Similarly, in the context of the Court of Appeals, the relevant frame of reference would at minimum be the entire geographic area in which vote dilution is alleged to have occurred rather than a handful of exogenous local elections within that area. In *Gingles* itself, the Court looked at polarization in the multi-member districts at issue—not at exogenous local elections. *See Gingles*, 478 U.S. at 52–54. If endogenous data points are not available, the next best place to turn is races that subsume *all* of the geography at issue—here, as is often the case, that means looking to statewide races. Courts have found that statewide elections provide probative evidence as to RPV even where they reflect a broader electorate than that of the position in question. *See, e.g.*, *LULAC*, 548 U.S. at 427; *Balt. Cnty. Branch of the NAACP v. Balt. Cnty.*, No. 21-cv-3232, 2022 WL 657562, at *9 (D. Md. Feb. 22, 2022). By contrast, courts have consistently found that elections involving an electorate narrower than that of the position in question are misleading for a RPV analysis. For example, the Supreme Court has called it the "wrong approach" for a district court to consider "only one, small part of" an illustrative district. *Abbott v. Perez*, 138 S. Ct. 2305, 2331–32 (2018); *see also, e.g.*, *Thomas v. Bryant*, 366 F. Supp. 3d 786, 805 (S.D. Miss. 2019) (rejecting RPV evidence of local elections within the geographic area of the relevant political office); *Rangel v. Morales*, 8 F.3d 242, 246 (5th Cir. 1993) (exogenous election evidence should

"encompass *more* geographic area than just [the election district at issue]" (emphasis added)).

247.    The Court therefore concludes that statewide exogenous elections are the next most relevant data points for analyzing racially polarized voting for both relevant offices, the Supreme Court and the Court of Appeals.

248.    The Court's conclusion is confirmed by the fact that *both parties*, endorsed this as the correct scope of analysis in their summary judgment briefing and presentations at trial. Both experts performed a single analysis to assess racially polarized voting for both the Supreme Court and Court of Appeals, focused first on endogenous elections and second on exogenous statewide elections as the next most probative available data points. They differed only in whether they limited their analysis to the most probative *biracial* election results for the relevant offices. So even if the case law did not support consideration of exogenous statewide elections—which, as discussed above, it does—the Court would reach the same conclusion.

249.    Defendants cannot rely on additional or different exogenous elections when they failed to present any argument, expert analysis, or other evidence in support of a different scope of analysis at trial. *See* Fed. R. Civ. P 37(c)(1); *Cottier II*, 604 F.3d at 561 n.4 (declining "to allow one party to augment its evidentiary presentation in a case involving extensive statistics that were the subject of complex analysis by experts for both parties" after the close of the record) (internal citations omitted); *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008-09 (8th Cir. 2008) (affirming exclusion of untimely evidence where expert reports relied on the existing disclosures, rendering the opposing party unable to "refute the evidence at trial"); *Hopman v. Union Pac. R.R.,* No. 4:18-cv-74, 2022 WL 963662, at *12 (E.D. Ark. Mar. 30, 2022) (a failure to present evidence at

trial is an appropriate ground to disregard that evidence).[6]

250.    *Third*, synthesizing these two principles, it is well established that elections that are both "[e]ndogenous *and* interracial . . . are the *best indicators* of whether the white majority usually defeats the minority candidate." *Bone Shirt II*, 461 F.3d at 1020–21 (emphasis added) (internal citation omitted). Courts around the country—many of which cite *Bone Shirt*—are overwhelmingly in accord on this point. *See, e.g.*, *Cisneros v. Pasadena Ind. Sch. Dist.*, No. 4:12-CV-2579, 2014 WL 1668500, at *9 (S.D. Tex. Apr. 25, 2014) (citing *Bone Shirt* for proposition that biracial endogenous elections are the "most probative"); *Large v. Fremont Cnty.*, 709 F. Supp. 2d 1176, 1205 (D. Wyo. 2010) (same); *United States v. City of Euclid*, 580 F. Supp. 2d 584, 597 n.16 (N.D. Ohio 2008) (same); *see also Black Political Task Force*, 300 F. Supp. 2d at 304 (holding that minority group's ability to elect preferred candidates "is best and most easily measured in elections that offer [B]lack voters the chance to support a viable [B]lack candidate against a viable white candidate") (internal citation omitted). As persuasively explained by Dr. Liu, and supported by the case law cited above, the next best indicators to consider here are biracial statewide exogenous elections.

251.    *Fourth*, there is no set number of elections that must be analyzed to support a conclusion that racially polarized voting exists under *Gingles II* and *III. See Gingles*, 478 U.S. at 57 n.25 ("The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances."). To be sure, the Supreme Court has held that "a pattern of racial[ly] polarized voting that extends over a period of time is more probative . . . than are the results of a single election." *Id.* at 57. However, in *Gingles*, the

---

[6] For both of these independent reasons—(1) the most relevant exogenous electorate for both the Supreme Court and Court of Appeals is *statewide* and (2) any post-trial consideration of additional election results would be untimely and prejudicial to Plaintiffs—the Court declines Defendants' post-trial request to take judicial notice of certain exogenous election results from Pulaski and nearby counties.

Supreme Court affirmed a finding of racially polarized voting based on data from "three election years." *Id.* at 61. The Court made clear that "the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim." *Id.* at 57 n.25. As noted above, both parties and both experts are in accord that the most recent 20 years of endogenous and exogenous statewide election results provides a sufficient dataset from which to assess racially polarized voting in this case. The Court agrees that 20 years of election results is sufficient.

252.  *Finally*, racially polarized voting may exist even if not observed in the results of every single election analyzed. The Supreme Court has held that "in a district where elections are shown usually to be polarized, the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting." *Id.* at 57. The question is whether "whites vote sufficiently as a bloc *usually* to defeat the minority's preferred candidates." *Id.* at 56 (emphasis added).

253.  Applying these principles and based on the foregoing findings of fact, the Court concludes that Plaintiffs have established *Gingles II* and *III*.

254.  More specifically, *Gingles II* is satisfied because the record shows that Black voters voted cohesively in the relevant elections. While there is no fixed threshold of Black support necessary to satisfy this precondition, it is well established that—at a minimum—support exceeding 60% is sufficient. *See Bone Shirt I*, 336 F. Supp. 2d at 999 ("[T]he court holds that cohesion exists at levels above 60 percent and may exist, albeit more weakly, at lower levels"); *see also African Am. Voting Rights Legal Defense Fund v. Villa*, 54 F.3d 1345, 1353 n.11 (8th Cir. 1995) (the "60% figure is merely a guideline, not an absolute threshold")

(internal citation omitted). Across nine of the eleven most probative biracial elections held in Arkansas over a twenty-year period, there was a clear candidate of choice for Black voters, with levels of support ranging from 61.79% to 84.7% for endogenous elections and 65.24% to 94.72% for exogenous elections. *See supra*. This level of cohesiveness satisfies *Gingles II*.

255.   Next, *Gingles III* is satisfied because the record shows that white voters usually voted as a bloc to defeat Black-preferred candidates. Across the same eleven elections, the candidate preferred by Black voters lost nine out of eleven elections—nearly 82% of the time. This includes three out of four endogenous elections and six out of seven exogenous elections. *See supra*.[7] A showing that the minority-preferred candidate was defeated by a majority white voting bloc 82% of the time is more than sufficient to satisfy *Gingles III*. *See Missouri NAACP*, 201 F. Supp. 3d at 1060–62 (finding racial polarization where Black-preferred candidates lost 75% of the time over a five-year period in mixed-race contested elections); *United States v. Vill. of Port Chester*, No. 06 CIV. 15173 (SCR), 2008 WL 190502, at *15 (S.D.N.Y. Jan. 17, 2008) (finding racially polarized voting where plaintiffs' expert showed that minority candidate of choice was defeated 75% of the time).

256.   Accordingly, the Court concludes that Black voters in the relevant electorates are "politically cohesive," and white voters "vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Gingles*, 478 U.S. at 56.

257. In reaching this conclusion, the Court rejects two arguments advanced by Defendants that non-racial factors account for these stark patterns of racially polarized voting.

---

[7] The Court also notes that a sufficient number of elections were analyzed from which to draw these conclusions. That there are "only" four endogenous elections in this case is of no moment—and indeed is itself indicative of RPV. *Gingles*, 478 U.S. at 57 n.25; *see also Gretna*, 834 F.2d at 502–03 (rejecting argument that analysis of only two elections within the relevant political unit cannot adequately reflect past and present reality); *Westwego*, 872 F.2d at 1209 ("*Gingles* 'suggests flexibility in the face of sparse data.'").

In considering these arguments, the Court notes that Plaintiffs do not bear the initial "burden of negating all nonracial reasons possibly explaining" racially polarized voting and Black electoral defeat. *Teague v. Attala Cnty.*, *Miss.*, 92 F.3d 283, 295 (5th Cir. 1996); *see also id.* at 291 (district court erred when it "placed upon the plaintiffs the insurmountable burden of coming forward with evidence disproving all nonracial reasons that can explain election results [where] the defendant had itself produced no real evidence that factors other than race were at work").

258. *First*, Defendants argue that the Court should discount evidence of racially polarized voting in the three endogenous elections involving Judge Griffen because he was "controversial" and "not a typical candidate." Defs' Post-Trial Br. 17, ECF No. 187. But they have failed to introduce facts to support this point. Indeed, they neither produced at trial nor cited in their brief any admissible evidence of even a single voter who purported to vote against Judge Griffen because he was "controversial" or "atypical." *Cf. Harvell I*, 71 F.3d at 1388 (declining to disregard election results that evince racially polarized voting based on defendants' "denigration" of unsuccessful Black candidates "as militant fringe candidates"). The legally salient fact is that Black voters overwhelmingly preferred Judge Griffen—for whatever reason—and white voters did not. There is no support in the law for the proposition that the defendants in a Section 2 case can rebut a prima facie showing that the *Gingles* factors are met by speculating as to reasons for which voters did or did not vote for a given candidate. *See id.*; *Goosby v. Town Bd. of Hempstead, N.Y.*, 180 F.3d 476, 493 (2d Cir. 1999) (holding that "inquiry into the *cause* of white bloc voting is not relevant to a consideration of the *Gingles* preconditions" (emphasis in original)).

259. *Second*, with respect to the exogenous elections that evince racially polarized

84

voting, Defendants say they should be discounted because partisan preferences of white and Black voters might have played a role in the polarization that Dr. Liu observed. *See, e.g.*, ECF No. 186 at 18–19. But again, they have not presented any analysis or evidence that could support a conclusion that partisanship rather than race accounted for the results of these elections. Indeed, Defendants' expert Dr. Alford conceded that he did no analysis to demonstrate that party was the cause of voter choices independent of race. Trial Tr., vol. 5 865:20–866:4 (Alford Cross). And other courts have rejected similar party-not-race arguments. The Eighth Circuit has made clear that the "reason" for voter "cohesion is *irrelevant* in the threshold determination of whether the *Gingles* preconditions are met." *Cottier v. City of Martin*, 445 F.3d 1113, 1119 (8th Cir. 2006) (hereinafter "*Cottier I*") (emphasis added). "To imply that party affiliation should negate political cohesion would have the effect of denying minority voters an equal opportunity to elect representatives of their choice regardless of the reason." *Id.*; *see also Bone Shirt I*, 336 F. Supp. 2d at 1008 ("[P]artisanship has no bearing on the *Gingles* factors.") (collecting cases).

### Overall Conclusion on *Gingles II* and *III*

260.  Based upon the foregoing findings of fact, the Court concludes that Plaintiffs have established *Gingles II* and *III*.

### TOTALITY OF CIRCUMSTANCES

261.  After a plaintiff establishes the *Gingles* preconditions, a "totality of circumstances" analysis is required to determine whether minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b); *see also LULAC*, 548 U.S. at 425–26. The Supreme Court has made clear that "whether the political processes are equally open

depends upon a searching practical evaluation of the past and present reality and on a functional view of the political process." *Gingles*, 478 U.S. at 45 (citation and internal quotations omitted).

262.  The Eighth Circuit has held that two of the factors "predominate the totality-of-the-circumstances analysis": Senate Factor 2, the extent to which voting in the jurisdiction is racially polarized, and Senate Factor 7, the extent to which members of the minority group have been elected to office in the jurisdiction.

263.  However, a plaintiff need not prove "any particular number of factors . . . or that a majority of them point one way or the other." *Id.* at 45 (citation omitted); *see also Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1120 (5th Cir. 1991) ("No one of the factors is dispositive; the plaintiffs need not prove a majority of them; other factors may be relevant.")(internal citations omitted). Moreover, the court is not limited to considering "solely these factors, and the factors are 'neither comprehensive nor exclusive.'" *Ga. State Conference of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015) (quoting *Gingles*, 478 U.S. at 45). Rather, "the final determination of whether the voting strength of minority voters is canceled out demands the court's overall judgment, based on the totality of the circumstances and guided by those relevant factors in the particular case." *Whitfield v. Democratic Party*, 890 F.2d 1423, 1432 (8th Cir. 1989) (citation and internal quotation omitted).

### Senate Factor 1: History of Voting Discrimination in Arkansas

264.  Senate Factor 1 calls for courts to consider "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." Senate Report at 206–07. This Court and the Eighth Circuit have taken judicial notice of

Arkansas's history of discrimination. *See, e.g., Smith*, 687 F. Supp. at 1317 ("We do not believe that this history of discrimination, which affects the exercise of the right to vote in all elections under state law, must be proved anew in each case under the Voting Rights Act."); *Harvell*, 71 F.3d at 1390 ("No one party to the litigation denies the long history of racial discrimination in the electoral process in Arkansas."); *Taylor v. Howe*, 225 F.3d 993, 1003 (8th Cir. 2000) ("There has been a 'long history of racial discrimination in the electoral process in Arkansas.'"); *Jeffers*, 895 F. Supp. 2d at 940 ("'[T]here is a history of racial discrimination in the electoral process in Arkansas."); *see also* Trial Tr. 583:16–585:14 (McCrary Direct) (citing cases). This Court adopts those repeated findings here.

265.   Based upon the foregoing findings of fact, the Court concludes that there is a persistent history of discrimination against Black voters that extends to the use of at-large voting and the election of appellate judges in Arkansas. This factor weighs in favor of a finding of vote dilution.

**<u>Senate Factor 2: Racially Polarized Voting</u>**

266.   Senate Factor 2 calls for the examination of "the extent to which voting in the elections of the state or political subdivision is racially polarized." Senate Report at 206–07. This factor overlaps with the *Gingles II* and *Gingles III* analysis, as set forth above. The record evidence in this case from both experts and witnesses, demonstrates that Arkansas elections are characterized by stark patterns of racially polarized voting. *See supra.* This factor weighs in favor of finding vote dilution.

**<u>Senate Factor 3: Enhancing Factors</u>**

267.   Senate Factor 3 looks to "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions,

or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." Senate Report at 206–07.

268.  The Supreme Court has long recognized the dilutive impact of enhancing factors, including at-large voting. *See, e.g.*, *Gingles*, 478 U.S. at 47 (affirming that at-large voting may "operate to minimize or cancel out the voting strength of racial minorities in the voting population"). The Eighth Circuit has likewise recognized that such devices impair minority voting strength. *See, e.g., Missouri NAACP*, 894 F.3d at 930 ("One manner in which a violation may occur is when districts that elect several at-large representatives 'operate to impair [B]lacks' ability to elect representatives of their choice'") (quoting *Gingles* 478 U.S. at 42); *Buckanaga v. Sisseton Indep. Sch. Dist. No. 54-5, S. Dakota*, 804 F.2d 469, 471 (8th Cir. 1986) (noting that the modern form of Section 2 "was aimed particularly at discriminatory at-large election systems which dilute minority voting strength."). Based upon the foregoing findings of fact, the Court concludes that the at-large voting for justices on the Arkansas Supreme Court enhances the opportunity for discrimination against Black voters.

269.  Additional voting practices for Arkansas judicial elections further enhance the opportunity for discrimination, including multi-member districts, numbered places, majority-vote requirements, staggered terms, and prohibitions on appointed incumbents seeking election. *Gingles*, 478 U.S. at 47–48 ("multimember districts" "may operate to minimize or cancel out the voting strength of racial minorities") (alteration in original); *Rogers v. Lodge*, 458 U.S. 613, 627 (1982) (numbered place voting enhances minorities' "lack of [electoral] access because it prevents a cohesive political group from concentrating on a single candidate"); *Harvell*, 71 F. 3d at 1390–91 (finding that "majority vote requirement" and "staggered terms" "tend to suppress minority voters' influence"); *Gingles*, 478 U.S. at note 29 (noting incumbency as a

special circumstance that has aided successful Black candidates in attaining elected office even in the face of polarized voting patterns). This factor weighs in favor of a finding of vote dilution.

### Senate Factor 4: Informal Candidate Slating

270. Senate Factor 4 investigates "exclusion of members of the minority group from candidate slating processes." Senate Report at 206–07. The salient question under this Factor is, what is "the ability of minorities to participate in [a] slating organization and to receive its endorsement"? *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1569 (11th Cir. 1984). A range of gatekeeping mechanisms can qualify as unofficial or informal slating, including endorsements by influential individuals or organizations. *See, e.g.*, *Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 221–22 (2d Cir. 2021) (considering informal slating by "[i]nfluential members of the white, private-school community" during school board elections). Even if candidates of all races are invited to an endorsement selection process, courts have weighed this Factor in favor of Plaintiffs where candidates of color have been denied "*meaningful* access" to the process because they rarely actually receive the endorsement or the electoral benefits of the slating organization's support. *See, e.g.*, *Missouri NAACP,* 201 F. Supp. 3d at 1078 (citing *Marengo Cnty. Comm'n*, 731 F.2d at 1569).

Based on the foregoing findings of facts, the Court finds that because Black candidates have been denied equal access to the support of endorsing organizations and individuals. This factor weighs in favor of a finding of vote dilution.

### Senate Factor 5: Discrimination in Areas of Life that Hinder Political Participation

271. To establish this Senate Factor, a plaintiff must demonstrate "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to

participate effectively in the political process." Senate Report at 206–07.

272. Courts have recognized that, as a result of past and/or present discrimination, Black voters in Arkansas suffer from socio-economic disadvantages that diminish their ability to participate in the political process. *Smith*, 687 F. Supp. at 1317 (finding that "the history of discrimination has adversely affected opportunities for [B]lack citizens in health, education, and employment."); *see also Jeffers I*, 730 F. Supp. at 211 ("as long as blacks, as a group, remain in a depressed socio-economic status, their political power will necessarily be less"); *Perkins*, 675 F.2d at 211 (stating "past discrimination has contributed to socio-economic depression among [B]lacks"). This Court itself has previously found that "[t]he hangover from this history necessarily inhibits full participation in the political process." *Smith*, 687 F. Supp. at 1317.

273. Based upon the foregoing findings of fact, the Court concludes that Black residents of Arkansas bear the effects of discrimination, which depress their socio-economic status and ability to participate in the political process. This factor weighs in favor of a finding of vote dilution.

### Senate Factor 6: Racial Appeals

274. Senate Factor 6 addresses "whether political campaigns have been characterized by overt or subtle racial appeals." *Gingles*, 478 U.S. at 37. Here, Plaintiffs have provided specific examples of "blatant," "subtle and furtive" racial appeals during campaigns over the past few decades. *Id.* at 40. Courts have previously noted that a white candidate buying newspaper ads or distributing campaign materials "containing their [B]lack opponent's picture," can be a racial appeal. *Jeffers I*, 730 F. Supp. at 212. Courts have weighed evidence of racial appeals in a jurisdiction favorably for Plaintiffs even when the campaign or topic

referenced in the appeal did not match the office at issue in litigation. *See, e.g.*, *Bone Shirt I*, 336 F. Supp. 2d at 1041 (weighing favorably evidence of racial appeals related to broader election coverage and statewide gubernatorial campaigns in a case regarding racial vote dilution of state legislative seats).

275.  Based upon the foregoing findings of fact, the Court concludes racial appeals have been present in judicial and non-judicial elections in Arkansas. The use of racial appeals in campaigns in Arkansas persists to recent elections, and the Court finds that this contributes to lessening the opportunity of Black citizens to participate equally in the political processes and to elect candidates of their choice. This factor weighs in favor of a finding of vote dilution.

**Senate Factor 7: Lack of Black Electoral Success**

276.  Senate Factor 7 directs the Court to weigh the "extent to which members of the minority group have been elected to public office in the jurisdiction." Senate Report at 207. To the extent Black candidates have been elected, this Court should "take account of the circumstances surrounding recent black electoral success in deciding its significance." *Gingles*, 478 U.S. at 60, 76. Ultimately, the Court considers how difficult it is for minority candidates to be elected. *See id*. at 48 n.15.

277. As detailed above, no Black candidate has ever been elected at-large to the Arkansas Supreme Court. Indeed, only two Black candidates have ever run for the Supreme Court. *See supra.* Courts have consistently held that a limited number of Black candidates running for office in the challenged electoral system is logically tied to the deterrent effects of the discriminatory system. *See, e.g.*, *Westwego*, 872 F. 2d at 1209 n. 9 (noting that the Supreme Court has refused to preclude vote dilution claims "where few or no [B]lack candidates have sought offices in the challenged electoral system," because "[t]o hold otherwise would allow

91

voting rights cases to be defeated at the outset by the very barriers to political participation that Congress has sought to remove"); *McMillan*, 748 F.2d at 1045 ("the lack of [B]lack candidates is a likely result of a racially discriminatory system"). The fact that only two Black candidates have run for the Supreme Court, and both lost to a white opponent, leads this Court to conclude that the current electoral system has deterrent effects on Black judicial candidates.

278.    Additionally, no Black candidate for the Court of Appeals has ever won a contested election against a white candidate. The only Black candidate ever elected *at all* in a disputed election defeated another Black candidate in the sole majority-Black district Court of Appeals district. *See supra.* Three other Black Court of Appeals judges were appointed and then ran unopposed. The Court finds the lack of electoral success of minority candidates in biracial elections to be more probative than the success of a small number of minority candidates elected unopposed or against another minority candidate. *See supra*. As the Eighth Circuit has admonished, "[a] system that works for minorities only in the absence of white opposition is a system that fails to operate in accord with the law." *Harvell I*, 71 F.3d at 1389–90. This record of woeful underrepresentation of Black jurists on the Court of Appeals supports a finding of vote dilution.

279.    The Court also has discretion to examine the deferential factor of proportionality. *See De Grandy*, 512 U.S. at 1000 (considering proportional representation). Here, the Court finds that minorities do not form effective voting majorities for Court of Appeals districts roughly proportional to the minority voters' respective shares in the voting age population. Black Arkansans comprise approximately 16 percent of the State's population, but only form a voting majority to elect a candidate of choice for one of the twelve Court of Appeals judges (8% of the positions). *See supra.* The Court finds that this does not reflect proportionality.

**Senate Factor 9: Tenuousness**

280.  An additional factor, often referred to as Senate Factor 9, concerns "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." Senate Report at 206–07. Courts have explained that "a tenuous explanation for at-large elections is circumstantial evidence that the system is motivated by discriminatory purposes and has a discriminatory result." *McMillan*, 748 F.2d at 1045.

281.  Defendants here have asserted a linkage interest in holding at-large elections for the Arkansas Supreme Court.[8] However, the mere assertion of a linkage interest is insufficient to defeat a Section 2 claim. *See Houston Lawyers' Ass'n v. Att'y Gen. of Tex.*, 501 U.S. 419, 426–27 (1991) (holding that a linkage interest "does not automatically, and in every case, outweigh proof of racial vote dilution."). Rather, even if the Court were to assume that there is a significant linkage interest, the Court must weigh that interest against the Section 2 violation. *See*, *e.g.*, *Prejean*, 227 F.3d at 516–17 (the Court must balance the linkage interest against the vote dilution evidence). In weighing those linkage interests, the Court notes that concerns about linkage may be less profound at the appellate level than the trial level, because the collegial appellate requires decisions to be made with multiple voices involved in the deliberative process. *See Nipper v. Smith*, 39 F.3d 1494, 1543-44 (11th Cir. 1994) (noting that while district plans for trial courts may limit "minority influence," the same concerns do not apply to collegial bodies).

282.  The Court finds that the State's asserted interest in linkage for the Arkansas Supreme Court is tenuous. As set forth in the above findings of fact, both the Court of Appeals

---

[8] Defendants have not made a linkage argument with respect to the Court of Appeals.

and Supreme Court exercise statewide jurisdiction. Defendants assert an interest in linking jurisdiction to the electoral district for Supreme Court judges (who are elected at-large), but do not assert any linkage interest for Court of Appeals judges (who are elected from seven districts). Judges on the Court of Appeals are eligible to hear cases from anywhere within the Court of Appeals' jurisdiction regardless of where the case arose or the district from which they are elected. Decisions of the Court of Appeals are also precedential in any court in the state, just like decisions of the Arkansas Supreme Court. *See* Ark. S. Ct. Rule 5-2I. In addition, merits decisions of the Court of Appeals are typically reached by three-judge panels that necessarily include judges elected only from certain districts and not others. Therefore, judges on the Court of Appeals routinely make decisions that affect the entire state, including voters who did not vote for them.

283.  Given the overlapping jurisdiction and structural similarities between the Court of Appeals and Supreme Court, the Court concludes that the State's rationale offered to maintain at-large voting for the Arkansas Supreme Court are tenuous. Even if the Court did not find the State's policy interest was tenuous, that interest would not outweigh the Section 2 violation in this case. As detailed above, Plaintiffs have met the *Gingles* preconditions and provided overwhelming Senate Factor evidence to show that the electoral process for Arkansas appellate judges violates Section 2 of the Voting Rights Act.

**Overall Conclusion on Totality of the Circumstances**

284.  Senate Factors 1, 2, 3, 4, 5, 6, 7, and the additional factor of tenuousness all support the conclusion that Black Arkansas voters do not have an equal opportunity to their candidates of choice. *See McMillan*, 748 F.2d at 1043–47 (finding a Section 2 violation based on Senate Factors 1, 2, 3, 5, 7, and 9). These include the most important Senate Factors: Senate

Factors 2 (racially polarized voting) and Senate Factor 7 (lack of Black electoral success). *See Missouri NAACP*, 894 F.3d at 938 (quoting *Bone Shirt II*, 461 F.3d at 1022). Considering the totality of circumstances, including the above Senate Factors, and based upon "a searching practical evaluation of the past and present reality and . . . a functional view of the political process," as well as "an intensely local appraisal of the design and impact of the contested electoral mechanisms," *Gingles*, 478 U.S. at 45, 79 (citations omitted), the Court concludes that the electoral scheme to elect justices to the Arkansas Supreme Court and judges to the Arkansas Court of Appeals deprives Black voters of the equal opportunity to elect candidates of their choice, in violation of Section 2. 52 U.S.C. § 10301.

## REMEDY

285. Having found a violation of Section 2, the Court will issue an order regarding appropriate process for creating remedial districts.

July 15, 2022

Respectfully submitted,

_____

Natasha Merle
R. Gary Spencer+
Victoria Wenger
Arielle Humphries
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, Fifth Floor
New York, NY 10006
Telephone: (212) 965-2200
Fax: (212) 226-7592
nmerle@naacpldf.org
gspencer@naacpldf.org
vwenger@naacpldf.org
ahumphries@naacpldf.org

Michael Skocpol
NAACP LEGAL DEFENSE &
  EDUCATIONAL FUND, INC.
700 14th Street N.W., Ste. 600
Washington, DC 20005
Telephone: (202) 682-1300
mskocpol@naacpldf.org

Arkie Byrd
MAYS, BYRD & ASSOCS., P.A.
212 Center Street, Suite 700
Little Rock, AR 72201
Telephone: (501) 372-6303
Fax: (501) 399-9280
abyrd@maysbyrdlaw.com

Demian A. Ordway
Neil R. Lieberman
Eileen M. DeLucia
Karen Sebaski
HOLWELL SHUSTER
  & GOLDBERG LLP
425 Lexington Ave.
New York, NY 10017
Telephone: (646) 837-5151
Fax: (646) 837-5150
dordway@hsgllp.com
nlieberman@hsgllp.com
edelucia@hsgllp.com
ksebaski@hsgllp.com

Rachel Mossman
SHEARMAN & STERLING LLP
2828 North Harwood Street,
Suite 1800
Dallas, TX 75201
Telephone: (214) 271-5385
Rachel.Mossman@Shearman.com

*+ Mailing address only. Working remotely from
and admitted to practice in, Georgia*

96